KRISTIN A. LINSLEY, SBN 154148
  klinsley@gibsondunn.com
ROSEMARIE T. RING, SBN 220769
  rring@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

PERLETTE MICHÈLE JURA, SBN 242332
  pjura@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

Attorneys for Defendant META PLATFORMS, INC.,
(f/k/a Facebook, Inc.), a Delaware corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>META PLATFORMS, INC., (f/k/a Facebook, Inc.), a Delaware corporation,<br><br>                    Defendant. | CASE NO. 4:22-CV-00051-YGR<br><br>**MOTION BY DEFENDANT META PLATFORMS, INC. TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**<br><br>**Hearing:**<br>Date:        June 21, 2022<br>Time:        2:00 pm<br>Place:       Oakland, California<br>Judge:      Hon. Yvonne Gonzalez Rogers |

Gibson, Dunn &
Crutcher LLP

1

## <u>NOTICE OF MOTION AND MOTION</u>

2

PLEASE TAKE NOTICE THAT, on June 21, 2022, or as soon thereafter as the matter may be

3

heard, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States

4

District Court, Northern District of California, located at 1301 Clay Street in Oakland, California,

5

Defendant Meta Platforms, Inc. will and hereby does move this Court, under Federal Rule of Civil

6

Procedure 12(b)(6), for an order dismissing all of the claims in Plaintiff's Complaint with prejudice.

7

This motion is based on the Memorandum of Points and Authorities submitted herewith, any

8

Reply Memorandum or other papers submitted in connection with the motion, the complaint filed in

9

this action, any matter of which this Court may properly take judicial notice, and any information

10

presented at argument.

11

12

Dated: March 7, 2022                    GIBSON, DUNN & CRUTCHER LLP

13

14

By:  _____*/s/ Rosemarie T. Ring*_____

15

Rosemarie T. Ring

16

Attorneys for Defendant META PLATFORMS, INC.,

17

(f/k/a Facebook, Inc.), a Delaware corporation

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................................. 1

II.    SUMMARY OF ALLEGATIONS ....................................................................................... 3

III.   LEGAL STANDARD ........................................................................................................... 5

IV.    ARGUMENT ......................................................................................................................... 6

     A.     The Complaint Fails to State a Claim for Strict Products Liability or
         Negligence ..................................................................................................................... 7

         1.     Plaintiff Does Not Plausibly Allege Causation .................................................. 7

         2.     Plaintiff's Strict Products Liability Claim Fails.............................................. 10

         3.     Plaintiff's Negligence Claim Fails .................................................................. 14

     B.     Plaintiff's Claims Are Barred by the Statute of Limitations....................................... 18

     C.     Plaintiff's Claims Are Barred by Section 230.............................................................. 20

         1.     Plaintiff's "Creative Pleading" Cannot Evade Section 230 Immunity ........... 20

         2.     Section 230 Bars Both Burmese and California Tort Law Claims ................. 23

     D.     Plaintiff's Claims Are Barred by the Foreign Affairs Doctrine.................................. 24

V.     CONCLUSION.................................................................................................................... 25

Gibson, Dunn &
Crutcher LLP

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

5

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2005)...................................................................................................24, 25

6

*Anderson v. Brouwer*,
99 Cal. App. 3d 176 (1979).................................................................................................19

7

*Anderson v. New York Tel. Co.*,
320 N.E.2d 647 (N.Y. 1974)...............................................................................................12

8

9

*Anderson v. Owens-Corning Fiberglas Corp.*,
53 Cal. 3d 987 (1991) .........................................................................................................11

10

*Ardrus v. Glover Constr. Co.*,
446 U.S. 608 (1980)............................................................................................................24

11

12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................5

13

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009).............................................................................................21

14

15

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003).............................................................................................20

16

17

*Beasley v. Conagra Brands, Inc.*,
374 F. Supp. 3d 869 (N.D. Cal. 2019) ................................................................................19

18

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).............................................................................................................11

19

20

*Bill v. Superior Court*,
137 Cal. App. 3d 1002 (1982).............................................................................................16

21

22

*Blazevska v. Raytheon Aircraft Co.*,
522 F.3d 948 (9th Cir. 2008)..........................................................................................23, 24

23

24

*Brooks v. Eugene Burger Mgmt. Corp.*,
215 Cal. App. 3d 1611 (1989).............................................................................................10

25

*Brown v. USA Taekwondo*,
11 Cal. 5th 204 (2021) ..........................................................................................2, 14, 15, 16

26

27

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003).............................................................................................23

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chanda v. Federal Home Loans Corp.*,
215 Cal. App. 4th 746 (2013) ...............................................................................................9

*Cohen v. Facebook, Inc.*,
252 F. Supp. 3d 140 (E.D.N.Y. 2017) ..................................................................................23

*Crosby v. Twitter, Inc.*,
921 F.3d 617 (6th Cir. 2019) .................................................................................................8

*Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.*,
39 Cal. App. 5th 995 (2019) ..................................................................................................9

*Delfino v. Agilent Tech., Inc.*,
145 Cal. App. 4th 790 (2006) ..............................................................................................17

*Doe I v. Unocal Corp.*,
2002 WL 33944505 (Cal. Super. June 10, 2002).................................................................6

*Doe v. Facebook, Inc.*,
No. 2019-16262 (151st Dist. Ct., Harris County, Tex. Oct. 4, 2019)..............................2, 11

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) ...............................................................................................16

*Doe v. MySpace, Inc.*,
474 F. Supp. 2d 843 (W.D. Tex. 2007) ................................................................................15

*Doe v. Twitter, Inc.*,
--- F. Supp. 3d ---, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021) ......................................22

*Dyroff v. Ultimate Software Group, Inc.*,
934 F.3d 1093 (9th Cir. 2019)...................................................................................15, 22, 23

*Eclectic Prop. East, LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014)..................................................................................................5

*Erlich v. Menezes*,
21 Cal. 4th 543 (1999) ...................................................................................................14, 16

*Fair Hous. Council v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008)..........................................................................................20, 21

*Fields v. Twitter, Inc.*,
881 F.3d 739 (9th Cir. 2018)..............................................................................................2, 8

*Force v. Facebook, Inc.*,
304 F. Supp. 3d 315 (E.D.N.Y. 2018) .............................................................................23, 24

Gibson, Dunn &
Crutcher LLP

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019)................................................................................................20, 22, 23

*Fortman v. Förvaltningsbolaget Insulan AB*,
212 Cal. App. 4th 830 (2013) ...................................................................................................13, 14

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ..........................................................................................................18, 19, 20

*Frausto v. Dep't of Cal. Highway Patrol*,
53 Cal. App. 5th 973 (2020) ...........................................................................................................7

*G&G Prods. LLC v. Rusic*,
902 F.3d 940 (9th Cir. 2018)..........................................................................................................5

*Gonzalez v. Derrington*,
56 Cal. 2d 130 (1961) .....................................................................................................................9

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021) ................................................................................................2, 3, 22, 23

*Green v. ADT, LLC*,
2016 WL 3208483 (N.D. Cal. June 10, 2016) ...............................................................................10

*In re Hyundai*,
926 F.3d 539 (9th Cir. 2019)...........................................................................................................5

*Intellect Art Multimedia, Inc. v. Milewski*,
2009 WL 2915273 (N.Y. Sup. Ct. Sept. 11, 2009) ........................................................................11

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002)..........................................................................................................11

*James v. Meow Media, Inc.*,
90 F. Supp. 2d 798 (W.D. Ky. 2000) ...............................................................................................9

*Johnson v. United States Steel Corp.*,
240 Cal. App. 4th 22 (2015) .........................................................................................................10

*Jolly v. Eli Lilly & Co.*,
44 Cal. 3d 1103 (1988) ..................................................................................................................18

*Kimzey v. Yelp!, Inc.*,
836 F.3d 1263 (9th Cir. 2016).......................................................................................................21

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014) ...........................................................................................15, 20, 22

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Marshall's Locksmith Serv. Inc. v. Google LLC,*
925 F.3d 1263 (D.C. Cir. 2019) ..................................................................................22

*Martinez v. Pac. Bell,*
225 Cal. App. 3d 1557 (1990) .......................................................................................9

*McCollum v. CBS, Inc.,*
202 Cal. App. 3d 989 (1988) .......................................................................................17

*McIndoe v. Huntington Ingalls Inc.,*
817 F.3d 1170 (9th Cir. 2016) ......................................................................................10

*McKelvey v. Boeing N. Am., Inc.,*
74 Cal. App. 4th 151 (1999) ...................................................................................18, 19

*Merrill v. Navegar, Inc.,*
26 Cal. 4th 465 (2001) ..............................................................................................8, 18

*Merritt v. Countrywide Fin. Corp.,*
2015 WL 5542992 (N.D. Cal. Sept. 17, 2015) ..........................................................2, 10

*Milwaukee Elec. Tool Corp. v. Superior Court,*
15 Cal. App. 4th 547 (1993) ........................................................................................18

*Modisette v. Apple Inc.,*
30 Cal. App. 5th 136 (2018) ........................................................................................17

*Mujica v. Occidental Petrol. Corp.,*
381 F. Supp. 2d 1164 (C.D. Cal. 2005) ...................................................................24, 25

*Nichols v. United States,*
578 U.S. 104 (2016) .....................................................................................................24

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.,*
971 F.3d 1042 (9th Cir. 2020) ......................................................................................18

*Pierson v. Sharp Mem'l Hosp., Inc.,*
216 Cal. App. 3d 340 (1989) ...............................................................................10, 11, 12

*Pokorny v. Quixtar, Inc.,*
601 F.3d 987 (9th Cir. 2010) ..........................................................................................5

*Regents of Univ. of Cal. v. Superior Court,*
4 Cal. 5th 607 (2018) ............................................................................................15, 16

*Rowland v. Christian,*
69 Cal. 2d 108 (1968) ..................................................................................................17

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sanders v. Acclaim Entm't, Inc.*,
188 F. Supp. 2d 1264 (D. Colo. 2002) .............................................................10

*Saponaro v. Grindr, LLC*,
93 F. Supp. 3d 319 (D.N.J. 2015) ....................................................................16

*Seely v. White Motor Co.*,
63 Cal. 2d 9 (1965) ..........................................................................................13

*Seismic Reservoir 2020, Inc. v. Paulsson*,
785 F.3d 330 (9th Cir. 2015)..............................................................................5

*Shiguago v. Occidental Petrol. Corp.*,
2009 WL 10671585 (C.D. Cal. Aug. 5, 2009) .................................................24

*Simmons v. Himmelreich*,
578 U.S. 621 (2016)..........................................................................................23

*Soule v. Gen. Motors Corp.*,
8 Cal. 4th 548 (1994) ...................................................................................7, 12

*Taylor v. Elliott Turbomachinery Co.*,
171 Cal. App. 4th 564 (2009) ..........................................................................17

*Thing v. La Chusa*,
48 Cal. 3d 644 (1989) .......................................................................................13

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003)..............................................................................3

*Way v. Boy Scouts of Am.*,
856 S.W.2d 230 (Tex. App. 1993) ....................................................................12

*Whiteley v. Philip Morris Inc.*,
117 Cal. App. 4th 635 (2004) .............................................................................7

*Winter v. G.P. Putnam's Sons*,
938 F.2d 1033 (9th Cir. 1991)....................................................................10, 12

*Young v. Facebook, Inc.*,
2010 WL 4269304 (N.D. Cal. Oct. 25, 2010)..................................................16

*Zamora v. Wells Fargo Bank*,
2013 WL 2319079 (N.D. Cal. May 28, 2013) ..................................................19

*Zschernig v. Miller*,
389 U.S. 429 (1968)......................................................................................3, 24

Gibson, Dunn &
Crutcher LLP

MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS – CASE NO. 4:22-CV-00051-YGR

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**STATUTES**

47 U.S.C. § 230(c)(1) ................................................................................................20

47 U.S.C. § 230(e) .....................................................................................................23

Cal. Civ. P. Code § 335.1 ..........................................................................................18

**RULE**

Fed. R. Civ. P. 44.1 .....................................................................................................5

**TREATISES**

California Civil Instructions, No. 430 ..........................................................................7

Restatement (Second) of Torts § 448 cmt. a (1965) ....................................................9

Restatement (Second) of Torts § 402A (1965) ..........................................................13

Restatement (Third) of Torts: Prods. Liab. § 19 (1998) .....................................10, 11

**OTHER AUTHORITIES**

*2021 Trafficking in Persons Report*, U.S. Dep't of State, Office of the Under Secretary for Global
Affairs ..........................................................................................................................6

Adrian Briggs, PRIVATE INTERNATIONAL LAW IN MYANMAR (2015) ...................................6

Andrew Huxley, *California Refuses to Apply Myanmar Law*, 6 AUSTRALIAN J. OF
ASIAN L. 88 (2004).......................................................................................................6

Dep't of Treas., Treasury Sanctions Commanders and Units of the Burmese Security Forces for
Serious Human Rights Abuses (Aug. 17, 2018), https://home.treasury.gov/news/press-
releases/sm460 ...........................................................................................................25

Exec. Order No. 14,014, 86 Fed. Reg. 9429 (Feb. 10, 2021) ..............................................25

On Public Designation, Due to Gross Violations of Human Rights, of Burmese Military Officials
(July 16, 2019), https://2017-2021.state.gov/on-public-designation-due-to-gross-violations-of-human-
rights-of-burmese-military-officials/index.html; ......................................................25

*Removing Myanmar Military Officials From Facebook*, FACEBOOK NEWSROOM (Aug. 28, 2018),
https://about.fb.com/news/2018/08/removing-myanmar-officials/........................................5

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Report of the detailed findings of the Independent International Fact-Finding Mission on Myanmar*
¶¶ 100–101 (Sept. 17, 2018), https://digitallibrary.un.org/record/1643079/files/A_HRC_39_CRP-2-
EN.pdf .................................................................................................................................3, 8

Roger P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational Tort
Litigation*, 63 EMORY L.J. 1089, 1131 (2014)................................................................5, 6

Steve Stecklow, *Why Facebook is losing the war on hate speech in Myanmar*, REUTERS (Aug. 15,
2018), https://www.reuters.com/investigates/special-report/myanmar-facebook-hate/..........................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS – CASE NO. 4:22-CV-00051-YGR

## I.   INTRODUCTION

This case arises from atrocities committed by the Myanmar military against the Rohingya ethnic minority in Burma.  For more than half a century, the Myanmar military has used the supposed "ethnic threat to national sovereignty" allegedly posed by the Rohingya people to justify its hold on power. Compl. ¶ 91.  And since 1989, "the Rohingya citizens of Myanmar … have been subjected to persecution based on their religious beliefs involving extrajudicial executions, torture, arbitrary detention," and other atrocities.  *Id.* ¶ 92.

Plaintiff Jane Doe alleges that she fled Burma after her father and some girls from her village suffered anti-Rohingya violence at the hands of the Myanmar military in 2012.  Compl. ¶¶ 151–154. She seeks to represent a class of "[a]ll Rohingya who left Burma (Myanmar) on or after June 1, 2012, and arrived in the United States under refugee status, or who sought asylum protection, and now reside in the United States."  *Id.* ¶ 159.

The complaint seeks to hold Meta liable for the Myanmar military's acts of violence under theories of strict liability and negligence.  It seeks "at least $150 billion" in damages based on the use of the Facebook platform by members of the Myanmar military to spread hateful content and to justify their acts of violence targeting the Rohingya.  These events are tragic and deplorable, and as the complaint acknowledges, Meta has invested heavily in people, technology, and partnerships—and has taken aggressive action against Myanmar military members—to combat the spread of hateful content on Facebook.  But the claims asserted against Meta here fail as a matter of law.

Although Plaintiff purports to invoke Burmese law, California law governs this motion.  The complaint offers no proof of foreign law as required by Federal Rule of Civil Procedure 44.1, nor does it provide guidance on any rule or principle of Burmese law that would support the claims alleged, including any legal basis for holding Meta liable for injuries to Plaintiff arising from violence committed 10 years ago by members of a foreign military against her father and others in her village.

Beyond this threshold issue, nothing in the complaint plausibly alleges that either Meta or its Facebook platform was the but-for or legal cause of Plaintiff's injuries.  The complaint establishes that the Myanmar military engaged in anti-Rohingya violence and spread hateful anti-Rohingya speech for decades before Facebook was introduced in Burma in 2011.  And it contains no facts sufficient to

MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS – CASE NO. 4:22-CV-00051-YGR

establish the legally required causal connection between the use of Facebook by members of the Myanmar military and the military actions in 2012 that that harmed Plaintiff's father and others in her village and caused her to flee.  The alleged chain of causation between any act by Meta and Plaintiff's alleged injury is too attenuated as a matter of law to support a finding of causation.  *See Fields v. Twitter, Inc.*, 881 F.3d 739, 750 (9th Cir. 2018).  And the alleged illegal actions by members of the military were a superseding cause that broke any legal chain of causation connected to Facebook.

Plaintiff's strict liability theory fails for the additional reason that Facebook is not a "product" as a matter of law.  In California and elsewhere, "strict liability extends only to *tangible* goods—not intangible goods or services."  *Merritt v. Countrywide Fin. Corp.*, 2015 WL 5542992, at *22 (N.D. Cal. Sept. 17, 2015) (emphasis added), *aff'd*, 783 F. App'x 717 (9th Cir. 2019).  Facebook is an intangible communications platform, not a tangible good.  Courts around the country have confirmed that communications platforms cannot be sued on a products liability theory.  *See*, *e.g.*, *Doe v. Facebook, Inc.*, No. 2019-16262 (151st Dist. Ct., Harris County, Tex. Oct. 4, 2019) (Facebook and Instagram are not "products" within the meaning of products liability laws) (attached as Exhibit B to Declaration of Rosemarie T. Ring).

The negligence claim fails for the same reason, to the extent it turns on the theory that Facebook was a negligently designed product.  And it fails on the separate ground that there is no "special relationship" between Meta, the Myanmar military, or victims of wrongful third-party conduct that gives rise to a recognized legal duty of care.  *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 215 (2021).

Each of Plaintiff's claims also is barred by the applicable two-year statute of limitations because this action was filed many years after Plaintiff's alleged 2012 injuries.  The facts alleged in the complaint establish that the statute began running in 2012, and the complaint does not plausibly allege facts that could support application of the discovery rule.

Even if Plaintiff could state a claim under California or Burmese law, the suit would be barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230.  As the Ninth Circuit has made clear, Section 230 bars claims that would impose liability on interactive computer service providers like Meta for alleged effects of harmful speech posted by third parties.  *See*, *e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 897 (9th Cir. 2021).  The complaint's assertions that members of the Myanmar

military posted anti-Rohingya content that was displayed via News Feeds, and that Meta "fail[ed] to remove such dangerous content" and made "connections between and among" third parties through content, Compl. ¶ 176, are indistinguishable from the theory that the Ninth Circuit found barred by Section 230 in *Gonzalez*.  And so is the complaint's attempt to plead around Section 230 by invoking Facebook's "algorithms" that determine what content gets shown to whom and where (if at all).  *Id.*; *see Gonzalez*, 2 F.4th at 894–95.  Because these claims impermissibly seek to impose liability on Meta as the publisher of third-party content, they cannot proceed.

Finally, the claims alleged in the complaint would require this Court to invade "the field of foreign affairs which the Constitution entrusts to the President and the Congress," *Zschernig v. Miller*, 389 U.S. 429, 432 (1968), and thus are preempted under the foreign affairs doctrine.

For all of these reasons, and because these defects cannot be cured by amendment, the complaint should be dismissed with prejudice.

## II.    SUMMARY OF ALLEGATIONS

Plaintiff seeks to represent a class of Rohingya people, a Muslim minority group that has long faced discrimination and persecution in Burma.  Dating back to the 1962 coup, the Myanmar military "has consistently used an imagined threat from the Rohingya to justify its hold on power."  Compl. ¶ 91.  In the 1970s and 1990s, hundreds of thousands of Rohingya fled the country to escape horrendous abuses, including extrajudicial execution, torture, and rape, primarily at the hands of the armed forces. *See* United Nations Human Rights Counsel, *Report of the detailed findings of the Independent International Fact-Finding Mission on Myanmar* ¶¶ 100–101 (Sept. 17, 2018), https://digitallibrary.un.org/record/1643079/files/A_HRC_39_CRP-2-EN.pdf ("UNHRC Report").[1]

Plaintiff Jane Doe is a Rohingya woman who lived in the Rakhine State in Western Burma. Compl. ¶ 150.  In 2012, members of the Myanmar military came to Plaintiff's village, where they detained, beat, and tortured her father.  *Id.* ¶ 151.  Around the same time, several girls in Plaintiff's village and nearby villages were abducted, and the Myanmar military killed others in her village.  *Id.*

---

[1]   In resolving a motion to dismiss, courts may consider "documents incorporated by reference in the complaint … without converting the motion to dismiss into a motion for summary judgment."  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Plaintiff's complaint references and cites the UNHRC Report throughout.  *See*, *e.g.*, Compl. ¶¶ 88, 105, 112–113.

¶ 152.  Plaintiff alleges that she then fled Burma and eventually settled in the United States.  *Id.* ¶ 153.  Five years later, in August 2017, the Myanmar military engaged in "clearance operations" in the Rakhine State that resulted in the deaths of at least 8,170 people and caused hundreds of thousands of Rohingya to flee Burma.  *Id.* ¶¶ 103, 106–107.

Plaintiff alleges that Meta is liable for her injuries and the "Rohingya genocide."  Compl. ¶ 2.  The complaint alleges that Facebook was introduced to Burma in 2011.  *Id.*  Although only 1.1% of the Burmese population used the internet in 2012, the Myanmar government deregulated telecommunications in 2013, resulting in widespread use of the internet, cell phones, and Facebook over the following years.[2]  The Myanmar military allegedly used Facebook as a "tool" to continue its longstanding efforts to "instill[] fear and hatred of the Rohingya," *id.* ¶¶ 92–93, and engaged in anti-Rohingya speech and incited violence against the Rohingya people on Facebook, *e.g.*, *id.* ¶¶ 94–101.  In the 2012 to 2013 timeframe, access to the Facebook platform allegedly allowed members of the Myanmar military to justify their campaign of violence, thus deterring local non-Rohingya people from intervening—specifically, the military's "hate campaign," carried out in part on Facebook, allegedly "created a conducive environment for the 2012 and 2013 anti-Rohingya anti-Muslim violence in the Rakhine State and beyond, without strong opposition from the general population."  *Id.* ¶ 115.

The complaint asserts that Facebook is designed to maximize "engagement."  Compl. ¶ 36.  It alleges that Facebook's algorithms prioritize "[p]osts with higher engagement scores" in users' News Feeds, and that Facebook allows other users to "'like,' 'comment' on, or 'share'" other users' content.  *Id.* ¶¶ 38, 42.  It also alleges that because "negative emotions" can sometimes be "the most engaging," Facebook's algorithms will prioritize divisive content, which is "rewarded with more likes, shares, and comments."  *Id.* ¶¶ 41, 52.

The complaint acknowledges that Meta has taken action against the Myanmar military and invested in people, technology, and partnerships to combat the spread of hateful and violent content on Facebook.  In 2018, Meta published an independent human rights impact assessment that it had commissioned regarding Burma.  *See* Compl. ¶¶ 140–141.  Meta also removed hundreds of Facebook

---

[2]  *See* Steve Stecklow, *Why Facebook is losing the war on hate speech in Myanmar*, Reuters (Aug. 15, 2018), https://www.reuters.com/investigates/special-report/myanmar-facebook-hate/ (cited at Compl. ¶ 78).

pages and accounts that "were linked to the Myanmar military." *Id.* ¶ 144.  And it has invested in "better technology to identify hate speech, improved reporting tools," and hired "more people to review content." *Removing Myanmar Military Officials From Facebook*, FACEBOOK NEWSROOM (Aug. 28, 2018), https://about.fb.com/news/2018/08/removing-myanmar-officials/ (cited at Compl. ¶ 143).

## III.   LEGAL STANDARD

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  The plaintiff's factual allegations "must be enough to raise a right to relief above a 'speculative level.'" *Eclectic Prop. East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir. 2014).  Claims also may be dismissed based on a dispositive issue of law.  *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015).

Although the complaint invokes Burmese law, *see* Compl. at 2, this motion is governed by California law.  Under California's choice of law rules, the proponent of foreign law "must shoulder the burden of demonstrating that foreign law, rather than California law, should apply." *In re Hyundai*, 926 F.3d 539, 561 (9th Cir. 2019); *see also id.* (federal courts sitting in diversity apply forum state's choice of law rules).  Plaintiff must show both a "conflict between [Burmese] law and California's law," and that Burma "has an interest in having its law applied." *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 995 (9th Cir. 2010).  Failure at either step ends the analysis, *see id.*—and that is the case here.

As to the first step, Plaintiff has not shown that Burmese law "materially differs from the law of California." *Hyundai*, 926 F.3d at 562.  "[A] party relying on foreign law has an obligation to raise the specific legal issues and to provide the district court with the information needed to determine the meaning of the foreign law." *G&G Prods. LLC v. Rusic*, 902 F.3d 940, 949 (9th Cir. 2018) (interpreting Fed. R. Civ. P. 44.1).  Yet the complaint does not cite any Burmese legal principle or rule, stating only that "Burmese law applies" and that it would not recognize Section 230.  Compl. at 2.  That conclusory assertion provides no information that could assist this Court in applying Burmese law.  And, according to scholarly sources, "[t]he content of Burmese law is unknowable," "its application [is] difficult, and any results uncertain and unpredictable." Roger P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational Tort Litigation*, 63 EMORY L.J. 1089, 1131 (2014) (citations omitted);

Gibson, Dunn & Crutcher LLP

*see also* Andrew Huxley, *California Refuses to Apply Myanmar Law*, 6 AUSTRALIAN J. OF ASIAN L. 88 (2004) ("Myanmar has the simulacrum of a legal system, but does not have real law, such as can be consulted and applied … in foreign courts."); Adrian Briggs, PRIVATE INTERNATIONAL LAW IN MYANMAR 105 (2015) ("[T]he domestic law of Myanmar on torts is not well developed."). For that reason, California courts have denied requests to apply Burmese law. *See Doe I v. Unocal Corp.*, 2002 WL 33944505 (Cal. Super. June 10, 2002) (applying California law because the "snippets and portions'" of Burmese law offered to support its application were "inadequate to identify a conflict" and "an insufficient basis" for deciding "the complex issues presented").[3]

As to the second step, Plaintiff cannot show that Burma has any interest in having its law applied in this case. "The State Department's Burma 2012 Human Rights Report depicts a judicial system that is 'seriously flawed,' with 'no reported examples of successful attempts' to use either criminal or civil law to remedy human rights violations." Alford, *Human Rights After Kiobel* at 1140; *see also 2021 Trafficking in Persons Report* 148, U.S. Dep't of State, Office of the Under Secretary for Global Affairs ("corruption and impunity reportedly continued to hinder law enforcement in general"). Accordingly, this Court should apply California law to this motion and dismiss this action for failure to state a claim.

## IV.   ARGUMENT

Plaintiff's claims against Meta fail as a matter of law for multiple reasons. *First*, her attempt to hold Meta liable for her injuries finds no support in California law. The actions the complaint attributes to Meta were not the factual or legal cause of Plaintiff's injury, and the unlawful actions of the Myanmar military broke any possible legal causation chain. Plaintiff's strict liability claim fails as a matter of law because Facebook is not a "product," and even if it were, the complaint does not and cannot allege that any design defect caused her injuries. The negligence claim separately fails because the law does not impose a legal duty on Meta for actions taken by third parties against Plaintiff. And even apart from these problems, Plaintiff's claims are barred by the statute of limitations.

*Second*, Plaintiff's claims are barred by Section 230. Under well-established Ninth Circuit law, Meta cannot be held liable for harms flowing from third-party content posted on Facebook. And

---

[3] Meta reserves its right to contest the application of Burmese law and to present further evidence on the subject if Plaintiff attempts to meet her obligation to provide evidence of Burmese law.

Plaintiff's theories that Meta should have taken down anti-Rohingya content or displayed such content differently impermissibly seek to impose liability on Meta as the publisher of third-party content.

*Finally*, Plaintiff's claims are preempted under the foreign affairs doctrine, which prohibits attempts to use state law to invade the foreign affairs power committed to the federal government.

A.     **The Complaint Fails to State a Claim for Strict Products Liability or Negligence**

1.     **Plaintiff Does Not Plausibly Allege Causation**

Plaintiff's claims fail as a matter of law because no action of Meta was the factual or legal cause of her injuries. According to the complaint and the documents that it incorporates by reference, the Myanmar military had engaged in anti-Rohingya speech and violence for decades before Facebook became available in Burma. The chain of causation that the complaint alleges—that absent Facebook, the Myanmar military would have ceased to engage in anti-Rohingya violence or other Burmese citizens would have prevented such violence, and that these factors were what caused members of the military to attack her father and fellow villagers—is simply too attenuated and speculative. And in any event, the Myanmar military's criminal acts were a superseding cause, breaking any chain of causation.

a.     **Facebook Was Not a Substantial Factor in Plaintiff's Injuries**

To allege causation for either of her claims, Plaintiff must plausibly allege that Facebook was a "legal cause" of her injury. *Whiteley v. Philip Morris Inc.*, 117 Cal. App. 4th 635, 696–97 (2004). "A tort is a legal cause of injury only when it is a *substantial factor* in producing the injury." *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 572 (1994) (emphasis added); *see also Frausto v. Dep't of Cal. Highway Patrol*, 53 Cal. App. 5th 973, 996 (2020) ("Proof of the causation element of negligence requires the plaintiff to establish that the defendant's breach of duty was a substantial factor in bringing about the harm."). The complaint does not plausibly allege that Facebook was a substantial factor in producing Plaintiff's injury. It does not plausibly allege even that Facebook was a but-for cause of her injury—that is, that the same harm would not have occurred absent Facebook. *See* CACI No. 430.

According to the complaint, Facebook was not introduced into Burma until 2011. Compl. ¶ 2. By that time, the Myanmar military *already* had engaged in a decades-long pattern of anti-Rohingya speech and violence that began and continued without any involvement by social media. Since 1989, the Rohingya had been subjected to "extrajudicial executions, torture, arbitrary detention, forced

disappearances, intimidation, gang-rape, forced labour, robbery, setting of fire to homes, eviction, land confiscation and population resettlement as well as the systematic destruction of towns and mosques." *Id.* ¶ 92.  And hundreds of thousands of Rohingya fled Burma to escape those atrocities in the 1990s. UNHRC Report ¶¶ 100–101.

There also are no factual allegations plausibly suggesting that Facebook was a substantial factor in causing *Plaintiff's* injuries.  The complaint alleges that the Myanmar military tortured her father and injured others in her village in 2012, just a year after Facebook was introduced in the country.  Compl. ¶¶ 151–152.  The complaint does not allege that the government used Facebook to direct, coordinate, or call for that attack.  It does not even allege that anyone who carried out that attack or any members of the surrounding population had ever used Facebook, such that either the violence itself, or the failure of the surrounding population to prevent it, could plausibly be linked to Facebook.  In fact, in 2012, only 1.1% of the Burmese population even used the internet.  *See supra*, at 4.  And although the complaint elides the quote, the U.N. Report it cites states that the government's "hate campaign" was carried out over the course of a decade using "documents, publications, statements, Facebook posts *and* audio-visual materials."  UNHRC Report ¶ 696 (emphasis added).  It does not suggest that Facebook posts by the military or others played any role whatsoever in the attacks on Plaintiff's village.

Multiple courts have rejected similar theories of proximate causation.  In *Fields*, for example, the plaintiffs alleged that Twitter "facilitated [ISIS's] growth and ability to plan and execute terrorist acts."  881 F.3d at 749–50.  Those allegations were insufficient to establish that Twitter proximately caused plaintiffs' injuries, the Ninth Circuit held, because there was "no connection" between Twitter and the person who actually carried out the attack that injured them.  *Id.* at 750.  Likewise, in *Crosby v. Twitter, Inc.*, the Sixth Circuit rejected plaintiffs' theory that social media companies proximately caused the Pulse nightclub shooting because the shooter "viewed online content from ISIS" on their platforms and "became 'self-radicalized.'"  921 F.3d 617, 624–25 (6th Cir. 2019).  "With the 'highly interconnected' nature of social media, the internet, and 'modern economic and social life,'" the court explained, it "expect[ed] Defendants' websites to cause some 'ripples of harm' that would 'flow far beyond the defendant's misconduct.'"  *Id.* at 625 (quoting *Fields*, 881 F.3d at 749).  "But without more, Defendants do not proximately cause all these potential ripples."  *Id.*; *see also Merrill v. Navegar, Inc.*,

Gibson, Dunn & Crutcher LLP

26 Cal. 4th 465, 489 (2001).

**b.    As a Matter of Law, the Myanmar Government's Violent Conduct Supersedes Plaintiff's Alleged Causal Chain**

A central premise of the complaint is that the Myanmar military tortured Plaintiff's father and injured others in her village.  Compl. ¶¶ 151–152.  That violent conduct is a superseding cause breaking any chain of causation.  *See Martinez v. Pac. Bell*, 225 Cal. App. 3d 1557, 1564, 1566 (1990) (shooting during a robbery broke the chain of causation as a matter of law even though defendant had been warned that its public telephones attracted "drug dealers and criminal elements" to the vicinity); *see also Gonzalez v. Derrington*, 56 Cal. 2d 130, 133 (1961) ("intentional misconduct" of third parties was "an independent, intervening cause").  Under California law, even if a tortfeasor's "conduct was a substantial contributing factor," a superseding cause absolves the tortfeasor "when an independent event [subsequently] intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible."  *Chanda v. Federal Home Loans Corp.*, 215 Cal. App. 4th 746, 755–56 (2013).

In assessing a superseding cause, California follows the Restatement of Torts.  *Crouch v. Trinity Christian Ctr. of Santa Ana, Inc.*, 39 Cal. App. 5th 995, 1022 (2019).  Under the Restatement, a superseding cause breaks the causal chain "when the actor's conduct creates a situation which is utilized by a third person to inflict intentional harm upon another[.]"  Restatement (Second) of Torts § 448 cmt. a (1965).  The Restatement captures the complaint's allegations precisely:  It alleges that, among other factors, Facebook was a "tool for the Burmese military and Buddhist extremists to use in promoting their message of religious intolerance, and, ultimately, ethnic cleansing."  Compl. ¶ 93.

Based on the allegations of the complaint, the superseding cause of military violence breaks any chain from Facebook to her injuries.  The alleged conduct of the Myanmar military is far beyond any risk that Meta could have foreseen when Plaintiff suffered her injuries in 2012.  The complaint alleges that Meta was "alerted to hate speech" "beginning in *2013*."  Compl. ¶ 125 (emphasis added).  And the Myanmar military's conduct was "extraordinary," *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 806 (W.D. Ky. 2000) (dismissing claims against video game makers for users' violent offline conduct), and well beyond any "normal response to dissemination" of content on a communications

platform, *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1276 (D. Colo. 2002) (same).

### 2. Plaintiff's Strict Products Liability Claim Fails

The complaint's failure to allege causation forecloses Plaintiff's strict products liability claim. But the claim fails for three additional, independent reasons: (1) Facebook is not a *product*; (2) Plaintiff's injury was not caused by any design defect; and (3) Plaintiff has not pleaded cognizable injuries as a bystander to the so-called product's alleged defectiveness.

### a. Facebook is Not a "Product"

For a products liability claim, a plaintiff "must show that the object or instrumentality claimed to be defective was in fact a 'product' as defined or contemplated by the Restatement of Torts, legislation or case law." *Brooks v. Eugene Burger Mgmt. Corp.*, 215 Cal. App. 3d 1611, 1626 (1989). As a matter of law, there can be no strict products liability claim with respect to "intangible goods or services." *See Merritt*, 2015 WL 5542992, at *22 (defective loans are not products because "California courts continue to require a link to a physical good when finding such liability"). Because Facebook is an intangible communications platform, not a tangible product, the strict liability claim should be dismissed.

"A product is a *physical article* which results from a manufacturing process and is ultimately delivered to a consumer." *Green v. ADT, LLC*, 2016 WL 3208483, at *3 (N.D. Cal. June 10, 2016) (emphasis added) (quoting *Pierson v. Sharp Mem'l Hosp., Inc.*, 216 Cal. App. 3d 340, 345 (1989)). The Ninth Circuit has held that California law does not extend products liability beyond such "tangible items" to "ideas and expression"—even when the "pure thought and expression" is embodied in a physical object like a book. *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991).

California courts also look to the Restatement of Torts. *See Brooks*, 215 Cal. App. 3d at 1626. Here, too, "[t]he Third Restatement defines a 'product' subject to strict liability as 'tangible personal property distributed commercially for use or consumption.'" *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (quoting Restatement (Third) of Torts: Prods. Liab. § 19(a) (1998) (Restatement)); *see Johnson v. United States Steel Corp.*, 240 Cal. App. 4th 22, 31 (2015) (quoting Restatement definition of "product" as "'tangible personal property'"). An intangible communication platform cannot satisfy this definition. When an alleged injury stems from published ideas, the medium containing the information—whether a book, magazine, or social media platform—simply is not a

product.  *See* Restatement § 19 cmt. d.

The complaint does not identify any "product" that could sustain a products liability claim.  It simply alleges that Facebook's "product" is defective.  Compl. ¶¶ 168–169, 171.  But conclusory allegations of a "product" are insufficient because this Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted).  The same is true of the allegation that "Facebook designed its system and the underlying algorithms" in a defective manner.  Compl. ¶ 167.  Neither Facebook's algorithms nor its "system" (whatever is meant by that word) is "a physical article which results from a manufacturing process and is ultimately delivered to a consumer."  *Pierson*, 216 Cal. App. 3d at 345.

For that reason, courts across the country have rejected efforts to apply products liability theories to websites or apps that facilitate communication and connections between users.  *See, e.g.*, *Doe v. Facebook, Inc.*, No. 2019-16262 (151st Dist. Ct., Harris County, Tex. Oct. 4, 2019) (dismissing products liability claim with prejudice, finding that Instagram is "not a product"); *Intellect Art Multimedia, Inc. v. Milewski*, 2009 WL 2915273, at *7 (N.Y. Sup. Ct. Sept. 11, 2009) (a "website [that] is a forum for third-party expression" is a "'service'"); *James v. Meow Media, Inc.*, 300 F.3d 683, 700–01 (6th Cir. 2002) ("video games, movies, and internet sites" are not "products").

California courts have articulated "a fundamental and reasonable basis for imposing strict tort liability on persons providing products but not upon those rendering services."  *Pierson*, 216 Cal. App. 3d at 345.  Because "[a] product is a physical article which results from a manufacturing process and is ultimately delivered to a consumer," the plaintiff's possession of the tangible product means that "[a] defect in the article even if initially latent is ultimately objectively measurable."  *Id.*  But "the concept of 'design defect'" is "concededly one of the most difficult areas for precise definition" even for tangible articles.  *Anderson v. Owens-Corning Fiberglas Corp.*, 53 Cal. 3d 987, 995 (1991).  And this framework is fundamentally unworkable as applied to services and intangible goods.  *Pierson*, 216 Cal. App. 3d at 345 (services are judged by "what is reasonable under the circumstances").  There is no objectively measurable basis for determining that the Facebook platform was defectively designed—meaning, as alleged, that "[t]he dangers inherent in the design of Facebook's algorithms and product outweigh the benefits" of enabling communications among billions of users worldwide.  Compl. ¶ 171.

The policy justifications articulated in *Pierson* apply with even greater force to communications platforms.  The complaint seeks to hold Meta strictly liable for developing a social media platform used by billions of people on which some users communicated, among other things, "hate speech and misinformation."  Compl. ¶ 168.  Analyzing that claim under a products liability framework—as the struggle in the complaint to identify the supposed product reveals, *see id.* ¶¶ 167–171—is next to impossible.  "The purposes served by products liability law," the Ninth Circuit has observed, "are focused on the tangible world and do not take into consideration the unique characteristics of ideas and expressions."  *Winter*, 938 F.2d at 1034.  And the "transmission of words is not the same as selling items with physical properties."  *Id.* at 1036 n.6.  Just as telephone companies are not liable if callers spread "defamatory messages" on their wires, *Anderson v. New York Tel. Co.*, 320 N.E.2d 647, 649 (N.Y. 1974), a communications platform does not become defective if users spread "extreme and outrageous hate speech, misinformation, and conspiracy theories," Compl. ¶ 167.  Any attempt to devise "objectively measurable" standards for intangible "defect[s]" in communications platforms, *Pierson*, 216 Cal. App. 3d at 345, "could seriously inhibit those who wish to share thoughts and theories," *Winter*, 938 F.2d at 1035; *see also Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 239 (Tex. App. 1993) ("ideas and information contained in the magazine [that] encouraged children to engage in activities that were dangerous" were "intangible characteristics, not tangible properties").

> **b.**     **No Alleged Design Defect Caused Plaintiff's Injuries**

Even if Facebook were a product, the strict products liability claim would nevertheless fail because the violence suffered by Plaintiff's father and others in her village was not caused by any alleged defect in Facebook's design.  As explained above, the complaint does not plausibly allege that Facebook caused Plaintiff's injuries.  But the strict liability claim requires Plaintiff to show in addition that some "*defect* in the manufacture or design of [Meta's] product cause[d]" her injuries.  *Soule*, 8 Cal. 4th at 560 (emphasis added).  The complaint does not and cannot do so.

According to the complaint, "Facebook designed its system and the underlying algorithms in a manner that rewarded users for posting, and thereby encouraged and trained them to post, increasingly extreme and outrageous hate speech, misinformation, and conspiracy theories attacking particular groups."  Compl. ¶ 167.  That is, Facebook's algorithms allegedly prioritize content with high

engagement scores, *id.* ¶ 38; other users are allowed to "like," "comment" on, or "share" content, *id.* ¶ 42; and divisive content is more likely to drive engagement, thereby "reward[ing] the user "with more likes, shares, and comments," *id.* ¶ 52.

Setting aside whether this alleged design can be considered defective, the complaint contains no allegations whatsoever connecting it to Plaintiff's injuries. The complaint does not allege that any users posted anti-Rohingya content in 2012 because they had been "rewarded" for posting similar content. *See* Compl. ¶ 94. And because the complaint does not allege that any assailant or bystander involved with the attack on Plaintiff's village ever used Facebook, it certainly does not allege that they saw anti-Rohingya content that they would not have seen absent Facebook's alleged design.

### c.   As a Bystander, Plaintiff Cannot Bring a Strict Products Liability Claim

Finally, even if Facebook were a product and its design had caused Plaintiff's injuries, her claim is not cognizable under California law because she is a bystander who is not alleged to have used Facebook. "The history of the doctrine of strict liability in tort indicates that it was designed … to govern the distinct problem of *physical* injuries." *Seely v. White Motor Co.*, 63 Cal. 2d 9, 15 (1965) (emphasis added). Generally, bystanders who are not users or consumers of a product cannot bring a strict products liability claim. Restatement (Second) of Torts § 402A.

Although Plaintiff alleges that concerns for her safety prompted her to flee Burma in 2012, Compl. ¶¶ 151–153, she does not allege that she suffered any physical injury. "In the absence of physical injury or impact to the plaintiff [her]self, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is *then aware* that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness." *Thing v. La Chusa*, 48 Cal. 3d 644, 647 (1989) (in banc) (emphasis added); *see also Fortman v. Förvaltningsbolaget Insulan AB*, 212 Cal. App. 4th 830, 845 (2013), *as modified* (Feb. 7, 2013) (applying *Thing* test to strict products liability).

In 2013, the California Court of Appeal rejected an "attempt to expand bystander recovery to hold a product manufacturer strictly liable for emotional distress when the plaintiff observes injuries sustained by a close relative arising from an unobservable product failure." *Fortman*, 212 Cal. App.

4th at 843–44.  That attempt failed because the plaintiff could not allege "contemporaneous awareness of the causal connection between the company's defective product and her [family member]'s injuries." *Id.* at 845 (emphasis added).  When a plaintiff "witnessed the injury, but did not meaningfully comprehend that *the company's defective product caused* the injury, she cannot satisfy the second *Thing* requirement."  *Id.* at 832 (emphasis added).

The complaint concedes that Plaintiff "did not meaningfully comprehend" that Facebook caused any of the injuries that she allegedly witnessed in 2012:  She allegedly "did not learn that Facebook's conduct was a cause of her injuries" for nearly a decade.  Compl. ¶ 158.  As a result, she cannot bring a "bystander" claim against Meta.

For all of these reasons, the strict liability claim should be dismissed.

### 3.    Plaintiff's Negligence Claim Fails

The negligence claim likewise suffers from multiple flaws in addition to the complaint's failure to plead adequately that Meta caused Plaintiff's injuries.  In particular, there is no support in California law for imposing a legal duty on social media companies to prevent harm to anyone—let alone non-users of their platform—committed by third parties.  And just as with the strict liability claim, the complaint does not plausibly allege that any breach of such a duty caused the violence committed in Plaintiff's village.  For these and other reasons, the negligence claim should be dismissed.

#### a.    Harm to Non-Users

The question "[w]hether a defendant owes a duty of care is a question of law."  *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999).  "Duty is not universal; not every defendant owes every plaintiff a duty of care."  *Brown*, 11 Cal. 5th at 213.  A plaintiff cannot plead a claim of negligence merely by alleging a generic "duty to use reasonable care."  Compl. ¶ 175.  Because the complaint's theory for to the 2012–2013 timeframe is that the Myanmar military used Facebook to justify its acts of violence and deter non-Rohingya people from intervening to stop the violence, *id.* ¶ 119, Plaintiff must plausibly plead that Meta had "a 'special relationship' with either the victim or the person who created the harm," *Brown*, 21 Cal. 4th at 215.

The complaint's allegations fail on both fronts.  The complaint does not allege, and could not plausibly allege, that Meta had a special relationship with the Myanmar military that "entail[ed] an

ability to control [the] conduct" of its members. *Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 619 (2018).  Nor does it allege a special relationship between Plaintiff and Meta that "gives the victim a right to expect" protection against ethnic violence by third parties in Burma.  *Id.*  The California Supreme Court has identified only a handful of traditional relationships—such as innkeepers to their guests or landlords to their invited guests—that can give rise to a duty to protect against harm inflicted by a third party.  *Id.* at 620.  Each relationship is marked by the "dependency" of the victim on the defendant and the defendant's "control over the plaintiff's welfare."  *Id.* at 621 (internal quotation marks omitted).  Plaintiff does not allege that she was dependent on Meta's ability to control her welfare; she does not even allege that she used Facebook.

Courts have consistently refused to create a special legal duty of care for websites even with respect to their own users.  *See*, *e.g.*, *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 851–52 (W.D. Tex. 2007).  The Ninth Circuit's decision in *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019), is particularly instructive.  The plaintiff there, like Plaintiff here, tried to allege that a website created or increased a risk of harm to its users by distributing harmful user content and recommending harmful groups to users.  *Compare id.* at 1095, 1100, *with* Compl. ¶ 176.  But the Ninth Circuit held that these allegations established only "nonfeasance" (the website's failure to protect its users from harmful content) as opposed to "misfeasance" (affirmative steps to put their users in a worse position).  *Dyroff*, 934 F.3d at 1101; *see Brown*, 11 Cal. 5th at 214–15 (explaining distinction under California negligence law).  The plaintiff thus failed to state a negligence claim because only misfeasance can create "a duty of care in the context of third-party acts"—like those at issue in this case—under well-settled principles of California law.  *Dyroff*, 934 F.3d at 1100–01.

Courts likewise have declined to impose a duty to protect users from harm allegedly caused by third-party content on Facebook in particular.  In *Dyroff*, the Ninth Circuit approvingly referred to a D.C. Circuit decision that held that "no special relationship [exists] between Facebook and its users." 934 F.3d at 1101 (citing *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359–60 (D.C. Cir. 2014)).  Judges in this District likewise have held that Facebook has no duty to "condemn all acts or statements that inspire, imply, incite, or directly threaten violence against anyone"—in no small part because such a duty, if imposed by state law, "would be inconsistent with the policy choices undertaken by Congress

in the Communications Decency Act, which sharply limits the responsibility of interactive computer service providers for the content provided by third parties." *Young v. Facebook, Inc.*, 2010 WL 4269304, at *5 (N.D. Cal. Oct. 25, 2010).

*Dyroff* governs this case. Because the Ninth Circuit has held that websites have no duty under California law to protect even their users from third-party acts allegedly facilitated by a communication platform, it necessarily follows that websites have no such duty with respect to non-users like Plaintiff. The argument that Meta owes a duty to the general public to prevent injuries that occur offline is contrary to the rule that a special relationship can create only "a duty of care owed to a limited community, not the public at large." *Regents*, 4 Cal. 5th at 621 (police officers, even when aware of third-party criminal activity, have no tort duty to protect the general public). Indeed, California courts have rejected analogous arguments that publishers or distributors have a duty of care to victims of third parties who were allegedly inspired to wrongdoing by harmful content. *See*, *e.g.*, *Bill v. Superior Court*, 137 Cal. App. 3d 1002, 1011 (1982) (movie producer had no duty to victim of shooting outside theater "even if [the movie] had the tendency to attract violence-prone individuals to the vicinity of theaters at which it was exhibited"). Meta seeks to ensure that people feel safe communicating on Facebook, and it takes seriously its role in keeping harmful content off the platform. But there is simply no support under any state's law, let alone California law, for holding that a website owes a legal duty of care to non-users who might be harmed by third parties. *See Doe v. GTE Corp.*, 347 F.3d 655, 661 (7th Cir. 2003); *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 326 & n.4 (D.N.J. 2015).

Even if Plaintiff had alleged that Meta engaged in an affirmative act of misfeasance or had a special relationship with her or those who attacked her village, Meta still would not have a duty of care to non-users. That is because California negligence law has two steps: The court first assesses whether existing law imposes a duty on the defendant, and if so, the court proceeds to decide whether to "limit[ ] a duty already established" in the law by reference to seven factors that animate California tort law. *Brown*, 11 Cal. 5th at 218, 221. These factors show that California courts would not recognize a duty as a matter of law even if the harm was foreseeable enough to allege causation. *See Erlich*, 21 Cal. 4th at 552 ("[F]oreseeability is not synonymous with duty; nor is it a substitute.").

*First*, the allegations fall short of the "very high degree of foreseeability" required to impose a

duty on Meta, which could prevent the alleged harm (if at all) only by "restraining" expression on its platform. *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1004 (1988). *Second*, this case involves a lower "degree of certainty that the plaintiff suffered injury" because Plaintiff was a bystander to violence committed by the Myanmar military. *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968). *Third*, the injuries are highly attenuated from the platform functions challenged by the complaint. *See* Compl. ¶ 176; *see also Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 145 (2018). As a result, the relation between Meta's conduct and Plaintiff's harm is far too indirect to justify a duty. *See McCollum*, 202 Cal. App. 3d at 1005. The fourth factor cuts against a duty because "the moral blame" rests with the Myanmar military. *Id.* So too, does the fifth factor, because Meta does not control the actions of the Myanmar military that occur offline, which had been occurring long before members of the military allegedly began using Facebook to try to justify those actions. *Taylor v. Elliott Turbomachinery Co.*, 171 Cal. App. 4th 564, 594 (2009). The sixth factor counsels against imposing a legal duty on websites to prevent injuries committed by third parties off the platform, where doing so would have a "significant chilling effect upon Internet free speech." *Delfino v. Agilent Tech., Inc.*, 145 Cal. App. 4th 790, 816 (2006). And the seventh factor reinforces the costs of this burden because the risk of "malicious acts" by third parties anywhere in the world that might relate in some way to content posted on Facebook is not "a readily insurable one." *Id.* at 816–17.

> **b.    Even if Meta Owed a Duty, Plaintiff's Negligence Claim Fails**

The complaint advances multiple general theories of how Meta purportedly breached its duty of care—for example, "designing its algorithms to fill Burmese users' News Feeds ... with disproportionate amounts of hate speech," "failing to remove ... such dangerous content from its system after having been repeatedly warned of the potential for such content to incite violence," and "making connections between and among violent extremists." Compl. ¶ 176. As with the strict liability claim, the complaint alleges no facts suggesting that these alleged breaches had anything to do with Plaintiff's injuries in 2012. It alleges, for instance, that Meta was warned about dangerous content in Burma "beginning in 2013." *Id.* ¶ 125. And nowhere does the complaint allege that Meta formed any "connections" between the members of the Myanmar military who attacked her village.

To the extent the second cause of action rests on a theory of "negligent design[]," Compl. ¶ 176,

Plaintiff has failed to state a claim because Facebook is not a product.  *See supra*, at 10–12.  Negligent design is an "alternate" theory to strict liability for "a plaintiff injured by an allegedly defective *product*"—not an across-the-board claim against services and intangible goods.  *Milwaukee Elec. Tool Corp. v. Superior Court*, 15 Cal. App. 4th 547, 557 (1993) (emphasis added).  As a form of products liability, negligent design differs from strict liability only by requiring the plaintiff to prove "an additional element, namely, that the defect in the product was due to the negligence of the defendant." *Merrill*, 26 Cal. 4th at 479 (internal quotation marks omitted).  And because Facebook is not a "product," the negligent design theory fails.

**B.     Plaintiff's Claims Are Barred by the Statute of Limitations**

The claims also are barred by the applicable two-year statute of limitations for personal injury claims.  Cal. Civ. P. Code § 335.1.  The complaint alleges that the attack on Plaintiff's village occurred in 2012 and that she fled the country at that time.  *See* Compl. ¶ 151.  California cases make clear that, in circumstances like this, the statute begins running at the time the plaintiff "ha[d] reason to suspect an injury and some wrongful cause."  *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005).  Accordingly, the allegations in the complaint establish that the claims are time-barred.  *See McKelvey v. Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 160 (1999).

California's discovery rule does not change this conclusion.  Under that rule, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that *someone* has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988) (emphasis added).  The complaint alleges that Plaintiff knew in 2012 that she had been wronged by the Myanmar military.  A plaintiff who suspects that an injury was wrongfully caused "ha[s] a duty to conduct a reasonable investigation" of all potential causes of that injury.  *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1048 (9th Cir. 2020).  And "ignorance of the identity of the defendant does not delay accrual of a cause of action."  *Fox*, 35 Cal. 4th at 813.  Thus, the claims are time-barred even if Plaintiff "did not learn" about the alleged role of Facebook in causing "her injuries until 2021."  Compl. ¶ 158.

Even if the discovery rule could potentially apply, the complaint fails to allege facts sufficient to support it.  To invoke the rule, "[a] plaintiff … must specifically plead facts to show (1) the time and

manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *McKelvey*, 74 Cal. App. 4th at 160 (emphasis added). The complaint alleges none of these things.

As for the "manner" in which Plaintiff discovered the factual basis for her cause of action against Meta. the complaint says nothing. Where a plaintiff "alleges no facts regarding the manner" of discovery, mere "statements" that the plaintiff "could not have made [the] discovery sooner are nothing more than conclusory." *Beasley v. Conagra Brands, Inc.*, 374 F. Supp. 3d 869, 883 (N.D. Cal. 2019). Such conclusory allegations are insufficient. *See, e.g.*, *id.*

Nor does the complaint allege facts showing that Plaintiff "conduct[ed] a reasonable investigation." *See Fox*, 35 Cal. 4th at 808–09. "In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that" she did in fact conduct a "diligent investigation of the circumstances of the injury." *Id.* at 809. The complaint does not allege any such facts, and the allegation that "Facebook's role" was not "widely known or well understood" before 2021 is insufficient. *See Anderson v. Brouwer*, 99 Cal. App. 3d 176, 182 (1979) ("Formal averments or general conclusions to the effect that the facts were not discovered until a stated date, and that plaintiff could not reasonably have made an earlier discovery, are useless."). Nor is it consistent with the documents incorporated into the complaint. Notably, the U.N. Report the complaint cites for the proposition "that Facebook had contributed to the 2017 Clearance Operations" is dated September 2018—more than three years before this action was filed. *See* Compl. ¶ 115. The *Guardian* article Plaintiff cites is from even earlier—April 2, 2018. *See id.* ¶ 116. A plaintiff must "allege specific facts supporting" not only her claim of diligence, but also "facts … support[ing] allegation that she did not suspect, nor did she have reason to discover, facts supporting a products liability action." *See Fox*, 35 Cal. 4th at 811. Here, far from supporting the invocation of the discovery rule, the facts in the complaint undermine it.

Plaintiff's inability to read or write (Compl. ¶ 158) may inform what she could "have reasonably discovered" *as a result* of a diligent investigation. *See Fox*, 35 Cal. 4th at 809. But any difficulties in obtaining information do not vitiate the obligation to plead reasonable diligence. *See Zamora v. Wells Fargo Bank*, 2013 WL 2319079, at *6 (N.D. Cal. May 28, 2013) (plaintiffs' inability to "speak or understand English" did not relieve them of their "burden to show diligence"). The complaint does not allege that Plaintiff took any steps to "obtain knowledge from sources open to [her] investigation."

1  *Fox*, 35 Cal. 4th at 808.  And the complaint has failed to "specifically plead facts" that would give rise

2  to an inference of futility as to further efforts.  *See id*.  As a result, the claims are time-barred.

### C.   Plaintiff's Claims Are Barred by Section 230

4       Section 230 protects "providers of interactive computer services against liability arising from

5  content created by third parties."  *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162

6  (9th Cir. 2008) (en banc).  That protection extends to any claim that seeks to hold an interactive

7  computer service liable for failing to block or disallow content created by others.  *Batzel v. Smith*, 333

8  F.3d 1018, 1031 n.18 (9th Cir. 2003).  Section 230 mandates dismissal of a claim when (1) the

9  defendant is a "provider … of an interactive computer service," and (2) the suit seeks to hold the

10  defendant liable as a "publisher or speaker" of (3) content created by someone other than the defendant

11  interactive computer service provider.  47 U.S.C. § 230(c)(1).

12       Plaintiff seeks to impose liability on Meta for the alleged harmful effects of anti-Rohingya

13  content posted by the Myanmar military and other extremists.  As a result, and despite Plaintiff's

14  attempt to plead around it, Plaintiff's claims are barred by Section 230.

### 1.   Plaintiff's "Creative Pleading" Cannot Evade Section 230 Immunity

16       *First*, there can be no dispute that Meta is a provider of "interactive computer services"—the

17  Facebook platform.  *See Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019); *Klayman*, 753 F.3d

18  at 1357 ("Facebook qualifies as an interactive computer service.").

19       *Second*, Plaintiff's claims necessarily arise from content created entirely by individuals or

20  entities other than the interactive computer service provider—here the Myanmar military and other

21  extremists who posted anti-Rohingya content.  *Roommates*, 521 F.3d at 1162; *see*, *e.g.*, Compl. ¶ 168

22  ("The design of Facebook's algorithms and product resulted in the proliferation and intensification of

23  hate speech, misinformation, and conspiracy theories attacking the Rohingya in Burma."); *id.* ¶ 176

24  (alleging that Facebook negligently "fail[ed] to remove … dangerous content from its system" and

25  "allow[ed] users to use Facebook" to spread extremist content).

26       *Finally*, despite the complaint's attempts to plead around Section 230, Plaintiff's claims seek

27  to treat Meta as the speaker or publisher of the user content giving rise to her injuries.  In evaluating

28  whether a claim treats a defendant as a publisher, "what matters is not the name of the cause of action."

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009).  The issue "is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Id.* at 1102.  "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.com*, 521 F.3d at 1170–71.  This flexible test prevents plaintiffs from using "creative pleading" to evade Section 230. *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016).

The complaint admits that third parties created the harmful content that it claims Meta should have removed, blocked, or displayed in a different manner.  *See* Compl. ¶¶ 95–97, 101.  It nonetheless alleges that Meta contributed to the development and creation of hate speech and misinformation "through the design of its algorithm and product." *Id.* ¶ 168.  But a platform does not make a "material contribution" to content by "merely … augmenting the content generally;" instead it must "materially contribut[e] *to its alleged unlawfulness*." *Roommates.com*, 521 F.3d at 1167–68 (emphasis added). This test "draw[s] the line at the crucial distinction between, on the one hand, taking actions" to display "actionable content and, on the other hand, responsibility for what makes the displayed content [itself] illegal or actionable." *Kimzey*, 836 F.3d at 1269 n.4.  The theory of the complaint boils down to the allegation that Meta "encouraged" divisive content by allowing *other users* to "'like,' 'comment' on, or 'share' it," Compl. ¶ 42, and that *other users* are more likely to engage with divisive content, *id.* ¶ 52. Put differently, the theory that Meta "contributed" to the third-party content itself depends entirely on third-party content and how Meta displayed it.

The heart of the complaint is that Facebook algorithms allegedly were designed to promote content that maximizes user engagement, including divisive content.  But that is only another way of challenging the decisions Meta made to display (or not display) third-party content, which is precisely what publishers do.  *See Barnes*, 570 F.3d at 1102 ("[P]ublication involves reviewing, editing, and deciding whether to publish or withdraw from publication third-party content.").  As the complaint describes them, the algorithms do not themselves constitute or create content, but just determine the frequency and placement of content posted by third parties.  *See* Compl. ¶ 11.  Plaintiff's allegation that Meta used editorial discretion to "include[] and prioritize[]" content "with higher engagement scores … in the News Feed," *id.* ¶ 39, amounts to an attempt to treat Meta as a publisher, not the creator,

of third-party content.  *Gonzalez*, 2 F.4th at 892; *Dyroff*, 934 F.3d at 1098.

The fact that Plaintiff's claims revolve around algorithms does not remove them from Section 230.  The Ninth Circuit repeatedly has held that an interactive computer service does not create content merely because it applies algorithms to recommend, promote, or display third-party content.  *See, e.g.*, *Gonzalez*, 2 F.4th at 894-95; *Dyroff*, 934 F.3d at 1098.  Indeed, Plaintiff's algorithmic theory of content creation is foreclosed by *Gonzalez*.  As in *Gonzalez*, the "complaint is devoid of any allegations that [Meta] specifically targeted [anti-Rohingya] content or designed its website to encourage" content that furthered that mission.  2 F.4th at 895.  Instead, the complaint alleges that Meta designed its platform to maximize user engagement, Compl. ¶¶ 36-40, and that divisive content—in general—results in more user engagement, *id*. ¶¶ 41-61.  Even if that were true, it would not make Facebook algorithms anything other than "content-neutral."  *See Gonzalez*, 2 F.4th at 895 ("Google matches what it knows about users based on their historical actions and sends third-party content to users that Google anticipates they will prefer.").  Meta's decision to "automate Facebook's editorial decision-making" does not remove its conduct from "the scope of publishing."  *See Force*, 934 F.3d at 67.

Meta's algorithms are simply "tools meant to facilitate the communication and content of others."  *Dyroff*, 934 F.3d at 1098.  "[T]he very essence of publishing is making the decision[s] whether to print or retract a given piece of content," as well as where and to whom to display it, *Klayman*, 753 F.3d at 1359, whether that decision is made manually or through an "automate[d]" process, *Force*, 934 F.3d at 67; *see also Marshall's Locksmith Serv. Inc. v. Google LLC*, 925 F.3d 1263, 1271 (D.C. Cir. 2019) ("automated editorial act[s]" protected by Section 230).  Other judges in this District have recognized that, when a plaintiff's claims turn on "how well" a defendant's "algorithm" was designed to prevent or remove "third-party content containing" harmful messages or images, the claim is "directly related" to the defendant's publishing decisions.  *See Doe v. Twitter, Inc.*, --- F. Supp. 3d ---, 2021 WL 3675207, at *32 (N.D. Cal. Aug. 19, 2021).  In short, a plaintiff "cannot plead around Section 230 immunity by framing … website features as content."  *Dyroff*, 934 F.3d at 1098.

The remaining theories suggest Meta harmed Plaintiff by allegedly failing to remove certain content, making connections among different users, and allowing people to use Facebook to disseminate extremist content.  *See* Compl. ¶ 176.  The Ninth Circuit repeatedly has held that Section

230 bars such claims.  *See*, *e.g.*, *Gonzalez*, 2 F.4th at 891, 893–96 (failure to remove content); *see Dyroff*, 934 F.3d at 1098–99 (connecting users and making recommendations); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124–25 (9th Cir. 2003) (inappropriate postings).

Because Plaintiff's claims seek to hold Meta liable as the speaker or publisher of third-party content, they are barred by Section 230.

**2.      Section 230 Bars Both Burmese and California Tort Law Claims**

The complaint's assertion that Section 230 does not apply because Plaintiff's claims arise under Burmese law fails for multiple reasons.  *See* Compl. at 2.  As explained above, California law—not Burmese law—governs this motion.  *See supra*, at 5–6.  But that assertion also fundamentally misapprehends the relationship between a federal immunity statute and foreign-law-based claims.  Indeed, the contention that "a conflict-of-laws analysis prevents the application of federal statutes to foreign-law-based claims" is not only misguided, it "is unsupported in law or logic."  *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 324 (E.D.N.Y. 2018), *aff'd on other grounds by Force*, 934 F.3d 53.  Instead, because the "claims involve a domestic application of § 230," the statute applies.  *See Gonzalez*, 2 F.4th at 888.

The "primary purpose [of Section 230] is limiting civil liability in American courts."  *Force*, 934 F.3d at 74.  And "[t]he regulated conduct—the litigation of civil claims in federal courts—occurs entirely domestically in its application."  *Gonzalez*, 2 F.4th at 888 (quoting *Force*, 934 F.3d at 74).  As a result, "foreign law claims [in U.S. courts] … remain subject to the limitations on liability provided by Section 230(c)(1)."  *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 160 n.14 (E.D.N.Y. 2017), *aff'd on other grounds by Force*, 934 F.3d 53; *Force*, 304 F. Supp. 3d at 324; *see also Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 953–54 (9th Cir. 2008) (applying federal statute of repose to bar tort claims arising under Macedonian law).

In enacting and amending Section 230, Congress crafted a series of exemptions for certain claims arising under federal and state law.  *See* 47 U.S.C. § 230(e).  If Congress intended to create an exemption for claims arising under foreign law, it would have said so.  *See Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) (Congress "says what it means and means what it says").  Given the particular exceptions to Section 230's immunity Congress enacted, "additional exceptions are not to be implied."

1    *Ardus v. Glover Constr. Co.*, 446 U.S. 608, 616–17 (1980); *see also Nichols v. United States*, 578 U.S.

2    104, 110 (2016) ("[T]o supply omissions transcends the judicial function").

3       Finally, Plaintiff's contention that federal immunity statutes do not apply to foreign tort claims

4    "would have the anomalous effect of preventing litigants from bringing an action in the United States

5    for [conduct] occurring in the United States while allowing litigants to bring the same action in the

6    United States if the [conduct] occurred abroad." *Blazevska*, 522 F.3d at 954; *Force*, 304 F. Supp. 3d

7    at 324 (Section 230 barred plaintiff's Israeli tort law claims). No court has adopted such a bizarre rule.

8    **D.**    **Plaintiff's Claims Are Barred by the Foreign Affairs Doctrine**

9       The state-law tort claims also are barred by the foreign affairs doctrine, which prevents "an

10    intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President

11    and the Congress." *Zschernig*, 389 U.S. at 432. State law is preempted where there is "the likelihood"

12    that it "will produce something more than incidental effect in conflict with express foreign policy of

13    the National Government." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2005). Even where a

14    state law is within the state's "traditional competence," it must yield if it affects foreign relations and

15    the state interest is weak. *See id.* at 419 n.11. Under this doctrine, Plaintiff's negligence and products

16    liability claims would require the Court to second-guess United States foreign policy on Burma.

17       Courts consider "the strength of the state interest … when deciding how serious a conflict must

18    be shown" to find a state law preempted under the foreign affairs doctrine. *Garamendi*, 539 U.S. at

19    420. California's interest here is weak because the complaint does not allege that Plaintiff ever resided

20    in California or that her injuries happened here. *See* Compl. ¶ 31; *Mujica v. Occidental Petrol. Corp.*,

21    381 F. Supp. 2d 1164, 1187 (C.D. Cal. 2005) (state interest weak where plaintiffs never resided in

22    California); *Shiguago v. Occidental Petrol. Corp.*, 2009 WL 10671585, at *7 (C.D. Cal. Aug. 5, 2009).

23    Given the absence of a strong California interest, there need not be a strong conflict to preempt the tort

24    claims. *Mujica*, 381 F. Supp. 2d at 1187–88.

25       The state tort law at issue here has "more than incidental effect in conflict with" the federal

26    government's ongoing foreign policy initiatives with respect to Burma in general, and the Myanmar

27    military in particular. The crux of Plaintiff's claims is that her injuries were caused by the illegal

28    actions of members of the Myanmar military, including allegations that the military has engaged in

"terrorism and mass genocide" for which Plaintiff seeks to hold Meta liable.  Compl. ¶ 1.  The connection with Meta turns on Plaintiff's allegation that the Myanmar military used Facebook to justify and support its illegal actions.  The Executive Branch already is addressing this same set of issues, having initiated a comprehensive and targeted response to the Myanmar government and the actions of its military—including financial sanctions on government officials and visa restrictions under Section 7031(c) of the Department of State Foreign Operations and Related Programs Appropriations Act.[4] Last year, President Biden issued a new Executive Order declaring that "the situation in and in relation to Burma, and in particular the February 1, 2021, coup … constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States."  Exec. Order No. 14,014, 86 Fed. Reg. 9429 (Feb. 10, 2021).  And the State Department has stated that "[a]n important part of our foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving alleged human rights abuses."  *Mujica*, 381 F. Supp. 2d at 1188.  Plaintiff's attempt to use California law to address this same set of concerns would undermine the United States' "preference … for the Government of Burma to hold any individuals responsible for atrocities, serious human rights abuses accountable within the Burmese judicial and legal system."  On Public Designation, *supra*.

"[A] doubt about the clarity of the conflict" here must "be resolved in the National Government's favor, given the weakness of the State's interest" in adjudicating these tort claims.  *Garamendi*, 539 U.S. at 425.  Accordingly, the tort claims must be dismissed on this basis as well.

## V.   CONCLUSION

Because Plaintiff fails to state a claim on which relief could be had, and because amendment would be futile, Meta respectfully requests that the complaint be dismissed with prejudice.

---

[4] *See* On Public Designation, Due to Gross Violations of Human Rights, of Burmese Military Officials (July 16, 2019), https://2017-2021.state.gov/on-public-designation-due-to-gross-violations-of-human-rights-of-burmese-military-officials/index.html; Dep't of Treas., Treasury Sanctions Commanders and Units of the Burmese Security Forces for Serious Human Rights Abuses (Aug. 17, 2018), https://home.treasury.gov/news/press-releases/sm460.

1    Dated: March 7, 2022

2                                              GIBSON, DUNN & CRUTCHER LLP

3

4                                              By:  _____*/s/ Rosemarie T. Ring*_____
                                                        Rosemarie T. Ring
5

6                                              Attorneys for Defendant META PLATFORMS, INC.,
                                               (f/k/a Facebook, Inc.), a Delaware corporation
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28