Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Richard Fields (*pro hac vice* forthcoming)
fields@fieldslawpllc.com
Fields PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
Tel: 833.382.9816

Jay Edelson (*pro hac vice*)
jedelson@edelson.com
Roger Perlstadt (*pro hac vice*)
rperlstadt@edelson.com
J. Eli Wade-Scott (*pro hac vice*)
ewadescott@edelson.com
Michael Ovca (*pro hac vice*)
movca@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>META PLATFORMS, INC. (f/k/a Facebook, Inc.), a Delaware Corporation,<br><br>*Defendant*. | Case No. 4:22-cv-00051-YGR<br><br>Hon. Yvonne Gonzalez Rogers<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date:      June 21, 2022<br>Time:      2:00 p.m.<br>Room:      Courtroom 1, 4th Floor<br>                1301 Clay Street<br>                Oakland, California 94612 |

# **TABLE OF CONTENTS**

**INTRODUCTION** ............................................................................................................. 1

**BACKGROUND** ............................................................................................................... 2

**CHOICE OF LAW** ......................................................................................................... 6

**ARGUMENT** ................................................................................................................... 6

I.      **PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS** ................................................................................................ 6

     A.    **Plaintiff did not discover Facebook's wrongdoing until 2021** .............................. 7

     B.    **Plaintiff did not have inquiry notice** ................................................................. 8

     C.    **Plaintiff had no duty to investigate** ................................................................... 8

II.     **PLAINTIFF'S COMPLAINT STATES CLAIMS FOR NEGLIGENCE AND PRODUCT LIABILITY** ........................................................................................ 9

     A.    **Plaintiff states a claim for negligence** ................................................................. 9

           1.    **Facebook owed a duty of reasonable care** ................................................. 9

           2.    **Plaintiff sufficiently alleges causation** .................................................... 11

     B.    **Plaintiff states a claim for product liability** ..................................................... 13

           1.    **Facebook is a product subject to product liability law** ........................... 13

           2.    **Facebook's "bystander" argument is without merit** ................................ 15

III.    **PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE CDA** ..................... 16

     A.    **Plaintiff does not seek to hold Facebook liable as the publisher or speaker of third-party content** ......................................................................... 17

           1.    **Facebook was the designer of a dangerous product** ................................ 17

           2.    **Facebook was a material contributor to the harmful content** ................. 19

           3.    **Facebook was the distributor—not the publisher or speaker—of third-party content** .................................................................................... 23

           4.    **Facebook negligently connected violent extremists and susceptible violent actors** ............................................................................................ 25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.** **To the extent the CDA would bar Plaintiff's claims, there is a true conflict between U.S. and Burmese law, and Burmese law of non-immunity governs** ..25

**1.** **A choice-of-law analysis is necessary** ........................................................25

**2.** **Under California choice-of-law rules, Burmese law applies to Facebook's immunity defense** ........................................................................................27

**a.** **U.S. and Burmese law differ on immunity** ...........................................28

**b.** **The U.S. and Burma have competing interests in having their respective law applied to this dispute** ................................................29

**c.** **Comparative impairment points to Burma** ........................................30

**d.** **Alternatively, principles of comity point to Burmese law** ..............33

**IV.** **PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE FOREIGN AFFAIRS DOCTRINE** ........................................................................................................34

**CONCLUSION** ..............................................................................................................35

1

## <u>TABLE OF AUTHORITIES</u>

2

**United States Supreme Court Cases:**

3

*Am. Ins. Ass'n v. Garamendi,*
        539 U.S. 396 (2003) ....................................................................................... 34

4

5

*Howlett v. Rose,*
        496 U.S. 356 (1990) ......................................................................................... 6

6

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC,*
        141 S. Ct. 13 (2020) ......................................................................... 23, 24, 28

7

8

*Zschernig v. Miller,*
        389 U.S. 429 (1968) ....................................................................................... 34

9

10

**United States Appellate Court Cases**

11

*Abogados v. AT&T, Inc.,*
        223 F.3d 932 (9th Cir. 2000) ........................................................................ 27

12

13

*Barnes v. Yahoo!, Inc.,*
        570 F.3d 1096 (9th Cir. 2009) ................................................................ *passim*

14

15

*Bassidji v. Goe,*
        413 F.3d 928 (9th Cir. 2005) .................................................................. 26, 27

16

17

*Blazevska v. Raytheon Aircraft Co.,*
        522 F.3d 948 (9th Cir. 2008) ........................................................................ 27

18

*Cooper v. Tokyo Elec. Power Co. Holdings, Inc.,*
        960 F.3d 549 (9th Cir. 2020) .................................................................. 30, 31

19

20

*Crosby v. Twitter, Inc.,*
        921 F.3d 617 (6th Cir. 2019) ................................................................. 11, 12

21

22

*de Fontbrune v. Wolfsy,*
        838 F.3d 992 (9th Cir. 2016) ........................................................................ 29

23

24

*Doe v. Internet Brands, Inc.,*
        824 F.3d 846 (9th Cir. 2016) ........................................................................ 16

25

*Dyroff v. Ultimate Software Grp., Inc.,*
        934 F.3d 1093 (9th Cir. 2019) ................................................................ *passim*

26

27

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
        521 F.3d 1157 (9th Cir. 2008) ................................................................ *passim*

28

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ................................................................... 11, 12

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002) ...................................................................... 7

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) .............................................................. 22, 25, 26

*Gingery v. City of Glendale*,
    831 F.3d 1222 (9th Cir. 2016) ..................................................................... 34

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) ................................................................ *passim*

*Herrick v. Grindr LLC*,
    765 F. App'x 586 (2d Cir. 2019) ................................................................ 18

*Homedics, Inc. v. Valley Forge Ins. Co.*,
    315 F.3d 1135 (9th Cir. 2003) ...................................................................... 6

*Huon v. Denton*,
    841 F.3d 733 (7th Cir. 2016) ................................................................ 20, 23

*Ileto v. Glock Inc.*,
    349 F.3d 1191 (9th Cir. 2003) ...................................................................... 9

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002) ............................................................... 13, 15

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ............................................................. 19, 22

*Klayman v. Zuckerberg*,
    753 F.3d 1354 (D.C. Cir. 2014) .................................................................. 10

*Lemmon v. Snap, Inc.*,
    995 F.3d 1085 (9th Cir. 2021) ............................................................. *passim*

*Liew v. Off. Receiver & Liquidator (Hong Kong)*,
    685 F.2d 1192 (9th Cir. 1982) .................................................................... 30

*Mayall ex rel. H.C. v. USA Water Polo, Inc.*,
    909 F.3d 1055 (9th Cir. 2018) .................................................................. 9, 11

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ...................................................................... 31

*McIndoe v. Huntington Ingalls Inc.*,
    817 F.3d 1170 (9th Cir. 2016) ........................................................................ 15

*Pavoni v. Chrysler Grp., LLC*,
    789 F.3d 1095 (9th Cir. 2015) ........................................................................ 11

*Rustico v. Intuitive Surgical, Inc.*,
    993 F.3d 1085 (9th Cir. 2021) ................................................................. *passim*

*Stockwell v. Firestone Tire & Rubber Co.*,
    892 F.2d 84, 1989 WL 155906 (9th Cir. Dec. 27, 1989) ............................ 33, 34

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) ..................................................................... 14, 15

**United States District Court Cases**

*Congoo, LLC v. Revcontent LLC*,
    No. 16-401, 2016 WL 1547171 (D.N.J. Apr. 15, 2016) ................................... 23

*Doe v. Mindgeek USA Inc.*,
    No. 21-100388, 2021 WL 5990195 (C.D. Cal. Dec. 2, 2021) ............... 21, 22, 23

*Doe v. MySpace, Inc.*,
    474 F. Supp. 2d 843 (W.D. Tex. 2007) ........................................................... 10

*Doe v. Twitter, Inc.*,
    No. 21-cv-00485, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021) .................... 18

*Force v. Facebook*
    304 F. Supp. 3d 315 (E.D.N.Y. 2018) ........................................................ 26, 27

*George v. Curwood, Inc.*,
    No. CIV-08-856, 2011 WL 13112073 (W.D. Okla. Feb. 25, 2011) ................. 14

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) .......................................................... 19

*Green v. ADT LLC*,
    No. 16-cv-02227-LB, 2016 WL 3208483 (N.D. Cal. June 10, 2016) .............. 15

*Hill v. Novartis Pharm. Corp.*,
    No. 1:06-cv-00939, 2012 WL 967577 (E.D. Cal. Mar. 21, 2012) ........ 30, 31, 32

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., Prods. Liab. Litig.*,
    No. 8:10 ML 2151 JVS, 2010 WL 6419562 (C.D. Cal. Dec. 9, 2010) ............... 7

*James v. Meow Media, Inc.*,
    90 F. Supp. 2d 798 (W.D. Ky. 2000) ............................................................... 13

*Kelly v. Amylin Pharms., LLC.*,
    No. 14cv1086, 2014 WL 12496549 (S.D. Cal. Aug. 8, 2014) .......................................... 31

*Lakes v. Bath & Body Works, LLC*,
    No. 2:16-cv-02989, 2019 WL 3731734 (E.D. Cal. Aug. 8, 2019) ................................... 33

*Merritt v. Countrywide Fin. Corp.*,
    No. 09-CV-01179-BLF, 2015 WL 5542992 (N.D. Cal. Sept. 17, 2015) ......................... 15

*Mujica v. Occidental Petroleum Corp.*,
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) ............................................................................. 34

*Ning Xianhua v. Oath Holdings, Inc.*,
    536 F. Supp. 3d 535 (N.D. Cal. 2021) ......................................................................... 34, 35

*Petrus v. N.Y. Life Ins. Co.*,
    No. 14-cv-2268-BAS, JMA, 2016 WL 1255812 (S.D. Cal. Mar. 31, 2016) ..................... 8

*Rodriguez v. Mahony*,
    No. 10-02902, 2012 WL 1057428 (C.D. Cal. Mar. 26, 2012) .......................................... 31

*Ross v. AT&T Mobility, LLC*,
    No. 19-cv-06669-JST, 2020 WL 9848766 (N.D. Cal. May 14, 2020) ............................. 13

*Sanders v. Acclaim Ent., Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002) ............................................................................. 13

*Schafer v. State Farm Fire & Cas. Co.*,
    507 F. Supp. 2d 587 (E.D. La. 2007) ............................................................................... 14

*Young v. Facebook, Inc.*,
    No. 5:10-cv-03579-JF/PVT, 2010 WL 4269304 (N.D. Cal. Oct. 25, 2010) .................... 10

*Zamora v. Wells Fargo Bank*,
    No. C 13-134-MEJ, 2013 WL 2319079 (N.D. Cal. May 28, 2013) ................................... 9

**State Court Cases**

*Barker v. Lull Eng'g Co.*,
    573 P.2d 443 (Cal. 1978) .................................................................................................. 15

*Barrett v. Sup. Ct.*,
    272 Cal. Rptr. 304 (Cal. Ct. App. 1990) .......................................................................... 15

*Bernhard v. Harrah's Club*,
    546 P.2d 719 (Cal. 1976) .................................................................................................. 32

*Bettencourt v. Hennessy Indus., Inc.*,
    141 Cal. Rptr. 3d 167 (Cal. Ct. App. 2012) ..................................................................... 12

*Brandon G. v. Gray*,
    3 Cal. Rptr. 3d 330 (Cal. Ct. App. 2003) ........................................................................ 7

*Brooks v. Eugene Burger Mgmt. Corp.*,
    264 Cal. Rptr. 756 (Cal. Ct. App. 1989) ........................................................................ 15

*Brown v. USA Taekwondo*,
    483 P.3d 159 (Cal. 2021).................................................................................... 9, 10, 11

*Brown v. USA Taekwondo*,
    253 Cal. Rptr. 3d 708 (Cal. Ct. App. 2019) ................................................................... 10

*Cabral v. Ralphs Grocery Co.*,
    248 P.3d 1170 (Cal. 2011)................................................................................................ 9

*Chanda v. Fed. Home Loans Corp.*,
    155 Cal. Rptr. 3d 693 (Cal. Ct. App. 2013) ................................................................... 12

*Chen v. L.A. Truck Ctrs., LLC*,
    213 Cal. Rptr. 3d 142 (Cal. Ct. App. 2017) ..................................................................... 6

*Doe v. Facebook, Inc.*,
    No. 2019-16262 (151st Dist. Ct. Harris Cnty., Tex. Oct. 4, 2019) .................................. 15

*Doe I v. Unocal Corp.*,
    Nos. BC 237980, BC 237679 (Cal. Super. Ct.)......................................................... 28, 29

*Elmore v. Am. Motors Corp.*,
    451 P.2d 84 (Cal. 1969).................................................................................................. 15

*Fluor Corp. v. Jeppesen & Co.*,
    216 Cal. Rptr. 68 (Cal. Ct. App. 1985) .................................................................... 14, 15

*Fortman v. Förvaltningsbolaget Insulan AB*,
    151 Cal. Rptr. 3d 320 (Cal. Ct. App. 2013) ................................................................... 16

*Fox v. Ethicon Endo-Surgery, Inc.*,
    110 P.3d 914 (Cal. 2005).............................................................................................. 7, 8

*Frausto v. Dep't of Cal. Highway Patrol*,
    267 Cal. Rptr. 3d 889 (Cal. Ct. App. 2020) .............................................................. 11, 12

*Gonzalez v. Derrington*,
    363 P.2d 1 (Cal. 1961).................................................................................................... 13

*Green v. Healthcare Servs., Inc.*,
    283 Cal. Rptr. 3d 482 (Cal. Ct. App. 2021) ................................................................... 12

*Intellect Art Multimedia, Inc. v. Milewski*,
    899 N.Y.S.2d 60 (N.Y. Sup. 2009) ................................................................. 15

*Jimenez v. Sup. Ct.*,
    58 P.3d 450 (Cal. 2002) .................................................................................. 16

*Johnson v. United States Steel Corp.*,
    192 Cal. Rptr. 3d 158 (Cal. Ct. App. 2015) ..................................................... 15

*Loomis v. Amazon.com LLC*,
    277 Cal. Rptr. 769 (Cal. Ct. App. 2021) ......................................................... 14

*Martinez v. Pac Bell*,
    275 Cal. Rptr. 878 (Cal. Ct. App. 1990) ......................................................... 13

*McCann v. Foster Wheeler LLC*,
    225 P.3d 516 (Cal. 2010) ................................................................................ 31

*Merrill v. Navegar, Inc.*,
    28 P.3d 116 (Cal. 2001) .................................................................................. 12

*Nelson v. Sup. Ct.*,
    50 Cal. Rptr. 3d 684 (Cal. Ct. App. 2006) ....................................................... 15

*Ovando v. Cnty. of Los Angeles*,
    71 Cal. Rptr. 3d 415 (Cal. Ct. App. 2008) ......................................................... 7

*Pierson v. Sharp Mem'l Hosp.*,
    264 Cal. Rptr. 673 (Cal. Ct. App. 1989) ......................................................... 15

*Price v. Shell Oil Co.*,
    466 P.2d 722 (Cal. 1970) ................................................................................ 15

*Regents of Univ. of Cal. v. Superior Ct.*,
    413 P.3d 656 (Cal. 2018) ......................................................................... 9, 10, 11

*Rowland v. Christian*,
    443 P.2d 561 (Cal. 1968) ................................................................................ 10

*S. Coast Framing, Inc. v. Workers' Comp. Appeals Bd.*,
    349 P.3d 141 (Cal. 2015) ................................................................................ 11

*Thing v. La Chusa*,
    771 P.2d 814 (Cal. 1989) ................................................................................ 16

*Tucci v. Club Mediterranee, S.A.*,
    107 Cal. Rptr. 2d 401 (Cal. Ct. App. 2001) ..................................................... 31

*Unruh-Haxton v. Regents of Univ. of Cal.*,
    76 Cal. Rptr. 3d 146 (Cal. Ct. App. 2008) ........................................................... 8

*Wash. Mut. Bank, FA v. Superior Court*,
    15 P.3d 1071 (Cal. 2001) ...................................................................................... 6

*Way v. Boy Scouts of Am.*,
    856 S.W.2d 230 (Tex. App. 1993) ..................................................................... 15

*Wong v. Tenneco, Inc.*,
    702 P.2d 570 (Cal. 1985) ................................................................................... 33

*Yanez v. Plummer*,
    164 Cal. Rptr. 3d 309 (Cal. Ct. App. 2013) ...................................................... 12

*Yuba City Unified Sch. Dist. v. Cal. State Teachers' Ret. Sys.*,
    227 Cal. Rptr. 3d 130 (Cal. Ct. App. 2017) ....................................................... 8

**Other Authorities:**

28 U.S.C. § 1332 ............................................................................................................ 5

47 U.S.C. § 207 ............................................................................................................ 24

47 U.S.C. § 223 ............................................................................................................ 24

47 U.S.C. § 230 ..................................................................................................... *passim*

CACI No. 430 ............................................................................................................... 11

Fed. R. Civ. P. 44.1 ................................................................................................. 25, 29

Restatement (Third) of Torts: Phys. & Emot. Harm § 19 ........................................... 13

Restatement (Third) of Torts: Prod. Liab. § 19 ......................................................... 13

Roger P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational Tort Litigation*,
    63 EMORY L.J. 1089 (2014) ................................................................................ 28

Antony Blinken, *Secretary Antony J. Blinken on the Genocide and Crimes Against Humanity in Burma* (Mar. 21, 2022),
    https://www.state.gov/secretary-antony-j-blinken-at-the-united-states-holocaust-memorial-museum/ .................................................................................................. 5, 33

Adrian Briggs, PRIVATE INTERNATIONAL LAW IN MYANMAR (2015),
    https://www.law.ox.ac.uk/sites/files/oxlaw/myanmar_book_26_may_2015.pdf ............. 28

Andrew Huxley, *California Refuses to Apply Myanmar Law*,,
    6 AUSTRALIAN J. OF ASIAN L. 88 (2004) ............................................................ 28

Justin Scheck, Newley Purnell, Jeff Horwitz, *Facebook Employees Flag Drug Cartels and
Human Traffickers. The Company's Response Is Weak, Documents Show*,,
    WALL STREET JOURNAL (Sept. 16, 2021), https://www.wsj.com/articles/facebook-drug-
cartels-human-traffickers-response-is-weak-documents-11631812953 ............................ 1

Frances E. Zollers, et al., *No More Soft Landings for Software: Liability for Defects in an
Industry That Has Come of Age*,
    21 SANTA CLARA COMPUTER & HIGH TECH. L.J. 745 (2005) .......................................... 14

**INTRODUCTION**

Years of ethnic violence and genocide have resulted in the deaths of tens of thousands of Rohingya (a Muslim minority group) in Burma and the displacement of hundreds of thousands more. Yet the purveyors of this violence—the Myanmar military and civilian terrorists—are not the only ones to blame. As the chairman of the U.N. Independent International Fact-Finding Mission on Myanmar found, Facebook, the social media platform, played a "determining role" in the genocide. Corporate whistleblowers have confessed that in working for Facebook, they had been "a party to genocide." And even Facebook officers such as Mark Zuckerberg and Sheryl Sandberg have acknowledged that the company failed to live up to its moral and legal obligations to control the use of its namesake platform for genocide in Burma. Perhaps most troubling of all, though, is the fact that the company appears to have learned nothing, as the cycle is currently repeating itself against the Tigrayan minority in Ethiopia.[1] Though Facebook knows how to make its product safer, nothing so far has convinced it to do so because, in the words of whistleblower Frances Haugen, "they have put their astronomical profits before people."

Plaintiff Jane Doe, a Rohingya refugee, filed a class action lawsuit against Defendant Meta Platforms, Inc. ("Facebook") for its role in the Burmese genocide. She alleges that Facebook's social media platform contained dangerous design flaws that encouraged and promoted the creation of toxic anti-Rohingya hate speech and incitements to violence against the Rohingya, and that Facebook was negligent in distributing and amplifying this dangerous content, as well as in making connections between existing and would-be violent extremists.

Facebook has moved to dismiss Plaintiff's complaint on several grounds, all of which are without merit. First, Plaintiff's claim is not barred by the statute of limitations. Although her original injury occurred earlier, she did not learn of Facebook's role in causing it until 2021, shortly before she filed suit. Second, Plaintiff states a claim for negligence. While Facebook

---

[1]     *See, e.g.*, Justin Scheck, Newley Purnell, Jeff Horwitz, *Facebook Employees Flag Drug Cartels and Human Traffickers. The Company's Response Is Weak, Documents Show*, WALL STREET JOURNAL (Sept. 16, 2021), https://www.wsj.com/articles/facebook-drug-cartels-human-traffickers-response-is-weak-documents-11631812953.

challenges both the duty and causation elements of that claim, Plaintiff has sufficiently alleged both. Facebook—like everyone—has a general duty to use reasonable care to avoid injuring others, a duty it allegedly breached. And with respect to causation, the "substantial factor" standard requires only that Facebook's contribution to Plaintiff's harm be more than negligible or theoretical, something Plaintiff has clearly alleged here. <u>Third</u>, Facebook's argument that its social media platform is not a "product" subject to product liability claims is inconsistent with Ninth Circuit and California precedent, and its assertion that Plaintiff cannot recover on her product liability claim because she was merely a bystander is simply wrong. <u>Fourth</u>, Section 230 of the Communications Decency Act, 47 U.S.C. § 230, does not immunize Facebook from liability here. Plaintiff's claims do not seek to treat Facebook as the publisher or speaker of third-party content as required for immunity under that statute. Regardless, if the CDA would immunize Facebook from liability here, it would conflict with Burmese law, which provides no such immunity, and a proper choice-of-law analysis would require application of Burmese law. <u>Lastly</u>, Plaintiff's claims are not preempted by the foreign affairs doctrine because Facebook has failed to show that this Court's adjudication of Plaintiff's claims would have any impact on U.S. foreign policy.

Facebook's motion to dismiss should be denied.

<b>BACKGROUND</b>

Facebook is a social media platform on which users can post text, photos, and videos that are shared with other users. The centerpiece of the Facebook experience is the "News Feed," a scrollable selection of posts that is the first thing a user sees when they open the platform. Compl. ¶ 38. Each user's News Feed is personalized for that user, with the posts they are shown selected by proprietary algorithms. *Id.* ¶¶ 38, 57. Users don't simply passively view content on Facebook, however. When scrolling through their feeds, users are prompted to post reactions to others' posts by "lik[ing]," "comment[ing] on," or "shar[ing]" them. *Id.* ¶ 42. Under each post, users can see how many times others have liked or shared that content and can read the comments. *Id.*

Facebook's goal is to maximize "engagement," a metric reflecting the amount of time a user spends on Facebook and the number of interactions ("likes," "shares," and "comments") that the user has with content. *Id.* ¶ 36. That's because for Facebook, engagement determines

1    advertising revenue, and, ultimately, profits. *Id.* Accordingly, Facebook incorporates engagement-

2    based rankings into its system and the algorithms that drive it. *Id.* ¶ 38. Unfortunately, and as

3    Facebook well knows, the most extreme and outrageous content—especially content attacking or

4    inciting violence against a perceived "out-group"— generates the most engagement. *Id.* ¶ 10. As a

5    result of Facebook's engagement-maximizing design plus the engagement-generating nature of

6    extreme content, Facebook contains at least three dangerous elements.

7          First, Facebook's engagement-maximizing algorithms include and prioritize in users'

8    News Feeds divisive and polarizing content—including toxic hate speech and dangerous

9    misinformation about targeted groups—while more benign content is buried or excluded

10    altogether. *Id.* ¶¶ 11, 38, 53-54. Second, when a user reacts to someone else's post—prompted by

11    Facebook's "like," "comment," and "share" buttons—the original poster receives a dopamine hit,

12    encouraging that poster to post additional, similar content. *Id.* ¶¶ 42, 53. Because divisive content

13    garners more reactions—and thus more dopamine hits—users are trained to incorporate more and

14    more toxic content into their posts. *Id.* ¶¶ 12, 52-53, 65. Coupled with Facebook's prioritization of

15    this more toxic content in others' News Feeds (leading to greater exposure and engagement),

16    Facebook creates a feedback loop generating ever-more-extreme (and dangerous) content. *Id.*

17    ¶¶ 12, 51-54, 65, 70, 75. Third, Facebook's efforts to maximize engagement include connecting

18    users with one another. *Id.* ¶ 13. But again, because extreme content drives engagement,

19    Facebook's algorithms (such as its "Groups You Should Join" and "Discover" algorithms) often

20    recommend that users join violent extremist groups. *Id.* ¶¶ 11, 17, 62, 176.

21          Facebook has long known about these dangers yet refuses to change its platform to address

22    them. *Id.* ¶¶ 13, 27, 54-55, 59-60, 75-76. As whistleblower Frances Haugen stated, "[t]he

23    company's leadership knows how to make Facebook … safer but won't make the necessary

24    changes because they have put their astronomical profits before people." *Id.* ¶ 27.

25          All of these dangers were present when Facebook entered the Burmese market around

26    2010. In addition, Facebook knew about conditions in Burma that exacerbated these dangers and

27    made the likelihood of harm foreseeable. To start, prior to Facebook's entry into the country, few

28    people in Burma had cellphones or access to the internet. *Id.* ¶¶ 18, 78. Facebook quickly filled

that void with a mobile app that gave Burmese users free access to a small set of websites and services. *Id.* ¶ 80. Facebook was the only social media platform included, however, and there was no email provider. *Id.* As a result—and because Facebook handled Burmese text better than companies like Google and Twitter—Facebook became synonymous with the internet and the primary source of information for many in Burma. *Id.* ¶¶ 81-82, 86. This rapid transition from a society without modern communications infrastructure to an internet-connected society monopolized by Facebook created—in the words of a subsequent report commissioned by Facebook—a "crisis of digital literacy." *Id.* ¶¶ 83-85. For people living in Burma at the time, "reading news on the internet" often meant "news they had seen on their Facebook newsfeed," and many struggled to verify or differentiate real news from misinformation. *Id.* ¶¶ 83, 86.

Furthermore, Facebook neglected to effectively monitor Burmese activity on its platform. *Id.* ¶ 127. By 2014, it had just one content reviewer who spoke Burmese (a local contractor in Dublin), adding a second in 2015. *Id.* ¶¶ 127, 142. Similarly, the contractor to whom Facebook outsourced the task of monitoring for violations of its community standards in Burma, Accenture, did not hire its first two Burmese speakers (who were based in Manila) until 2015. *Id.* ¶ 127. Indeed, rather than monitor Burmese content itself, Facebook initially tried to rely entirely on users to report inappropriate posts. *Id.* ¶ 128. But while users could post in Burmese, the system for reporting problematic posts was entirely in English. *Id.*

After Facebook's entry into Burma, anti-Rohingya content proliferated on the platform. *Id.* ¶ 20. The dangerous engagement-maximizing algorithms described above helped generate a false narrative that the Rohingya were illegal Bengali immigrants rather than native Burmese, often relying on dehumanizing, derogatory terms and fabricated stories. *Id.* ¶¶ 94-101, 115-19, 121, 125. Indeed, Facebook was the perfect tool for the Myanmar[2] military and others to promote religious intolerance and ethnic cleansing. *Id.* ¶¶ 93, 140.

That online extremism soon boiled over into real-world violence. On June 8, 2012, many Rohingya were killed, and their homes and shops were set on fire and looted. *Id.* ¶ 94. In the

---

[2]    Plaintiff uses "Myanmar" when referring to the ruling military government, and "Burma" when referring to the country and its people. *See* Compl. ¶ 1 n.2.

1    ensuing weeks and months, there were more killings, burnings, lootings, sexual violence, arbitrary

2    arrests, and torture. *Id.* This violence—incited by content encouraged, promoted, and distributed

3    by Facebook—continued for years, culminating in "clearance operations" in 2017. *Id.* ¶¶ 5, 95-

4    135. Tens of thousands of Rohingya were brutally murdered, gang raped, tortured, and burned

5    alive. *Id.* ¶ 5. Hundreds of thousands more—including Plaintiff—fled Burma to escape this ethnic

6    violence. *Id.* ¶¶ 6, 103, 150-54. The United States recently declared the violence a genocide.[3]

7           Facebook was repeatedly alerted to anti-Rohingya content but failed to address it

8    meaningfully or adequately. *Id.* ¶¶ 125-35, 142. Facebook officers, including Mark Zuckerberg

9    and Sheryl Sandberg, later acknowledged their failures. *Id.* ¶¶ 25, 136-49. Whistleblowers

10   admitted that they, "working for Facebook, had been a party to genocide." *Id.* ¶ 142. And the

11   chairman of the U.N. Independent International Fact-Finding Mission on Myanmar described

12   Facebook as having played a "determining role" in the genocide. *Id.* ¶ 9.

13          Plaintiff, a Rohingya woman, was one of the many victims of ethnic violence in Burma. In

14   2012, when she was sixteen years old, her father was detained, beaten, and tortured for two weeks

15   by the Myanmar military. *Id.* ¶ 151. She saw at least seven men and an elderly woman from her

16   village killed and knew that many others in her village were also killed, including women and

17   children. *Id.* ¶ 152. Fearful that she would be abducted and sexually assaulted or killed herself,

18   Plaintiff's family urged her to flee alone. *Id.* ¶ 153. She fled by boat to Bangladesh, traveled to

19   Thailand and then Malaysia, where the UNHCR eventually arranged for her resettlement in the

20   United States. *Id.* ¶ 154. Plaintiff's family land, home, and personal property were seized, and

21   those that remained in Burma were forced from their homes. *Id.* ¶ 155.

22          Upon learning of Facebook's role in the genocide in 2021, she filed this lawsuit on behalf

23   of herself and other Rohingya refugees. Compl. ¶ 158. Her complaint contains one count each for

24   strict product liability and negligence. Facebook has moved to dismiss the complaint.[4]

25

26   [3]      Antony Blinken, *Secretary Antony J. Blinken on the Genocide and Crimes Against

27   Humanity in Burma* (Mar. 21, 2022), https://www.state.gov/secretary-antony-j-blinken-at-the-
     united-states-holocaust-memorial-museum/ ("Blinken Speech").

28   [4]      Plaintiff filed her complaint in state court, which Facebook removed. While Facebook
     asserts that this Court has jurisdiction under 28 U.S.C. § 1332(d)(2), it is unclear whether all
     requirements of that section are satisfied. *See* dkt. 28 at 1-2.

1

**CHOICE OF LAW**

2       Before addressing the merits of Facebook's motion, Plaintiff offers a brief clarification on

3  her choice-of-law position. As a federal court sitting in diversity, this Court applies California

4  choice-of-law rules. *Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1091 (9th Cir. 2021).

5  "California follows the doctrine of dépeçage, under which different states' laws can be applied to

6  different issues in the case." *Chen v. L.A. Truck Ctrs., LLC*, 213 Cal. Rptr. 3d 142, 151 (Cal. Ct.

7  App. 2017) *rev'd on other grounds*, 444 P.3d 727 (2019). Thus, "a separate conflict of laws

8  inquiry must be made with respect to each issue in the case." *Wash. Mut. Bank, FA v. Superior Ct.*,

9  15 P.3d 1071, 1081 (Cal. 2001). Here, because Plaintiff does not assert that any conflict exists

10  between California and Burmese law as to her affirmative claims for product liability and

11  negligence, California law applies to those claims. *See Homedics, Inc. v. Valley Forge Ins. Co.*,

12  315 F.3d 1135, 1138 (9th Cir. 2003). As to Facebook's asserted defense of immunity under the

13  CDA, however, there *is* a potential conflict between California and Burmese law. As discussed

14  more fully below, *see infra* Argument III.B, Burmese law does not immunize internet companies

15  from liability for third-party content posted on their platforms. Thus, if the CDA would immunize

16  Facebook from liability here, California and Burmese law conflict.[5] Furthermore, California

17  choice-of-law rules would resolve that conflict in favor of applying Burmese law to that issue. The

18  immediate point, however, is simply that Plaintiff's invocation of Burmese law is narrow:

19  California law applies to her affirmative product liability and negligence claims; Burmese law

20  applies only to Facebook's affirmative defense of immunity (and only if the Court finds that the

21  CDA would—in contrast to Burmese law—provide immunity to Facebook for its conduct here).

22

**ARGUMENT**

23  **I.       PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF
                LIMITATIONS.**
24

25       Facebook's limitations defense fails because Plaintiff's harm is ongoing; Facebook's

26  conduct continues to make Burma unsafe for the Rohingya, and Plaintiff is thus unable to return

27

28  ───────────────
    [5]       The federal CDA is considered a part of California law. *See Howlett v. Rose*, 496 U.S. 356,
    367 (1990).

1   home. "When a tort involves continuing wrongful conduct, the statute of limitations doesn't begin

2   to run until that conduct ends." *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002).

3   Regardless, even looking only to her 2012 injuries (as Facebook mistakenly does), California's

4   discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to

5   discover, the cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005).

6   "The question when a plaintiff actually discovered or reasonably should have discovered the facts

7   for purposes of the delayed discovery rule is a question of fact unless the evidence can support

8   only one reasonable conclusion." *Ovando v. Cnty. of Los Angeles*, 71 Cal. Rptr. 3d 415, 429 (Cal.

9   Ct. App. 2008). A plaintiff need only plead facts showing the time and manner of discovery and

10  the inability to have made earlier discovery despite reasonable diligence. *Fox*, 110 P.3d at 920-21.

11      **A.      Plaintiff did not discover Facebook's wrongdoing until 2021.**

12      The critical question is not when Plaintiff learned of her injury, but when she learned of

13  *Facebook's role* in causing it. "[A] diligent plaintiff's investigation may only disclose an action

14  for one type of tort … and facts supporting an entirely different type of tort action … may, through

15  no fault of the plaintiff, only come to light at a later date. Although both claims seek to redress the

16  same physical injury to the plaintiff, they are based on two distinct types of wrongdoing and

17  should be treated separately in that regard." *Id.* at 925.

18      The same is true here. Although Plaintiff knew she had been harmed by ethnic violence in

19  2012, she did not learn about Facebook's role in causing those injuries until 2021. *See id.* at 924-

20  25 (product liability claim not discovered until plaintiff learned of defect's role in causing her

21  injuries, even though related medical malpractice claim accrued earlier); *Brandon G. v. Gray*, 3

22  Cal. Rptr. 3d 330, 335 (Cal. Ct. App. 2003) (claims against county accrued when parents learned

23  of county's misrepresentations about daycare facility, not of child's molestation).

24      Facebook does not argue that Plaintiff's allegation as to her knowledge is implausible, so

25  "the Court must accept [the alleged] facts [regarding her lack of actual knowledge or suspicion of

26  the wrongful cause of her injuries] as true." *In re Toyota Motor Corp. Unintended Acceleration*

27  *Mktg., Sales Pracs., Prods. Liab. Litig.*, No. 8:10 ML 2151 JVS, 2010 WL 6419562, at *3 (C.D.

28  Cal. Dec. 9, 2010). Facebook's argument that Plaintiff's ignorance of its identity does not excuse

delay thus misses the point. The question is not when she discovered Facebook's *identity*, but rather when she learned about facts supporting a *cause of action* against Facebook. *See Fox*, 110 P.3d at 920 (explaining distinction between ignorance of identity and ignorance of cause of action).[6]

### B.    Plaintiff did not have inquiry notice.

In light of Plaintiff's lack of actual knowledge, Facebook cannot prevail unless it demonstrates that Plaintiff was put on inquiry notice prior to December 6, 2019 (two years before filing her complaint). Facebook does not attempt that argument, nor could it. The earliest alleged published references to Facebook's role in the genocide are 2018 media and government reports, and a *mea culpa* from Facebook on its website. Compl. ¶¶ 86-87, 136-49. But "public awareness of a problem through media coverage alone [does not] create[] constructive suspicion for purposes of discovery" because "[t]he statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only 'once the plaintiff has a suspicion of wrongdoing.'" *Unruh-Haxton v. Regents of Univ. of Cal.*, 76 Cal. Rptr. 3d 146, 163 (Cal. Ct. App. 2008) (citation and emphasis omitted). Furthermore, those reports were all in English, which Plaintiff doesn't read or speak. Compl. ¶ 158. In any case, this issue cannot be resolved on the pleadings because "the question of inquiry notice … is a question of fact." *Yuba City Unified Sch. Dist. v. Cal. State Teachers' Ret. Sys.*, 227 Cal. Rptr. 3d 130, 138 (Cal. Ct. App. 2017).

### C.    Plaintiff had no duty to investigate.

Finally, Facebook argues that Plaintiff fails to allege that she conducted a diligent investigation. But the reasonable diligence requirement is triggered only if the plaintiff is on inquiry notice; "[i]f there are no circumstances to arouse the suspicion of a reasonably prudent person, the … statute will not commence to run, even though the means of obtaining the information are available." *Petrus v. N.Y. Life Ins. Co.*, No. 14-cv-2268-BAS, JMA, 2016 WL 1255812, at *7 & n.9 (S.D. Cal. Mar. 31, 2016) ("Where, as here, Plaintiff was not on inquiry notice of the facts constituting the [wrongdoing], it is not necessary to 'toll' the statute.").

---

[6]    Although Plaintiff's allegation that she lacked knowledge of Facebook's role in her injury until 2021 is sufficient, to the extent the Court requires her to allege *how* she learned about Facebook's misconduct, Plaintiff can allege that she learned about it through her attorneys.

Facebook makes no effort to identify circumstances that should have put Plaintiff on notice of its misconduct, nor to argue that she was even aware of those circumstances. At best, Facebook cites 2018 media and U.N. reports discussing Facebook's role, but it does not and cannot suggest that Plaintiff was aware of or could have read these materials—particularly considering her allegation that she cannot read or write, and that Facebook's role in the genocide was not known or understood within the Rohingya community prior to 2021. Compl. ¶ 158.[7]

## II.   PLAINTIFF'S COMPLAINT STATES CLAIMS FOR NEGLIGENCE AND PRODUCT LIABILITY.

### A.   Plaintiff states a claim for negligence.

Negligence under California law has four required elements: duty, breach, causation, and damages. *Ileto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003). Here, Facebook challenges only the duty and causation elements. Both challenges fail.

#### 1.   Facebook owed a duty of reasonable care.

Facebook—like everyone—has a "general duty … to exercise, in [its] activities, reasonable care for the safety of others." *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1060 (9th Cir. 2018) (quoting *Cabral v. Ralphs Grocery Co.*, 248 P.3d 1170, 1172 (Cal. 2011)); *see also Regents of Univ. of Cal. v. Superior Ct.*, 413 P.3d 656, 663 (Cal. 2018) ("In general, each person has a duty to act with reasonable care under the circumstances.").

Ignoring its general duty of reasonable care, Facebook contends that Plaintiff must allege that Facebook had a "special relationship" with either the Myanmar military or with the victims of ethnic violence. But as Facebook's cases show, a special relationship is required only when a plaintiff tries to establish liability through nonfeasance—that is, "when a defendant does not help a plaintiff"—rather than misfeasance—"when a defendant makes the plaintiff's position worse." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1100-01 (9th Cir. 2019). *See also Brown v.*

---

[7]    Facebook's reliance on *Zamora v. Wells Fargo Bank*, No. C 13-134-MEJ, 2013 WL 2319079 (N.D. Cal. May 28, 2013), is misplaced. That case held that "[w]here a plaintiff has access to papers disclosing the loan terms at the inception of the loan, it is presumed that reasonable diligence would have enabled such a plaintiff to discover the alleged fraud," *id.* at *6, a holding that is irrelevant here.

*USA Taekwondo*, 483 P.3d 159, 165 (Cal. 2021) ("*Brown II*"). Thus, for example, absent a special relationship, "a person who stumbles upon someone drowning generally has no legal duty to help the victim." *Id.* at 164. In contrast, "the law imposes a general duty of care on a defendant … when it is the defendant who has created a risk of harm to the plaintiff, including when the defendant is responsible for making the plaintiff's position worse." *Id.* (quotations omitted).

That's exactly what Plaintiff alleges here. Facebook didn't simply "stumble upon" ethnic violence in Burma and refuse to help; Facebook helped foment the violence itself. It created a risk of harm to Plaintiff (and hundreds of thousands of others) and made the position of the Rohingya people worse than if Facebook had acted differently (or not at all). Accordingly, Plaintiff's negligence claim rests not on any duty arising out of a "special relationship," but on Facebook's general duty to use reasonable care while going about its business so as not to injure others.[8]

Nor can Facebook limit its duty of reasonable care based on the so-called *Rowland* factors. *See generally Rowland v. Christian*, 443 P.2d 561 (Cal. 1968). The *Rowland* factors—which "must be evaluated at a relatively broad level of factual generality"—fall into two categories. *Brown v. USA Taekwondo*, 253 Cal. Rptr. 3d 708, 726 (Cal. Ct. App. 2019) ("*Brown I*"). The first involves "foreseeability and the related concepts of certainty and the connection between plaintiff and defendant," while "[t]he second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability." *Id.* None of these considerations suggest that Facebook's general duty of reasonable care should be excused or limited here. The point of the *Rowland* factors is to determine whether "clear considerations of policy" justify "carving out an entire category of cases" from an otherwise applicable duty. *Brown II*, 483 P.3d at

---

[8]     The cases cited by Facebook, which were based on a defendant's failure to intervene to stop harm rather than a defendant's contribution to the risk of harm, are distinguishable. *See Dyroff*, 934 F.3d at 1100 (defendant's website features "did not create a risk of harm"); *Brown II*, 483 P.3d at 161-64 (plaintiff athletes did not allege that defendant sports organizations created risk of abuse by coach); *Regents*, 413 P.3d at 674 (university's "duty to protect students from foreseeable violence during curricular activities" stemmed from special relationship, not from university's contribution to such risk); *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 851–52 (W.D. Tex. 2007) (no allegation that MySpace contributed to the risk); *Young v. Facebook, Inc.*, No. 5:10-cv-03579-JF/PVT, 2010 WL 4269304, at *5 (N.D. Cal. Oct. 25, 2010) (no allegation that Facebook contributed to "statements that inspire, imply, incite, or directly threaten violence against anyone"); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359-60 (D.C. Cir. 2014) (no allegation that Facebook contributed to antisemitic posts).

170 (quoting *Regents*, 413 P.3d at 670). No public policy justifies excusing Facebook from a general duty of care to avoid fomenting violence against ethnic and religious minorities. *See Mayall*, 909 F.3d at 1060 ("In the absence of a statutory provision establishing an exception to the general rule of [reasonable care], courts should create one only where clearly supported by public policy.") (quotations omitted).

### 2.    Plaintiff sufficiently alleges causation.

Facebook's argument regarding the sufficiency of Plaintiff's causation allegations is premature (and wrong). "[C]ausation determinations should not be taken away from the jury except where no reasonable person could dispute the absence of causality." *Pavoni v. Chrysler Grp., LLC*, 789 F.3d 1095, 1098 n.3 (9th Cir. 2015) (quotations omitted). Here, Plaintiff's complaint alleges that (1) Facebook's dangerous design encourages and amplifies incitements to violence, (2) Facebook's introduction into Burma played a "determining role" in ethnic violence there, and (3) Plaintiff was the victim of such ethnic violence. If those allegations are true—which, of course must be assumed at the pleading stage—these facts could support an ultimate finding of causation. *See id.* (causation can be established by circumstantial evidence).

Facebook's causation argument also demands too much. Under California's "substantial factor" test, "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm." CACI No. 430. This "standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical. Even 'a very minor force' that causes harm is considered a cause in fact of the injury." *Frausto v. Dep't of Cal. Highway Patrol*, 267 Cal. Rptr. 3d 889, 909 (Cal. Ct. App. 2020). The test "requir[es] only that the contribution of the individual cause be more than negligible or theoretical." *S. Coast Framing, Inc. v. Workers' Comp. Appeals Bd.*, 349 P.3d 141, 146 (Cal. 2015) (citation omitted).

Facebook's reliance on *Fields v. Twitter, Inc.*, 881 F.3d 739, 748 (9th Cir. 2018), and *Crosby v. Twitter, Inc.*, 921 F.3d 617, 624 (6th Cir. 2019), cases brought under the federal Anti-Terrorism Act, is unavailing. *Fields* expressly declined to apply the "substantial factor" test, holding instead that the ATA is more stringent, requiring a "direct relationship between a

defendant's acts and a plaintiff's injuries." *Fields*, 881 F.3d at 748. Similarly, in *Crosby*, the Sixth Circuit required "some direct relation between the injury asserted and the injurious conduct alleged," and reiterated that "directness" was an important aspect of the ATA's causation standard. 921 F.3d at 624. Neither case analyzed California's "substantial factor" test, which lacks the directness requirement of the ATA.[9]

Facebook also argues that its culpability is eclipsed—indeed, entirely erased—because wrongful acts by the Myanmar military were superseding causes that broke the chain of causation. But Plaintiff need not establish that Facebook's misconduct was the *only* cause of her harm, or even the most direct or important one. *See, e.g.*, *Frausto*, 267 Cal. Rptr. 3d at 908-11 (officers' failure to take arrestee to hospital in lieu of jail after he ingested drugs could have proximately caused arrestee's death, even though arrestee himself ingested lethal amount of substance). She merely needs to allege that Facebook's misconduct was *one* cause: "even if [Facebook's products] were only 'a very minor force' that caused harm to [Plaintiff], and even if other persons or entities also contributed to the harm, [Facebook's] product could still be found to be a substantial factor in bringing about [Plaintiff's] injuries." *Bettencourt v. Hennessy Indus., Inc.*, 141 Cal. Rptr. 3d 167, 184 (Cal. Ct. App. 2012). *See also Yanez v. Plummer*, 164 Cal. Rptr. 3d 309, 313 (Cal. Ct. App. 2013) ("[A] defendant cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing the plaintiff's harm[.]").

In any case, Facebook's own authorities confirm that the superseding cause defense is available only when the independent event was unforeseeable. *Chanda v. Fed. Home Loans Corp.*, 155 Cal. Rptr. 3d 693, 701-02 (Cal. Ct. App. 2013) (holding superseding cause defense was unavailable because notary's forgery of loan documents was foreseeable); *Green v. Healthcare Servs., Inc.*, 283 Cal. Rptr. 3d 482, 491 (Cal. Ct. App. 2021) ("Since [the plaintiff's] theory of negligence was necessarily predicated on [the defendant's] failure to take adequate precautions to prevent [a] foreseeable suicide, that suicide as a matter of law could not be a superseding cause.").

---

[9]     Facebook's reliance on *Merrill v. Navegar, Inc.*, 28 P.3d 116, 131-32 (Cal. 2001), is also unavailing. That case turned on a California statute specifically immunizing gun manufacturers from liability in product liability actions advanced by survivors or victims of gun violence in certain circumstances—not an application of the substantial factor test.

*See also* Restatement (Third) of Torts: Phys. & Emot. Harm § 19 ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of … a third party.").[10] Here, Plaintiff alleges that the risk of violence was foreseeable, based on Facebook's awareness of previous instances in which it had fueled real-world violence, Compl. ¶¶ 75-76, and the circumstances surrounding its entry into the Burmese market. Because these are "sufficient facts to raise the inference that [Facebook] knew or should have known of the risks and potential consequences [of its conduct]," Plaintiff's claims "cannot be dismissed … on the basis of the defense of superseding cause." *Ross v. AT&T Mobility, LLC*, No. 19-cv-06669-JST, 2020 WL 9848766, at *12 (N.D. Cal. May 14, 2020).

### B. Plaintiff states a claim for product liability.

In addition to stating a claim for negligence, Plaintiff's complaint also states a claim for strict products liability. Facebook's arguments to the contrary—that Facebook is not a "product" and that Plaintiff was merely a "bystander" to others' use of or harm from the platform—fall flat.

### 1. Facebook is a product subject to product liability law.

Facebook asserts that its social media platform is "intangible" and therefore not a "product" within the meaning of products liability law. But the tangible/intangible line that Facebook tries to draw is not nearly as bright as Facebook suggests. The Restatement definition of "product" to which Facebook points expressly includes intangible goods (such as electricity), explaining that such things "are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property." Restatement (Third) of Torts: Prod. Liab. § 19(a). Thus, for example, while the "pure thought and expression"

---

[10]    In contrast, Facebook's other authorities involve clearly unforeseeable intentional torts. *Martinez v. Pac Bell*, 275 Cal. Rptr. 878, 883 (Cal. Ct. App. 1990) (phone company not vicariously liable for unforeseeable shooting committed near public phone); *Gonzalez v. Derrington*, 363 P.2d 1, 2-3 (Cal. 1961) (man's decision to throw gasoline into bar and ignite it, causing explosion, not foreseeable consequence of gas station's sale of gasoline in open container); *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 803-04 (W.D. Ky. 2000) (theft of gun used to kill classmates not foreseeable consequence of watching violent movie, playing violent video games, and visiting pornographic websites) *aff'd* 300 F.3d 683 (6th Cir. 2002); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1276 (D. Colo. 2002) (shooting of teacher not foreseeable response to playing video games or watching violent movies).

1    of a book may not be considered a product, aeronautical charts depicting information helping

2    pilots to land planes are. *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1035-36 (9th Cir. 1991).

3         Like aeronautical charts, Facebook is a tool, not pure thought and expression, and is

4    therefore a product for purposes of product liability law. *See* Frances E. Zollers, et al., *No More*

5    *Soft Landings for Software: Liability for Defects in an Industry That Has Come of Age*, 21

6    SANTA CLARA COMPUTER & HIGH TECH. L.J. 745, 763 (2005) ("The aeronautical charts cases

7    provide a more perfect analogy to software than the book cases for a number of reasons.").

8    Indeed, the Ninth Circuit's decision in *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021),

9    which allowed a product liability claim to proceed based on Snapchat's defective software

10   design, defeats Facebook's argument that its social media platform is not a product. Other cases

11   have similarly taken for granted that defective software can form the basis for a products liability

12   claim. *See*, *e.g.*, *George v. Curwood, Inc.*, No. CIV-08-856, 2011 WL 13112073 (W.D. Okla.

13   Feb. 25, 2011) (permitting products liability claim based in part on defective software to go to

14   trial); *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 600–01 (E.D. La. 2007)

15   (recognizing that "courts and legal scholars have suggested that defective computer software

16   may give rise to strict products liability in tort"). Even thirty years prior to *Lemmon*, the Ninth

17   Circuit suggested that "[c]omputer software that fails to yield the result for which it was

18   designed" may be a product for purposes of tort liability. *Winter*, 938 F.2d at 1036.

19        Furthermore, in California, "the policy reasons underlying the strict products liability

20   concept should be considered in determining whether something is a product within the meaning

21   of its use … rather than … [focusing] on the dictionary definition of the word." *Fluor Corp. v.*

22   *Jeppesen & Co.*, 216 Cal. Rptr. 68, 71 (Cal. Ct. App. 1985); *accord Loomis v. Amazon.com LLC*,

23   277 Cal. Rptr. 769, 776 (Cal. Ct. App. 2021) ("California courts must consider the policies

24   underlying the doctrine to determine whether to extend strict liability in a particular

25   circumstance."). Treating apps like Facebook and Snapchat as products is consistent with the

26   purposes of strict products liability. Social media companies place their apps on the market for use

27   by consumers; they are the only ones that know, and can change, how the apps work; and they are

28   the only ones that can ensure that the apps are safe. Individual users, let alone non-user victims,

1    have no ability to change the algorithms' design or functioning. Thus, "characterizing [social

2    media apps like Facebook] as 'products' serves the paramount policy to be promoted by the

3    doctrine, i.e., the protection of otherwise defenseless victims of manufacturing defects and the

4    spreading throughout society of the cost of compensating them." *Fluor*, 216 Cal. Rptr. at 68

5    (cleaned up). Just as the plaintiff in *Lemmon* was entitled to demonstrate that Snapchat's

6    dangerous design was a factor in causing an automobile accident, Plaintiff is entitled to

7    demonstrate that Facebook's dangerous design was a factor in causing harm to her and others

8    similarly situated.[11]

9                **2.    Facebook's "bystander" argument is without merit.**

10           Facebook also argues that products liability claims cannot be brought by "bystanders who

11   are not users or consumers of [the] product." Mot. at 13. Facebook's assertion that "bystanders"

12   are not entitled to the protections of product liability law, however, is meritless. *See Elmore v. Am.*

13   *Motors Corp.*, 451 P.2d 84, 89 (Cal. 1969) ("If anything, bystanders should be entitled to greater

14   protection than the consumer or user where injury to bystanders from the defect is reasonably

15   foreseeable."); *Price v. Shell Oil Co.*, 466 P.2d 722, 725 (Cal. 1970) (same); *Barker v. Lull Eng'g*

16   *Co.*, 573 P.2d 443, 434 (Cal. 1978) (liability may be found whenever the "trier of fact concludes

17   that the product's design is unsafe to consumers, users, or bystanders"); *Nelson v. Sup. Ct.*, 50 Cal.

18   Rptr. 3d 684, 688 (Cal. Ct. App. 2006) (same); *Barrett v. Sup. Ct.*, 272 Cal. Rptr. 304, 309 (Cal.

19

20   ---

[11]      Most of the cases cited by Facebook did not involve apps or software. *See Winter*, 938
21   F.2d at 1035-36 (book); *Merritt v. Countrywide Fin. Corp.*, No. 09-CV-01179-BLF, 2015 WL
     5542992, at *1 (N.D. Cal. Sept. 17, 2015) (mortgage loans); *Pierson v. Sharp Mem'l Hosp.*, 264
22   Cal. Rptr. 673, 676 (Cal. Ct. App. 1989) (hospitals); *Way v. Boy Scouts of Am.*, 856 S.W.2d 230,
     239 (Tex. App. 1993) (advertising supplement); *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d
23   1170, 1173-74 (9th Cir. 2016) (warships); *Brooks v. Eugene Burger Mgmt. Corp.*, 264 Cal. Rptr.
     756, 765 (Cal. Ct. App. 1989) (apartment dwellings, playground equipment and grounds). The rest
24   do not require dismissal of Plaintiff's claim. *See Green v. ADT LLC*, No. 16-cv-02227-LB, 2016
     WL 3208483, at *3 (N.D. Cal. June 10, 2016) (rejecting argument that "the predominant nature of
25   the transaction was for services, not products"); *Johnson v. United States Steel Corp.*, 192 Cal.
     Rptr. 3d 158, 172 (Cal. Ct. App. 2015) (holding there was no triable issue as to whether product
26   was defective); *Intellect Art Multimedia, Inc. v. Milewski*, 899 N.Y.S.2d 60 (N.Y. Sup. 2009)
     (declining to decide question because "plaintiff has not even alleged that the website was in a
27   defective condition"); *James*, 300 F.3d at 701 (relying on Kentucky law); *Doe v. Facebook, Inc.*,
     No. 2019-16262 (151st Dist. Ct. Harris Cnty., Tex. Oct. 4, 2019) (no written opinion; only a
28   conclusory finding in hearing transcript).

1   Ct. App. 1990) ("Manufacturers of defective products are liable for injuries not only to the

2   purchaser or user of such products, but to injured bystanders as well[.]").

3          Nor, contrary to Facebook's suggestion, is Plaintiff alleging injury arising solely out of

4   emotional distress from having witnessed someone else get injured. Rather, the pervasive violence

5   ignited by Facebook's defectively-designed product gave rise to Plaintiff's reasonable

6   apprehension that she would be abducted, beaten, or killed. That apprehension forced her to leave

7   her family and her country, losing her home and other personal property. *See Jimenez v. Sup. Ct.*,

8   58 P.3d 450, 456 (Cal. 2002) ("[T]he economic loss rule allows a plaintiff to recover in strict

9   products liability in tort when a product defect causes damage to other property.") (quotations

10  omitted). For that reason, the cases cited by Facebook do not apply; they addressed the "narrow

11  issue" of a plaintiff "whose *only* injury is emotional distress … caused by knowledge of the injury

12  to a third person caused by the defendant's negligence." *Thing v. La Chusa*, 771 P.2d 814, 815

13  (Cal. 1989) (emphasis added). *See also Fortman v. Förvaltningsbolaget Insulan AB*, 151 Cal.

14  Rptr. 3d 320, 323 (Cal. Ct. App. 2013) (emotional distress was *only* injury).

15  **III.     PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE CDA.**

16         Facebook next argues that Plaintiff's claims are barred by Section 230(c)(1) of the CDA,

17  which states that "[n]o provider or user of an interactive computer service shall be treated as the

18  publisher or speaker of any information provided by another information content provider." 47

19  U.S.C. § 230(c)(1). As the Ninth Circuit repeatedly reminds, however, "the CDA does not declare

20  'a general immunity from liability deriving from third-party content.'" *Doe v. Internet Brands,*

21  *Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th

22  Cir. 2009)). In other words, "Congress has not provided an all purpose get-out-of-jail-free card for

23  businesses that publish user content on the internet." *Id.* at 853. Here, Facebook's attempt to get a

24  free pass for its conduct by invoking the CDA is unavailing for two reasons. First, Section 230 on

25  its face does not apply to Plaintiff's claims because Plaintiff's claims do not treat Facebook as a

26  publisher or speaker of third-party content. Second, if Section 230 did provide immunity against

27  Plaintiff's claims, such immunity would create a true conflict with Burmese law (which provides

28  no such immunity), and under California choice-of-law rules, Burmese law would apply.

**A.      Plaintiff does not seek to hold Facebook liable as the publisher or speaker of third-party content.**

The CDA bars state law causes of action that "seek[] to treat" an internet service provider as a publisher or speaker of third-party content. *Barnes*, 570 F.3d at 1100-01. But rather than treating Facebook as a publisher or speaker of harmful content provided by others, Plaintiff's claims seek to treat Facebook as (1) the designer of a dangerous product, (2) a material contributor to the harmful content, (3) a distributor of the harmful content, and/or (4) a negligent matchmaker.

**1.      Facebook was the Designer of a Dangerous Product.**

The first theory on which Plaintiff seeks to hold Facebook liable as something other than the publisher or speaker of third-party content is for the negligent design of its product. As explained above, Plaintiff alleges that Facebook designed its social network using algorithms to maximize engagement, which created a dangerous feedback loop encouraging the creation of ever-more-extreme posts and prioritizing those posts to others. Plaintiff further alleges that this design led directly to extreme violence against the Rohingya. In other words, she alleges that a Facebook design flaw caused harm to her and others—"a common products liability tort" from which Facebook is not immune under the CDA. *Lemmon*, 995 F.3d at 1091-92.

As in *Lemmon*, Plaintiff's product liability claims rest on the premise that social media companies "have a duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public." *Id.* at 1092 (quotations omitted). This duty "differs markedly from the duties of publishers as defined in the CDA." *Id.* Social media companies like Facebook (and Snap) "have a specific duty to refrain from designing a product that poses an unreasonable risk of injury or harm to consumers." *Id.* "[E]ntities acting solely as publishers" on the other hand "have no similar duty." *Id.* Here, as in *Lemmon*, Plaintiff's product liability claims "do[] not seek to hold [Facebook] liable for its conduct as a publisher or speaker." *Id.* Rather, her negligent design claims treat Facebook "as a products manufacturer, accusing it of negligently designing a product ([Facebook]) with a defect ([the like/share/comment and News Feed algorithms that encourage the creation and promotion of extreme, dangerous content])." *Id.* Thus, "the duty that [Facebook] allegedly violated 'springs from' its distinct capacity as a product

designer." *Id.* (quoting *Barnes*, 570 F.3d at 1107). As in *Lemmon*, "[b]ecause [Plaintiff's] claim does not seek to hold [Facebook] responsible as a publisher or speaker, but merely seeks to hold [Facebook] liable for its own conduct, principally for the creation of the [reward and News Feed algorithms], § 230(c)(1) immunity is unavailable." 995 F.3d at 1093 (quotations omitted).

Facebook cites *Doe v. Twitter, Inc.*, No. 21-cv-00485, 2021 WL 3675207 (N.D. Cal. Aug. 19, 2021) for the proposition that a claim turning on how well a website's algorithms "prevent or remove" harmful third-party postings is barred by the CDA. Mot. at 22. But Plaintiff's product liability theory is not based on Facebook's failure to prevent or remove content, it's based on Facebook's design defects that encourage the creation of extreme and dangerous content in the first place. Facebook's dangerous design can thus be remedied by fixing its algorithms rather than by removing or blocking any third-party content. *Cf. Twitter*, 2021 WL 3675207, at *32 (where plaintiffs sought to require Twitter to alter content posted by its users, CDA immunity precluded product liability claim); *Herrick v. Grindr LLC*, 765 F. App'x 586, 590-91 (2d Cir. 2019) (app entitled to CDA immunity where "the manufacturing and design defect claims seek to hold [app] liable for its failure to combat or remove offensive third-party content"). Just as the alleged product defect in *Lemmon* could be fixed by removing a Snapchat design element that rewarded users for posting dangerous content (there, content posted while traveling at speeds over 100 mph), the alleged product defect here could be fixed by removing the Facebook design elements that reward users for posting dangerous content. In both cases, no third-party content need be blocked or removed. Snapchat users could still post the dangerous content (a picture of their speedometer showing excessive speed, say) and Facebook users could still post inciteful misinformation and hate speech, even if a court forced those companies to remove product defects that incentivize and invite such dangerous content.

Contrary to Facebook's assertion, "[a]llegations concerning [the Facebook algorithms'] reward system are not a creative attempt to plead around the CDA." *Lemmon*, 995 F.3d at 1094. And because "[Plaintiff's] claim does not seek to hold [Facebook] responsible as a publisher or speaker, but merely seeks to hold [it] liable for its own conduct, principally for the creation of [a

1  dangerous design defect], § 230(c)(1) immunity is unavailable." *Id.* at 1093 (quotations and

2  alterations omitted).

3  **2.      Facebook was a material contributor to the harmful content.**

4  A second reason why Facebook is not entitled to CDA immunity is because the harmful

5  content at issue was not created solely by third parties—Facebook materially contributed to its

6  harmful nature. "[I]mmunity applies only if the [defendant] is not also an 'information content

7  provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or

8  development of' the offending content." *Fair Hous. Council of San Fernando Valley v.*

9  *Roommates.Com, LLC,* 521 F.3d 1157, 1162 (9th Cir. 2008) (quoting 47 U.S.C. § 230(f)(3)). In

10  other words, "a website may lose immunity under the CDA by making a material contribution to

11  the creation or development of content." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 (9th Cir.

12  2016).

13  Here, the complaint alleges that Facebook did exactly that. While Facebook was not

14  literally the author of the harmful content at issue here—hateful, divisive misinformation inciting

15  violence against the Rohingya—it made a "material contribution" to the creation and development

16  of such content. *Id.* Its engagement-maximizing algorithms and "like," "share," and "comment"

17  features created a feedback loop among its users leading to the generation of more and more

18  extreme and dangerous content (both quantitatively and qualitatively). Facebook's dopamine-

19  triggering reaction mechanism and its hate-speech-prioritizing algorithms are more than "neutral

20  tools" facilitating the posting of content online. *Cf. Roommates.Com*, 521 F.3d at 1169

21  ("[P]roviding '*neutral* tools' to carry out what may be unlawful [conduct] does not amount to

22  'development' for purposes of the immunity exception."); *Goddard v. Google, Inc.*, 640 F. Supp.

23  2d 1193, 1196-97 (N.D. Cal. 2009) ("A website does not so 'contribute' when it merely provides

24  third parties with neutral tools to create web content[.]"). By rewarding and promoting the most

25  divisive and dangerous content, Facebook's algorithms are far from neutral.

26  Regardless, even if Facebook's tools could be considered neutral as a general proposition,

27  Facebook did more than just offer them to its users; it encouraged and incentivized those users to

28  create dangerous misinformation and hate speech. "Providing neutral tools for navigating websites

is fully protected by CDA immunity, *absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes*." *Roommates.Com*, 521 F.3d at 1174 n.37 (emphasis added). Inducing users to create harmful content—which the Complaint alleges Facebook did—is sufficient contribution to or development of that content to lose the shield of CDA immunity. *See, e.g.*, *Huon v. Denton*, 841 F.3d 733, 742 (7th Cir. 2016) ("A company can … be liable for creating and posting, *inducing another to post*, or otherwise actively participating in the posting of a defamatory statement in a forum that that company maintains.") (emphasis added); *cf. Roommates.Com*, 521 F.3d at 1171 (explaining that a website had immunity in a prior case because "the website provided neutral tools, which [a third party] used to publish [harmful content], *but the website did absolutely nothing to encourage the posting* of [harmful] content.") (emphasis added); *Gonzalez v. Google LLC*, 2 F.4th 871, 893 (9th Cir. 2021) (same, calling website's lack of encouragement to post harmful content "critical" to CDA immunity).

In *Huon*, for example, the Seventh Circuit reversed the district court's dismissal of a defamation claim against a website arising out of third-party comments on the website. The website was not entitled to CDA immunity, held the court, because the website had, among other things, "encouraged and invited users to defame [plaintiff], through selecting and urging the most defamation-prone commenters to post more comments and continue to escalate the dialogue." 841 F.3d at 742 (internal quotations omitted). The court saw "nothing farfetched about [plaintiff's] factual allegations," particularly in light of allegations that the website "was planning to 'monetize' comments, and why advertisers might find this commenting system appealing." *Id.* So, too, here, where Plaintiff alleges that Facebook rewards its users for creating divisive posts and encourages its most radical users to post ever-more-dangerous content in the name of "engagement." The complaint plausibly alleges facts analogous to those alleged in *Huon*—that Facebook "encouraged and invited users to [incite violence against the Rohingya], through selecting and urging the most [violent] commenters to post more comments and continue to escalate the dialogue." *Id.*

The Ninth Circuit's decision in *Gonzalez v. Google*, in which the court held that Google was entitled to CDA immunity for terrorist recruitment videos posted on Google's YouTube website, is not to the contrary. In that case—unlike here—the complaint did not allege that Google encouraged YouTube users to post the harmful content. Indeed, the court explained that the complaint there was "devoid of any allegations that Google … designed its website to encourage videos that further the terrorist group's mission." 2 F.4th at 895.

> Instead, the Gonzalez Plaintiffs' allegations suggest that Google provided a neutral platform that did not specify or prompt the type of content to be submitted, nor determine particular types of content its algorithms would promote.

*Id.* Here, in contrast, Plaintiff alleges that Facebook's dopamine-based reaction and News Feed algorithms encourage exactly the kind of dangerous posts that caused her harm. *Compare e.g.*, Compl. ¶ 12 ("Facebook's algorithms train users to post more hate speech and misinformation[.]") *with Gonzalez*, 2 F.4th at 896 ("The [complaint] does not allege that Google's algorithms prompted ISIS to post unlawful content."). Rather than arguing that Google encouraged or prompted users to post unlawful content (and thus that Google materially contributed to such content), the *Gonzalez* plaintiffs' theory of liability focused on Google's recommendations of terrorist content to other users. *Id.* at 881. But while the *Gonzalez* court rejected this "matchmaking" theory, *id.* at 894-95, it did not address—because the plaintiffs didn't raise—the argument that a website's inducing and encouraging its users to post harmful content is a material contribution to the creation and development of that content. And as *Gonzalez* makes clear, CDA immunity is not all-or-nothing, but rather depends on the particular theory of liability. *Id.* at 897-99 (finding Google not entitled to CDA immunity for claims based on revenue-sharing theory). Indeed, the court made a point of noting that "we do not hold that machine-learning algorithms can *never* produce content within the meaning of Section 230." *Id.* at 896 (quotations omitted).

Nor does the Ninth Circuit's decision in *Dyroff* mandate dismissal. As in *Gonzalez*, the plaintiff in *Dyroff* asserted (and the court rejected) a matchmaking theory; the website at issue there connected buyers and sellers of illegal drugs. But also like *Gonzalez*—and unlike here—the plaintiff in *Dyroff* did not allege that the defendant's website encouraged or prompted the posting of the unlawful content. *See Doe v. Mindgeek USA Inc.*, No. 21-100388, 2021 WL 5990195, at *5

1  (C.D. Cal. Dec. 2, 2021) ("Significantly, the plaintiff [in *Dyroff*] did not allege that [defendant]

2  encouraged the creation of posts to sell illegal substances."). Again, here the complaint alleges that

3  Facebook encouraged the creation of the actionable content and describes the mechanisms by

4  which it did so.[12]

5       In light of the dangerous feedback loops created by Facebook's algorithms, it can hardly be

6  said that Facebook "did absolutely nothing to encourage the posting of [the harmful] content."

7  *Roommates.Com*, 521 F.3d at 1171. Furthermore, Facebook's conduct wasn't "merely augmenting

8  the content generally, but … materially contributing to its alleged unlawfulness." *Gonzalez*, 2

9  F.4th at 892 (quotations and emphasis omitted). The "crucial distinction" with respect to material

10 contribution is between "on the one hand, taking actions (traditional to publishers) that are

11 necessary to the display of unwelcome and actionable content and, on the other hand,

12 responsibility for what makes the displayed content illegal or actionable." *Kimzey*, 836 F.3d at

13 1269 n.4. Here, Facebook's conduct was not simply engaging in the traditional publisher activity

14 of displaying content on its platform. Rather, it materially contributed to the content's harmfulness

15 by encouraging its users to post more and more dangerous and violent things. Facebook's

16 algorithms are responsible—in a material way—for what makes the content actionable.[13]

17      Finally, while Facebook's conduct wasn't identical to the conduct at issue in

18 *Roommates.Com* or *Mindgeek* where the defendants' websites provided specific tags to label

19 unlawful content, there's no reason to think that those cases set forth the only kind of conduct that

20 can constitute material contribution to the creation or development of actionable content.

21

22 [12]    Like the Ninth Circuit in *Gonzalez* and *Dyroff*, the Second Circuit in *Force v. Facebook*
   focused on a matchmaking theory and did not address whether a website's reward-based
23 algorithms that encourage the creation of extreme content can be a material contribution to the
   development or creation of such content. *Force v. Facebook, Inc.*, 934 F.3d 53, 65-66 & n.20 (2d
24 Cir. 2019) ("To the extent that plaintiffs rely on their undeveloped contention that the algorithms
   are 'designed to radicalize,' we deem that argument waived. In addition, this allegation is not
25 made in plaintiffs' complaints."). Unlike in *Force*, Plaintiff's "designed to radicalize" contention
   here is neither undeveloped nor omitted from her complaint.
26
   [13]    As with her product liability theory, Plaintiff's material contribution theory is not based on
27 Facebook's failure to block or remove harmful content, but on Facebook's role in generating the
   content in the first place. By changing its algorithms, Facebook's material contribution to
28 dangerous content "could be remedied without changing any of the content posted by [its] users."
   *Gonzalez*, 2 F.4th at 898.

Facebook didn't offer specific tags for anti-Rohingya content in the way that Roommates.Com offered race and sexual orientation drop-down menus that encouraged users to post unlawful housing ads or that Mindgeek used subject matter tags that encouraged users to post child pornography. But though the three websites used different mechanisms, each clearly encouraged users to post not just any content but content that was actionable—discriminatory housing ads in *Roommates.Com*, child pornography in *Mindgeek*, and dangerous incitement to anti-Rohingya violence here. "Read in the light most favorable to Plaintiff, the allegations establish that part of Defendants' operating model depends upon the development and creation of [dangerous inciteful hate speech] and that their tools are designed to elicit that exact content." *Mindgeek*, 2021 WL 5990195 at *7.[14]

### 3. Facebook was the distributor—not the publisher or speaker—of third-party content.

Plaintiff also seeks to hold Facebook liable for its role as a *distributor* of third-party content. "Traditionally, laws governing illegal content distinguished between publishers or speakers (like newspapers) and distributors (like newsstands)." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (Thomas, J., writing separately). Publishers and speakers—because they exercised editorial control—were held to a high standard; they could be strictly liable for transmitting illegal content. *Id.* In contrast, distributors acted as mere conduits, and could thus be held liable only when they knew or constructively knew that content they were distributing was illegal. *Id.* Here Plaintiff seeks (in addition to her other theories) to hold Facebook liable as the distributor of content it knew was harmful and unlawful. Specifically, she alleges that

---

[14] If Plaintiff is not ultimately able to prove the truth of her allegations, Facebook can, at that point, seek the protection of CDA immunity. At the pleading stage, however, her allegations are sufficient to establish that Facebook was responsible (at least in part) for the harmful content at issue here. *See, e.g.*, *Congoo, LLC v. Revcontent LLC*, No. 16-401, 2016 WL 1547171, at *3 (D.N.J. Apr. 15, 2016) (holding Plaintiffs' allegations regarding defendant's development of unlawful content were sufficient to overcome CDA immunity "at this juncture"); *Huon*, 841 F.3d at 742 ("Discovery is the proper tool for [plaintiff] to use to test the validity of his allegations [that website encouraged the posting of actionable content], and if he is unable to marshal enough facts to support his claim the … Defendants can move for summary judgment.").

1    Facebook was made aware—repeatedly—of dangerous and unlawful content but nevertheless

2    continued to distribute it. Compl. ¶¶ 22, 125-49.[15]

3         While some courts interpreting the CDA have rejected the distinction between speakers

4    and publishers on the one hand and distributors on the other, *see Malwarebytes*, 141 S. Ct. at 15

5    (collecting cases); *Batzel v. Smith*, 333 F.3d 1018, 1027 n.10 (9th Cir. 2003) (same), the Ninth

6    Circuit has repeatedly declined to decide the issue. *See Batzel*, 333 F.3d at 1027 n.10 ("We …

7    need not decide whether § 230(c)(1) encompasses both publishers and distributors."); *Barnes*, 570

8    F.3d at 1104 ("[W]e need not resolve the dispute at all…."). Furthermore, as Justice Thomas has

9    noted, "there are good reasons to question" an interpretation of the CDA that fails to take account

10   of the traditional distinction between publishers and distributors. *Malwarebytes*, 141 S. Ct. at 15.

11   For example, "had Congress wanted to eliminate both publisher and distributor liability, it could

12   have simply created a categorical immunity in § 230(c)(1): No provider 'shall be held liable' for

13   information provided by a third party." *Id.* at 16. "After all, it used that exact categorical language

14   in the very next subsection, which governs removal of content." *Id.* (citing 47 U.S.C. § 230(c)(2)).

15   Presumably Congress' use of the limited phrase "shall be treated as the publisher or speaker"

16   rather than the all-encompassing "shall be held liable" means something. *See id.* at 14.

17   Additionally, "Congress expressly imposed distributor liability in the very same Act that included

18   § 230." *Id.* at 15. The CDA makes it unlawful to "knowingly … display" obscene content to

19   minors, even if created by a third party, a provision that is enforceable by civil remedy. *Id.* (citing

20   47 U.S.C. §§ 207, 223(d)). "It is odd to hold … that Congress implicitly eliminated distributor

21   liability in the very Act in which Congress explicitly imposed it." *Id.*

22        Consequently, a "modest understanding" of Section 230 is that, while a website cannot be

23   treated as the *publisher* of third-party content—and thus subject to strict liability—simply by

24   hosting or distributing that content, the CDA does not immunize websites for *distributor*

25   liability—liability for the *knowing* hosting or distribution of illegal or harmful content. *Id.* at 14-

26   15. "In short, the statute suggests that if a company *unknowingly* leaves up illegal third-party

27

28   ───────────────
     [15]    In this way, Plaintiff's distributor liability theory differs from her other theories; unlike her
     product designer, material contributor, and negligent matchmaker theories, her distributor liability
     theory *is* premised on Facebook's failure to block or remove dangerous third-party content.

content, it is protected from *publisher* liability by § 230(c)(1)." *Id.* (emphasis added). Here, Plaintiff alleges that Facebook knowingly distributed dangerous third-party content inciting violence against the Rohingya. The CDA's bar on treating Facebook as the speaker or publisher of such content does not immunize it from its knowing distribution of the unlawful content.

### 4. Facebook negligently connected violent extremists and susceptible violent actors.

Finally, Plaintiff seeks to hold Facebook liable as a matchmaker negligently making dangerous connections between anti-Rohingya extremists and those likely to act on incitements to violence. Plaintiff acknowledges that the Ninth Circuit's binding decisions in *Gonzalez* and *Dyroff* held that websites are entitled to CDA immunity from claims based on negligent matchmaking theories. Nevertheless, a nonfrivolous argument exists for reversal of those decisions by either the Ninth Circuit *en banc* or the Supreme Court, and Plaintiff invokes Judge Berzon's concurrence in *Gonzalez*, 2 F.4th at 913-18, and Judge Katzman's partial dissent in *Force*, 934 F.3d at 76-89, as her argument here to preserve the issue for further review.

### B. To the extent the CDA would bar Plaintiff's claims, there is a true conflict between U.S. and Burmese law, and Burmese law of non-immunity governs.

Under each of the four theories discussed above—product liability, material contribution, distributor liability, and negligent matchmaker—Facebook is not entitled to CDA immunity. If (and only if), however, this Court finds that Section 230 would bar some or all of Plaintiff's claims, a conflict exists between U.S. and Burmese law, which provides for no such immunity. *See generally* Declaration of Andrew Harding, attached hereto as Exhibit 1.[16] Under California choice-of-law rules, which apply in this diversity case, *see Rustico*, 993 F.3d at 1091, Burmese law governs Facebook's assertion of an immunity defense.

### 1. A choice-of-law analysis is necessary.

To the extent Facebook suggests that engaging in a choice-of-law analysis that could result in the application of something other than the CDA to its immunity defense is improper, Mot. at

---

[16]      Plaintiff submits Professor Harding's declaration as "relevant material" to determining Burmese law under Fed. R. Civ. P. 44.1.

23, its argument conflates two distinct issues: choice-of-law and extraterritorial application of statutes. The portion of *Gonzalez* cited by Facebook addressed an argument made by the plaintiffs there that granting Google Section 230 immunity for videos posted by foreign terrorist organizations that led to killings in France would be an improper extraterritorial application of the CDA. 2 F.4th at 887. The Ninth Circuit rejected that argument, holding that because Section 230's focus is limiting liability, "the conduct relevant to the statute's focus occurs at the location associated with the imposition of liability… i.e., at the situs of th[e] litigation." *Id.* at 888. In other words, application of CDA immunity by a U.S. court is not an extraterritorial application of the CDA.

But while *Gonzalez* addressed the CDA extraterritoriality argument—an argument that Plaintiff isn't making here—that case did not address choice-of-law. The *Gonzalez* plaintiffs did not argue that French (or some other non-U.S.) law applied, either generally or to Google's assertion of immunity. That's where Facebook's citation to the district court's decision in *Force v. Facebook* ("*Force I*") comes in. In that decision, the plaintiffs argued that a New York choice-of-law analysis would point to Israeli law as the law governing certain claims, and that Section 230 immunity should thus not apply to those claims "as the CDA is a feature of American law that has no corollary in Israel." *Force I*, 304 F. Supp. 3d 315, 324 (E.D.N.Y. 2018). The district court refused to perform a choice-of-law analysis, however, asserting that state choice-of-law rules "could not direct courts to disregard federal law." *Id.* at 324-25. But *Force I*, which is obviously not binding on this Court, is inconsistent with Ninth Circuit precedent, which requires a choice-of-law analysis.[17]

In *Bassidji v. Goe*, for example, the Ninth Circuit faced a question as to whether U.S. or Hong Kong law applied to a particular contract. 413 F.3d 928, 932-33 (9th Cir. 2005). Unlike *Force I*, however, the Ninth Circuit engaged in a straightforward California choice-of-law inquiry to determine which law applied. While the court ultimately determined that U.S. law applied, it did so based on California choice-of-law rules. Had the Ninth Circuit instead applied the *Force I*

---

[17]     The district court's choice-of-law ruling in *Force I* was not endorsed by the Second Circuit. *Force*, 934 F.3d at 75 n.32 ("[W]e express no opinion as to the district court's conclusion that Section 230 applies to foreign law claims brought in United States courts.").

1   approach for which Facebook advocates here, it would simply have held that U.S. law applies

2   because California choice-of-law rules can't trump U.S. law, rather than applying California

3   choice-of-law rules to see which law applied. *Compare Force I*, 304 F. Supp. 3d at 325 ("It is

4   almost too obvious to state that New York law, including the law governing conflict of laws, could

5   not direct courts to disregard federal law.") *with Bassidji*, 413 F.3d at 932-33 ("To determine

6   whether [U.S. law] barred Goe from issuing the guarantees, we must decide whether [U.S. law]

7   applies to them…. We therefore apply the choice-of-law principles of the forum state, here

8   California."). Thus, to determine whether U.S. or Burmese law governs Facebook's asserted

9   immunity defense, this Court—like the Ninth Circuit in *Bassidji*—should conduct a choice-of-law

10   analysis.[18]

11              **2.**       **Under California choice-of-law rules, Burmese law applies to**

12                          **Facebook's immunity defense.**

13       "It is well-established that in diversity cases, such as this one, federal courts must apply the

14   choice-of-law rules of the forum state." *Rustico*, 993 F.3d at 1091 (quotations omitted). A

15   California choice-of-law analysis generally involves three steps. *Id.* First, the Court must

16   determine "whether the substantive laws of [the United States] and the foreign jurisdiction differ

17   on the issue before it." *Id.* Second, if the laws do differ, the Court must determine "what interest, if

18   any, the competing jurisdictions have in the application of their respective laws." *Id.* Third, if both

19   jurisdictions have a legitimate interest, the Court must "apply the law of the [jurisdiction] whose

20   interest would be more impaired if its law were not applied." *Id.* Here, application of this analysis

21   requires applying Burmese law to Facebook's assertion of immunity.

---

[18]    Facebook also asserts that failing to apply the CDA here would have the "anomalous effect" of allowing suits for conduct occurring outside the United States to go forward while suits for the same conduct inside the United States would be barred. Mot. at 24 (citing *Blazevska v. Raytheon Aircraft Co.*, 522 F.3d 948, 954 (9th Cir. 2008)). But there's nothing anomalous about conduct occurring in one jurisdiction being actionable while the same conduct occurring in another is not. Different sovereigns have different laws, and courts use choice-of-law analyses to determine which law governs. *See, e.g.*, *Abogados v. AT&T, Inc.*, 223 F.3d 932 (9th Cir. 2000) (engaging in California choice-of-law analysis to determine whether New York or Mexican law applied to conduct that was actionable in New York but not Mexico). *Blazevska* is doubly irrelevant. Like *Gonzalez*, it addressed extraterritoriality rather than choice of law. And because, as discussed above, application of the CDA doesn't occur extraterritorially, *Blazevska* isn't helpful on that point either. *See Gonzalez*, 2 F.4th at 888 n.7 (finding *Blazevska* irrelevant to CDA).

1

### a.      U.S. and Burmese law differ on immunity.

2       If the CDA would immunize Facebook against any or all of Plaintiff's claims, it conflicts

3  with Burmese law. As Professor Harding explains, unlike U.S. law, nothing in Burmese law would

4  prevent the imposition of civil liability on internet companies for content posted on their platforms

5  by third parties. Harding Decl. ¶¶ 6-12. Burmese tort law is based on and uses the same principles

6  as English and U.S. common law, and just like Anglo-American common law, there is no general

7  immunity for internet companies from tort liability for third-party content posted on their

8  platforms. *Id.* ¶ 8; *Malwarebytes*, 141 S. Ct. at 14; *Batzel*, 333 F.3d at 1026-27. *Unlike* U.S. law,

9  however, which includes the CDA, there is no Burmese statute derogating this common law

10 principle of no immunity from liability for third-party content. *Compare* Harding Dec. ¶¶ 9-12

11 *with Malwarebytes*, 141 S. Ct. at 14-15 *and Batzel*, 333 F.3d at 1026-27.

12       Facebook argues that Burmese tort law "is not well developed" and ultimately

13 "unknowable," Mot. at 5-6, but Facebook reads too much into the sources it cites. For its "not well

14 developed" line, Facebook cites Adrian Briggs, PRIVATE INTERNATIONAL LAW IN MYANMAR 105

15 (2015). But Professor Briggs notes that "[t]here is much more of [Burmese law] than people

16 probably realise, and it is robust, sensible, and perfectly usable common law." *Id.* at preface.[19]

17 And even where he states that Burmese tort law is not well developed, Professor Briggs explains

18 (consistent with Professor Harding's declaration) that "one has to suppose that the English

19 common law would be a guide to the development of the domestic law of Myanmar on tort." *Id.* at

20 105.

21       For its "unknowable" line, Facebook cites Roger P. Alford, *Human Rights After Kiobel:*

22 *Choice of Law and the Rise of Transnational Tort Litigation*, 63 EMORY L.J. 1089, 1131 (2014).

23 But Professor Alford doesn't appear to have any particular expertise in or experience with

24 Burmese law, and to support his assertion, he simply cites the case of *Doe I v. Unocal Corp.*, Nos.

25 BC 237980, BC 237679 (Cal. Super. Ct.).[20] In *Unocal*, defendants asked the court to apply

26

---

27 [19]       The preface is not paginated, but the quoted language can be found on page 12 of the pdf
version of the treatise, available at

28 https://www.law.ox.ac.uk/sites/files/oxlaw/myanmar_book_26_may_2015.pdf.
[20]       The third article cited by Facebook likewise focuses on *Unocal*. Andrew Huxley,
*California Refuses to Apply Myanmar Law*, 6 AUSTRALIAN J. OF ASIAN L. 88 (2004).

Burmese law in an attempt to avoid joint, vicarious, and/or third-party liability for tortious acts committed in Burma by a corporation of which they were indirect minority shareholders. In a pair of opinions at separate stages of the case, the court declined to apply Burmese law. In the first opinion—cited by Facebook—the court found that defendants had failed to sufficiently establish a conflict between California and Burmese law. 2002 WL 33944505 (June 10, 2002). In the second opinion—not cited by Facebook here but referenced in the Alford and Huxley articles it cites—the court found that Burmese law "[was] indeterminate and d[id] not address the issues arising in this action." Ruling on Defs.' Choice of Law Motions at 9-10 (July 30, 2003), available at https://ccrjustice.org/sites/default/files/assets/unocal-state-choice-law-ruling.pdf.

Ultimately, the *Unocal* orders do not support the proposition that Plaintiff here cannot establish Burmese law for two reasons. First, whether or not Burmese law was indeterminate as to the relevant issues in *Unocal* (vicarious liability for minority shareholders), Burmese law relevant to the issue here—social media companies' immunity (or lack thereof) from liability for third-party content—is determinable, as evidenced by Professor Harding's declaration. Harding Dec. ¶¶ 6-12. Second, *Unocal* was a state court case in which the content of foreign law was determined pursuant to state, rather than federal, procedure. Under federal rules, "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. This Rule is "intended to be flexible and informal to encourage the court and counsel to regard the determination of foreign law as a cooperative venture requiring an open and unstructured dialogue among all concerned." *de Fontbrune v. Wolfsy*, 838 F.3d 992, 997 (9th Cir. 2016) (quotations omitted). Plaintiff has submitted Professor Harding's declaration setting forth Burmese law and its lack of CDA-like immunity for internet companies. On this point at least, Burmese law is clear, and it differs from U.S. law.

### b. The U.S. and Burma have competing interests in having their respective law applied to this dispute.

The second step of the choice-of-law inquiry asks what interest each jurisdiction has in having its law applied to the disputed issue. *Rustico*, 993 F.3d at 1091. If only one jurisdiction has

1    a legitimate interest in having its law applied, there is a "false conflict," in which case the law of

2    the one jurisdiction with an actual interest governs. *Id.* Here, however, both the U.S. and Burma

3    have a legitimate interest in having their respective law applied to this dispute. As the legislative

4    findings and policy objectives of Section 230 evidence, the U.S. has an interest in "encourag[ing]

5    the unfettered and unregulated development of free speech on the internet." *Batzel*, 333 F.3d at

6    1027. The U.S. also has a general interest "in promoting economic activity within its borders,

7    attracting corporations and protecting those corporations whose principal places of business are

8    located in the [United States]," an interest arguably furthered by Section 230 immunity. *Hill v.*

9    *Novartis Pharm. Corp.*, No. 1:06-cv-00399, 2012 WL 967577, at *8 (E.D. Cal. Mar. 21, 2012).

10   Burma, on the other hand, as evidenced by its own statutes regulating the internet, has an interest

11   in preventing the creation or distribution of misinformation "detrimental to the interest of or to

12   lower the dignity of any organization or any person," Harding Decl. ¶ 9, "making mischief using a

13   telecommunications network," *id.* ¶ 10, and "bullying, … disturbing, … or threatening a person

14   using a telecommunication network," *id. See also Liew v. Off. Receiver & Liquidator (Hong*

15   *Kong)*, 685 F.2d 1192, 1197 (9th Cir. 1982) (policies and interests of foreign states "may be

16   inferred" from their statutory law). Burma also "has an interest in regulating the conduct of

17   manufacturers who, like Defendant, have allegedly placed their products into [Burma's] stream of

18   commerce with … a defect." *Hill*, 2012 WL 967577, at *10. These competing interests—the U.S.

19   interest in unregulated internet speech and protection of domestic corporations on the one hand

20   and Burma's interest in protecting its people from harm caused by social media platforms on the

21   other—are in direct conflict in this case, requiring the Court to move to the third step of the

22   analysis. *Rustico*, 993 F.3d at 1091.

23                    **c.    Comparative impairment points to Burma.**

24           The third step focuses on the "comparative impairment" of the interested jurisdictions and

25   requires the Court "to identify and apply the law of the state whose interest would be the more

26   impaired if its law were not applied." *Id.* In conducting this inquiry, the Court does not "judge

27   which policy embodies 'the better or worthier rule,' but instead must determine which

28   jurisdiction's interest would be most 'significantly impair[ed]' if its law were not applied."

1   *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 563 (9th Cir. 2020) (quoting

2   *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010)). Here, that's Burma.

3        "[W]ith respect to regulating or affecting conduct within its borders, the place of the wrong

4   has the predominant interest." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593 (9th Cir. 2012).

5   The "place of the wrong" here is Burma, where Facebook encouraged and distributed incitements

6   to violence that caused great harm to the Rohingya. *See Hill*, 2012 WL 967577, at *7 (state where

7   drug was prescribed and injured residents, rather than drugmaker's home state, was place of wrong

8   and had predominant interest in applying its law to tort suit); *Rodriguez v. Mahony*, No. 10-02902,

9   2012 WL 1057428, at *10-11 (C.D. Cal. Mar. 26, 2012) (Mexican state had predominant interest

10  in lawsuit brought against California defendants by Mexican harmed in Mexico). Here, Burma has

11  determined that social media companies acting within its borders are not immune from liability for

12  third-party content posted on their platforms, as is its right. *See Kelly v. Amylin Pharms., LLC.*,

13  No. 14cv1086, 2014 WL 12496549, at *4 (S.D. Cal. Aug. 8, 2014) ("[Every sovereign] has an

14  interest in setting the appropriate level of liability for companies conducting business within its

15  territory."). Burma's predominating interest in regulating conduct and preventing harm within its

16  borders would be greatly impaired if Section 230 immunity—rather than Burmese law of non-

17  immunity—were applied in this case. *See Tucci v. Club Mediterranee, S.A.*, 107 Cal. Rptr. 2d 401,

18  411 (Cal. Ct. App. 2001) ("[T]he Dominican Republic's … legitimate interest in seeing that its

19  law determines the consequences of actions within its borders causing injury to people there …

20  would be significantly undermined if its laws were not applied.").

21        In contrast, the United States' interest in unfettered speech on the internet and protecting

22  domestic corporations from liability would not be significantly impaired by denying Facebook

23  immunity here. The United States' interest in having the CDA applied "is relatively weak under

24  the specific facts of this case, which involve claims brought by a Plaintiff with no connection to

25  [the United States] based on [harm] that did not occur in [the United States]." *Rodriguez*, 2012

26  WL 1057428, at *11. "The case has a connection to [the United States] only inasmuch as it

27  happens to be Defendant's principal place of business." *Hill*, 2012 WL 967577 at *6. "[Burma] is

28  where Plaintiff's injury allegedly occurred." *Id.* "Plaintiff was a resident of [Burma] at the time of

1  the alleged misconduct." *Id.* And Burma is where Defendant distributed Facebook and encouraged

2  dangerous incitements to violence against the Rohingya to flourish. The fact that corporate

3  decisions may have been made at Facebook's headquarters in California does not change the

4  calculus; "the misconduct extends into [Burma]" and "arguably occurred as much in [Burma] as in

5  [the United States], if not more so." *Id.* at *7.

6          Denying Facebook immunity for its conduct in Burma and the resulting harm that occurred

7  there would not significantly impair the interests promoted by Section 230 immunity because this

8  case has no effect on Facebook's operations in the United States. For better or worse, Facebook is

9  free to publish dangerous, violent third-party content throughout the United States (as well as in

10  any other country willing to immunize it for such activity). But when Facebook chooses to enter

11  the Burmese market, any interest the U.S. has in having Section 230 applied to such conduct is

12  minimal and would not be significantly impaired by application of Burma's own laws regarding

13  immunity instead. To paraphrase the California Supreme Court, "[the United States'] interest in

14  protecting its [social media companies] from civil liability of a boundless and unrestricted nature

15  will not be significantly impaired when as in the instant case liability is imposed only on those

16  [social media companies] who actively solicit [Burmese] business." *Bernhard v. Harrah's Club*,

17  546 P.2d 719, 725 (Cal. 1976); *See also Hill*, 2012 WL 967577, at *9 ("New Jersey's interest in

18  protecting its corporations will not be significantly impaired because Plaintiff is seeking to hold

19  Defendant liable only for misconduct occurring out of the solicitation of California business.

20  Defendant and other corporations … are presumably free to do business in forty-eight other states

21  without the specter of being held punitively liable under California law for their potential

22  misconduct."). Facebook, "by the course of its chosen commercial practice has put itself at the

23  heart of [Burma's] regulatory interest," namely to prevent use of the internet as a tool for

24  dangerous misinformation and threats against people within its borders. *Bernhard*, 546 P.2d at

25  725. Furthermore, "[i]t seems clear that [Burma] cannot reasonably effectuate its policy" if its

26  regulation does not include foreign social media companies "who regularly and purposely"

27  provide platforms for such dangerous content in Burma. *Id.* Simply put, the CDA is not a shield

28  that U.S. social media companies can carry throughout the world to immunize themselves from

liability for tortious conduct in foreign countries. *See Lakes v. Bath & Body Works, LLC*, No. 2:16-cv-02989, 2019 WL 3731734, at *3 (E.D. Cal. Aug. 8, 2019) ("[I]t would be nonsensical to permit a defendant to carry a nationwide shield from punitive damages simply because the state in which it maintains its headquarters has prohibited such damages.") (quotation omitted).

Because Burma's interests would be comparatively more impaired by application of Section 230 immunity than would be the United States' interest by application of Burmese law of non-immunity, Burmese law governs Facebook's immunity defense here.

> **d.      Alternatively, principles of comity point to Burmese law.**

An alternative ground for applying Burmese law to Facebook's assertion of immunity here is comity. *See, e.g.*, *Stockwell v. Firestone Tire & Rubber Co.*, 892 F.2d 84, 1989 WL 155906, at *3 (9th Cir. Dec. 27, 1989). Under California's notion of comity, "the forum state will generally apply the substantive law of a foreign sovereign to causes of action which arise there … out of respect for the sovereignty of other states or countries." *Id.* (quoting *Wong v. Tenneco, Inc.*, 702 P.2d 570, 575 (Cal. 1985)). Here, as discussed above, Plaintiff's cause of action arose in Burma. Consequently, California choice-of-law principles of comity would—like the comparative impairment analysis—select Burmese law in the conflict between U.S. and Burmese immunity law. While an exception to the comity doctrine exists when the foreign law is contrary to the forum's public policy, the foreign law must be "so offensive … as to be prejudicial to recognized standards of morality and to the general interests of the citizens." *Id.* Here, it can hardly be said that not granting Facebook immunity for its encouragement and distribution of inciteful hate speech in Burma fanning the flames of a genocide there would be prejudicial to recognized standards of morality and the general interests of U.S. citizens.[21]

Consequently, whether through comparative impairment or comity, California choice-of-law rules point to Burmese law governing Facebook's assertion of an immunity defense here. *See*

---

[21]      Indeed, the converse is most likely true. *See, e.g.*, Blinken Speech (citing role of "dehumanizing hate speech" in Rohingya genocide, and reaffirming United States' "commitment to accompany Rohingya on this path out of genocide—toward truth, toward accountability") (emphasis omitted).

*Stockwell*, 1989 WL 155906, at *3 (finding both comparative impairment analysis and comity selected Costa Rican law).

## IV.  PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE FOREIGN AFFAIRS DOCTRINE.

Finally, Facebook argues that Plaintiff's claims are barred by the foreign affairs doctrine. "The foreign affairs doctrine is a preemption doctrine that prevents 'an intrusion by [a] State into the field of foreign affairs which the Constitution entrusts to the President and Congress.'" *Ning Xianhua v. Oath Holdings, Inc.*, 536 F. Supp. 3d 535, 556 (N.D. Cal. 2021) (quoting *Zschernig v. Miller*, 389 U.S. 429, 432 (1968)). To determine whether Plaintiff's California tort claims create such an intrusion, this Court considers the following factors: "(1) whether there is a likelihood that [the California law at issue] will conflict with U.S. foreign policy; (2) whether [the California law at issue] addresses a traditional state responsibility, and (3) the strength of the state interest." *Id.* at 557. Each of these factors show that the foreign affairs doctrine does not apply here.

First, Facebook "ha[s] not shown a likelihood that the application of [California tort law] in the instant case 'will produce something more than incidental effect in conflict with express foreign policy of the National Government.'" *Id.* (quoting *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419-20 (2003)). While Facebook makes sweeping statements about this litigation second-guessing or undermining U.S. policy, it fails to support these conclusory assertions with any explanation of how, exactly, this case is "likely to have … any appreciable effect on foreign affairs." *Gingery v. City of Glendale*, 831 F.3d 1222, 1230-31 (9th Cir. 2016). Facebook does not argue that (let alone explain how) this case would "in any way affect[] relations between the United States and [Burma]." *Id.* at 1231. Nor has Facebook argued "that the federal government has expressed any view on the [litigation]—much less complained of interference with its diplomatic agenda." *Id. Cf. Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1169 (C.D. Cal. 2005) (U.S. State Department filed a Statement of Interest indicating that it opposed litigation as severely impacting diplomatic relationship with Columbia). Facebook simply "ha[s] not pointed to a specific policy with which the Court's adjudication of the instant case would conflict." *Ning Xianhua*, 536 F. Supp. 3d at 557. Neither the Executive Order (issuing sanctions

related to February 2021 coup), the State Department Special Briefing (announcing the designation of certain Burmese military officials as ineligible for entry into the United States), nor the Treasury Department Press Release (sanctioning four Burmese military commanders and two Burmese military units) cited by Facebook express any U.S. policy that would be remotely impacted by this Court's consideration of Plaintiff's tort claims against Facebook. "Accordingly, Defendant[] ha[s] not shown that the application of [California tort law] would produce more than an incidental or indirect effect on foreign affairs." *Id.*

Second, California product liability and negligence law "addresses a traditional state responsibility." *Id.* Facebook does not assert otherwise, nor does it contend that the "real purpose" of California tort law is to regulate foreign affairs. *Id.*

Third, while Facebook asserts that California's interest here is weak because Plaintiff never resided nor was injured here, this argument "ignores the fact that [Facebook is] headquartered in California." *Id.* at 557-58. "California has a strong interest in the conduct of its corporations and residents." *Id.* at 558 (quotations omitted).

Consequently, because this Court's adjudication of Plaintiff's claims would have no impact on foreign policy, because tort law falls within a traditional state responsibility, and because California has a strong interest in the conduct of its corporate citizens, Plaintiff's claims are not barred by the foreign affairs doctrine. *See id.* (holding Chinese dissident's state law claim against U.S. email provider alleging that provider disclosed private emails to Chinese government—leading to dissident's detention and torture—not barred by foreign affairs doctrine).

## CONCLUSION

For the foregoing reasons, Facebook's motion to dismiss should be denied. Alternatively, to the extent this Court finds that Plaintiff's complaint fails to state a claim, she respectfully requests leave to file an amended complaint.

1  Dated: April 21, 2022

JANE DOE

2  By: /s/ Roger Perlstadt

3  One of her attorneys

4  Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com

5  Yaman Salahi (SBN 288752)
ysalahi@edelson.com

6  EDELSON PC

7  150 California Street, 18th Floor
San Francisco, California 94111

8  Tel: 415.212.9300
Fax: 415.373.9435

9

10  Jay Edelson (*pro hac vice*)
jedelson@edelson.com

11  Roger Perlstadt (*pro hac vice*)
rperlstadt@edelson.com

12  J. Eli Wade-Scott (*pro hac vice*)
ewadescott@edelson.com

13  Michael Ovca (*pro hac vice*)
movca@edelson.com

14  EDELSON PC

15  350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654

16  Tel: 312.589.6370
Fax: 312.589.6378

17

18  Richard Fields (*pro hac vice* forthcoming)
fields@fieldslawpllc.com

19  Fields PLLC

20  1701 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006

21  Tel: 833.382.9816

22  *Counsel for Plaintiff and the Proposed Class*

23

24

25

26

27

28