KRISTIN A. LINSLEY, SBN 154148
  klinsley@gibsondunn.com
ROSEMARIE T. RING, SBN 220769
  rring@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

PERLETTE MICHÈLE JURA, SBN 242332
  pjura@gibsondunn.com
BRADLEY J. HAMBURGER, SBN 266916
  bhamburger@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000
Facsimile:  213.229.7520

Attorneys for Defendant META PLATFORMS, INC.,
(f/k/a Facebook, Inc.), a Delaware corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JANE DOE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., (f/k/a Facebook, Inc.), a Delaware corporation,<br><br>Defendant. | CASE NO. 4:22-CV-00051-YGR<br><br>**REPLY IN SUPPORT OF MOTION BY DEFENDANT META PLATFORMS, INC. TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)**<br><br>**Hearing:**<br>Date:        August 23, 2022<br>Time:        2:00 pm<br>Place:       Oakland, California<br>Judge:      Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................................ 1

II.     ARGUMENT ...................................................................................................................... 2

   A.   The Complaint Fails to State a Claim for Strict Products Liability or
        Negligence ................................................................................................................ 2

        1.   Plaintiff Does Not Plausibly Allege Causation ................................................. 2

        2.   Plaintiff's Strict Products Liability Claim Fails ................................................ 3

        3.   Plaintiff's Negligence Claim Fails ................................................................... 6

   B.   Plaintiff's Claims Are Barred by the Statute of Limitations ....................................... 8

   C.   Plaintiff's Claims Are Barred by Section 230 ............................................................. 9

        1.   Plaintiff's "Creative Pleading" Cannot Evade Section 230 Immunity ............. 9

        2.   Section 230 Bars Burmese Tort Law Claims .................................................. 12

   D.   Plaintiff's Claims Are Barred by the Foreign Affairs Doctrine ................................. 15

III.    CONCLUSION ................................................................................................................ 15

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Ins. Ass'n v. Garamendi*,
539 U.S. 396 (2003) ..................................................................................................................15

*Est. of B.H. v. Netflix, Inc.*,
2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ...................................................................1, 4, 7

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009)......................................................................................1, 10

*Bartel v. Tokyo Elec. Power Co.*,
371 F. Supp. 3d 769 (S.D. Cal. 2019) ..................................................................................13

*Bassidji v. Goe*,
413 F.3d 928 (9th Cir. 2005).........................................................................................13, 14

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003)..............................................................................................12

*Beasley v. Conagra Brands, Inc.*,
374 F. Supp. 3d 869 (N.D. Cal. 2019) ...................................................................................9

*Bill v. Superior Court*,
137 Cal. App. 3d 1002 (1982)................................................................................................7

*Brown v. USA Taekwondo*,
11 Cal. 5th 204 (2021) ...........................................................................................................6

*Delfino v. Agilent Tech., Inc.*,
145 Cal. App. 4th 790 (2006)................................................................................................7

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003)..................................................................................................7

*Doe v. Mindgeek USA Inc.*,
2021 WL 5990195 (C.D. Cal. Dec. 2, 2021) .......................................................................12

*Doe v. Twitter, Inc.*,
555 F. Supp. 3d 889 (N.D. Cal. 2021) .....................................................................1, 10, 11

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019)..........................................................................................7, 11

*Eidson v. Medtronic, Inc.*,
981 F. Supp. 2d 868 (N.D. Cal. 2013) ...................................................................................9

REPLY IN SUPPORT OF MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS
CASE NO. 4:22-CV-00051-YGR

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Elmore v. Am. Motors Corp.*,
70 Cal. 2d 578 (1969) ....................................................................................................5

*Fair Hous. Council v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008)..................................................................................11, 12

*Flowers v. Carville*,
310 F.3d 1118 (9th Cir. 2002)......................................................................................8

*Fluor Corp. v. Jeppesen & Co.*,
170 Cal. App. 3d 468 (1985)........................................................................................5

*Force v. Facebook, Inc.*,
304 F. Supp. 3d 315 (E.D.N.Y. 2018) .......................................................................13

*Fortman v. Förvaltningsbolaget Insulan AB*,
212 Cal. App. 4th 830 (2013)....................................................................................5, 6

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) ...............................................................................................8, 9

*George v. Curwood, Inc.*,
2011 WL 13112073 (W.D. Okla. Feb. 25, 2011) .........................................................4

*Goddard v. Google, Inc.*,
640 F. Supp. 2d 1193 (N.D. Cal. 2009) .......................................................................11

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021)...........................................................................................11

*Hill v. Novartis Pharm. Corp.*
2012 WL 967577 (E.D. Cal. Mar. 21, 2012) ...............................................................15

*Huon v. Denton*,
841 F.3d 733 (7th Cir. 2016).........................................................................................12

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019).........................................................................................14

*Jimenez v. Superior Court*,
29 Cal. 4th 473 (2002) ..................................................................................................6

*Jolly v. Eli Lilly & Co.*,
44 Cal. 3d 1103 (1988) .................................................................................................8

*Jones v. Dirty World Ent. Recordings LLC*,
755 F.3d 398 (6th Cir. 2014).........................................................................................12

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kashani v. Tsann Kuen China Enter. Co.*,
118 Cal. App. 4th 531 (2004)...........................................................................................13

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016)......................................................................................11, 12

*Knox v. Davis*,
260 F.3d 1009 (9th Cir. 2001)..............................................................................................8

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021)..........................................................................................5, 10

*Mancuso v. S. Cal. Edison Co.*,
232 Cal. App. 3d 88 (1991)...................................................................................................4

*McCollum v. CBS, Inc.*,
202 Cal. App. 3d 989 (1988)................................................................................................7

*Milwaukee Elec. Tool Corp. v. Superior Court*,
15 Cal. App. 4th 547 (1993).................................................................................................8

*Modisette v. Apple Inc.*,
30 Cal. App. 5th 136 (2018)........................................................................................2, 3, 7

*Mujica v. Occidental Petrol. Corp.*,
381 F. Supp. 2d 1164 (C.D. Cal. 2005)...............................................................................15

*Ning Xianhua v. Oath Holdings, Inc.*,
536 F. Supp. 3d 535 (N.D. Cal. 2021) ...............................................................................15

*Nodine v. Shiley Inc.*,
240 F.3d 1149 (9th Cir. 2001)..............................................................................................8

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
971 F.3d 1042 (9th Cir. 2020)..............................................................................................8

*Palmer v. Savoy*,
2021 WL 3559047 (N.C. Super. Ct. July 28, 2021) ...........................................................11

*Pierson v. Sharp Mem'l Hosp., Inc.*,
216 Cal. App. 3d 340 (1989)............................................................................................4, 5

*Quinteros v. InnoGames*,
2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ..............................................................4, 11

*Rowland v. Christian*,
69 Cal. 2d 108 (1968) ..........................................................................................................7

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Seely v. White Motor Co.*,
63 Cal. 2d 9 (1965) ...............................................................................................................6

*Shih v. Starbucks Corp.*,
53 Cal. App. 5th 1063 (2020)................................................................................................3

*Snow v. A.H. Robins Co.*,
165 Cal. App. 3d 120 (1985)..................................................................................................8

*Sommer v. Gabor*,
40 Cal. App. 4th 1455 (1995)...............................................................................................14

*St. Louis-S.F. Ry. Co. v. Superior Court for L.A. Cnty.*,
276 Cal. App. 2d 762 (1969)................................................................................................15

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
951 F.3d 1142 (9th Cir. 2020)..............................................................................................13

*Thing v. La Chusa*,
48 Cal. 3d 644 (1989) ............................................................................................................6

*United States v. Little Misere Land Co.*,
412 U.S. 580 (1973) .............................................................................................................13

*Unruh-Haxton v. Regents of Univ. of Cal.*,
162 Cal. App. 4th 343 (2008)................................................................................................9

*Weirum v. RKO Gen., Inc.*,
15 Cal. 3d 40 (1975) ..............................................................................................................7

*Winter v. G.P. Putnam's Sons*,
938 F.2d 1033 (9th Cir. 1991)...........................................................................................4, 5

**STATUTES**

47 U.S.C. § 230 ......................................................................................................................1

47 U.S.C. § 230(c) ...............................................................................................................13

**TREATISES**

Restatement (Second) of Torts § 402A (1965) ......................................................................5

Restatement (Third) of Torts § 19(a) (1998) .........................................................................4

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**OTHER AUTHORITIES**

Roger P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational Tort Litigation*, 63 EMORY L.J. 1089 (2014) ..............................................................................................14

Frances E. Zollers et al., *No More Soft Landings for Software: Liability for Defects in an Industry That Has Come to Age*, 21 SANTA CLARA COMP. & HIGH TECH. L.J. 745 (2005)..................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn & Crutcher LLP

REPLY IN SUPPORT OF MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS
CASE NO. 4:22-CV-00051-YGR

## I.    INTRODUCTION

Meta deplores the horrific acts of violence committed by the Myanmar military against the Rohingya ethnic minority.  And it takes seriously its efforts to combat the posting of hateful content on Facebook, including by investing heavily in people, technology, and partnerships in Burma.  But Plaintiff's opposition brief only confirms that her attempt to hold Meta liable for the Myanmar military's violent attack on her village in 2012 fails as a matter of law.

To begin, the opposition does not dispute that the Myanmar military engaged in anti-Rohingya speech and violence for many decades before Facebook became available in Burma in 2011.  And it cannot point to any allegations in the complaint plausibly suggesting that Meta or Facebook caused the attack on Plaintiff's village one year later.  There are no allegations that the Myanmar military used Facebook to call for any such attack—much less that Facebook's design "amplifie[d]" any such "incitement[] to violence."  Opp. 11, Dkt. 35.  And the military's violent conduct is a paradigmatic superseding cause breaking any chain of causation.

The opposition also has no answer to the well-settled rule that there is no products liability "for books, movies, or other forms of media."  *Est. of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) (Gonzalez Rogers, J.).  Although the opposition notes that software defects embedded in a physical product can support products liability, *see* Opp. 14, it cites no case holding that an intangible communications platform like Facebook that is not embedded in a physical product can meet the legal definition of "product."  Likewise, the opposition identifies no case holding that an online communications platform has a legally recognized duty to prevent third parties from engaging in offline harm.  *See id.* at 9–11.

Even if the complaint stated a viable claim, its claims would be barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230.  The opposition concedes that the complaint's "matchmaking" theory is foreclosed by settled law.  Opp. 25.  The Ninth Circuit has rejected the "distributor" theory as contrary to the statutory text.  *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103–05 (9th Cir. 2009).  And "products liability" theories are barred where, as here, the alleged design flaw is "directly related to the posting of third-party content."  *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021).  Ultimately, Plaintiff's claims turn on how Meta chose to display (or not display)

Gibson, Dunn & Crutcher LLP

third-party content and therefore seek to treat Meta as a publisher, which Section 230 does not allow.

For all of the reasons explained in Meta's motion and below, and because the defects in the complaint cannot be cured by amendment, this Court should dismiss this action with prejudice.

## II.   ARGUMENT

### A.   The Complaint Fails to State a Claim for Strict Products Liability or Negligence

#### 1.   Plaintiff Does Not Plausibly Allege Causation

The opposition cannot dispute that the Myanmar military engaged in anti-Rohingya speech and violence for decades before Facebook became available in Burma in 2011. Mot. 7–8, Dkt. 22. And it points to no allegations suggesting that Facebook played any role whatsoever in the 2012 attack on Plaintiff's village. *Id.* at 8. Because "the only reasonable conclusion is an absence of causation"—that is, neither Meta nor Facebook caused Plaintiff's injuries and, even if they did, the Myanmar military's violent conduct broke any causal chain—this Court should hold that the complaint does not plausibly allege causation as a matter "of law." *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 152 (2018).

The opposition's efforts to truncate into three steps the attenuated and speculative causal chain alleged in the complaint are unavailing. *See* Opp. 11. Even if it were true that Facebook's "design … amplifies incitements to violence," *id.*, there are no allegations suggesting that the government used Facebook to call for the attack on Plaintiff's village—or that anyone who carried out or could have prevented the attack had ever used Facebook at all—much less that Facebook's *design* was the cause of their actions. Likewise, the complaint does *not* allege that "Facebook's introduction into Burma played a 'determining role' in ethnic violence there," *id.*; it says that Facebook has been described "as having played a 'determining role' in the *genocide*." Compl. ¶ 9, Dkt. 1-2 (emphasis altered). This Court need not accept that implausible legal conclusion as true. But even if it were true, it would not fill the gap between any alleged conduct by Meta and the attack on Plaintiff's village. *See, e.g.*, Mot. 4 (only 1.1% of Burmese population used the internet in 2012). Simply put, although Plaintiff was harmed by deplorable ethnic violence carried out by the Myanmar military, *see* Opp. 11, there is no alleged connection between that violence or the people who perpetrated it and Facebook.

The opposition cites no case finding that causation was sufficiently alleged on similar facts. Nor does it dispute that multiple courts have rejected similar—and even less speculative and

attenuated—theories of proximate cause.  *See* Mot. 8 (collecting cases).  Instead, it asserts that those cases applied a "directness" requirement that conflicts with California law, Opp. 11–12, but that is wrong.  Under California law, "legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay." *Modisette*, 30 Cal. App. 5th at 154.  Thus, even where a defendant's conduct is a "but-for" cause of plaintiff's injury, California courts have rejected causation where that conduct is "too remotely connected with [p]laintiffs' injuries to constitute their legal cause." *Id.*; *accord, e.g.*, *Shih v. Starbucks Corp.*, 53 Cal. App. 5th 1063, 1069 (2020).

Here, the complaint does not plausibly allege that Meta or Facebook was even a but-for cause of Plaintiff's injuries, given the government's longstanding anti-Rohingya speech and violence before the introduction of Facebook in the country, and the lack of any alleged connection between Facebook and the 2012 attack.  But even if it did, the chain of causation—but for Facebook's introduction in 2011, the government would not have engaged in anti-Rohingya speech; but for Facebook's design, that speech would not have been amplified; but for that amplification, the Myanmar military would not have continued to engage in anti-Rohingya violence and/or would not have attacked and/or would have been prevented from attacking Plaintiff's village in 2012—is far too attenuated and speculative.

In any event, the Myanmar military's violent conduct as alleged in the complaint was a superseding cause breaking any causal chain.  *See* Mot. 9–10.  The opposition argues that the military's violence was a "foreseeable" risk of Facebook's "entry into the Burmese market." Opp. 12–13.  But it cannot point to any allegation making that conclusion plausible.  It cites vague allegations that "misinformation related to the source and cause for ongoing violence" was posted on Facebook "during a 2010 conflict in Kyrgyzstan" and that other governments during the Arab Spring used Facebook to engage in "widespread misinformation campaigns." Compl. ¶¶ 75–76.  But it never shows how those alleged events could have made the 2012 attacks on Plaintiff's village foreseeable, especially when, per the complaint, Meta was "alerted to hate speech" in Burma only "beginning in 2013." *Id.* ¶ 125.

### 2.    Plaintiff's Strict Products Liability Claim Fails

#### a.    Facebook is Not a "Product"

California law limits products liability to "a physical article which results from a manufacturing

Gibson, Dunn & Crutcher LLP

process and is ultimately delivered to a consumer." *Pierson v. Sharp Mem'l Hosp., Inc.*, 216 Cal. App. 3d 340, 345 (1989).  As court after court has held, plaintiffs cannot bring products liability claims for injuries caused by "pure thought and expression" in a communicative medium.  *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991); *see, e.g.*, *Quinteros v. InnoGames*, 2022 WL 898560, at *7 (W.D. Wash. Mar. 28, 2022) (dismissing product liability claim against creator of allegedly "addictive" online video game because it was "not a product"); Mot. 11 (collecting cases).  As this Court has explained, "[t]here is no strict liability for books, movies, or other forms of media." *Netflix*, 2022 WL 551701, at *3.

The opposition has no response to those cases, which it relegates to a footnote.  *See* Opp. 15 n.11.  Nor does it deny the "tangible/intangible line" that typically marks the boundary of products liability.  *Id.* at 13.  It contends only that Plaintiff's claim falls within the exception for intangible goods whose "distribution and use is sufficiently analogous to the distribution and use of tangible personal property."  Restatement (Third) of Torts § 19(a) (1998).  For example, electricity (though a service as a general matter) becomes a product when "sold and delivered" to the "consumer's meter."  *Mancuso v. S. Cal. Edison Co.*, 232 Cal. App. 3d 88, 101 (1991).

The strict liability claim here, which arises from the intangible design of Facebook, does not fit that narrow exception for intangible goods with physical characteristics.  This is not a case where electricity is delivered at an "excessive voltage" to the consumer.  *Mancuso*, 232 Cal. App. 3d at 102.  Nor is it a case where software embedded in a physical product fails to perform its intended function. *See, e.g.*, *George v. Curwood, Inc.*, 2011 WL 13112073, at *3–*4 (W.D. Okla. Feb. 25, 2011) (software defect in automated machine turret caused serious brain injury); *cf. Winter*, 938 F.2d at 1036 (opining in dicta that products liability may be appropriate for "software that fails to yield the result for which it was designed" if equivalent to a "physical 'product'").  Even the opposition's own authorities confirm that, for strict liability to apply, "it would be necessary for a defect to cause the harm, not an outside force misusing the software."  Frances E. Zollers et al., *No More Soft Landings for Software: Liability for Defects in an Industry That Has Come to Age*, 21 Santa Clara Comp. & High Tech. L.J. 745, 776 (2005).  But the complaint does not allege that a software malfunction caused a physical injury; instead, it asserts that third parties misused a communications platform by posting allegedly harmful speech on

4

Facebook.  Compl. ¶ 167.  For this type of claim, products liability is an unworkable framework because no factfinder could determine whether there is an "objectively measurable" defect.  *Pierson*, 216 Cal. App. 3d at 345.

The opposition identifies no case holding that an intangible communications platform is a product.  In *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), the court held that Section 230 did not bar a negligent design claim involving Snapchat (a photo-sharing app) where the claim stood "independently of" content on the app.  *Id.* at 1093.  But the court did not consider, much less decide, whether the Snapchat app meets the legal definition of a product—an issue the parties did not raise.  *Cf. id.* at 1095 (declining to address Snap's alternative causation argument).  Far from "defeat[ing]" the argument that Facebook "is not a product," Opp. 14, *Lemmon* says nothing on that point.

The opposition quickly abandons precedent in favor of "the policy reasons underlying the strict products liability concept."  *Fluor Corp. v. Jeppesen & Co.*, 170 Cal. App. 3d 468, 475 (1985).  Yet those policies favor Meta because this case is about a communications medium, not a "salable commodity" with "inherent lethal potential."  *Id.* at 476 (air navigational chart with objectively inaccurate information is a product).  As the opposition describes Plaintiff's theory, Facebook's "design defects" are algorithms that "maximize engagement" with the alleged effect of "encourag[ing] the creation of extreme and dangerous content."  Opp. 18–19.  But the "transmission of words is not the same as" the transmission of electricity, let alone "selling items with physical properties."  *Winter*, 938 F.2d at 1036 n.6.  Products liability theories, which "are focused on the tangible world and do not take into consideration the unique characteristics of ideas and expression," do not apply here.  *Id.* at 1034.

### b.   As a Bystander, Plaintiff Cannot Bring a Strict Products Liability Claim

The strict liability claim also falters because Plaintiff did not use any allegedly defective product.  *See* Restatement (Second) of Torts § 402A (1965).  Bystanders can recover for their own *physical* injuries—for example, when a defect in a car causes a crash with a pedestrian.  *See, e.g.*, *Elmore v. Am. Motors Corp.*, 70 Cal. 2d 578, 586 (1969).  But that is not this case.  Absent some physical injury that they personally suffered, bystanders cannot recover damages for emotional distress unless they witnessed a physical injury to a relative and "meaningfully comprehend[ed]" at the time "that the company's defective product caused the injury."  *Fortman v. Förvaltningsbolaget Insulan AB*,

Gibson, Dunn &
Crutcher LLP

212 Cal. App. 4th 830, 832 (2013), *as modified* (Feb. 7, 2013); *see Thing v. La Chusa*, 48 Cal. 3d 644, 647 (1989).  That element is missing here:  the complaint alleges that Plaintiff was unaware of Meta's alleged role in the injuries for nearly a decade.  Compl. ¶ 158.

The opposition tries to distinguish *Fortman* and *Thing* because the complaint seeks damages for economic losses.  *See* Opp. 16.  But that request just creates another problem:  plaintiffs cannot recover economic losses caused by a defective product unless the defect causes damage to "other property."  *Jimenez v. Superior Court*, 29 Cal. 4th 473, 483 (2002) (defective window damaged other components of house).  This exception exists because direct damage to property—say, a collision with another driver's car—counts as a form of "physical injury."  *Seely v. White Motor Co.*, 63 Cal. 2d 9, 18 (1965).  The complaint does not contend that Facebook caused a physical injury to Plaintiff's personal property.  Instead, it alleges that she suffered economic losses when third parties took property left behind in Burma.  *See* Opp. 16; *see also* Compl. ¶ 155.  California law does not recognize that as a "physical injury" to person or property, so Plaintiff cannot bring a strict liability claim for economic losses or emotional distress.  *Seely*, 63 Cal. 2d at 18; *see Fortman*, 212 Cal. App. 4th at 832.

### 3. Plaintiff's Negligence Claim Fails

Plaintiff's negligence claim rests on third-party wrongdoing and thus cannot proceed unless Meta had "a 'special relationship' with either the victim or the person who created the harm."  *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 215 (2021).  Specifically, the complaint alleges that Meta breached its duty of care by "negligently designing its algorithms" to allow harmful content to appear for Burmese users, "negligently contributing to the creation of" harmful content, "negligently failing to remove" harmful content, "negligently making connections" among Facebook users, and "negligently allowing users to use Facebook in a manner" that created a risk to Plaintiff.  Compl. ¶ 176.  These and other allegations make clear that Plaintiff's theory is that Meta breached its duty to stop "the proliferation of such content on its system."  *Id.* ¶ 177.  Because Plaintiff cannot show the requisite special relationship, the opposition asserts that Meta has a "general duty of reasonable care."  Opp. 9.  But "not every defendant owes every plaintiff a duty of care."  *Brown*, 11 Cal. 5th at 213.

Nor can the opposition sidestep the "special relationship" requirement by recharacterizing Meta's conduct as "misfeasance."  Opp. 9.  California law defines that term as an "*affirmative* act of

Gibson, Dunn &
Crutcher LLP

defendant which created an undue risk of harm." *Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 48 (1975) (emphasis added).  And courts have repeatedly declined to treat expression (or tools that facilitate expression) as affirmative conduct creating a risk of harm.  *See Bill v. Superior Court*, 137 Cal. App. 3d 1002, 1011 (1982) (movie not "affirmative" risk-creating conduct "even if it had the tendency to attract violence-prone individuals to the vicinity of theaters"); *see also, e.g.*, *Doe v. GTE Corp.*, 347 F.3d 655, 661 (7th Cir. 2003).

*Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019), confirms that the provision of content-neutral tools to facilitate expression does not constitute misfeasance as a matter of law.  There, the plaintiff alleged that a website "steered users to additional groups dedicated to the sale and use of narcotics," but the Ninth Circuit held that such conduct was "nonfeasance" under California law because "the functions Plaintiff references—recommendations and notifications—were used regardless of the groups in which a user participated."  *Id.* at 1095, 1101.  The same is true here of the platform functions challenged by Plaintiff—Facebook's algorithms that allegedly prioritize "[p]osts with higher engagement scores," and features that allow other users to "'like,' 'comment' on, or 'share'" content.  Compl. ¶¶ 38, 42.

Even if the complaint had alleged affirmative risk-creating conduct, California law still would not recognize a legal duty of care under the factors set out in *Rowland v. Christian*, 69 Cal. 2d 108 (1968).  *See*, *e.g.*, *Netflix*, 2022 WL 551701, at *3 ("California courts have declined to find a duty as a matter of law under the *Rowland* factors for claims implicating expression.").  The seven factors address two overarching topics:  foreseeability and policy concerns.  *See* Mot. 16–17.  Again, the opposition points to no allegations suggesting that the Myanmar military's 2012 conduct was a foreseeable result of Facebook's alleged design.  And, under like circumstances, California courts have refused to recognize duties of care that would require defendants to "restrain[]" expression in order to stop unpredictable or attenuated harms.  *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1004 (1988); *see, e.g.*, *Modisette*, 30 Cal. App. 5th at 145.  This rule avoids creating a "significant chilling upon Internet free speech."  *Delfino v. Agilent Tech., Inc.*, 145 Cal. App. 4th 790, 816 (2006); *cf. Netflix*, 2022 WL 551701, at *4 ("[C]ountervailing First Amendment policy concerns warrant limiting the duty even if there were a special relationship.").  Although the opposition contends that no public policy

counsels against a duty in this case, it cites no decision imposing a negligence duty on remotely analogous facts.  *See* Opp. 10–11.

Finally, to the extent the negligence cause of action advances a theory of "negligent design[]," Compl. ¶ 176, the complaint fails to state a claim because Facebook is not a product.  *See supra*, at 3–5; *see also Milwaukee Elec. Tool Corp. v. Superior Court*, 15 Cal. App. 4th 547, 557 (1993).

## B. Plaintiff's Claims Are Barred by the Statute of Limitations

Plaintiff alleges that she fled Burma after witnessing violence committed by the Myanmar military against her family members and others in her village in 2012.  Compl. ¶¶ 151–154.  These events, as recounted in the complaint, gave Plaintiff "reason to suspect an injury and some wrongful cause" as of 2012—so the two-year statute of limitations for her claims expired in 2014.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005); Mot. 18–20.  The opposition cannot evade the limitations bar by contending that Plaintiff continues to experience harm.  *See* Opp. 6–7.  The continuing tort doctrine applies where there is "no single incident" that can "fairly or realistically be identified as the cause of significant harm."  *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002).  A "mere continuing impact from past violations is not actionable," *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001), and "the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date," *Nodine v. Shiley Inc.*, 240 F.3d 1149, 1153 (9th Cir. 2001).  Here, the "single incident" that caused Plaintiff's alleged harm was the violence she witnessed in her village in 2012, prompting her to leave her home and her country at that time.

Nor can Plaintiff invoke California's discovery rule by arguing that the statute did not begin to run until 2021, when Plaintiff first allegedly suspected *Facebook* played a role in the 2012 events.  Opp. 7–8.  Under California law, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that *someone* has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988) (emphasis added).  A plaintiff who suspects that an injury was wrongfully caused "ha[s] a duty to conduct a reasonable investigation" of all potential causes of that injury.  *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1048 (9th Cir. 2020).  Because Plaintiff was aware of her injury in 2012, she was on inquiry notice of the need to take reasonable steps to investigate *all* potential causes of that injury.  *See Snow v. A.H. Robins Co.*, 165

Cal. App. 3d 120, 129 (1985).  That distinguishes this case from *Unruh-Haxton v. Regents of University of California*, 162 Cal. App. 4th 343 (2008), where the plaintiffs were unaware that they had experienced any injury at all, and public and media discussion of other similarly situated individuals' injuries was insufficient to impute "suspicion of wrongdoing" to the plaintiffs.  *Id.* at 364.  Indeed, according to documents incorporated into the complaint, various media outlets raised questions about Facebook's role in Myanmar as early as 2014.  Compl. ¶ 125; *see also id.* ¶ 115 (2018 U.N. report); *id.* ¶ 116 (2018 *Guardian* article); Mot. 19.  Thus, even apart from the tangible and obviously wrongful events that Plaintiff witnessed in 2012, this case is like *Eidson v. Medtronic, Inc*., where the plaintiffs should have suspected the cause of their injuries when "widespread media attention" on the issue occurred *after* they were aware of them.  *See* 981 F. Supp. 2d 868, 894 n.7 (N.D. Cal. 2013).

Because Plaintiff was on inquiry notice that she had suffered a wrongful injury, the complaint must plead facts "to show (1) the time and manner of discovery [of the cause of her injury] and (2) the inability to have made earlier discovery despite reasonable diligence."  *Fox*, 35 Cal. 4th at 808.  But the complaint does not allege anything regarding how Plaintiff discovered Facebook's alleged role in her injuries, much less establish diligence and subsequent non-discovery.[1]  *See Beasley v. Conagra Brands, Inc.*, 374 F. Supp. 3d 869, 883 (N.D. Cal. 2019) (discovery rule does not apply where plaintiff "alleges no facts regarding the manner" of discovery).  "[T]he plaintiff has the burden to 'show diligence,'" and failure to do so is fatal in the context of the discovery rule.  *See Eidson*, 981 F. Supp. 2d at 893–94.  Because no facts are alleged that would show Plaintiff tried and was unable to discover the alleged link to Facebook that forms the basis of her current claims, those claims are time-barred.

## C.  Plaintiff's Claims Are Barred by Section 230

### 1.  Plaintiff's "Creative Pleading" Cannot Evade Section 230 Immunity

Plaintiff's claims are barred by Section 230 because they seek to impose liability on Meta for the alleged harmful effects of anti-Rohingya content posted by third parties on Facebook.  Mot. 20–23.  The opposition's various efforts to avoid that conclusion fail.

---

[1]  The opposition's statement that Plaintiff "learned about [Facebook's role] through her attorneys" is conclusory and not pled in the complaint.  Nor does it explain why Plaintiff spoke with an attorney about possible remedies *before* she was on inquiry notice of an injury.  *See Fox*, 35 Cal. 4th at 921 ("[C]onclusory allegations [concerning diligence] will not withstand demurrer.").

As an initial matter, the opposition concedes that Plaintiff's "matchmaker" theory—that Meta allegedly made "dangerous connections between anti-Rohingya extremists"—is foreclosed by binding Ninth Circuit precedent.  Opp. 25.  But the same is true of her "distributor" theory—that Meta failed to "block or remove dangerous third-party content" that it allegedly "*knew* was harmful and unlawful." *Id.* at 23–25 (emphasis added).  The Ninth Circuit expressly rejected that theory in *Barnes*, where it declined to resolve the "academic debate" over whether the statutory term "publisher" includes the term "distributor," as used in defamation law.  570 F.3d at 1103–05.  That debate "has little to do with the meaning of the statutory language," and the court refused "to read the principles of defamation law into it." *Id.*  Thus, the court *rejected* plaintiff's argument that she could evade Section 230 by suing "Yahoo as a distributor, not as a publisher." *Id.*  But even if those two theories were not foreclosed, they would not save Plaintiff's claims:  The complaint does not allege that Facebook made any connections among those who attacked her village in 2012.  And the complaint alleges that Meta was alerted to anti-Rohingya content on Facebook "beginning in 2013"—*after* the 2012 attack—rendering irrelevant any theory that turns on Meta's knowledge of content relating to the attack.  Comp. ¶ 125.

Plaintiff's "product liability" theory (Opp. 17–19) fares no better.  "[T]he nature of the alleged design flaw in this case—and the harm that is alleged to flow from that flaw—is directly related to the posting of third-party content." *Twitter*, 555 F. Supp. 3d at 930; *see* Opp. 18 (claims "based on Facebook's design defects that encourage the creation of extreme and dangerous *content*" (emphasis added)).  As the opposition concedes, there is no blanket Section 230 exception for products liability claims. *See* Opp. 18.  It cites *Lemmon*, but there, the "danger" allegedly posed by Snapchat was a speed filter created by Snap that allegedly rewarded users for driving at unreasonably high speeds, a theory of liability that the court concluded had "*nothing to do*" with Snap's "editing, monitoring, or removing" of any third-party content.  995 F.3d at 1093–94 (emphasis added).  Snap's alleged duty was "fully independent of [its] role in monitoring or publishing third-party content," and the plaintiffs' claim "st[ood] independently of the content." *Id.*  And the court expressly distinguished that case from "creative attempt[s] to plead around" Section 230, where "the plaintiff's claims, at bottom, depended on a third party's content, without which no liability could have existed." *Id.* at 1094; *see also id.* at 1093 n.4 (Section 230 would *not* permit the plaintiffs "to fault Snap for publishing other Snapchat-user

content … that may have incentivized the boys to engage in dangerous behavior").

Courts in this district and elsewhere have disallowed claims, like Plaintiff's, that try to reframe liability based on third-party content as products liability theories. *See Twitter*, 555 F. Supp. 3d at 930; *Quinteros*, 2022 WL 898560, at *4 (Section 230 barred "all claims arising from the publication of user-generated content," including products liability claim); *Palmer v. Savoy*, 2021 WL 3559047, at *6 (N.C. Super. Ct. July 28, 2021) (Section 230 bars claims that "arise from and depend upon the actual content of the snaps taken by" third parties). And for good reason: if online communications platforms were "products," and if Section 230 could be evaded by describing traditional publisher activity as a design defect, the statute would be rendered a nullity.

Finally, the opposition cannot escape Section 230 by asserting that Meta "materially contributed" to anti-Rohingya content posted by third parties. Opp. 19–23. It concedes that Meta "was not literally the author of the harmful content at issue here." *Id.* at 19. And the complaint does not and cannot allege that Meta "specifically targeted [anti-Rohingya] content or designed its website to encourage" such content. *Gonzalez v. Google LLC*, 2 F.4th 871, 895 (9th Cir. 2021). Instead, the opposition asserts that Facebook's "engagement-maximizing algorithms and 'like,' 'share,' and 'comment' features created a feedback loop," leading *users* to post "more extreme and dangerous content." Opp. 19. But the complaint "cannot plead around Section 230 immunity by framing these website features as content." *Dyroff*, 934 F.3d at 1098.

As the opposition acknowledges (at 19), "[a] website does not … 'contribute'" to the development of content "when it merely provides third parties with neutral tools to create web content." *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196–97 (N.D. Cal. 2009). And every feature about which the opposition complains—Facebook's algorithms and tools that allow other users to like, share, or comment—are content neutral. Those features may at most affect how Facebook *displays* content, but "users ultimately determine what content to post." *Id.* at 1197. Because those features are "'neutral tool[s]' operating on 'voluntary inputs,'" they do not "amount to content development or creation." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016) (quoting *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1172 (9th Cir. 2008) (en banc)). Thus, the opposition concedes (at 22) that this case is distinguishable from *Roommates.com*, where the website "designed its system

to use allegedly unlawful criteria so as to limit the results of each search, and to force users to participate in its discriminatory process." 521 F.3d at 1167.[2]

The opposition's theory that Meta made a material contribution to anti-Rohingya content by displaying more prominently content with which *other users* engaged cannot be squared with well-settled law. The "proliferation and dissemination of content does not equal creation or development of content." *Kimzey*, 836 F.3d at 1271; *see also Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003) (the "'development of information' … means something more substantial than merely editing portions of an e-mail and selecting material for publication"—while "rejecting other e-mails for inclusion"). Adopting "an encouragement test"—that turns on how an interactive computer service provider chooses to display (or not) third-party content—"would inflate the meaning of 'development' to the point of eclipsing the immunity from publisher-liability that Congress established." *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 414 (6th Cir. 2014). The opposition does not cite any case accepting its "dangerous feedback loop[]" theory, Opp. 22, and this Court should not be the first.[3] As the Ninth Circuit explained in *Roommates.com*, "there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality." 521 F.3d at 1174. But "[s]uch close cases … must be resolved in favor of immunity, lest we cut the heart out of [S]ection 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Id.*

### 2. Section 230 Bars Burmese Tort Law Claims

This Court also should not be the first to find that a *state's* conflict of law principles can override a *federal* immunity statute, "prevent[ing] the application of federal statutes to foreign-law-based

---

[2]  The opposition also cites *Doe v. Mindgeek USA Inc.*, 2021 WL 5990195 (C.D. Cal. Dec. 2, 2021). But there, the website, among other things, allegedly "took one of the videos featuring Plaintiff and uploaded, distributed, and featured that video on a separate, independent platform, where it was tagged as 'teen' porn to drive traffic"; "feature[d] other videos containing child pornography to target users interested in this unlawful content"; "compile[d] video playlists with titles and tags indicating the videos are child pornography"; "instruct[ed] sex traffickers to post videos using categories that are coded language for child porn"; and acknowledged that using "age verification technology would severely harm [its] business operations." *Id.* at *6. Those allegations are nothing like this case.

[3]  In *Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016), the plaintiff "adequately pleaded that at least some of the allegedly defamatory comments were authored by [defendant's] employees," so the court did not need to address whether the defendant was "an 'information content provider'" under Section 230. *Id.* at 743.

Gibson, Dunn & Crutcher LLP

claims." *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 324 (E.D.N.Y. 2018), *aff'd on other grounds by* 934 F.3d 53 (2d Cir. 2019); Mot. 23–24.  The opposition's argument that Section 230 does not apply because Burmese law "provides for no such immunity," Opp. 25, ignores the plain text of the statute and the Supremacy Clause and is unsupported by any precedent.

In instructing U.S. courts that they may not treat an interactive computer service provider as "the publisher or speaker" of third-party content, 47 U.S.C. § 230(c), Congress created no exception for foreign law claims.  The opposition urges this Court to imply such an exception but offers no response to black-letter interpretive principles preventing the Court from doing so.  *See* Mot. 23–24.

Instead, the opposition relies solely on "California choice-of-law rules."  Opp. 26.  But under the Supremacy Clause, and even in diversity cases, federal courts must apply federal law "on matters governed by the U.S. Constitution or federal statutes."  *Bartel v. Tokyo Elec. Power Co.*, 371 F. Supp. 3d 769, 790 (S.D. Cal. 2019).  And if the ordinary application of a state's choice of law principles dictates an outcome that is "plainly not in accord with" federal law, the "choice of law merges with the constitutional demands of controlling federal legislation," *United States v. Little Misere Land Co.*, 412 U.S. 580, 604 (1973), and, under the demands of the Supremacy Clause, "the state or local law simply must give way," *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1152 (9th Cir. 2020).  Thus, California law does and must incorporate Section 230, both in its substantive law and in its choice of law.  *See Kashani v. Tsann Kuen China Enter. Co*., 118 Cal. App. 4th 531, 543 (2004) (recognizing that "California law includes federal law" for purposes of choice-of-law analysis).

Unsurprisingly, the opposition does not cite a single case holding that federal law can be displaced by a state's choice-of-law rules, a proposition that "is unsupported in law or logic."  *Force*, 304 F. Supp. 3d at 324.  It cites *Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005), but that case confirms that California's choice-of-law rules cannot undermine federal law.  There, the plaintiff argued that an Executive Order did not render a contract made in Hong Kong illegal, because, as a matter of California law, contracts must be interpreted according to their place of execution.  *See id.* at 932–33.  But California law, the court reasoned, "incorporates [the Executive Order] through the Supremacy Clause" and thus required the court to interpret the contract in accordance with federal law.  *Id.* at 933.  And because both "[f]ederal and California law … would bar an American court from ordering" a payment

that "violate[d] the precise terms of the Executive Order," no American court could award the "damages remedy" the plaintiff sought. *Id.* at 939–40. In short, nothing in *Bassidji* suggests that there is a state choice of law exception to otherwise applicable federal law.

Nor does the opposition carry Plaintiff's burden to show that Burmese law and California law materially differ, that there is a true conflict between the two, or that Burma's interests will be comparatively more impaired if California law is applied. *See In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019); *see* Mot. 5–6.

The opposition does not dispute that Burmese law is not well developed, or that California courts have refused to apply it. *See* Opp. 28. Plaintiff's own expert, Professor Harding, concedes that "the law reports" in Burma since the 1960s "are quite thin," Declaration of Perlette M. Jura, Ex. A., Harding Tr. 42:2–6; that "there is virtually no secondary material to look at" to discern Burmese tort law, *id.* at 42:15–20; that there have been "extremely few" tort cases "since the military coup of 1962," *id.* at 43:17–20; and that he does not "know anybody who would be able to describe themselves as an expert on Myanmar [tort] law," *id.* at 72:17–21; *see also id.* at 87:8–11. Drawing on two *criminal* law statutes, Professor Harding contends that Burmese law does not provide immunity for third-party content. *See* Harding Decl. ¶ 11, Dkt. 36-1. But he also concedes that "there is no such thing as product liability in Myanmar," Harding Tr. 35:2–4, and that he has never seen a tort case in Burma against a platform company like Meta—or any online communications platform—or a case where a company's algorithms formed the basis of a negligence claim, *see id.* at 60:11–19; 63:3–6. The opposition thus fails to provide the evidence necessary for a court to draw "meaningful conclusions" about the outcome of applying Burmese law here, *Sommer v. Gabor*, 40 Cal. App. 4th 1455, 1469 (1995), other than to suggest that Plaintiff's claims fail under Burmese law, as they do under California law.

Even "suppos[ing]" that Burmese law permits its courts to impose tort liability on social media services based on third-party content, *see* Harding Decl. ¶¶ 6–12; Opp. 28, the opposition does not show a true conflict between Burmese and California law. It does not deny that "[t]he State Department's Burma 2012 Human Rights Report depicts a judicial system that is 'seriously flawed,' with 'no reported examples of successful attempts' to use either criminal or civil law to remedy human rights violations." Roger P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational Tort*

*Litigation*, 63 EMORY L.J. 1089, 1140 (2014).  And it concedes that California has a strong interest "in promoting economic activity within its borders, attracting corporations and protecting those corporations whose principal places of business are located in [California]," an interest furthered by Section 230.  *Hill v. Novartis Pharm. Corp*. 2012 WL 967577, at *8 (E.D. Cal. Mar. 21, 2012).[4]

**D.    Plaintiff's Claims Are Barred by the Foreign Affairs Doctrine**

Finally, Plaintiff's claims are preempted under the foreign affairs doctrine, because California's interest in applying its tort law to a Plaintiff who has never resided here is weak, and the claims are likely to "produce something more than incidental effect in conflict with express foreign policy of the National Government."  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2003); Mot. 24–25.  The opposition's reliance (at 35) on *Ning Xianhua v. Oath Holdings, Inc.*, 536 F. Supp. 3d 535 (N.D. Cal. 2021), for the proposition that California has a strong interest in applying its tort law is misplaced. There, the defendant made the allegedly unlawful "decision to share communications" from its "California headquarters."  *Id.* at 558.  And the claim itself involved state statutory law, not tort law. *Compare id.* ("California has a strong interest in ensuring that its residents comply with the [Unfair Competition Law] within its borders."), *with Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1187 (C.D. Cal. 2005) ("With respect to Plaintiffs' tort claims, the Court finds that California has a weak interest … because Plaintiffs have never resided in this state").

"[G]iven the weakness of the State's interest," any "doubt about the clarity of the conflict" must "be resolved in the National Government's favor."  *Garamendi*, 539 U.S. at 425.  Despite the opposition's assertion otherwise, there can be no doubt that attempting to use California tort law to impose liability in a suit implicating the Myanmar military in "terrorism and mass genocide" (Compl. ¶ 1) would conflict with the Executive Branch's foreign policy, including its preference for Burma to establish legal mechanisms for addressing and resolving alleged human rights abuses.  *See* Mot. 25.

**III.    CONCLUSION**

Meta respectfully requests that the complaint be dismissed with prejudice.

---

[4]  The opposition asserts that comity principles require California courts to adopt the law of a foreign sovereign whenever a cause of action "arise[s] there," Opp. 33, boiling comity down to a form of *lex loci delicti*.  But California has rejected the *lex loci delicti* theory of conflicts in favor of the government interest analysis.  *See St. Louis-S.F. Ry. Co. v. Superior Court for L.A. Cnty.*, 276 Cal. App. 2d 762, 767 (1969).  Plaintiff cannot revive an outmoded choice-of-law test under the guise of comity.

Gibson, Dunn &
Crutcher LLP

Dated: June 23, 2022

GIBSON, DUNN & CRUTCHER LLP


By:  _____/s/ Rosemarie T. Ring_____
                  Rosemarie T. Ring


Attorneys for Defendant META PLATFORMS, INC.,
(f/k/a Facebook, Inc.), a Delaware corporation

Gibson, Dunn &
Crutcher LLP