UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

*ORIGINAL*

| | | |
|---|---|---|
| JANE DOE, individually and on behalf of all others similarly situated, | ) ) ) ) | Motion to Dismiss |
| Plaintiff. | ) ) | |
| vs. | ) ) | NO. C 22-00051 YGR |
| META PLATFORMS, INC. (f/k/a Facebook, Inc.), a Delaware corporation. | ) ) ) ) | Pages 1 - 34 |
| Defendant. | ) ) | Oakland, California |
| _____) | | Wednesday, December 14, 2022 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiff:          Edelson PC, LLC
                        350 North LaSalle, Suite 1300
                        Chicago, Illinois  60654
                   BY:  ROGER PERLSTADT, ATTORNEY AT LAW

                        Edelson PC
                        150 California Street, 18th Floor
                        San Francisco, CA  94111
                   BY:  YAMAN SALAHI, ATTORNEY AT LAW


                   (Appearances continued next page)


Reported By:          Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## A P P E A R A N C E S (CONT'D.)

                              Fields PLLC
                              1701 Pennsylvania Avenue NW
                              Suite 200
                              Washington, DC  20006
                    BY:   EDWARD HAN, ATTORNEY AT LAW


     For Defendant:         Gibson, Dunn & Crutcher
                              555 Mission Street, Suite 3000
                              San Francisco, California  94111
                    BY:   ROSEMARIE T. RING. ATTORNEY AT LAW



                              --o0o--

```
 1    Wednesday, December 14, 2022                    9:53 a.m.

 2                      P R O C E E D I N G S

 3                         ---oOo---

 4         THE COURT:  All right.  Let me go ahead at this point

 5    then and call the Doe versus -- Jane Doe versus Meta

 6    Platforms, 22-51.

 7         And while you are reshuffling -- before people leave --

 8    don't leave yet -- I have -- I want to say something in terms

 9    of what happened in this case, and I want everybody to hear

10    me.

11         Do I have -- counsel.

12         Have a seat in the audience.  This won't take long.

13         It is really important that you all remember how to

14    communicate with the Court.  And I have a lot of you in here,

15    which is why I'm raising this issue.

16         I try to make myself accessible.  And I went to put this

17    case on the calendar because of its potential overlap with

18    this MDL.

19         My courtroom deputy sent an email to both sides explaining

20    that I wanted to put this on the calendar.  We received an

21    email back from Ms. Ring without copying opposing counsel.

22         Now, I think Ms. Ring believed that it wasn't an ex-parte

23    communication, but I disagree, and this is the reason why.  In

24    response to whether or not we could have the hearing set after

25    the MDL conference, Ms. Ring advised my courtroom deputy that
```

1    she didn't think she could prepare for both hearings at the

2    same time in terms of availability.

3        So my question to you, Ms. Ring, not -- not a real

4    question, it's somewhat more rhetorical -- and to all of you

5    is to think, well, what did you expect him to do?  He's not

6    going to make a substantive call as to whether or not to

7    schedule a hearing when an attorney has told him substantive

8    information about whether or not they were available.

9        You can tell him, "I'm not available," and not give him a

10   reason or say you are available, but you can't give him

11   substantive information without letting the other side know if

12   you expect that information to be communicated to me.  I don't

13   understand how you expected him to respond.

14       Hold on.

15       It is always best to just copy the other side, to let the

16   other side know when you're communicating with me.  I take

17   very seriously my reputation for being fair to both sides and

18   to not communicating with you all individually.  That's the

19   practice pointer for all of you.

20       Let's call the case, and you can make a statement if you'd

21   like.

22           **THE CLERK:**  Now calling civil case 22-51-YGR, Doe

23   versus Meta Platforms, Inc.

24       Counsel, starting with the plaintiff, please state your

25   appearance for the record.

```
 1              THE COURT:  At the mics.
 2              MR. PERLSTADT:  Good morning, Your Honor.  Roger
 3    Perlstadt from Edelson PC for plaintiff Jane Doe.
 4         I have with me at counsel table Yaman Salahi also of
 5    Edelson and Edward Han from Fields PLLC.
 6              MS. RING:  Good morning, Your Honor.  Rose Ring,
 7    Gibson Dunn, on behalf of Meta Platforms.
 8              THE COURT:  All right.  You wanted to say something,
 9    Ms. Ring.
10              MS. RING:  I did, Your Honor, but I'll keep it short.
11         First of all, I'm very sorry.  I just wanted to clarify
12    that my response -- I replied all to say that I had a conflict
13    in hearings this morning.  And I -- I thought I did because on
14    my calendar, we had blocked off two hours for the MDL
15    proceeding.
16         And then I was driving and I didn't realize that they were
17    both before you.  So if you were asking to have a hearing this
18    morning, presumably that conflict could be resolved.
19         So that was the call I made to say I'm sorry, I was wrong,
20    I don't actually have a conflict, or at least I probably won't
21    because I would imagine Judge Gonzalez Rogers knows that both
22    of these hearings are going on and we'll be able to clear
23    that.
24         I did also mention in the voice -- that was the purpose of
25    my voicemail to say that I didn't realize the first hearing
```

```
 1    was you.
 2              THE COURT:  You're right, it was a voicemail.  But it
 3    was what followed.
 4              MS. RING:  Your Honor, I'm not arguing with you.
 5    You're right.  I did it.  I was driving home, it was late.  I
 6    just -- I felt that I had inadvertently said something to the
 7    Court that was wrong and I was -- called and left a voicemail.
 8    But you're right, I should not have done that and I won't do
 9    it going forward.
10              THE COURT:  And -- and as I understand it, it got
11    plaintiffs' counsel, then we get a big email trying to explain
12    and trying to undo what had happened.
13              MS. RING:  Yes.  Yes.
14              THE COURT:  So --
15              MS. RING:  I was having a difficult day between
16    schedule and personal, and I called and left a voicemail
17    because I didn't want to leave what was a mistake pending with
18    the Court.  I was trying to clear it up as soon as I could.
19    But I should have replied all to that email.
20              THE COURT:  The other thing I think it's important
21    for everybody to understand is that in order to deal with the
22    massive number of cases we have, it is efficient for me to
23    always deal with things that are alike at once.
24         So I will tell my law clerks:  We're going into antitrust
25    land.  Or I'm going into criminal land.  Or I'm going to
```

1    securities land.  And if I've got two or three cases, those

2    are what I work on all at once.

3        So working on this Doe-Meta platforms when I'm also

4    thinking about the MDL is efficient for me.  So even though it

5    may be inconvenient, it's unfortunately too bad.  Because for

6    me, it is most efficient, and that's the only way that I can

7    manage my docket.

8            **MS. RING:**  I understand, Your Honor.  Again, I think

9    that day was a 17-hour day for me, and I have four hearings

10   this week.  Because the holidays are coming and everyone is

11   trying to do it.  So I -- I certainly understand, and we want

12   to help the Court in any way we can.

13           **THE COURT:**  Well, you won't have too much to do

14   today.

15       And that is because you should know, Mr. Perlstadt, that

16   my view is with respect to your case, I am not going to do

17   anything on -- I am trying -- I'd like to get your case

18   aligned with what I'm doing on the MDL.  And I'm not

19   interested in making rulings prematurely on your case that may

20   have impact on what I'm doing on the MDL and everyone else's

21   cases.

22       There are some real issues with your complaint.  And those

23   are the ones that we're going to deal with.  The motion is

24   going to be granted with leave to amend, and I'm going to put

25   you on a different schedule, but I'm not going to deal with

1    some of the other issues that I'm still going to have to deal

2    with in the MDL.  It's not -- I want the benefit of all the

3    briefing from various peoples who are considered, and so I'm

4    not going to address those now.

5       But I do think there are things that are separate and

6    apart and distinct about your case that you need to deal with,

7    and so that's why I said the motion's going to be granted with

8    leave to amend.

9       So let's go through those.

10      It's my understanding from the briefing with respect to

11   the product liability that you are not proceeding on the

12   consumer expectations test, that you are only proceeding on

13   the risk benefit test theory; is that correct?  And if it's

14   not correct, then you don't have enough allegations in your

15   complaint to support a consumer expectations test.

16         **MR. PERLSTADT:**  Our position -- I'll just repeat what

17   we said in the briefing.

18      Our position is bystanders can bring claims for product

19   liability.  This was a dangerous product that harmed Ms. --

20   Ms. Doe as a bystander.  She suffered physical injuries for

21   that.

22      Physical injuries has been described as including both

23   personal injury and damage to property.  So she had other --

24   other property damage.

25      So I think we have stated enough in the complaint that she

1   suffered physical damage from being a bystander to this -- to

2   this product even though she wasn't a user of it herself.

3       So I'm -- I think we have -- I'm -- I'm absolutely happy

4   to hear what you believe is missing from our claim, and I'm

5   happy to try to replead it, if that's -- sounds like that's

6   the direction you're going.

7           **THE COURT:**  Strict liability under California, there

8   are three types of product defects, right?  Manufacturing,

9   design, and warning.  You agree with me so far?

10          **MR. PERLSTADT:**  I'm sorry, manufacturing, design

11  and...?

12          **THE COURT:**  And warning, defects.

13          **MR. PERLSTADT:**  Warning, sure.

14          **THE COURT:**  Right?

15          **MR. PERLSTADT:**  Yes.

16          **THE COURT:**  My understanding is you are only

17  proceeding on a design defect theory, correct?

18          **MR. PERLSTADT:**  Correct.

19          **THE COURT:**  In order to state a design defect theory,

20  you must follow -- you must fall under one of two tests, or

21  both, but you have to satisfy the elements of that test.

22      Are we still on the same page?

23          **MR. PERLSTADT:**  Yes, Your Honor.

24          **THE COURT:**  Which test are you proceeding under?

25          **MR. PERLSTADT:**  I apologize, Your Honor.  I would

```
 1   have to --
 2           (Inaudible to the Certified Shorthand Reporter.)
 3           THE COURT:  Never speak from the table.  We need you
 4   on the mic.
 5           MR. SALAHI:  Your Honor, our primary argument in this
 6   set of briefing --
 7                   (Off-the-record discussion.)
 8           THE COURT:  You have to -- we don't know who you are.
 9           MR. SALAHI:  Your Honor, Yaman Salahi for the
10   plaintiff.
11      The primary argument on this iteration of the complaint is
12   under the risk benefit test.
13           THE COURT:  Okay.  So you concede -- hold on.  You
14   concede that you are not proceeding on a consumer expectations
15   test; is that correct?
16           MR. SALAHI:  We haven't made that argument, but if we
17   have leave to amend, I don't want to waive that opportunity
18   now without having a chance to take a closer look at that.
19           THE COURT:  Okay.  As I said, there is not sufficient
20   allegations for the latter, for sure.
21      In any event, the complaint lacks allegations about what
22   the design defect was in 2012.  2012, ten years ago.
23           MR. PERLSTADT:  Respectfully, I think our complaint
24   does set out the design defect.
25           THE COURT:  I disagree.  So what else can you allege,
```

1  if anything?

2          **MR. PERLSTADT:**  We can -- Your Honor, we -- we allege

3  that the -- the design of Facebook is the -- the way that the

4  Facebook algorithms work is sort of twofold.  It --

5          **THE COURT:**  So it's not as if these platforms haven't

6  changed over time.

7          **MR. PERLSTADT:**  Agreed.

8          **THE COURT:**  The iPhone in 2008 is very different from

9  an iPhone in 2022.

10          **MR. PERLSTADT:**  Yeah.

11          **THE COURT:**  And so here I am ten years later, and I

12  need to understand what your perspective is about what was the

13  state of play in 2012.

14          **MR. PERLSTADT:**  Our position was -- is that in 2012,

15  shortly after Facebook was introduced into Burma, the design

16  of Facebook encouraged the -- the way the feedback mechanisms

17  work, the share, the like, the comment buttons, and two -- two

18  parts.  The share comment-like feature we allege created these

19  kind of dopamine hits in -- in content creators.  And the --

20  so the -- and that more extreme content was more likely to get

21  these reactions.  And so the -- the Facebook -- the way

22  Facebook was designed encouraged posters to create more and

23  more extreme content.

24      On the other end, the news feed algorithms were designed

25  in a way that promoted in users news feeds the most extreme

1   content because it was more likely to get views and hits and

2   impressions.

3       And so the way that Facebook was designed, we allege, was

4   in a manner that both encouraged the creation of more and more

5   extreme, more and more violent content, more and more hateful

6   against L groups, as well as promoted and amplified that kind

7   of content.  And we think that -- that was -- we -- we allege

8   that that was what was going on in 2012.

9           **THE COURT:**  Any response, Ms. Ring?

10          **MS. RING:**  Your Honor, we don't -- we don't think the

11  complaint -- the plaintiff here, as you know, alleges that

12  there was an attack on her village in 2012 that caused her to

13  flee.  We don't think that there are any allegations in the

14  complaint that would support a reasonable inference that that

15  attack in 2012 had anything to do with Facebook.

16      Facebook was introduced into Burma in 2011, and there are

17  no allegations that anyone that was involved in that -- in

18  that attack in 2012 or anyone who plaintiffs allege otherwise

19  would have stood up and fought against the military to prevent

20  that attack even used Facebook, let alone viewed any of the

21  content that plaintiffs alleged caused, you know, the

22  further -- further creation of that content or the wide

23  dissemination of it.

24      So we think more fundamentally there are no factual

25  allegations.  Whatever the allegations about how Facebook

1    operates are, there are no factual allegations that would

2    support a reasonable inference that what happened in 2012 to

3    the plaintiff here had anything to do with Facebook.

4              MR. PERLSTADT:  Could I respond to that, Your Honor?

5              THE COURT:  Yeah.  I think I -- I mean I agree with

6    Ms. Ring.  The causation allegations in this complaint are

7    lacking.  I mean -- in -- the complaint has to allege that

8    Meta's conduct was a substantial factor.  That's the law.  A

9    substantial factor in bringing about these ethnic attacks.

10   And I just --

11             MR. PERLSTADT:  If I may, Your Honor.

12             THE COURT:  You may.

13             MR. PERLSTADT:  I -- I agree, substantial factor is

14   absolutely the test.  It's -- it's sort of a generous test

15   though, it's more than negligible or theoretical.

16        And with respect to what was going on in 2012

17   specifically, we allege in paragraph 94 that posts early in

18   2012 about -- there were posts in 2012 about the alleged rape

19   and murder of a Buddhist women by Rohingyan men, and that went

20   viral, contributed to violence that year.

21        I went back and reread some of the reports, some of the

22   news reports, some of the UN reports.  This is a big deal,

23   this -- this specific post that went viral about the -- the

24   alleged rape and murder of a Buddhist women by Rohingyan men

25   in early 2012, and that's in paragraph 94.

1           In paragraph 115, we also talk about Facebook posts and

2     audiovisual materials on Facebook dehumanizing Rohingyan

3     people, calling them Bengali invaders and existential

4     threat --

5           (Clarification by the Certified Stenographic Reporter.)

6           MR. PERLSTADT:  I'm sorry.

7           Dehumanizing the Rohingyan people, calling them Bengali

8     invaders and an existential threat to -- to Myanmar, that

9     there was a hate --

10          THE COURT:  Where does that viral post say anything

11    about plaintiff's village?

12          MR. PERLSTADT:  Well, it doesn't, Your Honor.  And

13    we -- we -- and I agree.  I agree.  We will have to show -- we

14    will have to show -- it's a fact question, but we will have to

15    show --

16          THE COURT:  You still have to allege -- to get

17    through the gate, you have to allege.

18          MR. PERLSTADT:  Absolutely.  But I think we have --

19    we have alleged -- we -- we have alleged that these things

20    happened in 2012.  We allege that these created this

21    environment of -- of hate.  And we will have to rely --

22          THE COURT:  Taking the allegations in the complaint

23    as true, you indicate that the ethnic violence had been

24    occurring for decades.  And if they had been occurring for

25    decades, it is not clear to me how the complaint alleges the

```
 1      plausible inference that this -- that this business activity
 2      was used to perpetuate that violence by a military regime that
 3      was already engaged in deplorable violence.
 4              MR. PERLSTADT:  It's a matter of degree, Your Honor.
 5      And -- and I think the plausibility of our allegations I think
 6      is confirmed by the -- the chairman of UN fact-finding
 7      commission found that Facebook played a determining role in
 8      ethnic violence.
 9        A member of Facebook's integrity team used this kind of
10      evidence to conclude that working for Facebook, he had been a
11      party to genocide.  I think our allegations are plausible.
12        Yes, we don't have at this point the kind of granular
13      information that's in Facebook's unique possession about what
14      posts were where and what members of the military were doing
15      what.
16        We -- we do -- but we do allege in the complaint that
17      those things are out there.  In paragraph 133, we allege that
18      Facebook has records of every post and image that was posted,
19      that most soldiers had Facebook on their phones so Facebook
20      has records of their locations.  And in paragraphs 143 and
21      144, we allege that Facebook acknowledged removing -- we think
22      much too late, but they removed these --
23              THE COURT:  Slow down.
24              MR. PERLSTADT:  -- dangerous accounts and that they
25      are preserving data including content.
```

1          Yes, we don't have access to this data, but I think what

2     we're alleging is plausible.  And I think at the pleading

3     stage, this fact question about causation can -- was -- I

4     think it's clear from the UN fact-finding mission and some of

5     Facebook's acknowledgments that they were contributing to the

6     ethnic violence.

7          Yes, we will have to connect the dots between the --

8               **THE COURT:**  All right.  A response.

9               **MS. RING:**  Your Honor, as we -- in stepping through

10    each of these allegations, I mean it -- again, I guess I go

11    back to this is a putative class action and there's a named

12    plaintiff.  And the named plaintiff has to state a claim.  The

13    named plaintiff says that her harm was an attack in her

14    village in 2012.

15         There's -- there are no facts in the complaint to support

16    any plausible inference that those attack -- that that attack

17    had anything to do with Facebook, whatever happened after.

18         And as for what happened after, each of these -- each of

19    these allegations, the UN reports, the UN reports talk about,

20    as Your Honor just explained, decades of ethnic violence going

21    on in the country.  Decades.

22         Three decades before, 300,000 Rohingyan people had to flee

23    the country, before -- three decades before Facebook ever was

24    introduced there.

25         Those UN reports also talk about multiple different ways

1    that these hateful messages were spread, Facebook being one of

2    them.  But again, that -- that is not enough to establish any

3    link between Facebook and what happened in 2012 or after.

4        And the chairman, you know, determining role, that was not

5    in the report.  That was in a press conference that he gave.

6        So, again, I just don't -- we don't think there -- there

7    is a single factual allegation that supports a reasonable

8    inference for what this plaintiff has to establish.

9            **THE COURT:**  There are other problems.

10       And I disagree with you.  I don't think that the way it's

11   alleged is plausible.  There has to be some more connection.

12       What about statute of limitations?  This is governed by a

13   two-year statute.  The injury occurred in 2012.  You're

14   required to plead facts to show the time and manner of

15   discovery and the inability to have made the discovery earlier

16   despite reasonable diligence.

17       Now maybe there's two years of tolling because the

18   plaintiff was 16.  But at this juncture, it's not clear from

19   the complaint how you get past the statute of limitations.

20           **MR. PERLSTADT:**  Two responses, Your Honor.

21       One is, as we note in our response, we do think that this

22   is a continuing harm.  Facebook is -- is continuing to engage

23   in this conduct.  It continues to make Burma unsafe for

24   plaintiff.  She can't return home.  We think the statute of

25   limitations frankly hasn't even started to run.

```
1        That said, if we are only looking at the 2012 injury, she

2   did not discover Facebook's role in causing it until 2021.

3   And as, you know, claims don't accrue until plaintiff

4   discovers the cause of action, not the injury, but the cause

5   of action.

6        THE COURT:  She has to be -- there has to be

7   reasonable diligence.  What has she done --

8                 (Simultaneous colloquy.)

9        MR. PERLSTADT:  All she knows is that her village was

10  attacked, she was scared for her life, her property was

11  destroyed, her home was taken, she flees the country.  She has

12  no idea that Facebook is behind this.  And --

13       THE COURT:  Behind what specifically?  So I mean

14  that's part of the problem.  You have to -- you've got to

15  identify something that they actually did to incite and then

16  tie that to her own learning of the alleged claim.

17       MR. PERLSTADT:  We allege that she did not learn of

18  this until 2021 when it -- when this information that Facebook

19  could have some responsibility could be a substantial factor

20  in her --

21       THE COURT:  You need to slow down.

22       MR. PERLSTADT:  I apologize, Your Honor.

23       We -- we do allege that in 2021, she discovered this --

24  the fact that Facebook may have been a substantial factor in

25  her harm, in 2021, when that information became known to the
```

1    community -- the Rohingyan community in the United States that

2    she's a part of.

3        I think this idea that she has a duty to investigate is

4    putting an impossible burden on her.  And a duty to

5    investigate only arises --

6              **THE COURT:**  So I don't --

7         **MR. PERLSTADT:**   -- if there's something to arouse

8    suspicion.  And there's nothing to arouse suspicion that

9    someone else might be responsible.

10             **THE COURT:**  It may be.  But it's what the California

11   Supreme Court said.

12             **MR. PERLSTADT:**  Yes.  But the California Supreme

13   Court, I -- I believe it's the *Ethicon* case that I'm thinking

14   of.  It's -- a person was injured during surgery.  And so

15   they -- they have a malpractice claim.  They know they've been

16   injured.  They have a malpractice claim against the surgeon.

17       And then years later they learn that, oh, darn it, it was

18   actually also the medical device that was implanted so I may

19   also have a claim against the medical device manufacturer.

20       But it's -- it's not clear that -- once you know of an

21   injury, I don't think you have a duty to explore all possible

22   potential causes of this.  People didn't know that Facebook

23   was necessarily involved in this until much later.  And it

24   certainly didn't -- didn't infiltrate into the Rohingyan

25   community.  She's -- she's -- does not speak English.  She

1    does not read or write English.  I'm not even sure she's

2    functionally literate in her own language.

3        The idea that she had -- that she didn't look hard enough

4    as to whether a social media company might have had some

5    substantial role in the harm incurred upon her in 2012, I

6    just -- it feels like an impossible standard, and I don't

7    believe that that's what the California Supreme Court

8    requires.

9        We allege that she didn't discover until 2021.  They don't

10    dispute that allegation, that she didn't dispute -- that she

11    didn't find out until 2021.  We explain that based on language

12    barriers, based on the struggle that she's had coming to

13    America, running away from ethnic violence, she wasn't able to

14    discover all these things that Facebook did and knew.

15        And I think that it's -- she -- it's -- it's appropriate

16    to, and consistent with California law, to say that the

17    discovery rule applies here.

18        **MS. RING:**  Your Honor, we're sympathetic to the

19    plaintiff's situation and so is California law.  The question

20    is what a reasonable person in the plaintiff's position would

21    have done to exercise reasonable diligence.

22        And the law is clear that a plaintiff has to allege facts

23    setting forth the time and manner of discovery.  We don't have

24    the manner of discovery.  And in opposition plaintiff said it

25    was the lawyers who told her.

 1          And the second, though, is really important to this

 2     discovery rule and to the statute of limitations in general.

 3     It's the facts to show the inability to have made earlier

 4     discovery despite reasonable diligence.

 5          Again, it takes her as she is, but there are no facts in

 6     this complaint to say that -- that she did anything.  And it's

 7     particularly noteworthy because the complaint is also full of

 8     reports and news reports and talking about this from 2015 to

 9     2018.

10          We don't know from the complaint did she come -- when she

11     fled Burma, did she arrive in the United States within a year,

12     or did she just arrive in 2020?  Did she live in a Rohingyan

13     community?  Did -- we don't know anything that would support a

14     reasonable inference that she couldn't have learned of

15     these -- these facts sooner than she did based on reasonable

16     diligence.  That's what the law requires.  And there's nothing

17     in the complaint to help us make that determination at all.

18          **THE COURT:**  Yeah, I agree.  It is the plaintiff's

19     burden to show diligence.  And frankly, you know, I don't even

20     know how you do that at this point because there aren't

21     allegations in the complaint.

22          The statute of limitations is going to be there for every

23     potential class member when these things happened in 2012 if

24     you've not figured out how it is that you're going to show

25     diligence.

1          **MR. PERLSTADT:**  I just --

2          **THE COURT:**  That -- and I mean -- and it is the rule.

3   I mean --

4          **MR. PERLSTADT:**  It is the rule.  But there are cases,

5   and I'll -- I'll point you to the *Unruh-Haxton* case that we

6   cite in our briefs as well, that suggest that public reports

7   about information that's not obvious is not going to be

8   enough.

9      I believe in the *Unruh* case, it was women who had had eggs

10  harvested for in vitro fertilization later found out

11  through -- or it later became discovered that -- that the -- I

12  believe the University of California system was -- or certain

13  doctors were stealing that genetic material, and plaintiffs

14  had no clue that they were injured by the people stealing this

15  information.

16     And the fact that there were public reports about this,

17  that news reports came out is not what triggers that.  And I

18  think that's especially true in our case when we have

19  significant language barriers, when we have significant

20  cultural barriers.

21     So I think -- I agree, California law applies.  I urge you

22  to look at *Unruh-Haxton* --

23                    (Simultaneous colloquy.)

24         **THE COURT:**  Well, you're going to go back.  I'm not

25  going to go look again.  I'm telling you now that --

```
 1              (Simultaneous colloquy.)

 2         THE COURT:  -- there is a problem.  And it is your

 3   burden to allege facts that are going to get you over this

 4   hump.  And I'll look at it again.  But I'm not going to look

 5   at it again now because I'm already telling you that there's

 6   an issue.

 7         MR. PERLSTADT:  I appreciate that.  Understood.

 8         THE COURT:  All right.  Let's move to negligence.

 9      Again, here we've got to have some measure of a duty.  And

10   under California law, Meta can only be liable where, one,

11   there is a special relationship that creates a duty, and

12   two -- or two, that it engaged in an act that increased the

13   risk of harm.

14      So it doesn't sound like there is a special relationship.

15   There are no allegations that allege a special relationship.

16   Do you agree?

17         MR. PERLSTADT:  Agree.  We're not pursuing -- we're

18   not pursuing on a special relationship.

19         THE COURT:  So then the question is the -- increasing

20   the risk of harm.  And here, you pretty much ignore the

21   Rowland factors.  And you've got to engage with those factors

22   in determining or in pleading a general duty.

23      I'll start with the defense at this point.

24         MS. RING:  Well, Your Honor, we agree that the

25   complaint does not have adequate allegations to support a duty
```

1  here.  I would say, and I apologize, we submitted some

2  supplemental authority yesterday, I believe.  It was an *Uber*

3  case decided by the California Court of Appeal.  And on that

4  element of increasing the risk of injury, the California

5  Supreme Court in *Brown* said it's not just increasing the risk

6  of injury, it's increasing it in a meaningful way.

7       The California Court of Appeal in *Uber* explained that what

8  that means is that the risk that's created has to be a

9  necessary component of the defendant's conduct, and went on to

10  describe how -- what that means is it's not just creating the

11  opportunity for the harm to the plaintiff, but it actually has

12  to be a necessary component of the defendant's conduct.

13       So here, the question is, you know, Facebook is a

14  communications platform and plaintiffs allege that the Myanmar

15  military abused it.  But it's used for all sorts of things.

16  Use by a military government to foment ethnic division and

17  then conduct a genocide is not a necessary component of

18  Facebook.

19       People send pictures of their grandkids and their pets,

20  and it's not a necessary component.  So we don't think there's

21  any fact that plaintiffs can allege to establish what is

22  generally termed as misfeasance, meaning something that

23  creates a risk that actually then could lead to a duty.

24       And, Your Honor, we also agree, as Your Honor referenced,

25  the *Netflix* case earlier and the factors, again, it's a

1   communications platform and so -- and one that's used for all

2   sorts of things.  And to impose a duty based on something that

3   someone does after viewing something on the platform, we don't

4   think is supported by the *Rowland* factors at all.

5          **THE COURT:**  So I'm pulling up the docket because I

6   don't -- I'm not sure it was the *Uber* case that was submitted.

7          **MS. RING:**  Oh, you know, what, Your Honor?  I'm

8   sorry.  You're right.  It was the --

9                    (Simultaneous colloquy.)

10         **MS. RING:**  *Jackson v. Airbnb*.  I apologize.

11         **THE COURT:**  Okay.  So do you have an *Uber* cite so

12  that the plaintiff can look at that one as well?

13         **MR. PERLSTADT:**  I've looked at it, Your Honor.

14         **THE COURT:**  You've looked at it?

15         **MR. PERLSTADT:**  I saw it yesterday.  Yes, thank you.

16         **THE COURT:**  All right.  Go ahead.

17                  (Off-the-record discussion.)

18         **MR. PERLSTADT:**  Oh, I'm sorry.  The *Airbnb*, I don't

19  know the case she's referring to.

20         **CERTIFIED STENOGRAPHIC REPORTER:**  I'm sorry.  You

21  really need to slow down --

22         **MR. PERLSTADT:**  I'm so sorry.

23         **CERTIFIED STENOGRAPHIC REPORTER:**  -- and only speak

24  one at a time, please.

25         **MR. PERLSTADT:**  I have seen the *Airbnb* case.  I

1    apologize.  I am not -- I don't know which *Uber* case she's

2    referring to.

3              **MS. RING:**  Okay.  It's -- the cite is

4    79 Cal. App. 5th, and the necessary component standard is

5    articulated at pin cite 427.

6              **THE COURT:**  Okay.  Well, I've not looked at it

7    either.  But, again, we're going to go through another round

8    here so make sure to take a look.

9         You can respond.

10             **MR. PERLSTADT:**  Thank you, Your Honor.

11        So with respect to the -- yes, we don't allege -- or we

12   don't -- we're not proceeding under a special relationship

13   theory.  As you identified, special relationships are only

14   required when trying to establish liability through

15   nonfeasance.  And here we are alleging misfeasance.  So many

16   of the cases they cite in their briefs, and the *Airbnb* case

17   they cite, they submitted yesterday, are all nonfeasance

18   cases.

19        For example, in *Airbnb*, there certainly weren't -- *Airbnb*,

20   that case involved whether Airbnb was liable for a shooting

21   that took place at one of the rental properties.  And I don't

22   believe there were allegations in that case that Airbnb was

23   encouraging and amplifying incitements to violence on their

24   property, which is what we have here.

25        We have -- we have allegations of misfeasance here.  And

1    so this case falls under -- not under special relationships,

2    but under the general duty of reasonable care under California

3    law.  Everyone owes --

4              THE COURT:  But -- but --

5              MR. PERLSTADT:   -- a general duty to exercise

6    reasonable care for the safety of others.

7              THE COURT:  Okay.  But it sounds like your complaint

8    is amplification generally, that is, the actions of Meta are

9    inappropriate because they amplified whatever somebody else

10   was doing.

11             MR. PERLSTADT:  And encouraged.

12             THE COURT:  So Meta doesn't get paid by people who

13   are happier because they've amplified happy things, but we

14   want to hold them responsible for amplifying things that we

15   don't like; is that what you're saying?

16             MR. PERLSTADT:  We're saying they encouraged and

17   amplified, incentive -- yes --

18                      (Simultaneous colloquy.)

19             THE COURT:  And just generally, that is, there are no

20   implications that they amplified this specifically to this

21   specific situation, it's just the nature of the -- it's the

22   nature of the beast.  The beast amplifies whatever the input

23   is.  That's your claim.

24             MR. PERLSTADT:  Yes.  But there's no intent

25   requirement for negligence.  If I'm -- if I'm speeding, my

1   intent is not to hit a child when I speed, but I can still be

2   held -- I have a duty not to speed to not hit a child.

3           **THE COURT:**  Doesn't matter whether you're speeding or

4   not.  If you hit the child, you hit the child.

5           **MR. PERLSTADT:**  But I have a duty to act reasonably.

6   If I'm -- if I'm obeying the law and a child jumps out in

7   front of me and there's nothing I could reasonably do, then I

8   won't be -- I don't believe I'll be liable.  There's no strict

9   liability.  That's -- that's -- we're talking about negligence

10  now.

11      So that you have a general duty to act in a manner that --

12  in a reasonable manner that doesn't harm other people.

13      If Facebook was reasonable here, by all means, they're not

14  liable.  But that's a breach question.  And I sort of think

15  Facebook is trying to make breach questions into duty

16  questions because breach is not something that can be decided

17  on a motion to dismiss.  Those are fact questions.

18      Duty is a legal question, and I think the --

19          **THE COURT:**  Duty --

20              (Simultaneous colloquy.)

21          **MR. PERLSTADT:**  I'm sorry?

22          **THE COURT:**  A duty of reasonable care is evaluated

23  under *Rowland*.

24          **MR. PERLSTADT:**  I would push back on that a little

25  bit.  *Rowland*, the purpose of *Rowland* -- and this is from

1    *Brown*, 2021 California Supreme Court.

2        The purpose of the *Rowland* factors is to determine whether

3    relevant circumstances warrant limiting a duty already

4    established.  It's not about whether we recognize legal duties

5    in new contexts.  We don't say, oh, look to *Rowland* to decide

6    whether there is a duty here.

7        We look to *Rowland* to decide whether, oh, in light of the

8    general duties or in light of another duty, maybe we shouldn't

9    have a duty here.

10       I think the paradigmatic case of application of the

11   *Rowland* factors is *Castaneda v. Olsher*, which is discussed in

12   the *Brown* case.  And in that case, despite -- despite a

13   general duty of landlords to protect tenants, including from

14   other tenants, requiring landlords to withhold renting units

15   to those they believe to be gang members would result in

16   arbitrary discrimination.  California Supreme Court didn't

17   think that was a workable solution anyway.

18       So the Supreme Court there said --

19       (Interruption by the Certified Stenographic Reporter.)

20           **MR. PERLSTADT:**  I'm sorry.  Too fast again.

21   Apologize.

22       So the -- the Supreme Court there, in *Castaneda*, as

23   explained in *Brown*, said that there were clear considerations

24   of policy that justified carving out such a requirement from

25   an otherwise applicable duty.  So that's how *Rowland* works.

1    *Rowland* is about, oh, there's a duty.  Facebook has a

2    general duty.  Maybe in this circumstance, we should -- there

3    are clear considerations of policy to carve out a duty --

4    carve out from the general duty these circumstances.  That's

5    how *Rowland* works.

6        And here, there are no clear considerations of policy that

7    would justify carving out from the general duty of care a duty

8    not to encourage and amplify incitements to violence.

9            **THE COURT:**  What about all the cases that say there's

10   a reluctance to impose a duty if it undermines First Amendment

11   expression?  There are lot of cases against you on that front.

12           **MR. PERLSTADT:**  I think -- I'd be curious which ones

13   you think specifically.  But with respect to Facebook just

14   sort of feints at restraining expression and chilling Internet

15   free speech as a policy.

16       But I think to the extent there are policy considerations

17   governing whether to hold social media companies liable for

18   things posted on their cites, the CDA makes that policy

19   balance.

20       So depending on -- on how the CDA shakes out, I don't

21   think *Rowland* justifies imposing some other additional or

22   different policy justifications on --

23           **THE COURT:**  How is this case any different from *The*

24   *Estate of B.H. v. Netflix* case I've already decided?

25       How is it any different?

1          **MR. PERLSTADT:**  I'd have to go back.  I don't believe

2     that was cited in the briefs.  I'd have to go back and look at

3     the -- if you could remind me of the facts, I'm happy to

4     discuss it, but I apologize for not having it at the tip of my

5     tongue right now.

6          **THE COURT:**  Netflix had disseminated a video -- and

7     it was in the reply -- called *13 Reasons Why*.  And someone

8     died.  Tragic.

9          **MR. PERLSTADT:**  And did you find that there was no

10     duty to -- that Netflix didn't have a duty not to --

11          **THE COURT:**  I had -- well, I declined to hold them

12     liable on a negligence theory.

13          **MR. PERLSTADT:**  I apolo- -- I would offer to --

14          **THE COURT:**  Go ahead.

15          **MR. PERLSTADT:**  -- to draft a surreply, but we're

16     going to have to -- sounds like we're going to have to rebrief

17     this anyway.

18          **MS. RING:**  Your Honor, we think *Netflix* clearly

19     applies here.

20        And I would just say on the other points that the Court

21     has described the standard here correctly.  Obviously

22     there's -- under *Brown* there's a -- there's two steps.

23     Plaintiffs can't make it past the first step which is a

24     special relationship or misfeasance.

25        The second step, then, is the *Rowland* factors.  And we

 1    also believe that -- and I think as -- again you accurately

 2    described, the question is whether a duty should be imposed

 3    even if the first step can be overcome.  And we think it can't

 4    for the reasons that you -- among others, for the reasons you

 5    explained in *Netflix*.

 6            **THE COURT:**  Okay.  One last issue, and that is -- and

 7    maybe I should have started here.

 8        But the question is CAFA jurisdiction.  You have indicated

 9    to me that the plaintiff is a resident of Illinois.  But is

10    she a citizen of Illinois?  Is that her permanent domicile?

11    If not, I mean -- and people confuse this all the time,

12    lawyers confuse it all the time.  Residence isn't sufficient.

13    We need -- we need citizenship.  And citizenship can be

14    defined as permanent domicile, but resident is not enough.

15            **MR. PERLSTADT:**  To be fair, we filed in state court

16    so the burden is on defendant -- they removed.  And Facebook

17    alleged minimal diversity in its removal papers.

18        We didn't dispute those allegations, the diversity

19    allegations in the removal.

20        I believe under *Ehrman v. Cox Communications* in the Ninth

21    Circuit, 2019, that that is enough for jurisdiction here.  If,

22    on removal, defendant alleges minimal diversity and those

23    factual allegations are not disputed, that jurisdiction is

24    secure.  But I -- I -- to be fair, the burden is on defendant

25    to be -- to establish jurisdiction here.

1      **THE COURT:**  Okay.

2          All right.  How much time do you want to revise your

3      complaint?

4          **MR. PERLSTADT:**  Following an order from this Court?

5          **THE COURT:**  No.  This is your order.  It's --

6          **MR. PERLSTADT:**  This.

7          **THE COURT:**  -- granted with leave to amend.  Get the

8      transcript.

9                    (Off-the-record discussion.)

10         **MR. PERLSTADT:**  90 days, Your Honor.

11         **THE COURT:**  All right.  90 days to amend.  That puts

12     us mid-March.

13         When do you want to respond?

14         **MS. RING:**  Your Honor, could we have 60 days, please?

15     I don't have my calendar in front of me.

16         Your Honor, to save you time, maybe we could meet and

17     confer with plaintiffs and submit some proposed briefing

18     schedule.

19         **THE COURT:**  That's fine.

20         **MS. RING:**  Thank you.

21         **THE COURT:**  All right.  But the order will have

22     90 days to amend.

23         **MR. PERLSTADT:**  Thank you, Your Honor.

24         **THE COURT:**  Okay.  Once in a while we get to rule

25     from the bench to again help our dockets.

1          **MR. PERLSTADT:**  Appreciate it.

2          **THE COURT:**  Okay.  Everybody have a happy holiday and

3     Happy New Year.  We're adjourned.

4          **MS. RING:**  Thank you, Your Honor.

5          (Proceedings were concluded at 10:38 A.M.)

6                          --o0o--

7

8

9

10                    **CERTIFICATE OF REPORTER**

11

12          I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled matter.

14     I further certify that I am neither counsel for, related to,

15     nor employed by any of the parties to the action in which this

16     hearing was taken, and further that I am not financially nor

17     otherwise interested in the outcome of the action.

18

19     _____

20          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

21              Sunday, December 18, 2022

22

23

24

25