Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson (*pro hac vice*)
jedelson@edelson.com
Roger Perlstadt (*pro hac vice*)
rperlstadt@edelson.com
J. Eli Wade-Scott (*pro hac vice*)
ewadescott@edelson.com
Michael Ovca (*pro hac vice*)
movca@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Richard Fields (*pro hac vice* forthcoming)
fields@fhcfirm.com
Edward Han (*pro hac vice*)
edhan@fhcfirm.com
Martin Cunniff (*pro hac vice*)
martincunniff@fhcfirm.com
FIELDS HAN CUNNIFF PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
Tel: 833.382.9816

*Counsel for Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> META PLATFORMS, INC., a Delaware corporation, <br><br> *Defendant.* | Case No. 4:22-cv-00051-YGR <br><br> Hon. Yvonne Gonzalez Rogers <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs Jane Doe 1 and Jane Doe 2 bring this First Amended Class Action Complaint and Demand for Jury Trial against Defendant Meta Platforms, Inc. ("Meta"), formerly known as Facebook, Inc. Plaintiffs, for their Complaint, allege as follows:

**INTRODUCTION**

1.      The Rohingya are an ethnic minority population who historically lived in Burma (also known as Myanmar) and who have long been the victims of discrimination and persecution by non-Rohingya Burmese and the Burmese government. But the scope of that persecution changed dramatically in the last decade, turning from sporadic violence to widespread human rights abuses—including terrorism and genocide—resulting in the killing and displacement of hundreds of thousands of Rohingya, including Plaintiffs and the Class.

2.      The purveyors of these violent acts—Burmese government forces and civilian militias—are not the only ones to blame. As the Chairman of the United Nations Independent International Fact-Finding Mission on Myanmar found, social media giant Meta played a "determining role" in the genocide. Indeed, corporate whistleblowers have since confessed that in working for Meta, they had been "a party to genocide." And even Meta officers such as Mark Zuckerberg and Sheryl Sandberg meekly admit the company should have done more to prevent the use of its social media platform, Facebook, for genocide in Burma.

3.      Specifically, Meta, among other things:

- Designed Facebook in a way that both encouraged the creation of toxic posts—including incitements to violence against the Rohingya—and amplified, promoted, and recommended such posts to those people most likely to act on them; and

- Failed to take reasonable precautions to minimize the risk of violence against the Rohingya even though such violence was foreseeable and—most egregiously—even after Meta was informed that such violence was occurring.

4.      Perhaps most troubling of all, is the fact that the company appears to have learned nothing, as the cycle is currently repeating itself against the Tigrayan minority in Ethiopia and elsewhere. Though Meta knows how to design its product so it does not incentivize hate, nothing so far has convinced it to do so because, in the words of whistleblower Frances Haugen, "they have put their astronomical profits before people."

5.      Plaintiffs seek to hold Meta responsible for the substantial role it played in the attacks on Plaintiffs and the Class, and to hold Meta accountable for the dangerous design flaws

that encouraged and promoted the creation of toxic anti-Rohingya propaganda and incitements to violence against them.

## PARTIES

6. Plaintiff Jane Doe 1 is a natural person and resident of the State of Illinois.

7. Plaintiff Jane Doe 2 is a natural person and resident of the State of Illinois.

8. Defendant Meta Platforms, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Hacker Way, Menlo Park, California 94025.

## JURISDICTION AND VENUE

9. Jane Doe 1 originally filed this action in California Superior Court for the County of San Mateo. Meta removed the case to the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1441, 1446, and 1453. In support of removal, Meta alleged that federal jurisdiction exists pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds $5 million, the Class has at least 100 members, and there is minimal diversity between the Class and Meta.

10. With respect to minimal diversity, Meta, a citizen of California and Delaware, alleged "for purposes of removal" that at least one member of the Class has naturalized as a United States citizen and established a domicile in a state other than California or Delaware, and that at least one member of the Class is a citizen of Burma.

## FACTUAL BACKGROUND

### I. **The Rohingya.**

11. The Rohingya are an ethnic minority group who historically lived in the Rakhine State on the western coast of present-day Burma (also known as Myanmar), near the border with Bangladesh. The Rohingya are predominately Muslim, while the majority of non-Rohingya Burmese are Buddhist.

12. The Rohingya lived in the Rakhine State going as far back as the 8th century. At one point, more than 1.4 million Rohingya lived in Rakhine, a state about half the size of the

Northern District of California. Figure 1 below shows a map of the Rakhine State in a dotted red line, within the larger political entity of Myanmar/Burma.



(**Figure 1.**)

13. Despite this extensive history in the region, the Rohingya have long been marginalized and discriminated against by Burma's military government. Adopting the same playbook as many other authoritarian regimes, the military has consistently cited an imagined threat from the Rohingya to justify its hold on power. As the U.N. has noted, "the 'Rohingya crisis' in Rakhine State … has been used by the military to reaffirm itself as the protector of a nation under threat…."

14. After Burma gained independence from Britain in 1948, the Rohingya were denied citizenship and treated as illegal immigrants from neighboring Bangladesh. Their freedom of movement and access to basic services such as education and healthcare was restricted, leaving them vulnerable to abuse and exploitation.

15. Over the following decades, the Rohingya faced periodic waves of violence and persecution. But the scope and violent nature of that persecution changed dramatically in the last decade, turning from sporadic violence into terrorism and genocide.

16. The key inflection point for that change was the introduction of Facebook into Burma around 2011, which materially contributed to the development and widespread dissemination of anti-Rohingya hate speech, misinformation, and incitement of violence, leading to mass killings and rape of the Rohingya people.

17. As set forth below, Meta encouraged the creation of, amplified, and distributed toxic and dangerous Facebook posts that directly resulted in attacks on the villages of each of the Plaintiffs, Jane Doe 1 and Jane Doe 2. In these horrific attacks, Plaintiffs fled for their lives to the United States, where they now remain because they are unable to return to Myanmar.

**II. Meta's Facebook Was a Substantial Factor in the Attacks on Plaintiffs and their Villages.**

18. Though Facebook started as a "social network" where users could quickly and easily share material within their friend groups, it became a wildly successful and unique business, deriving enormous wealth from acquiring and monetizing the data of those billions of people leading their lives in Facebook's digital ecosystem.

19. This is relevant because in order to increase advertising revenue and profits, Meta needed to acquire more Facebook users and keep them engaged longer. So Meta needed to expand to new markets, like Burma, and Meta needed to make Facebook "stickier" (meaning people need to stay on it longer and, in turn, share more of their data).

20. But Meta realized an ugly truth: Facebook becomes "stickier" when it is filled with toxicity. What this means is that the more Facebook stokes divisiveness, polarization, and violence, the more money Meta makes. Unfortunately, this has real world consequences, like what happened to Plaintiffs and the Class. Worse yet, it was entirely foreseeable—and even known to Meta—that when it entered Burma, the attacks on Plaintiffs and the Class would happen.

**A. *Meta Entered Burma in 2011.***

21. Beginning around 2011, Meta arranged for tens of millions of Burmese to gain access to the Internet for the first time, access that would be offered exclusively through the Facebook social network. Meta accomplished this by partnering with Burmese

telecommunications companies to pre-load and "zero-rate" a Facebook mobile app that would give users access to its social network along with a selection of websites and services for free.

22. This meant that when people in Burma bought smartphones, they came pre-loaded with Facebook, which could be used to access the Internet for the first time for free. In contrast, other social media sites or Internet services could be accessed only by incurring data charges.

23. Meta's plan worked. Facebook became wildly popular in Burma and eventually, for tens of millions of Burmese citizens, Facebook became synonymous with the Internet.

**B.** ***Meta Rushed into Burma, Ignoring Key Issues that Would Eventually Play a Substantial Role in the Attacks on Plaintiffs, their Families, and their Villages.***

24. When Meta develops a new product or enters a new market, it typically must undergo rigorous technical and legal review. But if the market is below a certain size or the product is going to impact less than a certain threshold population, like the population of Burma, certain reviews are ignored. Meta calls this the "2% rule." Unfortunately for Plaintiffs, Meta was so eager to dominate the Burmese market, and the market was technically small enough, that key issues were overlooked. This ultimately contributed substantially to the violence against Plaintiffs, their families, and their villages.

25. First, most people in Burma do not speak English. Although Burmese users at the time could post on Facebook in Burmese, the platform's interface—including its system for reporting problematic posts—was in English. This meant that users could not read, understand, or agree to Facebook's terms or policies (especially the terms that governed what users were and were not allowed to do on the platform), and could not report misinformation, hate speech, or calls for violence.

26. Second, Meta made little effort to actively monitor what was happening on its platform in Burma, such that Burmese-language content that was in violation of Facebook's terms of service or community guidelines flourished. For a population of over 20 million, Facebook had only one content reviewer who spoke Burmese and for some time, did not have any. By 2015, Facebook had four Burmese speakers reviewing content, but they were stretched thin, reviewing content of over 7.3 million active users. Nevertheless, in spite of Meta's

insufficient monitoring (and thanks to the efforts of non-governmental organizations), Meta was well aware that such incitement to violence and genocidal content was being disseminated in Burma on Facebook, as described in more detail in the following section.

27.     Third, the introduction of Facebook created a crisis of digital literary, which Meta subsequently acknowledged. Before Meta, the vast majority of people in Burma had never used the Internet. A report commissioned by Meta in 2018 described how the rapid transition of Burma from a society without modern communications infrastructure to an Internet-connected society caused "a crisis of digital literacy: A large population of internet users lacks basic understanding of how to … make judgments on online content … [and] many people [found] it difficult to verify or differentiate content (for example, real news from misinformation)." As noted by Sarah Su, a Meta employee who works on content safety issues on the News Feed, "[w]hat you've seen in the past five years is almost an entire country getting online at the same time, we realized that digital literacy is quite low. They don't have the antibodies to [fight] viral misinformation." This means people could not differentiate between what information was reliable and what information was propaganda and hate speech.

### C.     *Meta was Repeatedly Warned About Facebook's Impact in Burma.*

28.     Because Burma's history of repressive military rule and ethnic violence was well-documented by the time Meta entered the country, it was entirely foreseeable that Facebook would be used to spread hate speech and misinformation and to incite violence.

29.     In fact, Meta was repeatedly warned that Facebook was being used to spread hate speech and misinformation, and to incite violence, by journalists, academics, and NGOs who were closely monitoring the use of Facebook in Burma and who were witnessing the devastating impact it was having. For instance:

- In 2012, Myanmar ICT for Development Organization (MIDO) co-founder, Htaike Htaike Aung, raised concerns over the proliferation of anti-Rohingya hate speech on Facebook at a roundtable organized by Freedom House at IGF Baku, Azerbaijan, attended by Meta's Director of Global Public Policy and Policy Director, Europe.

- In 2013, a new civil society organization called Panzagar, meaning "flower speech," was formed in Burma. The group spoke out locally about anti-

Muslim hate speech directed at the Rohingya minority that was proliferating on Facebook. Panzagar reported instances of hate speech to Meta.

- Also in 2013, Meta's Director of Global Public Policy, European Policy Director, and India Policy Director were warned of Facebook's role in inciting the rising tensions against Rohingya at roundtable at IGF Bali, Indonesia.

- In November 2013, an Australian journalist visited Meta's headquarters and briefed Elliot Schrage (Vice President of Communications and Public Policy) on the proliferation of anti-Rohingya content on Facebook.

- In March 2014, Meta's staff, including Meta's head of engineering, were briefed by academics on Facebook's role in the deteriorating situation in Burma.

- Also in March 2014, leading humanitarian rights leaders visited Meta's headquarters to brief Meta's Compassion team on how Facebook was being used to incite violence against Rohingya.

30.    Briefings like these continued regularly through at least 2018, each time warning of more dire and devastating situations. These examples only skim the surface.

31.    Unfortunately, despite these repeated warnings, Meta was slow to act and did not do enough to stop Facebook from being used to incite violence against Rohingya (which Meta subsequently admitted, as described in Section IV below). It turned a blind eye as Facebook became a machinery of the genocide that victimized Jane Doe 1, Jane Doe 2, and other members of the proposed Class.

**D.    *The Warnings Should Not Have Been Surprising to Meta, which Designed Facebook to Promote Material Likely to Stimulate Engagement, Including Content Promoting Hate and Inciting Violence.***

32.    Meta's goal is to maximize "engagement" on Facebook, a metric reflecting the amount of time a user spends on Facebook and the amount of interaction ("likes," "shares," comments, etc.) that a user has with any given content. For Meta, engagement determines advertising revenue, which determines profits.

33.    To that end, beginning in 2009, Meta intentionally incorporated engagement-based ranking of content into Facebook and the algorithms that drive it. Facebook's News Feed—the first thing that users see when opening the app or entering the site and "the center of the Facebook experience"—is driven by engagement. Posts with higher engagement scores are

included and prioritized in the News Feed, while posts with lower scores are buried or excluded altogether.

34. To maximize engagement, Facebook does not merely manipulate the content in users' News Feeds; it also employs a system of social rewards that trains and conditions users to create such content. When users post content, other users who are shown that content are prompted to "like," "comment" on, or "share" it. Under each piece of content, users can see how many times others have liked or shared that content and can read the comments.

35. Meta engineers and data scientists meet regularly to assess the billions of likes, comments and clicks Facebook users make every day to "divine ways to make us like, comment and click more," so that users will keep coming back and seeing more ads from the company's two million advertisers. Engineers are continually running experiments with a small share of Facebook users to boost engagement.

36. Unfortunately, as mentioned above, users are more engaged and Facebook becomes "stickier" when it is filled with toxicity, misinformation, and hate. Meta knows that the most negative emotions—fear, anger, hate—are the most engaging. Meta employs psychologists and social scientists as "user researchers" to analyze its user's behavior in response to online content. An internal presentation by one such researcher, leaked in May 2020, warned: "Our algorithms exploit the human brain's attraction to divisiveness…. If left unchecked, … [Facebook would feed users] more and more divisive content in an effort to gain user attention & increase time on the platform."

37. Meta knew that it could increase engagement and the length of time users spend on Facebook (and subsequently increase its revenue) by adjusting its algorithms to manipulate users' News Feeds to recommend more divisive and inflammatory content, thus causing "massive-scale emotional contagion."

38. In an internal memo leaked by now-famous whistleblower, Frances Haugen, Meta researchers acknowledged that it was Facebook's "core product mechanics"—meaning the fundamental features and functions of the product—that had let misinformation and hate speech flourish on the site.

39.     As a result, when Facebook's algorithms prioritize and recommend content that triggers anger at out-groups, the users who posted the content are rewarded with "likes" and "shares" and are thereby conditioned to create more of that content. In other words, if a user makes two posts—one containing hateful, outraged, and divisive content and one lacking such content—Facebook's algorithms will promote and recommend the hateful, outraged, and divisive post to more users. Consequently, the hateful, outraged, and divisive post will be rewarded with more likes, shares, and comments. The user quickly learns that, to obtain a reaction to his or her posts, he or she should incorporate as much hateful, outraged, and divisive content as possible.

40.     Additionally, Facebook algorithms, such as "Discover" and "Groups You Should Join," recommend violent content to susceptible users and suggest they join extremist groups. For example, internal Meta research revealed that 64% of all users joining German extremist groups on Facebook were the result of Facebook's own recommendation tools.

41.     It is now clear that, by modifying the design of Facebook and its underlying algorithms, Meta can influence and manipulate the quantity, substance, and emotional tone of the content its users produce. Simply put, it is evident—based largely on admissions from former Meta executives—that Facebook's algorithms are not "neutral." The algorithms do not merely recommend content based on users' previously expressed interests; rather, to maximize engagement, recommendations are heavily biased toward promoting and rewarding the creation of content that will enrage, polarize, and radicalize users. Meta does not simply "connect" people with similar interests; it exploits the universal human instinct for tribalism by actively herding people into groups that define themselves through their violent opposition to "other" people— often identified by race, religion, or political ideology.

42.     As Ms. Haugen explained in testimony before Congress:

> [Meta] knows that content that elicits an extreme reaction from you is more likely to get a click, a comment or reshare. And … they know that other people will produce more content if they get the likes and comments and reshares. They prioritize content in your feed so that you will give little hits of dopamine to your friends, so they will create more content.

43.     Similarly, as Meta's former Vice President for User Growth, Chamath Palihapitiya, once confessed, "I think we have created tools that are ripping apart the social

fabric of how society works…. The short-term dopamine-driven feedback loops we've created are destroying how society works…. No civil discourse, no cooperation[,] misinformation, mistruth."

44. Through its dopamine-based incentive structure of social rewards and cues, as well as its algorithmic promotion and recommendation of hate speech and misinformation, Meta's conduct is a substantial factor in the development and creation of outraged, extreme, and divisive content.

### III. The Attacks on Plaintiffs, their Families, and their Villages.

#### A. The Attack on Jane Doe 1.

45. Plaintiff Jane Doe 1 is a Rohingya Muslim woman who used to live in a village in Maungdaw Township in Burma's Rakhine State in a house with her parents and two sisters.

46. In 2012, when Jane Doe 1 was around 16 years old, her village was attacked by members of the Rakhine militia (a civilian "security force"), Burmese Border Guard, and Field Police. Her father was detained, beaten, and tortured for two weeks. Her home, property, and family business were destroyed.

47. Many young Rohingya girls in Jane Doe 1's village and nearby villages were taken from their families. Many Rohingya who left their homes were killed. Jane Doe 1 saw at least seven men killed, as well as an elderly woman. She knew that many others in her village were also killed, including women and children, but she could only see those directly in the vicinity of her home.

48. Fearful that Jane Doe 1 would be abducted and sexually assaulted or killed, her family eventually urged her to flee Burma, alone.

49. Though she lost everything and suffered serious emotional distress, Jane Doe 1 ultimately resettled in the United States after a grueling years'-long, near-death journey fleeing through multiple countries. To this day, Jane Doe 1 continues to suffer emotional distress by the ethnic violence and threats of violence inflicted on her and her family. It remains unsafe for her to return.

### **B.** **Facebook's Role in Inciting the Violence that Led to the Attack on Jane Doe 1.**

50.     As mentioned above, Facebook was introduced in Burma in 2011 and skyrocketed in popularity, effectively becoming the Internet for millions of people in one of the least developed and literate countries in the world.

51.     Almost immediately, and for reasons discussed in Section II, misinformation, hate speech, and specific calls for violence against the Rohingya spread like wildfire across Facebook, including organizing and calling for violence in Jane Doe 1's village.

52.     One particular set of Facebook posts caused a wave of violence in Rakhine (and in Jane Doe 1's village in particular) in 2012. Those posts claimed that a Rakhine Buddhist woman had been gang-raped and killed by Rohingya men, a rumor that has since been discredited. *See* Figure 2, showing an example of one such post from 2012 (referring to the Rohingya as "Bengali Muslims"). Facebook users also posted images from wars and disasters in other countries and falsely attributed them to supposed Rohingya atrocities.



(**Figure 2.**)

53.     As the violence in Jane Doe 1's community began to unfold, Facebook lit up with anti-Rohingya posts and calls for killings. Using a derogatory term for dark-skinned Rohingya Muslims—"kalar"—one Facebook user declared: "We should kill all the Kalars in Burma or banish them, otherwise Buddhism will cease to exist." Another posted: "Bad Kalar. We already allowed them to live in our country. Now they have raped and killed our women…. If we just watch, we will end soon. Unless we take initiative and plan to end Kalar men and women, Rakhine people will end."

54.     A nationalist group then formed a Facebook page entitled "Kalar Beheading Gang," which quickly solicited and attracted a significant number of "likes" by mid-June.

55.     Some Facebook users went so far as to post offers of money to those who would rape and kill Rohingya in Jane Doe 1's community.

56.     Alongside Facebook posts targeting Jane Doe 1's community and calling for violence, a number of posts also targeted individuals who had expressed support for, or sought to document the violence against, the Rohingya, including journalists and human rights organizations. *See* Figure 3, showing a screenshot of a Facebook post calling for assassination of Rohingya, among others.



(**Figure 3.**)

57.     Amid the attacks, Myanmar Presidential Spokesman Zaw Htay posted on Facebook:

Rohingya terrorists … are crossing the border into Myanmar with weapons…. Our troops have received the news in advance so they will completely destroy them [the Rohingya]. It can be assumed that the troops are already destroying them [the Rohingya]. We don't want to hear any humanitarian or human rights excuses. We don't want to hear your moral superiority, or so-called peace and loving kindness.

58.     All of this came on the heels of an earlier rash of Facebook posts reacting to— often in violent and threatening terms—the publication of a BBC article sympathetic to the Rohingya. For example, various commenters posted:

Kick out all Muslim Kalar from Burma. If this doesn't work, then kill them to death.

Don't assume I won't sharpen my knife. I am ready to make it sharp for the sake of protecting our nation, religion and races against those Bengali cheaters.

[Expletive] Kalar, we will slap your face with shoes and cut your heads…. We will set you on fire to death and turn the mosques into wholesales/retail pork markets.

59.     Ultimately, Facebook posts, pages, and groups like these were effective for inciting and organizing the violence in Jane Doe 1's village. These posts are examples and are just the tip of the iceberg. They incited rioting resulted in more than 50 Rohingya being killed, and drove 140,000 Rohingya from their homes, including Jane Doe 1.

## *C.     The Attack on Jane Doe 2.*

60.     Plaintiff Jane Doe 2 is a 28-year-old Rohingya Muslim woman who used to live in a village in Maungdaw Township in Burma's Rakhine State in a house with her parents and seven siblings.

61.     In August 2017, the Burmese military (including the now-infamous 33rd and 99th Light Infantry Division), Rakhine militia, Burmese Border Guard, and Field Police entered Jane Doe 2's village and began burning houses and raping women. When Rohingya tried to escape their burning houses, they were shot and killed. This wave of violence become known as the "2017 Clearance Operation" and Rohingya genocide. Many non-Rohingya civilians (often referred to as "ethnic Rakhine") participated in the violence.

62.     Jane Doe 2 and her family were fortunate enough to survive this wave of violence. One night, around three in the morning, they started to hear gunshots and see nearby houses catch fire. They immediately grabbed whatever belongings they could and ran.

63.     Jane Doe 2 and her family traveled by foot—with little to no food or water—hoping to find safe shelter.

64.     They first tried to cross the border with Bangladesh but were unsuccessful because they could not afford the ferry to get across the water border. They then traveled to various villages, where they witnessed burned homes and learned about the mass killings.

65.     Fortunately, Jane Doe 2 was ultimately able to escape Burma. She first escaped to Thailand, close to the Malaysian border. However, because of COVID-19 restrictions, she was unable to enter Malaysia. She remained in a detention facility in Thailand for three years, where there was not enough food and no freedom of movement.

66.     Eventually, the United Nations Refugee Agency arranged for Jane Doe 2's resettlement. Jane Doe 2 was ultimately resettled to Chicago, Illinois in November 2022.

67.     As a result, Jane Doe 2 ultimately lost her home and majority of her personal belongings that she could not carry. To this day, Jane Doe 2 continues to suffer emotional distress by the ethnic violence and threats of violence inflicted on her and her family. It remains unsafe for her to return.

### D.     *Facebook's Role in Inciting the Violence that Led to the Attack on Jane Doe 2.*

68.     Facebook was a key tool in organizing and carrying out the attacks on Jane Doe 2's village was Facebook.

69.     Soldiers used Facebook to deploy a strategy called "Four Cuts," which meant cutting off Rohingya from (1) food, (2) funding, (3) information and (4) recruitment (of volunteers to help defend their people). The military deployed this strategy by flooding Facebook with posts, pages, and messages designed to terrorize and dehumanize the Rohingya, which allowed them to "justify" what followed: using Facebook to incite violence and carry out attacks, including the attack on Jane Doe 2's village.

70.     Meta has access to tens of thousands of now-deleted posts that show the dehumanization and misinformation campaign against the Rohingya. The following are a small sample of specific Facebook posts and pages that were used to incite the violence in Jane Doe 2's village that were captured before they were publicly removed from Facebook.

71.     For context, the Burmese military deployed an armored brigade with 60 tanks and armored personnel carriers and nine infantry battalions from its elite 33rd and 99th Light Infantry Divisions—units infamous for atrocities committed throughout Myanmar—to the Rakhine State to carry out the 2017 Clearance Operation, including specifically in Jane Doe 2's village.

72.     Multiple public posts by two particular soldiers, and the reactions from their friends, shed light on how Facebook played a substantial role in the attacks on Jane Doe 2's region.

73.     For example, 99th Light Infinity Division soldier Sai Sitt Thway Aung used Facebook to dehumanize the Rohingya and then incite violence in Jane Doe 2's community. Figure 4 shows an August 27, 2017 post to his 5,000 followers, which says (in Burmese on the left and translated into English on the right):



(**Figure 4.**)

74. As Figure 4 illustrates, Aung's followers encouraged him (and others) to kill Rohingya, posting comments like "From the kids to the dogs, don't leave a single one of them alive;" "May the black dogs' race be wiped out;" and "Shoot the kalar. Shoot all of them. Don't leave the kalar villages. Terminate them."

75. Upon information and belief, many of Aung's followers, as well as the hundreds of people who engaged with his incitements to violence, were fellow members of the Myanmar military and others who then engaged in violence against Jane Doe 2's village.

76. Lieutenant Kyi Nyan Lynn of the 33rd Infantry, who at the time was using the name Mine Naung Lynn on Facebook, posted the following message shown in Figure 5 on Facebook after landing near Jane Doe 2's village. Comments to that message called on Lynn to "crush the kalars into dust," which Lynn agreed to do (and which subsequently happened).





(**Figure 5.**)

77.     Upon information and belief, many of Lieutenant Lynn's followers, as well as the hundreds of people who engaged with his incitements to violence, were fellow members of the Myanmar military and others who then engaged in violence against Jane Doe 2's village.

78.     Days later, Aung took to Facebook to request that the army chief send him to Jane Doe 2's region to "fight" and get "revenge." *See* Figure 6, showing Aung's August 25, 2017 Facebook post. Later that same day, his wish had been granted and he was deployed to Jane Doe 2's region.



(**Figure 6.**)

79.     Sadly, only a few days later, Aung took back to Facebook to post directly from Jane Doe 2's region, confirming the "dogs [the Rohingya] are now corpses" and that he was going to continue "shooting and clearing more…." *See* Figure 7, showing Aung's August 28, 2017 Facebook post.



(**Figure 7.**)

80.     Around the same time, Lieutenant Lynn posted about attacking a Rohingya village—potentially Jane Doe 2's, as later reporting confirmed the 33rd Infantry attacked her village in particular. *See* Figure 8, showing Lynn's August 26, 2017 Facebook post. Lynn's followers encouraged him to "eat [the Rohingya] alive," "[s]mash them all," and not "let even one of them escape." *See id.* Lynn agreed.



(**Figure 8.**)



81.    In the end, the Burmese military's strategy to use Facebook to carry out the attack on Jane Doe 2's village (and hundreds of others) succeeded. In all, nearly 400 villages—including Jane Doe 2's—were destroyed in this operation.

82.    Barely a week later, Aung returned to Facebook to let his followers know that the "kalar are quiet now." *See* Figure 9, showing Aung's September 5, 2017 Facebook post.



(**Figure 9.**)

83.     These are just a small sample of the likely thousands of similar Facebook posts that existed at the time, and which were posted by and engaged with by those who encouraged and engaged in the violent attacks on Jane Doe 1 and Jane Doe 2's villages. Upon information and belief, more such posts can be obtained through discovery of Meta's archives.

## IV.     The International Community, and Even Facebook Itself, Subsequently Confirms the "Determining Role" Facebook Played in the Attacks on Plaintiffs and their Villages.

84.     In 2018, after the 2017 Clearance Operations, several senior Meta executives, including Mark Zuckerberg, belatedly admitted that the company had a responsibility to prevent Facebook from being used to incite violence in Burma and should have done more in that regard. On April 10, 2018, Zuckerberg testified before the U.S. Senate:

> SEN. PATRICK LEAHY: ... [S]ix months ago, I asked your general counsel about Facebook's role as a breeding ground for hate speech against Rohingya refugees. Recently, U.N. investigators blamed Facebook for playing a role in inciting possible genocide in Myanmar. And there has been genocide there….
>
> This is the type of content I'm referring to. It calls for the death of a Muslim journalist. Now, that threat went straight through your

detection system, it spread very quickly, and then it took attempt after attempt after attempt, and the involvement of civil society groups, to get you to remove it.

Why couldn't it be removed within 24 hours?

ZUCKERBERG: Senator, what's happening in Myanmar is a terrible tragedy, and we need to do more....

LEAHY: We all agree with that.

85. In a statement to Reuters, Mia Garlick, Meta's director of Asia Pacific Policy, stated: "*We were too slow to respond to concerns raised by civil society, academics and other groups in Myanmar*. We don't want Facebook to be used to spread hatred and incite violence. This … is especially true in Myanmar where *our services can be used to amplify hate or exacerbate harm against the Rohingya*."

86. In August 2018, Sara Su, a Product Manager, posted on Facebook's blog:

> *We have a responsibility to fight abuse on Facebook. This is especially true in countries like Myanmar* where many people are using the internet for the first time and social media can be used to spread hate and fuel tension on the ground.
>
> *The ethnic violence in Myanmar is horrific and we have been too slow to prevent misinformation and hate on Facebook*.

87. On September 5, 2018, Meta COO Sheryl Sandberg testified before the U.S. Senate:

> SEN. MARK WARNER: … Ms. Sandberg, you made mention in your opening testimony the fact that sometimes political actors are using the platforms really to incent violence. I mean, I think you've made at least some reference, mention of Myanmar. We've obviously seen a great tragedy take place there where hundreds of thousands of Rohingya Muslims are fleeing and in many ways. The U.N. High Commissioner has said that fake accounts on Facebook have incented that violence. *Do you believe that Facebook has both a moral obligation and potentially even a legal obligation* to take down accounts that are actually incentivizing violence?
>
> SHERYL SANDBERG: *I strongly believe that*. In the case of what's happened in Myanmar, it's, it's devastating and we're taking aggressive steps and *we know we need to do more*….

88. In 2018, Meta commissioned Business for Social Responsibility (BSR) to publish a human rights impact assessment of Meta's presence in Burma. BSR found that:

- "Facebook is ... used to spread rumors about people and events. Character assassinations were described to BSR during this assessment, and in extreme cases these have extended to online death threats .... There are indications that organized groups make use of multiple fake accounts and news pages to spread hate speech, fake news, and misinformation for political gain. Rumors spread on social media have been associated with communal violence and mob justice."

- "The Facebook platform in Myanmar is being used by bad actors to spread hate speech, incite violence, and coordinate harm.... *Facebook has become a means for those seeking to spread hate and cause harm, and posts have been linked to offline violence* .... [F]or example, the Report of the Independent International Fact-Finding Mission on Myanmar describes how Facebook has been used by bad actors to spread anti-Muslim, anti-Rohingya, and anti-activist sentiment."

- "*The consequences for the victim are severe, with lives and bodily integrity placed at risk from incitement to violence*."

89. On November 5, 2018, Alex Warofka, Meta's Product Policy Manager, issued a statement on the BSR report: "The report concludes that, prior to this year, we weren't doing enough to help prevent our platform from being used to foment division and incite offline violence. We agree that we can and should do more."

90. In an interview with PBS's Frontline in 2018, Guy Rosen, who led Meta's safety and integrity team, acknowledged that "[t]he ethnic violence in Myanmar is horrifying, and we were too slow to spot how this was playing out on our platform."

91. In October 2021, a former member of Meta's Integrity Team summed up Meta's role in the genocide—and its callous disregard for the victims—in a sworn whistleblower declaration to the SEC. It stated, among other things:

At Facebook ... there's no will to actually fix problems, in particular if doing so might reduce user engagement, and therefore profits....

Any projects Facebook undertakes under the banner of charity or community building are actually intended to drive engagement....

Internet.org, *Facebook's scheme to provide Internet to the developing world, wasn't about charity* .... *Inside the company, the dialogue was that this is about gaining an impenetrable foothold in order to harvest data from untapped markets.* Through Internet.org, which provided Facebook at free or greatly reduced rates in key markets, Facebook effectively became the Internet for people in many developing countries.... **[Meta**

*executives would] **say 'When you are the sole source for the Internet you are the sole source for news.'***

Facebook executives often use data to confuse, rather than clarify what is occurring. There is a conscious effort to answer questions from regulators in ways that intentionally downplay the severity of virtually any given issue….

An[] example of their playbook played out in the wake of the genocide of the Rohingya refugees in Myanmar, a country where Facebook was effectively the Internet for most people, and where the long-isolated population was vulnerable to information manipulation. ***Facebook executives were fully aware that posts ordering hits by the Myanmar government on the minority Muslim Rohingya were spreading wildly on Facebook***, because it was being reported in the media and multiple aid-organizations, as well as major, top-tier reporters who used to call the company when they discovered early on that the genocide was being accommodated on Facebook. It was clear before the killing even started that members of the military junta in Myanmar were directing this activity. But, when the violence of the early stages of the Myanmar government-directed genocide metastasized and ***the murders were unmistakably being directed on Facebook***, I was instructed to tell the media, "We know now, and we finally managed to remove their access, but we did not have enough Burmese-speaking moderators." This part was true; there was only one Burmese translator on the team of moderators for years, in the same period when the communications apparatus grew by leaps and bounds. ***But the issue of the Rohingya being targeted on Facebook was well known inside the company for years***. I refused to deploy the approved talking point.

Later, after widespread public blowback forced the company to hire a human rights group to conduct an independent review, Facebook's policy manager Alex Warofka released a statement with the typical Facebook 'mea culpa' response: 'We agree that we can and should do more.' I quickly realized that ***the company was giving a PR response to a genocide that they accommodated***— that, ***I, working for Facebook, had been a party to genocide***. This is what prompted me to look for another job.

92. Not surprisingly, Marzuki Darusman, chairman of the United Nations Independent International Fact-Finding Mission on Myanmar, described Meta as having played a "***determining role***" in the genocide and the Fact-Finding Mission specifically found that Facebook had contributed to the violence in 2012 and 2013, and to the 2017 Clearance Operations. Similarly, in September 2022, Amnesty International released a report—based largely on its own interviews and its review of internal Meta documents leaked by Frances Haugen in 2021—that concluded: "Meta's reckless business practices in Myanmar lit a match

amidst a tinderbox of simmering ethnic tensions, and it ultimately ***substantially contributed*** to the litany of severe human rights abuses suffered by the Rohingya."

93.     The admissions by Meta executives and former Meta executives that it should have done more to prevent the genocide in Burma—and its subsequent efforts, if any—came too late for the tens of thousands of Rohingya who have been murdered, raped, and tortured, and for the hundreds of thousands who have been displaced from their homes and/or are now living in squalid, dangerous refugee camps.

94.     These admissions are acknowledgement that Meta substantially contributed to the anti-Rohingya violence in Burma, that the harm to Plaintiffs and the Class was foreseeable, that Plaintiffs and the Class suffered injury, that there was a close connection between Meta's conduct and the injury suffered by Plaintiffs and the Class, and that moral blame attached to Meta's conduct.

95.     Sadly, if this weren't bad enough, Meta seems to have learned nothing from what happened to Plaintiffs and the Class. A September 2021 Wall Street Journal article based on leaked internal Meta documents reported:

> Facebook treats harm in developing countries as 'simply the cost of doing business' in those places, said Brian Boland, a former Facebook vice president who oversaw partnerships with internet providers in Africa and Asia before resigning at the end of last year. Facebook has focused its safety efforts on wealthier markets with powerful governments and media institutions, he said, even as it has turned to poorer countries for user growth.
>
> 'There is very rarely a significant, concerted effort to invest in fixing those areas,' he said.
>
>                         * * *
>
> An internal Facebook report from March said actors including some states were frequently on the platform promoting violence, exacerbating ethnic divides and delegitimizing social institutions. 'This is particularly prevalent—and problematic—in At Risk Countries,' the report says.

96.     And despite its promises to "do more" generally, Meta continues to engage in tortious conduct in Burma. Anti-Rohingya hate speech is still circulating on Facebook, resulting in ongoing harm to the Rohingya.

97.     Amnesty International reported in September 2022 that "[t]here is evidence to suggest that Meta's algorithms are continuing to amplify harmful content in Myanmar in violation of its own policies." For example, in 2020, Facebook's algorithms actively promoted a video by U Wirathu, the anti-Rohingya Buddhist monk and hate figure who had been banned from Facebook since 2018, that violated Facebook's community standards.

98.     A March 2022 report by Global Witness also highlighted how Meta continues to amplify harmful content in Burma. As part of its investigation, Global Witness collected eight real-world examples of hate speech against Rohingya—including posts that called for the "killing of Rohingya"—and submitted them to Meta to purchase advertisements in Burma. Meta accepted all eight advertisements for publication, despite each advertisement's falling within Meta's own definition of hate speech.

99.     By continuing to stoke hatred of and incite violence against the Rohingya in Burma, Meta has made it impossible for the Rohingya, including Jane Doe 1 and Jane Doe 2, to return to their homeland.

## STATUTE OF LIMITATIONS

100.     Jane Doe 1 did not learn that Meta's conduct was a cause of her injuries until 2021. She learned through her attorneys. A reasonable investigation by Jane Doe 1 into the causes of her injuries would not have revealed this information prior to 2021 because Facebook's role in the genocide was not widely known or well understood within the Rohingya community. Further, even if such information was known to various journalists or investigators at earlier points in time, her ability to discover such information was significantly hindered by her inability to read or write any language, or to speak or understand spoken English, and it was not until 2021 that whistleblowers leaked critical information revealing Facebook's role in the attacks on her and her village. And, as discussed above, Meta's continuing tortious conduct is inflicting ongoing injury on Jane Doe 1.

101.     Jane Doe 2 did not learn that Meta's conduct was a cause of her injuries until 2023. She learned through her attorneys. A reasonable investigation by Jane Doe 2 into the causes of her injuries would not have revealed this information prior to this case being filed

because Facebook's role in the genocide was not widely known or well understood within the Rohingya community. Further, even if such information was known to various journalists or investigators at earlier points in time, her ability to discover such information was significantly hindered by her inability to read or write any language, or to speak or understand spoken English, and it was not until 2021 that whistleblowers leaked critical information revealing Facebook's role in the attacks on her and her village. And, as discussed above, Meta's continuing tortious conduct is inflicting ongoing injury on Jane Doe 2.

102.    As discussed above, the Rohingya have been dehumanized and subjected to a genocide in Burma, which has included the denial of fundamental rights: access to education and freedom of movement among them. Plaintiffs and the class have been substantially hampered in their ability to gather information by the horrific circumstances to which they have been subjected. Meanwhile, Meta attempted to cover up its role until whistleblowers came forward in 2021. A reasonable investigation, viewed in light of the fact that Plaintiffs and the class are the victims of a genocide, would not have earlier revealed that Meta was a cause of Plaintiffs or the class's injuries.

**NOTICE OF DETERMINING FOREIGN LAW**

103.    Plaintiffs give notice that, to the extent that Meta raises the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), as a defense to Plaintiffs' claims, and to the extent that the Court were to find that Section 230 immunizes some or all of Meta's conduct, Section 230 conflicts with Burmese law. Burmese law does not immunize social media companies for their role in inciting violence and contributing to genocide as alleged in this Complaint. In the event of such a conflict here, Burmese law applies.

**CLASS ACTION ALLEGATIONS**

104.    **Class Definition**: Plaintiffs bring this action on behalf of themselves and a Class defined as follows:

> All Rohingya who left Burma (Myanmar) on or after June 1, 2012, and arrived in the United States under refugee status, or who sought asylum protection, and now reside in the United States.

The following are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

105.    **Numerosity**: The Class is so numerous that joinder of all members is impracticable. At least 1,000 members of the Class reside in the United States. Class members are ascertainable and can be identified through public records.

106.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class and those questions predominate over any questions that may affect individual members of the Class. These common questions of law and fact include, but are not limited to:

- Whether Facebook contains design defects that harmed Plaintiffs and the Class;

- Whether Meta is strictly liable for any such design defects;

- Whether Meta negligently designed Facebook;

- Whether Meta failed to take reasonable precautions while operating Facebook in Burma to avoid foreseeable harm to Plaintiffs and the Class;

- Whether Meta aided and abetted others' causing harm to Plaintiffs and the Class; and

- Whether Meta's conduct was a substantial factor in the harm suffered by Plaintiffs and the Class.

107.    **Typicality**: Plaintiffs' claims are typical of the claims of all members of the Class. Plaintiffs and the other Class members sustained damages as a result of Defendant's uniform wrongful conduct.

108. **Adequacy**: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex class actions and particular expertise in litigation involving social media. Plaintiffs and their counsel are committed to vigorously prosecuting the action on behalf of the Class and have the resources to do so. Neither the Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class. Defendant has no defenses unique to Plaintiffs.

109. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's conduct that Plaintiffs challenge apply and affect members of the Class uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same.

110. **Superiority**: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The members of the proposed Class are, by definition, recent immigrants and lack the tangible resources, language skills, and cultural sophistication to access and participate effectively in the prosecution of individual lawsuits in any forum having jurisdiction over Defendant. A class action in which the interests of the Class are advanced by representative parties therefore provides the greatest chance for individual Class members to obtain relief. Moreover, duplicative individual litigation of the complex legal and factual controversies presented in this Complaint would increase the delay and expense to all parties and impose a tremendous burden on the courts. By contrast, a class action would reduce the burden of case management and advance the interests of judicial economy, speedy justice, and uniformity of decisions.

**FIRST CAUSE OF ACTION**
**Strict Product Liability**
**(On Behalf of Plaintiffs and the Class)**

111.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

112.    Meta makes its Facebook social media product widely available to users around the world.

113.    Facebook contains significant design flaws. Among other things, three elements of Facebook's design—reactions, recommendations, and engagement-maximizing algorithms— interact to create a dangerous feedback loop that (1) encourages users to create extreme and polarizing content (including incitements to violence) and (2) promotes and amplifies such content. In addition, at all relevant times, while Facebook users could post on Facebook in Burmese, Facebook's interface allowing users to report problematic posts was only in English.

114.    These design flaws were a substantial factor in Facebook users' posting and acting upon incitements to violence, causing great harm to Plaintiffs.

115.    The benefits of Facebook's design do not outweigh the risks. As this case illustrates, the likelihood and gravity of harm from Facebook's design is high. Meta could have feasibly and cost-effectively designed Facebook in an alternative, safer, manner.

116.    The kind of harm resulting from the ethnic violence committed by the Myanmar military and their non-Rohingya supporters is precisely the kind of harm that could have been reasonably expected from Facebook's propagation and prioritization of anti-Rohingya hate speech and misinformation in its system, *e.g*., wrongful death, personal injury, pain and suffering, emotional distress, and property loss.

**SECOND CAUSE OF ACTION**
**Negligent Product Design**
**(On Behalf of Plaintiffs and the Class)**

117.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

118.    Meta makes its Facebook social media product widely available to users around the world.

119.    Facebook contains significant design flaws. Among other things, three elements of Facebook's design—reactions, recommendations, and engagement-maximizing algorithms—

interact to create a dangerous feedback loop that (1) encourages users to create extreme and polarizing content (including incitements to violence) and (2) promotes and amplifies such content. In addition, at all relevant times, while Facebook users could post on Facebook in Burmese, Facebook's interface allowing users to report problematic posts was only in English.

120.    These design flaws were a substantial factor in Facebook users' posting and acting upon incitements to violence, causing great harm to Plaintiffs.

121.    Meta failed to use reasonable care in designing Facebook to avoid exposing others to harm. Meta knew or should have known about the likelihood and gravity of potential harm to others—including Plaintiffs—resulting from these design flaws. The burden on Meta to design Facebook in a manner reducing or avoiding the harm to Plaintiffs was minimal.

122.    The kind of harm resulting from the ethnic violence committed by the Myanmar military and their non-Rohingya supporters is precisely the kind of harm that could have been reasonably expected from Facebook's propagation and prioritization of anti-Rohingya hate speech and misinformation in its system, *e.g.*, wrongful death, personal injury, pain and suffering, emotional distress, and property loss.

### THIRD CAUSE OF ACTION
#### Negligence
#### (On Behalf of Plaintiffs and the Class)

123.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

124.    Under California Civil Code section 1714 and the common law, Meta has a duty to exercise in its activities reasonable care for the safety of others. In introducing and operating Facebook in Burma—as everywhere—Meta had a duty to use reasonable care to avoid injuring others.

125.    Meta breached this duty by failing to take reasonable precautions while operating Facebook in Burma.

126.    Posts on Facebook directed imminent violence against the Rohingya, including Plaintiffs.

127.    The probability that third parties would act on these posts was high, and it was foreseeable to Meta that third parties would do so. Nevertheless, not only did Meta allow these

posts to be distributed on Facebook, it encouraged the creation of such posts through the feedback loop described above, it promoted and amplified such posts so that more users would see them, and it recommended these posts to those users most likely to act on them.

128.    Meta knew of these posts and the harm they were causing to Plaintiffs and others.

129.    Moreover, the kind of harm resulting from the ethnic violence committed by the Myanmar military and their non-Rohingya supporters is precisely the kind of harm that could have been reasonably expected from Facebook's propagation and prioritization of anti-Rohingya hate speech and misinformation in its system, *e.g.*, wrongful death, personal injury, pain and suffering, emotional distress, and property loss.

130.    Meta could have taken reasonable precautions to minimize the risk of harm, including among other things (1) changing the design of Facebook so as not to promote, recommend, or encourage the creation of incitements to violence against Plaintiffs and others; (2) changing the design of Facebook to allow users to report problematic posts in Burmese, not just English; and (3) hiring more content moderators to monitor Burmese-language posts.

131.    Meta's failure to take these and other reasonable precautions was a substantial factor in causing Plaintiffs' harm.

**FOURTH CAUSE OF ACTION**
**Aiding and Abetting Incitement to Violence**
**(<u>On Behalf of Plaintiffs and the Class</u>)**

132.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

133.    Posts on Facebook directed imminent violence against the Rohingyan community, including Plaintiffs.

134.    Meta knew that Facebook users were posting such incitements to violence.

135.    Meta provided substantial encouragement and assistance to these Facebook users by, among other things, (1) providing social rewards for the creation of such posts via Facebook's feedback loop described above, and (2) promoting, amplifying, and recommending such posts to others.

136.     Meta's encouragement and assistance to Facebook users posting incitements to violence was a substantial factor in Plaintiffs' harm.

## FIFTH CAUSE OF ACTION
### Aiding and Abetting Other Torts
### (<u>On Behalf of Plaintiffs and the Class</u>)

137.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

138.     Rohingya villages—including Plaintiffs'—were attacked by Burmese government forces and civilian militias, causing harm to Plaintiffs and their property. Those attackers engaged in tortious conduct toward Plaintiffs and their property including but not limited to assault, battery, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, and trespass to chattels.

139.     Meta knew that these attacks were happening.

140.     Meta provided substantial encouragement and assistance to these attackers by, among other things, (1) encouraging the creation of, promoting, amplifying, and recommending anti-Rohingya propaganda and incitements to violence on Facebook, and (2) allowing the attackers to use Facebook to coordinate the attacks.

141.     Meta's encouragement and assistance to these attackers was a substantial factor in Plaintiffs' harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jane Doe 1 and Jane Doe 2, on behalf of themselves and the Class, respectfully request that this Court enter an Order:

A.     Certifying the case as a class action on behalf of the Class, as defined above, appointing Plaintiffs Jane Doe 1 and Jane Doe 2 as representatives of the Class, and appointing their counsel as Class Counsel;

B.     Declaring that Defendant is strictly liable for the defects in Facebook's design, that Defendant negligently designed Facebook, that Defendant acted negligently toward Plaintiffs, that Defendant aided and abetted Facebook users in inciting violence against Plaintiffs, and that Defendant aided and abetted Burmese forces and civilian militias in their attacks against Plaintiffs;

C.     Awarding the Class compensatory damages for personal injury, pain and suffering, emotional distress, and loss of property;

D.     Awarding Plaintiffs and the Class punitive damages in an amount to be determined at trial;

E.     Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

F.     Awarding the Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

G.     Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Respectfully Submitted,

**JANE DOE 1** and **JANE DOE 2**, individually and on behalf of all others similarly situated,

Dated: March 14, 2023

By: /s/ J. Eli Wade-Scott
One of Plaintiffs' Attorneys

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jay Edelson (*pro hac vice*)
jedelson@edelson.com
Roger Perlstadt (*pro hac vice*)
rperlstadt@edelson.com
J. Eli Wade-Scott (*pro hac vice*)
ewadescott@edelson.com
Michael Ovca (*pro hac vice*)
movca@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Richard Fields (*pro hac vice* forthcoming)
fields@fhcfirm.com
Edward Han (*pro hac vice*)
edhan@fhcfirm.com
Martin Cunniff (*pro hac vice*)
martincunniff@fhcfirm.com
FIELDS HAN CUNNIFF PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
Tel: 833.382.9816

*Counsel for Plaintiffs and the Proposed Class*