KRISTIN A. LINSLEY, SBN 154148
  klinsley@gibsondunn.com
ROSEMARIE T. RING, SBN 220769
  rring@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: 415.393.8200

JACOB T. SPENCER, *pro hac vice*
  jspencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: 202.955.8500

PERLETTE MICHÈLE JURA, SBN 242332
  pjura@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000

*Attorneys for Defendant*
*Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | CASE NO. 4:22-CV-00051-YGR<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Hearing:**<br>Date:         September 19, 2023<br>Time:         2:00 p.m.<br>Courtroom:  1, 4th Floor<br>Judge:        Hon. Yvonne Gonzalez Rogers |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on September 19, 2023, or as soon thereafter as the matter may be heard, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street in Oakland, California, Defendant Meta Platforms, Inc. will and hereby does move this Court, under Federal Rule of Civil Procedure 12(b)(6), for an order dismissing with prejudice all of the claims in Plaintiffs' First Amended Complaint ("FAC").

This Motion is based on this Notice of Motion and Motion, the memorandum of points and authorities submitted herewith, any reply memorandum or other papers submitted in connection with the Motion, the pleadings filed in this action, any matter of which this Court may properly take judicial notice, and any information presented at argument.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiffs' claims are barred by the statute of limitations.

2.      Whether the FAC plausibly pleads the required elements of Plaintiffs' products liability (Counts I and II), negligence (Count III), and aiding and abetting (Counts IV and V) claims.

3.      Whether Plaintiffs' claims are barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1).

4.      Whether Plaintiffs' claims are barred by the foreign affairs doctrine.


Dated: April 28, 2023                    GIBSON, DUNN & CRUTCHER LLP


By:      */s/ Rosemarie T. Ring*
                    Rosemarie T. Ring

*Attorneys for Defendant*
*Meta Platforms, Inc.*

1

## <u>TABLE OF CONTENTS</u>

2

Page

3 I.   INTRODUCTION ................................................................................................. 1

4 II.  SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY .................................. 1

5 III. LEGAL STANDARD ........................................................................................... 3

6 IV.  ARGUMENT ...................................................................................................... 3

7        A.   Plaintiffs' Claims Are Barred by the Statute of Limitations ........................................ 3

8
        B.   The Amended Complaint Fails to Plead the Required Elements of the Claims ........... 6
9
             1.   Plaintiffs Have Not Plausibly Alleged Causation (All Counts) ........................ 6
10
             2.   Plaintiffs' Products Liability Claims (Counts I and II) Fail ........................... 10
11
12           3.   Plaintiffs' Negligence Claims (Counts II and III) Fail .................................... 13

13           4.   Plaintiffs' Aiding-and-Abetting Claims (Counts IV and V) Fail ................... 17

14       C.   Alternatively, Plaintiffs' Claims Are Barred by Section 230 (All Counts) ............... 18

15           1.   Plaintiffs' "Creative Pleading" Cannot Evade Section 230 Immunity .......... 19

16           2.   Burmese Law Cannot Displace Section 230 .................................................... 22

17       D.   Plaintiffs' Claims Are Barred by the Foreign Affairs Doctrine (All Counts) ............. 24

18 V.   CONCLUSION ................................................................................................... 25

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2005) .................................................................................................................25

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
    225 Cal. App. 4th 1451 (2014) ...................................................................................................6

*Anderson v. Brouwer*,
    99 Cal. App. 3d 176 (1979) ........................................................................................................5

*Anderson v. Owens-Corning Fiberglas Corp.*,
    53 Cal. 3d 987 (1991) ...............................................................................................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................3, 10

*Estate of B.H. v. Netflix, Inc.*,
    2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ......................................................................11, 15

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) .............................................................................................19, 20

*Bill v. Super. Ct.*,
    137 Cal. App. 3d 1002 (1982) ..............................................................................................14, 15

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ..................................................................................................................18

*Braxton v. Municipal Ct.*,
    10 Cal. 3d 138 (1973) ...............................................................................................................17

*Bride v. Snap, Inc.*,
    2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ...........................................................................22

*Brooks v. Eugene Burger Mgmt. Corp.*,
    215 Cal. App. 3d 1611 (1989) ...................................................................................................10

*Brown v. USA Taekwondo*,
    11 Cal. 5th 204 (2021) .........................................................................................................13, 15

*Casey v. U.S. Bank Nat. Ass'n*,
    127 Cal. App. 4th 1138 (2005) .............................................................................................17, 18

*Chanda v. Fed. Home Loans Corp.*,
    215 Cal. App. 4th 746 (2013) .....................................................................................................9

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017) ..................................................................................22, 23

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Crosby v. Twitter, Inc.*,
    921 F.3d 617 (6th Cir. 2019)..................................................................................9, 10

*Crouch v. Trinity Christian Ctr.*,
    39 Cal. App. 5th 995 (2019) ...........................................................................................9

*Delfino v. Agilent Tech., Inc.*,
    145 Cal. App. 4th 790 (2006) .......................................................................................17

*Doe I v. Unocal Corp.*,
    2002 WL 33944505 (Cal. Super. June 10, 2002)..........................................................24

*Doe No. 1 v. Uber Techs., Inc.*,
    79 Cal. App. 5th 410 (2022) ...........................................................................11, 14, 15

*Doe v. GTE Corp.*,
    347 F.3d 655 (7th Cir. 2003)........................................................................................15

*Doe v. Myspace, Inc.*,
    528 F.3d 413 (5th Cir. 2008)........................................................................................21

*Doe v. Roman Catholic Bishop*,
    189 Cal. App. 4th 1423 (2010) .......................................................................................5

*Doe v. Twitter, Inc.*,
    555 F. Supp. 3d 889 (N.D. Cal. 2021) .......................................................................6, 22

*Dyroff v. Ultimate Software Grp.*,
    934 F.3d 1093 (9th Cir. 2019)...........................................................................14, 15, 20

*Eidson v. Medtronic, Inc.*,
    981 F. Supp. 2d 868 (N.D. Cal. 2013) ........................................................................4, 5

*Erlich v. Menezes*,
    21 Cal. 4th 543 (1999) .................................................................................................13

*In re Facebook, Inc.*,
    625 S.W.3d 80 (Tex. 2021)...........................................................................................11

*Fair Hous. Council v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)..........................................................................19, 20, 21

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018)......................................................................................9, 10

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006).........................................................................................18

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002).........................................................................................4

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Force v. Facebook, Inc.*,
    304 F. Supp. 3d 315 (E.D.N.Y. 2018) ...................................................................................22, 23

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019)...............................................................................19, 20, 21, 23

*Fortman v. Förvaltningsbolaget Insulan AB*,
    212 Cal. App. 4th 830 (2013) ............................................................................................12, 13

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005) .........................................................................................................3, 4, 5, 6

*G&G Prods. LLC v. Rusic*,
    902 F.3d 940 (9th Cir. 2018)................................................................................................24

*George v. eBay, Inc.*,
    71 Cal. App. 5th 620 (2021) ..................................................................................................18

*Gerard v. Ross*,
    204 Cal. App. 3d 968 (1988).................................................................................................17, 18

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008)................................................................................................3

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193 (N.D. Cal. 2009) ................................................................................20

*Gonzalez v. Derrington*,
    56 Cal. 2d 130 (1961) .............................................................................................................9

*Green v. ADT, LLC*,
    2016 WL 3208483 (N.D. Cal. June 10, 2016) .......................................................................10

*Herrick v. Grindr LLC*,
    765 F. App'x 586 (2d Cir. 2019) ...........................................................................................21

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019).................................................................................................23

*Jackson v. Airbnb, Inc.*,
    2022 WL 16752071 (C.D. Cal. Nov. 4, 2022)...............................................................11, 13, 14

*Jackson v. Airbnb, Inc.*,
    2022 WL 16753197 (C.D. Cal. Nov. 4, 2022)........................................................................22

*Jacobs v. Meta Platforms, Inc.*,
    2023 WL 2655586 (Cal. Super. Mar. 10, 2023) ..............................................................10, 11

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002)................................................................................................12

Gibson, Dunn &
Crutcher LLP

MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 4:22-CV-00051-YGR

**<u>TABLE OF AUTHORITIES</u>**
(continued)

Page(s)

*James v. Meow Media, Inc.*,
  90 F. Supp. 2d 798 (W.D. Ky. 2000) .................................................................................9

*Jiminez v. Super. Ct.*,
  29 Cal. 4th 473 (2002) ......................................................................................................13

*Johnson v. U.S. Steel Corp.*,
  240 Cal. App. 4th 22 (2015) .............................................................................................10

*Jolly v. Eli Lilly & Co.*,
  44 Cal. 3d 1103 (1988) ...................................................................................................4, 6

*Jones v. Dirty World Ent. Recordings, LLC*,
  755 F.3d 398 (6th Cir. 2014) ............................................................................................21

*Kashani v. Tsann Kuen China Enter. Co.*,
  118 Cal. App. 4th 531 (2004) ...........................................................................................23

*Kimzey v. Yelp!, Inc.*,
  836 F.3d 1263 (9th Cir. 2016) .....................................................................................19, 20

*Klayman v. Zuckerberg*,
  753 F.3d 1354 (D.C. Cir. 2014) ...................................................................................19, 21

*Knox v. Davis*,
  260 F.3d 1009 (9th Cir. 2001) ............................................................................................4

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) ..........................................................................................21

*McCollum v. CBS, Inc.*,
  202 Cal. App. 3d 989 (1988) ......................................................................................15, 16

*McIndoe v. Huntington Ingalls Inc.*,
  817 F.3d 1170 (9th Cir. 2016) ..........................................................................................10

*Merrill v. Navegar, Inc.*,
  26 Cal. 4th 465 (2001) ......................................................................................................10

*Merritt v. Countrywide Fin. Corp.*,
  2015 WL 5542992 (N.D. Cal. Sept. 17, 2015) .................................................................10

*Modisette v. Apple Inc.*,
  30 Cal. App. 5th 136 (2018) ......................................................................................6, 8, 16

*Molenda v. Universal City Studios LLC*,
  2020 WL 6653505 (C.D. Cal. June 8, 2020) ....................................................................18

*In re Mortg. Elec. Registration Sys., Inc.*,
  754 F.3d 772 (9th Cir. 2014).............................................................................................17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mujica v. Occidental Petrol. Corp.*,
  381 F. Supp. 2d 1164 (C.D. Cal. 2005) ..................................................................25

*Murphy v. Directv, Inc.*,
  724 F.3d 1218 (9th Cir. 2013)................................................................................23

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ...............................................................................................12

*NetChoice, LLC v. Att'y Gen. of Fla.*,
  34 F.4th 1196 (11th Cir. 2022) ..............................................................................16

*Nodine v. Shiley Inc.*,
  240 F.3d 1149 (9th Cir. 2001) .................................................................................4

*Norgart v. Upjohn Co.*,
  21 Cal. 4th 383 (1999) .............................................................................................5

*O'Handley v. Padilla*,
  579 F. Supp. 3d 1163 (N.D. Cal. 2022) .................................................................15

*Ogden v. Wells Fargo Bank, N.A.*,
  2019 WL 1751818 (C.D. Cal. Feb. 6, 2019) .........................................................17

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
  971 F.3d 1042 (9th Cir. 2020)..................................................................................4

*Pierson v. Sharp Mem'l Hosp., Inc.*,
  216 Cal. App. 3d 340 (1989)........................................................................10, 11, 12

*Quesada v. Herb Thyme Farms, Inc.*,
  62 Cal. 4th 298 (2015) ...........................................................................................23

*Quinteros v. InnoGames*,
  2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ...............................................11, 22

*Richard B. LeVine Inc. v. Higashi*,
  131 Cal. App. 4th 566 (2005) .................................................................................17

*Doe ex rel. Roe v. Snap, Inc.*,
  2022 WL 2528615 (S.D. Tex. July 7, 2022) ..........................................................22

*Rowland v. Christian*,
  69 Cal. 2d 108 (1968) .......................................................................................13, 15

*Rustico v. Intuitive Surgical, Inc.*,
  993 F.3d 1085 (9th Cir. 2021).................................................................................24

*S&S Worldwide, Inc. v. Wells Fargo Bank*,
  509 F. Supp. 3d 1154 (N.D. Cal. 2020) .................................................................18

Gibson, Dunn &
Crutcher LLP

1
2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

*Salameh v. Tarsadia Hotel,*
726 F.3d 1124 (9th Cir. 2013) ..................................................................................3

4
5

*Sanders v. Acclaim Entm't, Inc.,*
188 F. Supp. 2d 1264 (D. Colo. 2002) .....................................................................9

6

*Saponaro v. Grindr, LLC,*
93 F. Supp. 3d 319 (D.N.J. 2015) ...........................................................................15

7
8

*Seely v. White Motor Co.,*
63 Cal. 2d 9 (1965) ...........................................................................................12, 13

9
10

*Seismic Reservoir 2020, Inc. v. Paulsson,*
785 F.3d 330 (9th Cir. 2015) ....................................................................................3

*Snow v. A.H. Robins Co.,*
165 Cal. App. 3d 120 (1985) .....................................................................................4

11
12

*Sommer v. Gabor,*
40 Cal. App. 4th 1455 (1995) ..................................................................................23

13
14

*Steinle v. United States,*
17 F.4th 819 (9th Cir. 2021) ......................................................................................6

15

*Steven F. v. Anaheim Union High Sch. Dist.,*
112 Cal. App. 4th 904 (2003) ..................................................................................16

16
17

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.,*
951 F.3d 1142 (9th Cir. 2020) .................................................................................23

18

*Taylor v. Elliott Turbomachinery Co.,*
171 Cal. App. 4th 564 (2009) ..................................................................................17

19
20

*Thing v. La Chusa,*
48 Cal. 3d 644 (1989) ..............................................................................................12

21

*TRW Inc. v. Andrews,*
534 U.S. 19 (2001) ...................................................................................................22

22
23

*United States v. Little Misere Land Co.,*
412 U.S. 580 (1973) .................................................................................................23

24

*Unruh-Haxton v. Regents of Univ. of Cal.,*
162 Cal. App. 4th 343 (2008) ....................................................................................5

25
26

*Vasilenko v. Grace Fam. Church,*
3 Cal. 5th 1077 (2017) ...............................................................................................6

27

*Wash. Mut. Bank, FA v. Super. Ct.,*
24 Cal. 4th 906 (2001) .............................................................................................24

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Weirum v. RKO Gen., Inc.*,
 15 Cal. 3d 40 (1975) ........................................................................................................14

*Winter v. G.P. Putnam's Sons*,
 938 F.2d 1033 (9th Cir. 1991)..............................................................................11, 12, 17

*Young v. Facebook, Inc.*,
 2010 WL 4269304 (N.D. Cal. Oct. 25, 2010)...................................................................16

*Zamora v. Wells Fargo Bank*,
 2013 WL 2319079 (N.D. Cal. May 28, 2013) ....................................................................5

*Ziencik v. Snap, Inc.*,
 2023 WL 2638314 (C.D. Cal. Feb. 3, 2023)......................................................................11

*Zschernig v. Miller*,
 389 U.S. 429 (1968) ..........................................................................................................25

**STATUTES**

47 U.S.C. § 230(c) ................................................................................................18, 22, 23

47 U.S.C. § 230(e)(3) ...........................................................................................18, 22, 23

Cal. Civ. Code § 335.1 ............................................................................................................3

**TREATISES**

Restatement (Second) of Torts § 402A .......................................................................................12

Restatement (Second) of Torts § 448.............................................................................................9

Restatement (Third) of Torts: Prods. Liab. § 19 ........................................................................10, 11

**OTHER AUTHORITIES**

A. Briggs, *Private International Law in Myanmar* (2015) ..................................................................23

On Public Designation, Due to Gross Violations of Human Rights, of Burmese Military Officials
 (July 16, 2019), https://2017-2021.state.gov/on-public-designation-due-to-gross-violations-of-
 human-rights-of-burmese-military-officials/index.html .................................................................25

R.P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational Tort
 Litigation*, 63 Emory L.J. 1089 (2014) ...........................................................................................23

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This lawsuit seeks to hold Meta liable for atrocities committed by the Myanmar military against the Rohingya ethnic minority in Burma.  The violent acts described in Plaintiffs' Amended Complaint ("FAC") were deplorable, and Meta has invested heavily in people, technology, and partnerships—and has taken aggressive action against Myanmar military members—to help combat the spread of hateful content on Facebook.  But as tragic as the experiences of Plaintiffs and other Rohingya were, Plaintiffs' attempts to impose liability on Meta fail as a matter of law.

This Court already identified multiple deficiencies in the original complaint, and the FAC remedies none of those core deficiencies.  Although complaint has been rewritten and adds a new Plaintiff, the core allegations and theories are the same:  Plaintiffs allege Meta should be liable because members of the Myanmar military posted extremist, hateful content calling for violence and spreading disdain against the Rohingya.  These theories remain deficient for multiple reasons.

*First*, as this Court recognized, Plaintiffs' claims are untimely because they were brought years after the statutory periods elapsed.  *Second*, the FAC does not—and cannot—plead the required elements for each claim.  Facebook was neither a but-for nor proximate cause of Plaintiffs' harms.  The products liability claims fail because Facebook is not a "product." Plaintiffs plead no facts establishing a duty for the negligence claim.  And the new aiding-and-abetting claims do not adequately plead a predicate tort, knowledge, *or* intent to facilitate.  *Third*, Section 230 bars Plaintiffs' claims, which seek to hold Meta liable for harms from third-party content posted online.  *Fourth* and finally, the foreign affairs doctrine requires dismissal of all the claims because they would interfere with the foreign affairs power committed solely to the federal executive branch and not to the states.

At bottom, the FAC fails to state a claim and the action should be dismissed with prejudice because there is no legal basis for claiming Meta is liable for the harms inflicted by the Myanmar military.

### II. SUMMARY OF ALLEGATIONS AND PROCEDURAL HISTORY

This Court dismissed the original complaint due to its many "deficiencies," Dkt. 55, and the allegations in the FAC closely resemble the original, deficient pleading.  Plaintiffs seek to represent a

putative class of Rohingya people, a minority group that has "long been the victims of discrimination and persecution by non-Rohingya Burmese and the Burmese government."  FAC ¶ 1, Dkt. 68.  Since at least 1948, more than half a century before Facebook was introduced in Burma, the Rohingya have faced "periodic waves of violence and persecution" by "Burmese government forces and civilian militias," resulting in the tragic "killing and displacement of hundreds of thousands of Rohingya."  *Id.* ¶¶ 1–2, 14–15.

Plaintiffs Jane Doe 1 and Jane Doe 2 are Rohingya women who lived in western Burma's Rakhine State.  FAC ¶¶ 45, 60.  Jane Doe 1 is the same Jane Doe from the original complaint.  In 2012, her village was attacked by the Myanmar military and members of a civilian "security force."  *Id.* ¶ 46.  The attackers detained and tortured her father, killed several members of her village, and took Rohingya girls from nearby villages.  *Id.* ¶¶ 46–47.  Jane Doe 1 fled Burma shortly thereafter.  *Id.* ¶¶ 48–49.  In 2017, the Myanmar military and civilian militias attacked Jane Doe 2's village in a wave of violence called the "Clearance Operation."  *Id.* ¶¶ 60–61.  Jane Doe 2 and her family fled to Thailand, grabbing "whatever belongings they could."  *Id.* ¶¶ 62, 64–65.  Jane Doe 2 resettled in the United States in November 2022.  *Id.* ¶ 66.

As before, the FAC asserts that Meta "[d]esigned Facebook in a way that both encouraged the creation of toxic posts" and "amplified, promoted, and recommended such posts."  FAC ¶ 3.  The FAC alleges that, because "negative emotions" can sometimes be "the most engaging," Meta designed Facebook's algorithms to prioritize divisive content and "reward" users with "likes" and "shares," a process that "encourages users to create extreme and polarizing content."  *Id.* ¶¶ 36–37, 39, 113.  The FAC does not allege a timeline relating to such engagement features or how Facebook's engagement-based rankings changed over time, including anything that links such features to the time of the attacks on Plaintiffs' villages.  It alleges only that Meta generally incorporated "engagement-based ranking of content into Facebook "beginning in 2009."  *Id.* ¶ 33.  The FAC faults Meta for "allow[ing]" certain types of content "to be distributed on Facebook."  *Id.* ¶ 127.

The FAC alleges that Meta is legally responsible for "genocide in Burma," and Plaintiffs' harms in particular, because the Myanmar military used Facebook as a "tool" to "justify" its violence.  FAC ¶¶ 2, 68–69.  It asserts, for example, that "Facebook lit up with anti-Rohingya posts and calls for

killings" during periods of violence, *id.* ¶ 53, and that certain unspecified "Facebook posts … directly resulted in attacks on the villages of each of the Plaintiffs," *id.* ¶ 17.  And it alleges that certain members of the Myanmar military posted hate speech and descriptions of their atrocities on Facebook, including attacks in the same general region as where Plaintiffs lived.  *Id.* ¶¶ 73–83.

The FAC acknowledges that Meta has taken action against the Myanmar military and deleted Facebook pages, accounts, and posts containing anti-Rohingya hate speech, which violate Facebook's Community Standards and are subject to removal.  *Id.* ¶¶ 70, 97–98.  In fact, Meta has "invested heavily in people, technology, and partnerships" to help combat the spread of hateful and violent content on Facebook.  *See* <https://about.fb.com/news/2018/11/myanmar-hria/> (cited at FAC ¶ 89).

### III.   LEGAL STANDARD

To survive a dismissal motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals" of the elements of a claim, supported by "mere conclusory statements," do not suffice.  *Id.* at 678.  Nor must the Court accept "a legal conclusion couched as a factual allegation," *id.*, or allegations based on "unwarranted deductions of fact[] or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  Claims also may be dismissed based on a dispositive issue of law.  *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015).  Discretion to grant dismissal with prejudice is "particularly broad" when—as in this case—prior leave to amend has been granted.  *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013).

### IV.   ARGUMENT

#### A.   Plaintiffs' Claims Are Barred by the Statute of Limitations

At the outset, all of Plaintiffs' claims remain time-barred.  The FAC contains no new allegations that cure the significant timeliness problems the Court identified.  Dkt. 61 at 17:18–19.  The applicable two-year limitations period, Cal. Civ. P. Code § 335.1, began running when Plaintiffs "ha[d] reason to suspect an injury and some wrongful cause."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005).  Because the attacks on Plaintiffs' villages occurred in 2012 and 2017, FAC ¶¶ 46, 61, the limitations period expired in 2014 (for Jane Doe 1) and in 2019 (for Jane Doe 2).

This Court already rejected the FAC's theory that "Meta's continuing tortious conduct is

inflicting ongoing injury," FAC ¶¶ 100–01.  *See* Dkt. 61 at 17:21–25.  The continuing harm doctrine applies where there is "no single incident" that can "fairly or realistically be identified as the cause of significant harm." *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002).  But a "mere continuing impact from past violations is not actionable," *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001), and "the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date," *Nodine v. Shiley Inc.*, 240 F.3d 1149, 1153 (9th Cir. 2001).  The "single incident[s]" that precipitated Plaintiffs' harms were the village attacks.  Extending the limitations period for as long as the plaintiff experiences effects of a past injury would render limitations meaningless.

Nor does California's discovery rule save the claims.  The FAC is incorrect that the limitations period started when Plaintiffs suspected *Facebook's* alleged role in their harms.  FAC ¶¶ 100–02.  But "ignorance of the identity of the defendant does not delay accrual of a cause of action." *Fox*, 35 Cal. 4th at 813.  As this Court recognized at the prior hearing, Dkt. 61 at 19:10–11, "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988).  Even if the plaintiff does not suspect the identity of the exact actor who caused the injury, one who suspects that *someone* wrongfully caused an injury "ha[s] a duty to conduct a reasonable investigation" of all potential causes.  *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1048 (9th Cir. 2020).  Here, when Plaintiffs' villages were attacked in 2012 and 2017, they were on notice that "*someone* ha[d] done something wrong to [them]," *Jolly*, 44 Cal. 3d at 1110, and had to "exercise … reasonable diligence" as to the cause, *Snow v. A.H. Robins Co.*, 165 Cal. App. 3d 120, 129 (1985).

Even apart from the obvious wrongs and harms Plaintiffs allegedly suffered in 2012 and 2017, the issues received "widespread media attention" *after* they were aware of those harms.  *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 894 n.7 (N.D. Cal. 2013).  Plaintiffs *knew* that they had suffered injuries by the time they fled Burma.  And documents incorporated into the FAC confirm that public materials (including a UN report published in both English *and* Burmese) specifically raised questions about Facebook's alleged role in Burma as early as 2018.  *E.g.*, FAC ¶ 84 (2018 U.S. Senate testimony); *id.* ¶ 90 (2018 PBS Frontline report); *id.* ¶ 92 (2018 UN report).  These allegations set this case apart

1    from *Unruh-Haxton v. Regents of Univ. of Cal.*, 162 Cal. App. 4th 343 (2008), where the plaintiffs

2    were unaware they had experienced any injury at all, and general public and media coverage relating

3    to other injuries was insufficient to impute "suspicion of wrongdoing" to the plaintiffs.  *Id*. at 364.

4         Because Plaintiffs were on inquiry notice, they must each plead facts "to show (1) the time and

5    manner of discovery [of the cause of injury] and (2) the inability to have made earlier discovery despite

6    reasonable diligence."  *Fox*, 35 Cal. 4th at 808.  This Court previously stressed this burden.  Dkt. 61 at

7    18:6–7, 13–16, 18–21.  Yet the FAC again makes neither showing.  As to time and manner of discovery,

8    each Plaintiff alleges that she learned of the cause of her harms "through her attorneys."  FAC ¶¶ 100–

9    01.  But "the fact that an attorney has not yet advised [one] does not postpone commencement of the

10   limitations period."  *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 398 n.2 (1999); *see Zamora v. Wells

11   Fargo Bank*, 2013 WL 2319079, at *5–6 (N.D. Cal. May 28, 2013) (allegation that plaintiffs discovered

12   claims only when "a lawyer reviewed" them insufficient to show diligence).  And such "conclusory

13   allegations [claiming diligence] will not withstand [dismissal]."  *Fox*, 35 Cal. 4th at 1808.

14        The FAC insists that Plaintiffs could not have made earlier discovery due to human rights

15   abuses suffered at the hands of the Myanmar military, FAC ¶ 102, but it nowhere alleges *any* steps

16   Plaintiffs took to investigate the potential causes of their harms or Meta's alleged involvement.  *See

17   Eidson*, 981 F. Supp. 2d at 893–94 (plaintiff's burden "to 'show diligence'").  It is "insufficient to

18   withstand" a pleadings challenge simply to allege that "there was no way 'through which her reasonable

19   diligence would have revealed, or through which she could have suspected the … cause of her injury.'"

20   *Fox*, 35 Cal. App. at 811.  "[G]eneral conclusions to the effect that the facts were not discovered until

21   a stated date, and that plaintiff could not reasonably have made an earlier discovery, are useless."

22   *Anderson v. Brouwer*, 99 Cal. App. 3d 176, 182 (1979).  Nor do allegations of limited language ability

23   absolve Plaintiffs of the duty to take reasonable steps to investigate.  *See Zamora*, 2013 WL 2319079,

24   at *6 (plaintiffs' inability to "speak or understand English" did not eliminate their "burden to show

25   diligence").  The law does not impose "a duty to discover"; rather, the duty is "merely to investigate

26   diligently."  *Doe v. Roman Catholic Bishop*, 189 Cal. App. 4th 1423, 1432 (2010).  This requires that

27   a plaintiff show she took reasonable steps to "obtain knowledge from sources open to [them]."  *Fox*,

28   35 Cal. 4th at 808–09.  Because the FAC does not allege Plaintiffs took any action to "investigate at

all," they cannot avail themselves of the discovery rule.  *Doe*, 189 Cal. App. 4th at 1433–34.[1]

**B.     The Amended Complaint Fails to Plead the Required Elements of the Claims**

   **1.     Plaintiffs Have Not Plausibly Alleged Causation (All Counts)**

As with the original complaint, all of Plaintiffs' claims fail because the FAC does not plausibly allege that any action by Meta caused their alleged injuries.  Dkt. 61 at 13:5–9.  To plead causation, the complaint must plead facts showing that Meta's conduct was "the proximate or legal cause of the resulting injury."  *Steinle v. United States*, 17 F.4th 819, 822 (9th Cir. 2021) (citing *Vasilenko v. Grace Fam. Church*, 3 Cal. 5th 1077, 1083 (2017)).  Plaintiffs must first plead "but-for causation"—that is, an act that was "a necessary antecedent of an event."  *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 153 (2018).  And because the "factual causes of an event may be traced far into the past, the law imposes additional limitations on liability"—proximate cause—that looks to "the degree of connection between the conduct and the injury, [and] also to public policy."  *Steinle*, 17 F.4th at 822; *see also Modisette*, 30 Cal. App. 5th at 153–54 (proximate cause concerns "the various considerations of policy that limit an actor's responsibility for the consequences of his conduct").  The FAC alleges neither.

   **a.     The FAC Does Not Adequately Plead But-For Causation**

Plaintiffs do not allege facts showing that Meta was a but-for cause of their harms.  When Meta introduced Facebook in Burma "[b]eginning around 2011," FAC ¶ 21, the "Rohingya ha[d] long been marginalized and discriminated against by Burma's military government," having faced "waves of violence and persecution" for decades.  *Id.* ¶¶ 13–15.  The military's decades-long pattern of violence that began—and continued—without any involvement by social media defeats any inference that Facebook's introduction in 2011 was a "necessary antecedent" of the attacks on Plaintiffs' villages.  As this Court ruled, "if [violence] had been occurring for decades, it is not clear … how the complaint alleges the plausible inference that this business activity [by Meta] was used to perpetrate that violence by a military regime that was already engaged in deplorable violence."  Dkt. 61 at 14:24–15:3.

---

[1] Plaintiffs' new "aiding-and-abetting" claims (Counts IV and V) are especially untimely.  Any claims against the principal tortfeasors accrued in 2012 and 2017.  *See Jolly*, 44 Cal. 3d at 1110.  And "[t]he statute of limitations for a cause of action for aiding and abetting a tort generally is the same as the underlying tort."  *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1478 (2014).  Because Plaintiffs were required to "conduct a reasonable investigation of *all* potential causes of that injury," *Fox*, 35 Cal. 4th at 808, their failure to do so—or even to plead diligence—bars these claims.

Gibson, Dunn &
Crutcher LLP

This deficiency is not cured by the boilerplate allegation that the introduction of Facebook in Burma was the "key inflection point" that "materially contributed to the development and widespread dissemination of anti-Rohingya hate speech, misinformation, and incitement of violence."  FAC ¶ 16. Given the Myanmar military's admitted history of "marginaliz[ing] and discriminat[ing] against" the Rohingya, the only plausible inference is that the Myanmar military would have escalated their campaign into "terrorism and genocide" *regardless* of whether it also used various media, such as Facebook, to try to justify its campaign to the general public. *Id.* ¶¶ 13, 15.

Nor do the new screenshots of third-party content posted to Facebook establish any causal link between Meta's actions and either the Myanmar military's persecution of the Rohingya or decisions by Burmese people to aid those efforts.  As to Jane Doe 1 (FAC ¶¶ 45–59), new allegations about content posted to Facebook "in 2012" do not support a plausible inference that the attack on her village at some unspecified time "[i]n 2012" would not have occurred but for Facebook. *Id.* ¶¶ 46, 52.  The FAC does not even allege that the posts *predated* the attack, much less connect them to the attack beyond the bare fact that they both occurred in the same year.  As to Jane Doe 2 (FAC ¶¶ 60–83), the excerpts from Facebook posts by Lieutenant Lynn establish only that he had *already* decided, *before* posting on Facebook, to commit acts of violence against the Rohingya. *Id.* at Fig. 5 (stating that he was "[o]n [a] plane"); Fig. 6 (asking to be "sen[t] … quickly to Rakhine" because he "want[ed] to fight").  Even assuming Lynn personally attacked Jane Doe 2's village, there are no facts that, if true, would establish that any third-party content on Facebook encouraged or incited him to commit violent acts, that any of his followers were induced by his posts to commit such acts themselves, or that Lynn and other members of the Myanmar military would not have perpetrated such acts but for Facebook's "like," "comment," or "share" features.  Although the FAC alleges that Meta "adjust[ed] its algorithms to manipulate users' News Feeds to recommend more divisive and inflammatory content," *id.* ¶ 37, there are *no* allegations that the Facebook posts in the screenshots were prioritized in any users' News Feeds or that followers would not have seen these posts but for any algorithms.  In short, the FAC alleges no facts showing that this content, though appalling and contrary to Facebook's Community Standards, was the *cause* rather than a *symptom* of anti-Rohingya sentiment in Burma.

This lack of causation is even more acute for products liability and negligence, which require

the *design of Facebook itself*—not just anti-Rohingya content on Facebook—to have caused Plaintiffs' harms.  The FAC asserts that "three elements of Facebook's design—reactions, recommendations, and engagement-maximizing algorithms—interact to create a dangerous feedback loop that (1) encourages users to create extreme and polarizing content (including incitements to violence) and (2) promotes and amplifies such content."  FAC ¶¶ 113, 119.  But there are no facts that, if true, would establish that reactions (*e.g.*, likes and comments, *id.* ¶ 34), recommendations (*e.g.*, "Groups You Should Join," *id.* ¶ 40), or content prioritization encouraged third parties to post anti-Rohingya content, much less incited the attacks on Plaintiffs' villages.  At most, the FAC generally alleges that some Facebook users posted false and derogatory content about the Rohingya before the 2012 attack on Jane Doe 1's village, *id.* ¶¶ 51–59, and that military members posted anti-Rohingya content in an effort to justify their activities in the Rakhine State, including their attack on Jane Doe 2's village, *id.* ¶¶ 68–83.  These allegations do not show that users posted anti-Rohingya content *because* they were "rewarded with 'likes' and 'shares,'" or *because* of the purported incentives to "incorporate as much hateful, outraged, and divisive content as possible."  *Id.* ¶ 39.  Causation plausibly runs only in the other direction:  Myanmar military members and their supporters expressed long-harbored prejudices on Facebook and separately acted on them in attacking Plaintiffs' villages—reprehensible events that would have been no different without "likes," recommendations, or engagement-prioritizing algorithms.[2]

### b.     The FAC Does Not Plead Proximate Causation

Even beyond but-for causation, the chain linking Meta to the attacks on Plaintiffs' villages is "too remotely connected … to constitute their legal cause."  *Modisette*, 30 Cal. App. 5th at 154.

The FAC's causation theory is attenuated and impermissibly speculative: among other links, that but for the introduction of Facebook to Burma, the Myanmar military would not have continued with or escalated its decades-long campaign of violence and persecution against the Rohingya; but for the way in which Meta designed Facebook's features like the News Feed, recommendations, "likes,"

---

[2] It is not even clear from the FAC how the relevant Facebook features were "designed" at the time of the attacks on Plaintiffs' villages.  As this Court observed, "[i]t's not as if these platforms haven't changed over time," and the complaint must at least allege "what was the state of play" at the relevant time.  Dkt. 61 at 11:5–6, 11–13.  The FAC's sole allegation is that "beginning in 2009, Meta intentionally incorporated engagement-based ranking of content into Facebook."  FAC ¶ 33.  But this says nothing about what features were in place at the time of the alleged attacks in 2012 and 2017.

Gibson, Dunn &
Crutcher LLP

"comments," and "share," the Myanmar military would not have posted anti-Rohingya rhetoric on Facebook; and but for engagement on Facebook, the Myanmar military would not have attacked Plaintiffs' villages or garnered public support among the Burmese population for their the military's conduct.

The causal chain is further attenuated because violent conduct by the Myanmar military and its supporters broke any causal chain between Meta's actions and Plaintiffs' harms.  Even if a defendant's "conduct was a substantial contributing factor," the defendant is not liable "when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." *Chanda v. Fed. Home Loans Corp.*, 215 Cal. App. 4th 746, 755–56 (2013); *see Gonzalez v. Derrington*, 56 Cal. 2d 130, 133 (1961) (intentional third-party misconduct was "an independent, intervening cause").  A superseding cause breaks the causal chain "when the actor's conduct creates a situation which is utilized by a third person to inflict intentional harm upon another."  Restatement (Second) of Torts § 448 cmt. a (1965); *see Crouch v. Trinity Christian Ctr.*, 39 Cal. App. 5th 995, 1022 (2019).

This is just what the FAC alleges: third parties—*i.e.*, members of the Myanmar military—used Facebook as a "tool" to spread "anti-Rohingya posts and calls for killings," and to "flood[] Facebook with posts, pages, and messages designed to terrorize and dehumanize the Rohingya," FAC ¶¶ 53, 69, after which the military and its supporters brutally attacked the Rohingya.  These "extraordinary" violent acts far exceed any risk that Meta could have foreseen, *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 806 (W.D. Ky. 2000), or any "normal response to dissemination" of content on a communications service, *Sanders v. Acclaim Entm't, Inc.*, 188 F. Supp. 2d 1264, 1276 (D. Colo. 2002).

Multiple courts have rejected similar proximate causation theories.  In *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), the plaintiffs alleged that Twitter "facilitated [ISIS's] growth and ability to plan and execute terrorist acts."  *Id.* at 749–50.  The Ninth Circuit found those allegations insufficient to establish that Twitter proximately caused plaintiffs' injuries, because there was "no connection" between Twitter and the person who committed the attack that injured them.  *Id.* at 750.  Likewise, in *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), the Sixth Circuit rejected the theory that social media companies proximately caused the Pulse nightclub shooting because the shooter "viewed online

content from ISIS" on their services and "became 'self-radicalized.'" *Id.* at 624–25. "With the 'highly interconnected' nature of social media, the internet, and 'modern economic and social life,'" one would "expect[] Defendants' websites to cause some 'ripples of harm' that would 'flow far beyond the defendant's misconduct.'" *Id.* at 625 (quoting *Fields*, 881 F.3d at 749). "But without more, Defendants do not proximately cause all these potential ripples." *Id.*

## 2. Plaintiffs' Products Liability Claims (Counts I and II) Fail

### a. Facebook Is Not a "Product"

This Court should dismiss the products liability claims (Counts I and II) because Facebook is an intangible communications service, not a tangible product. *Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at *4 (Cal. Super. Mar. 10, 2023). A plaintiff asserting a strict products liability or negligent design claim "must show that the object or instrumentality claimed to be defective was in fact a 'product' as defined or contemplated by the Restatement of Torts, legislation or case law." *Brooks v. Eugene Burger Mgmt. Corp.*, 215 Cal. App. 3d 1611, 1626 (1989); *see Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 479 (2001) (negligent design is species of products liability). The Restatement "defines a 'product' … as 'tangible personal property distributed commercially.'" *McIndoe v. Huntington Ingalls Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) (quoting Restatement (Third) of Torts: Prods. Liab. § 19(a) (1998)); *accord Johnson v. U.S. Steel Corp.*, 240 Cal. App. 4th 22, 31 (2015). Products liability thus does not reach "intangible goods or services." *Merritt v. Countrywide Fin. Corp.*, 2015 WL 5542992, at *22 (N.D. Cal. Sept. 17, 2015), *aff'd*, 783 F. App'x 717 (9th Cir. 2019).

An intangible communication service like Facebook cannot meet the "product" definition because it is not "'a physical article which results from a manufacturing process and is ultimately delivered to a consumer.'" *Green v. ADT, LLC*, 2016 WL 3208483, at *3 (N.D. Cal. June 10, 2016) (quoting *Pierson v. Sharp Mem'l Hosp., Inc.*, 216 Cal. App. 3d 340, 345 (1989)). Although Plaintiffs claim Facebook is a "social media product" that "contains significant design flaws" like "reactions, recommendations, and engagement-maximizing algorithms," FAC ¶¶ 112–13, 118–19, this Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

Numerous courts—including this one—have rejected efforts to apply products theories to websites or apps, including Facebook, that facilitate communication and connections between users.

See, e.g., Jacobs, 2023 WL 2655586, at *4 ("Facebook is a service for the purposes of the products liability analysis"); Ziencik v. Snap, Inc., 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023) (Snapchat not a product); Jackson v. Airbnb, Inc., 2022 WL 16752071, at *9–10 (C.D. Cal. Nov. 4, 2022) (Airbnb not a product); Doe No. 1 v. Uber Techs., Inc., 79 Cal. App. 5th 410, 427–28 (2022) (plaintiffs did not appeal holding that Uber is not a product); In re Facebook, Inc., 625 S.W.3d 80, 85 n.1 (Tex. 2021) (noting trial court's dismissal of products claim because "Facebook is not a 'product'").  These decisions comport with the principle that products liability does not extend to "ideas and expression," including "[a] publisher's role in bringing ideas and information to the public."  Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1034, 1037 n.8 (9th Cir. 1991); accord Quinteros v. InnoGames, 2022 WL 898560, at *7 (W.D. Wash. Mar. 28, 2022) (allegedly "addictive" online video game is "not a product").  As this Court explained in Estate of B.H. v. Netflix, Inc., products liability theories do not apply to "books, movies, or other forms of media."  2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022).  When an alleged injury stems from ideas and expression, the medium publishing the information—whether a book, magazine, or social media service—is not a product.  See Restatement (Third) of Torts: Prods. Liab. § 19 cmt. d.

The requirement of a tangible product makes good sense.  Courts have noted that "the concept of 'design defect'" is "concededly one of the most difficult areas for precise definition."  Anderson v. Owens-Corning Fiberglas Corp., 53 Cal. 3d 987, 995 (1991).  But at least when "[a] product is a physical article which results from a manufacturing process and is ultimately delivered to a consumer," the plaintiff's possession of the tangible product means that "[a] defect in the article even if initially latent is ultimately objectively measurable."  Pierson, 216 Cal. App. 3d at 345.  This framework is fundamentally unworkable as applied to services and intangible goods.  Here, for example, there is no objectively measurable basis for determining that Facebook was defectively designed—i.e., that "the likelihood and gravity of harm from Facebook's design" outweighs the benefits of enabling communications among billions of users worldwide.  FAC ¶ 115; see id. ¶ 121.

These concerns are at their apex here because products liability's "focus[] on the tangible world" does "not take into consideration the unique characteristics of ideas and expressions" or the difference between the "transmission of words" and "selling items with physical properties."  Winter,

MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 4:22-CV-00051-YGR

938 F.2d at 1034, 1036 n.6.  Any attempt to impose "objectively measurable" standards for intangible "defect[s]" in communications services, *Pierson*, 216 Cal. App. 3d at 345, "could seriously inhibit those who wish to share thoughts and theories," *Winter*, 938 F.2d at 1035.  "Products liability law is geared to the tangible world," and expanding it to "intangibles such as ideas and expression" would present significant constitutional problems under the First Amendment, which places a "high priority on the unfettered exchange of ideas."  *Id.* at 1034–35; *see James v. Meow Media, Inc.*, 300 F.3d 683, 695 (6th Cir. 2002) ("[C]ourts have made clear that attaching tort liability to protected speech can violate the First Amendment." (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964))).  One need look no further than the FAC, which seeks to hold Meta liable for developing a social media services used by billions of people, only a small fraction of whom allegedly misused that service to spread "hate speech and misinformation."  FAC ¶¶ 116, 122.  Claims like Plaintiffs' that challenge "extreme and polarizing content" on communications services, *id.* ¶¶ 113, 119, fall outside the realm of products liability.

### b.  As Bystanders, Plaintiffs Cannot Bring Products Liability Claims

California law also bars the products claims because Plaintiffs were bystanders who didn't use Facebook.  "The history of the doctrine of strict liability in tort indicates that it was designed … to govern the distinct problem of physical injuries."  *Seely v. White Motor Co.*, 63 Cal. 2d 9, 15 (1965).  Absent a physical injury, bystanders who do not "use[] or consume[]" a product cannot bring a products claim.  Restatement (Second) of Torts § 402A.  Although Plaintiffs allege that concerns for their safety prompted them to flee Burma in 2012 and 2017, FAC ¶¶ 48, 65, they do not allege that they suffered any physical injury and thus cannot recover damages for either emotional distress or property loss.

As for emotional distress damages, absent "physical injury or impact to the plaintiff [her]self," such damages are recoverable "only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is *then aware* that it is causing injury to the victim and, (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness."  *Thing v. La Chusa*, 48 Cal. 3d 644, 647 (1989) (emphasis added).  Such a claim fails unless the plaintiff can allege "contemporaneous awareness of the causal connection between the company's defective product and her [family member]'s injuries."  *Fortman*

*v. Förvaltningsbolaget Insulan AB*, 212 Cal. App. 4th 830, 845 (2013).  When a plaintiff "witnessed the injury, but did not meaningfully comprehend that the company's defective product caused the injury, she cannot satisfy the second *Thing* requirement."  *Id.* at 832.  That limitation is dispositive here:  the FAC alleges that Plaintiffs "did not learn that Meta's conduct was a cause of [their] injuries" until 2021 and 2023, respectively, long after the injuries they allegedly witnessed in 2012 and 2017.  FAC ¶¶ 100–01.  And Jane Doe 2 also fails to allege that she was closely related to any victims in her village.  *Id.* ¶ 62.  Accordingly, neither can bring products claims against Meta for emotional distress.

The absence of physical injury also prevents recovery for lost property.  Under the economic loss rule, "a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone."  *Seely*, 63 Cal. 2d at 18.  Although direct damage to "other property"—such as a collision with another driver's car—counts as a form of physical injury, *see Jiminez v. Super. Ct.*, 29 Cal. 4th 473, 483 (2002), the FAC nowhere alleges that Facebook caused a physical injury to Plaintiffs' property.  The only allegation is that Plaintiffs left behind property that third parties then seized, FAC ¶¶ 46, 67, but there are no allegations of any "physical injury" to either Plaintiffs or their property that would allow them to bring products liability claims as bystanders.

### 3.   Plaintiffs' Negligence Claims (Counts II and III) Fail

Plaintiffs' negligence claims fail because, as with the first complaint, their FAC does not establish a duty of care.  Dkt. 61 at 23:9–22.  "Duty is not universal," and "not every defendant owes every plaintiff a duty of care."  *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 213 (2021).  "As a general rule, … one owes no duty to control the conduct of another, nor to warn those endangered by such conduct."  *Id.* at 211.  A duty first requires an exception to the "no-duty-to-protect" rule, such as misfeasance or a special relationship between the defendant and the plaintiff or the third-party wrongdoer.  *Id.* at 214–15.  If an exception is found, the *Rowland* factors guide whether to impose a duty.  *Id.* (citing *Rowland v. Christian*, 69 Cal. 2d 108 (1968)); *see Airbnb*, 2022 WL 16752071, at *6 (misfeasance and special relationship exceptions are "expansions of duty rules and must, in each case, pass muster under *Rowland* in order to apply").  Because duty is a legal question, *Erlich v. Menezes*, 21 Cal. 4th 543, 552 (1999), and because the FAC fails both steps, the claims should be dismissed.

a.   **The FAC Does Not Plead an Exception to the No-Duty-to-Protect Rule**

Plaintiffs' negligence claims fail *Brown*'s first step because no exception to the no-duty-to-protect rule applies, as the FAC fails to plead misfeasance by Meta or a special relationship between Meta and either Plaintiffs or the members of the military who attacked their villages.

*No Misfeasance*.  In California, "misfeasance" giving rise to a duty is an "affirmative act of defendant which created an undue risk of harm." *Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 48 (1975). It is not enough that a defendant may have "create[d] an opportunity" for injurious conduct, or that such harms are "a foreseeable result of a defendant's actions." *Uber*, 79 Cal. App. 5th at 427.  The critical hallmark of misfeasance is whether the injurious conduct is a "necessary component" of the defendant's actions. *Id.*; *Airbnb*, 2022 WL 16752071, at *7.

It is well settled that distributing third-party content, developing engagement features, and connecting users are not acts of "misfeasance."  In *Dyroff v. Ultimate Software Group*, 934 F.3d 1093 (9th Cir. 2019), the Ninth Circuit held that a website that allegedly "steered users to … groups dedicated to the sale and use of narcotics" did not commit misfeasance because the site's "recommendations and notifications [features] were used regardless of the groups in which a user participated," so the sale and use of narcotics were not necessary components of the website's conduct. *Id.* at 1101.  In *Uber*, the court held that a ride-sharing app had no duty to protect plaintiffs abducted and sexually assaulted by fake Uber drivers.  79 Cal. App. 5th at 427.  Although a "fake Uber scheme may be a foreseeable result of the Uber business model" that made it easier for assailants to "commit" their crimes, these connections did not mean that the plaintiffs' abduction and sexual assault were "necessary components" of Uber's business model. *Id.*  And California courts recognize that media companies have no duty of care to victims of criminals who were inspired to violence by content they distributed. *E.g.*, *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1011 (1982) (no duty even if producer's movie "had the tendency to attract violence-prone individuals to the vicinity of theaters at which it was exhibited").

The same is true here.  The FAC does not—and could not—allege facts to establish that atrocities like genocide and ethnic violence are a "necessary component" of Meta's business model. Even if the broad claims that Meta designed Facebook in a way that "encouraged the creation of toxic posts … and amplified, promoted, and recommended such posts to those people most likely to act on

them," FAC ¶ 3; *see id.* ¶¶ 33–44, 113, 119, might suggest Facebook "creat[ed] an opportunity" for some individuals to spread content that could motivate violence, thereby "worsen[ing] the [Plaintiffs'] position," that would "not render [the Myanmar military's] conduct a necessary component of [Meta's] actions—even when that conduct is foreseeable." *Uber*, 79 Cal. App. 5th at 428–29.

*No Special Relationship.*   Nor is there a duty based on any theory of a "special relationship" between Meta on the one hand, and Plaintiffs or the Myanmar military on the other.   Plaintiffs have conceded that no such special relationship exists, Dkt. 35 at 10 ("Plaintiff's negligence claim rests not on any duty arising out of a 'special relationship.'"); Dkt. 61 at 23:17–18, and the FAC alleges nothing new to the contrary.   Courts routinely decline to impose on an internet service a duty to protect *users* from harm allegedly caused by third parties, and certainly Meta owed no such duty to Plaintiffs, who do not claim to have been Facebook users. *See*, *e.g.*, *Dyroff*, 934 F.3d at 1101; *Doe v. GTE Corp.*, 347 F.3d 655, 661 (7th Cir. 2003); *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 326 & n.4 (D.N.J. 2015).

## b.   The *Rowland* Factors Preclude a Finding of Duty

The lack of any recognized basis for a duty—such as misfeasance or a special relationship—is reason alone to dismiss the negligence claims.   But even if the FAC alleged facts supporting either source of duty, the *Rowland* factors would "limit" any such duty given the low degree of foreseeability and weighty policy concerns. *See Brown*, 11 Cal. 5th at 217 (citing *Rowland*, 69 Cal. 2d at 108).

This Court noted in *Netflix* that "California courts have declined to find a duty as a matter of law under the *Rowland* factors for claims implicating expression."   2022 WL 551701, at *3; Dkt. 61 at 30:10–11 (noting "lot[s] of cases" are "reluctan[t] to impose a duty if it undermines First Amendment expression").   Meta's development of content organization features for Facebook is "socially unobjectionable," and "in light of First Amendment considerations, must be deemed so even if it had the tendency to attract violence-prone individuals." *Bill*, 137 Cal. App. 3d at 1011; *see McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1005–06 (1988) (it is "simply not acceptable to a free and democratic society" to impose a duty upon defendants "to limit and restrict their creativity in order to avoid the dissemination of ideas" that "may adversely affect [some] individuals").   The First Amendment prohibits government interference with Meta's content-moderation policies relating to, *inter alia*, excluding, moderating, filtering, labeling, restricting, or promoting third-party content on Facebook.

1   *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022); *see also NetChoice, LLC v.*

2   *Att'y Gen. of Fla.*, 34 F.4th 1196, 1214 (11th Cir. 2022) (state statute restricting what content-

3   moderation policies social media services can implement is likely unconstitutional).  Imposing a duty

4   here would thus, at a minimum, raise serious constitutional concerns.

5         For similar reasons, *Young v. Facebook, Inc.* held that Facebook has no duty to "condemn all

6   acts or statements that inspire, imply, incite, or directly threaten violence against anyone"—in part

7   because such a duty "would be inconsistent with the policy choices undertaken by Congress in the

8   Communications Decency Act, which sharply limits the responsibility of interactive computer service

9   providers for content provided by third parties."  2010 WL 4269304, at *5 (N.D. Cal. Oct. 25, 2010).

10         The FAC also falls far short of the "very high degree of foreseeability [that is] required" to

11   impose a duty in these circumstances, where the claims implicate expression and there is no "simple

12   means" by which Meta can predictably stop third parties from engaging in violent conduct off

13   Facebook.  *McCollum*, 202 Cal. App. 3d at 1004.  Plaintiffs' alleged harms are highly attenuated from

14   the Facebook engagement features discussed in the FAC—such as the "'like,' 'comment' on, or 'share'

15   it" prompts, FAC ¶ 34, News Feed recommendations, *id.* ¶ 37, or "Discovery" and "Groups You

16   Should Join" features, *id.* ¶ 40—none of which directly "put the danger in play."  *Modisette*, 30 Cal.

17   App. 5th at 146.  Rather, Plaintiffs' alleged harms were the direct result of conduct by third-party actors

18   in the Myanmar military and civilian militia—and not from Facebook's engagement features or

19   anything else Meta did.  FAC ¶¶ 72–74.  This disconnect between Meta's conduct and Plaintiffs'

20   alleged harms "significantly weakens their claim of duty."  *Modisette*, 30 Cal. App. 5th at 147.  And

21   there is no ground for "'a baseline assumption'" that all Facebook users "will ordinarily use" the service

22   to incite, justify, or encourage violence.  *Id.*  Meta takes seriously the need to combat the spread of

23   hateful content on Facebook, but imposing a legal duty here would improperly require it to adopt "an

24   unduly pessimistic view of human nature": that Burmese people, if given access to Facebook, would

25   use it to spread hate speech and falsehoods.  *Steven F. v. Anaheim Union High Sch. Dist.*, 112 Cal.

26   App. 4th 904, 917 (2003) (moral blame on teacher who exploits role to molest student, not on school

27   district with policies against such conduct).

28         Finally, *Rowland*'s policy factors confirm that no duty should be imposed.  Any "moral blame"

1    rests with the Myanmar military and its supporters, as Meta does not control their actions that have

2    been occurring offline since long before Facebook was available in Myanmar.   *Taylor v. Elliott*

3    *Turbomachinery Co.*, 171 Cal. App. 4th 564, 594 (2009).  The risk of "malicious acts" by third parties

4    anywhere in the world that might relate in some way to content posted on Facebook is not "a readily

5    insurable one." *Id.* at 816–17.  And as noted above, imposing a legal duty on website services to

6    prevent injuries committed by third parties off the service would have a "significant chilling effect

7    upon Internet free speech." *Delfino v. Agilent Tech., Inc.*, 145 Cal. App. 4th 790, 816 (2006).  Indeed,

8    even if the Court were "tempted to create this duty, the gentle tug of the First Amendment and the

9    values embodied therein would remind us of the social costs." *Winter*, 938 F.2d at 1037.

10                     **4.      Plaintiffs' Aiding-and-Abetting Claims (Counts IV and V) Fail**

11           The FAC's new civil aiding-and-abetting claims—based on alleged "incitement to violence"

12   and other torts—fare no better.  FAC ¶¶ 132–41.  To allege aiding-and-abetting, a plaintiff must assert

13   (1) the actual commission of an underlying tort *and* that the defendant (2) "knew that a tort had been,

14   or was to be, committed" *and* (3) "acted with the intent of facilitating the commission of that tort."

15   *Gerard v. Ross*, 204 Cal. App. 3d 968, 983 (1988).  The FAC does not establish any of these elements.

16           To start, Plaintiffs do not allege facts establishing the "actual commission of a tort."  *Richard*

17   *B. LeVine Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 (2005).  "Incitement to violence," as alleged in

18   Count IV, is a First Amendment exception, not a California tort.  *See Braxton v. Municipal Ct.*, 10 Cal.

19   3d 138, 148 (1973).  Although Count V lists a litany of potential torts that might have occurred during

20   the attacks on Rohingya villages, FAC ¶ 138, it alleges no facts that establish the elements of these

21   torts, who committed them, or how they harmed Plaintiffs.   Such conclusory accusations do not

22   plausibly allege that any "person has actually committed a tort."  *Ogden v. Wells Fargo Bank, N.A.*,

23   2019 WL 1751818, at *8 (C.D. Cal. Feb. 6, 2019).  Having failed to "state[] a valid" underlying tort,

24   the "claim for aiding and abetting … therefore necessarily fails."  *In re Mortg. Elec. Registration Sys.,*

25   *Inc.*, 754 F.3d 772, 786 (9th Cir. 2014).

26           The FAC also fails to allege Meta "had actual knowledge of the specific primary wrong."  *Casey*

27   *v. U.S. Bank Nat. Ass'n*, 127 Cal. App. 4th 1138, 1145–46 (2005).  Plaintiffs must allege facts showing

28   that Meta "knew that a tort had been, or was to be, committed."  *Id.* at 1146.  As to Jane Doe 1, the

allegation that some Meta executives attended a roundtable in 2012 where some participants warned about "the proliferation of anti-Rohingya hate speech on Facebook," FAC ¶ 29, does not allege even generalized knowledge of incitement to violence (which is different from hate speech, *see Brandenburg v. Ohio*, 395 U.S. 444, 448–49 (1969))—let alone a specific tort.  Nor does the FAC allege knowledge as to any torts affecting Jane Doe 2.  It describes general warnings and briefings relayed to Meta executives from 2012 to 2014, FAC ¶¶ 29–30—facts that could show at most "a vague suspicion" that some Facebook users were "spread[ing] hate speech and misinformation," FAC ¶ 29, but not knowledge of any specific underlying tort or of any plan to attack Jane Doe 2's village.  *In re First Alliance Mortg. Co.*, 471 F.3d 977, 993 n.4 (9th Cir. 2006), *accord Casey*, 127 Cal. App. 4th at 1149–53.  These defects cannot be cured with public statements by Meta executives "after the 2017 Clearance Operation."  FAC ¶ 84; *see id.* ¶ 61.  Even if such statements related to specific torts against Plaintiffs, they were made *after* Plaintiffs' harms in 2012 and 2017 and cannot show Meta's knowledge "prior to or at the time of" the underlying torts.  *S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1166 (N.D. Cal. 2020); *see*, *e.g.*, *Molenda v. Universal City Studios LLC*, 2020 WL 6653505, at *3 (C.D. Cal. June 8, 2020).

Finally, the FAC does not allege that Meta "acted with the intent of facilitating the commission of [a] tort."  *Gerard*, 204 Cal. App. 3d at 983.  "[K]nowledge alone … is not enough to state a claim for aiding and abetting," as "California law necessarily requires [that the] defendant have made a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act."  *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 641 (2021) (internal quotation marks omitted).  Because the FAC does not allege that Meta acted with the *purpose* to facilitate the Myanmar military's attacks, the aiding-and-abetting theory fails.

## C.   Alternatively, Plaintiffs' Claims Are Barred by Section 230 (All Counts)

Section 230 independently bars Plaintiffs' claims.  It precludes any claim where (1) the defendant is a "provider … of an interactive computer service," and (2) the suit seeks to hold the defendant liable as a "publisher or speaker" of (3) content created by someone other than the defendant interactive computer service provider.  47 U.S.C. § 230(c)(1); *see also id.* § 230(e)(3).  It protects "providers of interactive computer services against liability arising from content created by third

parties," *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc).

### 1.    Plaintiffs' "Creative Pleading" Cannot Evade Section 230 Immunity

Section 230 bars Plaintiffs' claims seeking to impose liability on Meta for the alleged harmful effects of anti-Rohingya content posted by members of the Myanmar military and other extremists.  All of the elements of Section 230 are met here, and Plaintiffs' contrary arguments are without merit.

*First*, it is undisputed that Facebook is an interactive computer service.  *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014); *accord Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019).

*Second*, Plaintiffs' claims necessarily arise from content created entirely by third-party individuals or entities other than Meta—the Myanmar military and other extremists who posted anti-Rohingya content.  *See Roommates*, 521 F.3d at 1162.  Each of Plaintiffs' claims turns on the alleged effects of content posted by third parties.  *See, e.g.*, FAC ¶ 34 ("when users post content, other users are shown that content"); *id.* ¶ 39 ("users who posted the content are rewarded with 'likes' and 'shares'"); *id.* ¶¶ 73–83 (describing posts on Facebook by members of Myanmar military); *id.* ¶ 113 (alleging that Facebook "users … create extreme and polarizing content").

*Third*, Plaintiffs' claims seek to treat Meta as the speaker or publisher of the user content allegedly giving rise to their harms.  When determining whether a claim treats a defendant as a publisher, "what matters is not the name of the cause of action." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009).  Rather, the issue "is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Id.* at 1102.  This flexible test prevents plaintiffs from using "creative pleading" to evade Section 230's protections. *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016).

Plaintiffs' claims would treat Meta as the publisher of allegedly harmful third-party content posted on Facebook by Myanmar military members.  Despite Plaintiffs' efforts to suggest otherwise, this core theory underlies all their claims against Meta, placing them all within the "heartland" of Section 230.  *Force*, 934 F.3d at 65.  Even Plaintiffs' efforts to plead affirmative actions by Meta, rather than third-party content, ultimately circle back to allegations about how Meta managed the third-party content—again, a theory challenging the exercise of traditional publishing functions in the "heartland" of Section 230.  The FAC asserts, for example, that Facebook's algorithms promote the creation and

spread of "engag[ing]" content, including "extreme and polarizing content," and faults Meta for not "minimiz[ing] the risk of harm" by "hiring more content moderators to monitor Burmese-language posts." FAC ¶¶ 119, 130.  But Section 230 protection is not lost because Meta's algorithms allegedly "prioritize[d]" certain content that "maximize[d] engagement." *Id.* ¶¶ 39, 41; *see Dyroff*, 934 F.3d at 1098.   As the Second Circuit noted in rejecting a similar theory that Facebook's use of "recommendation" algorithms removed the claims from Section 230, the content arrangement that algorithms produce is the "essential result of publishing" and is protected by Section 230.  *Force*, 934 F.3d at 66.  And as the Ninth Circuit has made clear, Section 230 protects Meta's decisions to "publish or to withdraw from publication" third-party content.  *Barnes*, 570 F.3d at 1102.

Plaintiffs cannot avoid Section 230 by asserting that Meta "materially contributed" to anti-Rohingya content posted by third parties by prioritizing content by engagement.  The Ninth Circuit has held that a provider must "materially contribut[e] to [the] alleged unlawfulness" of the third-party content, and "merely … augmenting the content generally" is not enough.  *Roommates*, 521 F.3d at 1168.   Put plainly, the "proliferation and dissemination of content does not equal creation or development of content." *Kimzey*, 836 F.3d at 1271.

The FAC claims that Facebook's algorithms are "not neutral" because they allegedly "recommend content" based not on "users' previously expressed interests" but on what content will "maximize engagement."  FAC ¶ 41.  It asserts that features—such as "likes," "shares," and "comments"—"reward" users for posting engaging content and thereby "encourage[] users to create" more of that same content. *Id.* ¶ 113.  But these allegations misstate the relevant analysis.  As the Ninth Circuit has recognized, features such as "likes" and "shares" are "tools meant to facilitate the communication and content of others," and "not content in and of themselves."  *Dyroff*, 934 F.3d at 1098.  At most, they affect how Facebook *displays* content, but "users ultimately determine what content to post." *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009); *accord Force*, 934 F.3d at 66.

Nor should this Court be the first to accept Plaintiffs' novel and unsupported "dangerous feedback loop" theory.  FAC ¶ 113.  As "encouragement test" like that offered by Plaintiffs "would inflate the meaning of 'development' to the point of eclipsing the immunity from publisher-liability

that Congress established." *Jones v. Dirty World Ent. Recordings, LLC*, 755 F.3d 398, 414 (6th Cir. 2014).  "[T]he very essence of publishing is making the decision[s] whether to print or retract a given piece of content," as well as where and to whom to display it, *Klayman*, 753 F.3d at 1359, whether that decision is made manually or through an "automate[d]" process, *Force*, 934 F.3d at 67. And "there will always be close cases where a clever lawyer could argue that *something* the website operator did encouraged the illegality." *Roommates*, 521 F.3d at 1174.  But "[s]uch close cases … must be resolved in favor of immunity, lest we cut the heart out of [S]ection 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Id.*

Finally, Section 230 bars Plaintiffs' products liability theory.  The statute contains no exception for products claims and would be a nullity if it could be evaded by relabeling traditional publisher activity as a "design defect."  For that reason, courts reject parties' attempts to avoid Section 230 by claiming providers should have adopted or modified certain "features" when the real liability theory is that the defendant failed to limit or prevent harmful third-party content.  *E.g.*, *Doe v. Myspace, Inc.*, 528 F.3d 413, 416, 420 (5th Cir. 2008); *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019).

The holding in *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), is not to the contrary. There, the alleged "danger" was Snap's speed filter—essentially, an online speedometer—that rewarded users for driving at unreasonably high speeds, a theory the Ninth Circuit held had "nothing to do" with Snap's "editing, monitoring, or removing" any third-party content.  *Id.* at 1093–94. Because Snap's duty not to offer such a dangerous device "st[ood] independently of the content," the court found the case different from "creative attempt[s] to plead around" Section 230 where "the plaintiff's claim, at bottom, depended on a third party's content, without which no liability could have existed." *Id.*  And the Court warned that Section 230 would *not* permit the plaintiffs "to fault Snap for publishing other Snapchat-user content … that may have incentivized the boys to engage in dangerous behavior"—a caveat that presumes that Section 230 bars content-based products claims and describes Plaintiffs' encouragement theory to a tee.  *Id.* at 1093 n.4.

Courts applying *Lemmon* have confirmed that Section 230 bars a products claim when "the nature of the alleged design flaw" and "the harm that is alleged to flow from that flaw" is "directly

related to the posting of third-party content." *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021), *overruled on other grounds by Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022).  In *Doe ex rel. Roe v. Snap, Inc.*, Section 230 barred a negligent design claim because the "lack of safety features" was relevant only if such features would have blocked "wrongful communication[s]."  2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022).  And in *Bride v. Snap, Inc.*, the court "distinguish[ed]" *Lemmon* because the challenged feature was not "independent of the content posted on Defendants' applications" and the plaintiff's claims would require defendants "to monitor third-party content."  2023 WL 2016927, at *5 (C.D. Cal. Jan. 10, 2023).  *Accord Jackson v. Airbnb, Inc.*, 2022 WL 16753197, at *2 (C.D. Cal. Nov. 4, 2022); *Quinteros*, 2022 WL 898560, at *1, *4–5.  Because the alleged design defect here "is directly related to the posting of third-party content," Section 230 bars the claims.  *Twitter*, 555 F. Supp. 3d at 930 (Section 230 bars claims based on "how well" a defendant's "algorithm" was designed to prevent and remove "third-party content containing" harmful messages).

### 2.   Burmese Law Cannot Displace Section 230

The Court also should not credit the FAC's allegation that a *state's* conflict-of-law principles— which Plaintiffs contend point to the application of Burmese law "to the extent that Meta raises [Section 230] as a defense to Plaintiffs' claims"—can override a *federal* immunity statute.  FAC ¶ 103.  Setting aside the fact that the FAC seeks the benefit of California law on every claim while disclaiming California law on the immunity issue, the idea that "a conflict-of-laws analysis prevents the application of federal statutes to foreign-law-based claims … is unsupported in law or logic." *Force v. Facebook, Inc.*, 304 F. Supp. 315, 324 (E.D.N.Y. 2018), *aff'd on other grounds*, 934 F.3d 53 (2d Cir. 2019).  It defies the plain text of Section 230, the Constitution, and applicable case law.  And, in any event, Plaintiffs have not shown that Burmese law is discernible.

The plain text of Section 230 confirms that it applies to all claims, even those that might be governed by foreign law.  In Section 230, Congress instructed courts not to treat an interactive computer service provider as "the publisher or speaker" of third-party content.  47 U.S.C. § 230(c).  Although the statute features several narrow exceptions, *id.* § 230(e), "there is no listed exception for foreign law claims," so "those claims remain subject to the limitations on liability provided by Section 230(c)(1)." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 160 n.14 (E.D.N.Y. 2017) (citing *TRW Inc. v. Andrews*,

534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.")), *aff'd on other grounds by Force*, 934 F.3d 53.

Plaintiffs' notion that the Court can override Section 230 via state law is an invitation to error, as any such theory is preempted. Section 230 expressly states that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). If the ordinary application of a state's choice-of-law principles dictates an outcome that is "plainly not in accord with" federal law, the "constitutional demands of controlling federal legislation" prevail, *United States v. Little Misere Land Co.*, 412 U.S. 580, 604 (1973), and, under the Supremacy Clause, the conflicting "state or local law simply must give way," *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1152 (9th Cir. 2020). Thus, "[i]n answering the question whether the rule of decision is supplied by the laws of State X or by federal law, general choice-of-law doctrines … have no applicability … because the relevant rule is supplied by the Constitution itself." *Murphy v. Directv, Inc.*, 724 F.3d 1218, 1228 (9th Cir. 2013) (internal quotation marks omitted). And because the Supremacy Clause creates "a constitutional choice-of-law rule," *Quesada v. Herb Thyme Farms, Inc.*, 62 Cal. 4th 298, 307 (2015), California cannot undo Section 230, either substantively or in its choice of law, *see Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 543 (2004). Thus, "foreign law claims [in U.S. courts] … remain subject to the limitations on liability provided by Section 230(c)(1)." *Cohen*, 252 F. Supp. 3d at 160 n.14; *Force*, 304 F. Supp. 3d at 324.

Regardless, Burmese law cannot apply here. Plaintiffs, as the parties invoking foreign law, must offer evidence of Burmese law sufficient for this Court to draw "meaningful conclusions regarding the result of applying" it. *Sommer v. Gabor*, 40 Cal. App. 4th 1455, 1469 (1995); *see In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 562 (9th Cir. 2019) (en banc) (party must show foreign law "materially differs" from California law). But one cannot draw "meaningful conclusions" about results under Burmese law, *see Sommer*, 400 Cal. App. 4th at 1469, because it "is not well developed," A. Briggs, *Private International Law in Myanmar* 105 (2015), and scholars have concluded that "[t]he content of Burmese law is unknowable," "its application [is] difficult, and any results uncertain and unpredictable." R.P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational*

*Tort Litigation*, 63 Emory L.J. 1089, 1131 (2014) (citations omitted); *see also* A. Huxley, *California Refuses to Apply Myanmar Law*, 6 Australian J. of Asian L. 88 (2004) ("Myanmar has the simulacrum of a legal system, but does not have real law, such as can be consulted and applied … in foreign courts.").  At least one court has refused to apply Burmese law on this basis.  *See*, *e.g.*, *Doe I v. Unocal Corp.*, 2002 WL 33944505 (Cal. Super. June 10, 2002).

Even Plaintiffs' expert, Professor Harding, conceded that "the law reports" in Burma "are quite thin," Dkt. 42-2 at 42:2–6; that "there is virtually no secondary material to look at," *id.* at 42:15–20; and that he does not "know anybody who would be able to describe themselves as an expert on Myanmar law," *id.* at 72:17–21; *see also id.* at 87:8–11.  He know of no case in Burma against a company like Meta—or any online communications service, *see id.* at 60:11–19; 63:3–6.  Plaintiffs thus fail at the first hurdle to show that Burmese law materially differs from that of California.  *See G&G Prods. LLC v. Rusic*, 902 F.3d 940, 950 (9th Cir. 2018) ("clearly distinguishable" statutes or cases insufficient to show that the law materially differs).[3]

But even if Burmese law were discernable and there were a true conflict with California law— and if it were permissible to resolve that conflict by ignoring federal law—California has a greater interest in having its laws (including U.S. laws like Section 230) applied under the applicable balancing test.  *See Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1091–92 (9th Cir. 2021).  Section 230 promotes the clear, stated "policy of the United States" to support free speech and the development of the Internet.  47 U.S.C. §§ 230(a), (b).  By contrast, Plaintiffs offer no allegations or evidence that Burma has a policy interest regarding speech on the Internet—much less one that would be more impaired if Myanmar law were not applied.  *See Wash. Mut. Bank, FA v. Super. Ct.*, 24 Cal. 4th 906, 920 (2001) (directing courts to look to the "relative commitment," "history and current status," and "function and purpose" of respective laws when weighing governmental interests).

### D.    Plaintiffs' Claims Are Barred by the Foreign Affairs Doctrine (All Counts)

Dismissal is also appropriate under the foreign affairs doctrine, which prevents "an intrusion

---

[3] Even if Burmese law did apply, Plaintiffs' claims would be barred under the Burmese one-year statute of limitations for personal injury claims, which runs from the date "[w]hen the injury is committed." Limitations Act of 1908, § 3, cl. 22, Div. 1, Sch. 1.

MOTION OF DEFENDANT META PLATFORMS, INC. TO DISMISS FIRST AMENDED COMPLAINT
CASE NO. 4:22-CV-00051-YGR

Gibson, Dunn &
Crutcher LLP

by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress." *Zschernig v. Miller*, 389 U.S. 429, 432 (1968).  Even within areas of the states' "traditional competence," the doctrine preempts state-law claims where there is a "likelihood" that they "will produce something [with] more than incidental effect in conflict with express foreign policy of the National Government." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2005).

Plaintiffs' claims would require this Court to make findings having "more than incidental effect in conflict with" the federal government's ongoing foreign policy initiatives regarding the political and human rights situation in Burma.  Plaintiffs assert harms allegedly caused by illegal actions of the Myanmar military, including from the military's "terrorism and genocide."  FAC ¶ 1.  The federal government is currently addressing these issues through comprehensive and targeted responses to the Myanmar government and its military—including financial sanctions, support for actions by the Geneva Convention at the International Court of Justice, and coordination with the UN and other multinational organizations on diplomatic responses.  The State Department has emphasized that "[a]n important part of our foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving alleged human rights abuses." *Mujica v. Occidental Petrol. Corp.*, 381 F. Supp. 2d 1164, 1188 (C.D. Cal. 2005).  Plaintiffs' attempt to address these same sensitive issues through California tort law would undermine the framework the Executive Branch has created to hold perpetrators accountable, as well as the United States' "preference … for the Government of Burma to hold any individuals responsible for atrocities, serious human rights abuses accountable within the Burmese judicial and legal system."  On Public Designation, Due to Gross Violations of Human Rights, of Burmese Military Officials (July 16, 2019), https://2017-2021.state.gov/on-public-designation-due-to-gross-violations-of-human-rights-of-burmese-military-officials/index.html.

## V.    CONCLUSION

For the above reasons, and because further amendment would be futile, Meta respectfully requests that the FAC be dismissed with prejudice.

Dated: April 28, 2023                         GIBSON, DUNN & CRUTCHER LLP

                                                        By:   _____/s/ Rosemarie T. Ring_____
                                                                Rosemarie T. Ring
                                                        *Attorneys for Defendant Meta Platforms, Inc.*