1  Rafey S. Balabanian (SBN 315962)
   rbalabanian@edelson.com
2  Yaman Salahi (SBN 288752)
   ysalahi@edelson.com
3  EDELSON PC
   150 California Street, 18th Floor
4  San Francisco, California 94111
5  Tel: 415.212.9300
   Fax: 415.373.9435
6
7  Jay Edelson (*pro hac vice*)
   jedelson@edelson.com
8  Roger Perlstadt (*pro hac vice*)
   rperlstadt@edelson.com
9  J. Eli Wade-Scott (*pro hac vice*)
   ewadescott@edelson.com
10 Michael Ovca (*pro hac vice*)
   movca@edelson.com
11 EDELSON PC
   350 North LaSalle Street, 14th Floor
12 Chicago, Illinois 60654
   Tel: 312.589.6370
13 Fax: 312.589.6378
14

Richard Fields (*pro hac vice* forthcoming)
fields@fhcfirm.com
Edward Han (*pro hac vice*)
edhan@fhcfirm.com
Martin Cunniff (*pro hac vice*)
martincunniff@fhcfirm.com
FIELDS HAN CUNNIFF PLLC
1701 Pennsylvania Avenue, NW, Suite 200
Washington, DC 20006
Tel: 833.382.9816

15 *Counsel for Plaintiffs and the Proposed Class*

16 **UNITED STATES DISTRICT COURT**

17 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

18 **OAKLAND DIVISION**

19

20 JANE DOE 1 and JANE DOE 2,
   individually and on behalf of all others
21 similarly situated,

22                              *Plaintiffs*,
        *v.*
23

24 META PLATFORMS, INC., a Delaware
   Corporation,
25
                              *Defendant.*
26

27

28

Case No. 4:22-cv-00051-YGR

Hon. Yvonne Gonzalez Rogers

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Date:        September 19, 2023
Time:        2:00 p.m.
Room:        Courtroom 1, 4th Floor
             1301 Clay Street
             Oakland, California 94612

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

I.      PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF
LIMITATIONS ........................................................................................................... 4

II.     PLAINTIFFS HAVE SUFFICIENTLY PLEADED THEIR CLAIMS ....................... 8

     A.     Plaintiffs have sufficiently alleged causation (All Counts) ................................... 8

     B.     Plaintiffs state claims for strict product liability and negligent product design
(Counts I and II) .................................................................................................. 12

          1.     Facebook is a product subject to product liability law ............................ 12

          2.     Meta's "bystander" argument is without merit ........................................ 14

     C.     Plaintiffs state claims for negligence (Counts II and III) ................................. 16

     D.     Plaintiffs state claims for aiding and abetting (Counts IV and V) ................... 21

III.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CDA ................................... 23

     A.     Plaintiffs do not seek to hold Meta liable as the publisher or speaker of third-
party content .................................................................................................... 24

          1.     Meta was the designer of a dangerous product ....................................... 24

          2.     Meta was a material contributor to the harmful content ........................ 26

          3.     Meta was the distributor—not the publisher or speaker—of third-party
content .................................................................................................... 30

          4.     Meta negligently connected violent extremists and susceptible violent
actors ...................................................................................................... 31

     B.     To the extent the CDA would bar Plaintiffs' claims, there is a true conflict
between U.S. and Burmese law, and Burmese law of non-immunity
governs ............................................................................................................ 31

IV.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE FOREIGN AFFAIRS
DOCTRINE ............................................................................................................. 34

CONCLUSION ..................................................................................................................... 35

1

**TABLE OF AUTHORITIES**

2

**United States Supreme Court Cases**

*Am. Ins. Ass'n v. Garamendi*,
   539 U.S. 396 (2003) ................................................................................ 34

*Howlett v. Rose*,
   496 U.S. 356 (1990) ................................................................................ 33

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*,
   141 S. Ct. 13 (2020) ........................................................................... 30, 31

*Twitter, Inc. v. Taamneh*,
   143 S. Ct. 1206 (2023) ............................................................................ 23

*Zschernig v. Miller*,
   389 U.S. 429 (1968) ................................................................................ 34

**United States Appellate Court Cases**

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ......................................................... 24, 25, 30

*Bassidji v. Goe*,
   413 F.3d 928 (9th Cir. 2005) .............................................................. 32, 33

*C.F.T.C. v. Monex Credit Co.*,
   931 F.3d 966 (9th Cir. 2019) .................................................................. 10

*Conmar Corp. v. Mitsui & Co. (U.S.A.)*,
   858 F.2d 499 (9th Cir. 1988) .................................................................... 5

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019) .................................................................. 11

*de Fontbrune v. Wolfsy*,
   838 F.3d 992 (9th Cir. 2016) .................................................................. 33

*Doe v. Internet Brands, Inc.*,
   824 F.3d 846 (9th Cir. 2016) .................................................................. 24

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008) .................................................................. 25

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) ....................................................... 18, 28, 29

*Ehrman v. Cox Commc'ns, Inc.*,
    932 F. 3d 1223 (9th Cir. 2019) ....................................................................... 1

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ...................................................................... 35

*ESG Cap. Partners, LP v. Stratos*,
    828 F.3d 1023 (9th Cir. 2016) ...................................................................... 21

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008) ....................................................... 27, 28, 29

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ........................................................................ 11

*Force v. Facebook, Inc.*
    934 F.3d 53 (2d Cir. 2019) ............................................................. 29, 31, 32

*Fortman v. Förvaltningsbolaget Insulan, AB*,
    212 Cal. App. 4th 830 (2013) ...................................................................... 15

*Gingery v. City of Glendale*,
    831 F.3d 1222 (9th Cir. 2016) ...................................................................... 35

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) .......................................................................... 31

*Herrick v. Grindr LLC*,
    765 F. App'x 586 (2d Cir. 2019) .................................................................. 25

*Homedics, Inc. v. Valley Forge Ins. Co.*,
    315 F.3d 1135 (9th Cir. 2003) ...................................................................... 32

*Huon v. Denton*,
    841 F.3d 733 (7th Cir. 2016) ................................................................. 27, 28

*Ileto v. Glock Inc.*,
    349 F.3d 1191 (9th Cir. 2003) ........................................................................ 9

*Immigrant Assistance Project of L.A. Cnty. V. I.N.S.*,
    306 F.3d 842, (9th Cir. 2002) ......................................................................... 4

*In re Air Crash Disaster Near Cerritos, Cal.*,
    973 F.2d 1490 (9th Cir. 1992) ...................................................................... 15

*In re First Alliance Mortg. Co.*,
    471 F. 3d 977 (9th Cir. 2006) ........................................................... 21, 22, 23

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) .................................................................. 27, 29

*Mayall ex rel. H.C. v. USA Water Polo, Inc.*,
    909 F.3d 1055 (9th Cir. 2018) .................................................................. 16

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .................................................................. 34

*Lemmon v. Snap, Inc.*,
    995 F.3d 1085 (9th Cir. 2021) ............................................. 12, 16, 24, 25, 26

*Netchoice, LLC v. Att'y Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022) .................................................................. 20

*Nev. Power Co. v. Monsanto Co.*,
    955 F.2d 1304 (9th Cir. 1992) .................................................................. 8

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013) .................................................................. 9

*Pavoni v. Chrysler Grp., LLC*,
    789 F.3d 1095 (9th Cir. 2015) .................................................................. 10

*Rustico v. Intuitive Surgical, Inc.*,
    993 F.3d 1085, 1091 (9th Cir. 2021) .................................................................. 31, 3

*Taylor v. Honeywell Int'l, Inc.*,
    599 F. App'x 664 (9th Cir. 2015) .................................................................. 15

*U.S. v. Schiff*,
    379 F.3d 621 (9th Cir. 2004) .................................................................. 19

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) .................................................................. 12, 20

**United States District Court Cases**

*A.M. v. Omegle.com*,
    614 F. Supp. 3d 814 (D. Or. 2022) .................................................................. 25

*Armstead v. Cnty. of Alameda*,
    No. 21-cv-05257, 2022 WL 888660 (N.D. Cal. Mar. 26, 2022) .................................. 9

*Bride v. Snap, Inc.*,
    No. 21-cv-06680, 2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ................................. 26

*City of L.A. v. JPMorgan Chase & Co.*,
    No. 14-cv-01468, 2014 WL 6453808 (C.D. Cal. Nov. 14, 2014) .................................. 10

*Doe v. Twitter, Inc.*,
    555 F. Supp. 3d 889 (N.D. Cal. 2021) ...................................................................... 26

*Doe v. Mindgeek USA Inc.*,
    No. 21-100388, 2021 WL 5990195 (C.D. Cal. Dec. 2, 2021) ................................... 29, 30

*Doe ex rel. Roe v. Snap, Inc.*,
    No. 22-00590, 2022 WL 2528615 (S.D. Tex. July 7, 2022) .......................................... 26

*Eidson v. Medtronic, Inc.*,
    981 F. Supp. 2d 868 (N.D. Cal. 2013) ........................................................................ 7

*Eidson v. Medtronic, Inc.*,
    40 F. Supp. 3d 1202 (N.D. Cal. 2014) ........................................................................ 7

*Est. of Alex through Coker v. T-Mobile US, Inc.*,
    313 F. Supp. 3d 723 (N.D. Tex. 2018) ...................................................................... 12

*Est. of B.H. v. Netflix, Inc.*,
    No. 21-cv-06561, 2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ...................................... 20

*Evans v. ZB, N.A.*,
    No. 17-cv-01123, 2019 WL 6918278 (E.D. Cal. Dec. 19, 2019) .................................... 6

*Force v. Facebook, Inc.*,
    304 F. Supp. 3d 315 (E.D.N.Y. 2018) .................................................................... 32, 33

*George v. Curwood, Inc.*,
    No. 08-856, 2011 WL 13112073 (W.D. Okla. Feb. 25, 2011) ...................................... 12

*Goddard v. Google, Inc.*,
    640 F. Supp. 2d 1193, (N.D. Cal. 2009) .................................................................... 27

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    782 F. Supp. 487 (C.D. Cal. 1991) ............................................................................ 5

*Jackson v. Airbnb, Inc.*,
    No. 22-3084, 2022 WL 16752071 (C.D. Cal. Nov. 4, 2022) ...................................... 18, 26

*James v. Meow Media, Inc.*,
    90 F. Supp. 2d 798 (W.D. Ky. 2000) ........................................................................ 11

*Lemmon v. Snap, Inc.*,
    No. 19-4504, 2022 WL 1407936 (C.D. Cal. Mar. 31, 2022) ...................................... 10, 11

*Lorenz v. E.W. Bancorp, Inc.*,
    No. 2:15-cv-06336, 2016 WL 199392 (C.D. Cal. Jan. 14, 2016) .................................... 22

*Mujica v. Occidental Petrol. Corp.*,
    381 F. Supp. 2d 1164 (C.D. Cal. 2005) ............................................................................. 35

*Neilson v. Union Bank of Cal., N.A.*,
    290 F. Supp. 2d 1101 (C.D. Cal. 2003) ....................................................................... 22, 23

*Ning Xianhua v. Oath Holdings, Inc.*,
    536 F. Supp. 3d 535 (N.D. Cal. 2021) .......................................................................... 34, 35

*O'Handley v. Padilla*,
    579 F. Supp. 3d 1163 (N.D. Cal. 2022) ............................................................................ 20

*Ogden v. Wells Fargo Bank, N.A.*,
    No. 15-3410, 2019 WL 1751818 (C.D. Cal. Feb. 6, 2019) ............................................... 21

*Opperman v. Path, Inc.*,
    84 F. Supp. 3d 962 (N.D. Cal. 2015) ........................................................................... 22, 23

*Sanders v. Acclaim Ent., Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002) ............................................................................. 11

*Schafer v. State Farm Fire & Cas. Co.*,
    507 F. Supp. 2d 587 (E.D. La. 2007) ............................................................................... 12

*Sentius Int'l, LLC v. Apple Inc.*,
    No. 20-cv-00477-YGR, 2020 WL 2850286 (June 2, 2020) ............................................. 35

*Sims v. Campbell Soup Co.*,
    No. 18-668, 2018 WL 7568640 (C.D. Cal. Sept. 24, 2018) ............................................... 8

*True Health Chiropractic Inc. v. McKesson Corp.*,
    332 F.R.D. 589 (N.D. Cal. 2019) ....................................................................................... 4

*Walsh v. Tehachapi Unified Sch. Dist.*,
    No. 11-cv-10489, 2013 WL 4517887 (E.D. Cal. Aug. 26, 2013) .................................... 15

**State Court Cases**

*Barker v. Lull Eng'g Co.*,
    20 Cal. 3d 413 (1978) ...................................................................................................... 14

*Barrett v. Sup. Ct.*,
    222 Cal. App. 3d 1176 (1990) .......................................................................................... 14

*Bill v. Sup. Court*,
    137 Cal. App. 3d 1002 (1982) ............................................................................... 17, 18, 20

*Bockrath v. Aldrich Chem. Co.*,
    21 Cal. 4th 71, 79 1999) ..................................................................................................... 9

*Brown v. USA Taekwondo*
    11 Cal. 5th 204 (2021) ............................................................................ 16, 17, 18, 19

*Cabral v. Ralph's Grocery Co.*,
    51 Cal. 4th 764 (2011) ........................................................................................ 16

*Chen v. L.A. Truck Ctrs., LLC*,
    7 Cal. App. 5th 757 (2017) .................................................................................. 31

*Delfino v. Agilent Techs., Inc.*,
    145 Cal. App. 4th 790 (2006) .............................................................................. 20

*Doe v. McKesson*,
    339 So. 3d 524 (La. 2022) .............................................................................. 10, 17

*Doe v. Uber Techs., Inc.*,
    79 Cal. App. 5th 410 (2022) ................................................................................ 18

*E-Fab, Inc. v. Accounts, Inc. Servs.*,
    153 Cal. App. 4th 1308 (2007) .............................................................................. 6

*Elmore v. Am. Motors Corp.*,
    70 Cal. 2d 578 (1969) ......................................................................................... 14

*Fluor Corp. v. Jeppesen & Co.*,
    170 Cal. App. 3d 468 (1985) ............................................................................... 13

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (Cal. 2005) .................................................................... 4, 6, 7, 8

*Frausto v. Dep't of Cal. Highway Patrol*,
    53 Cal. App. 5th 973 (2020) .................................................................................. 9

*Golden Gate Land Holdings LLC v. Direct Action Everywhere*,
    81 Cal. App. 5th 82 (2022) ................................................................................. 21

*Green v. Healthcare Servs., Inc.*,
    68 Cal. App. 5th 407 (2021) ................................................................................ 10

*Hardin v. PDX, Inc.*,
    227 Cal. App. 4th 159 (2014) .............................................................................. 12

*Jacobs v. Meta Platforms, Inc.*,
    No. 22CV005233, 2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) .......................... 13

*Jolly v. Eli Lilly & Co.*,
    44 Cal. 3d 1103 (1988) ......................................................................................... 7

*Loomis v. Amazon.com LLC*,
    63 Cal. App. 5th. 466 (2021) ............................................................................... 13

*Maynard v. Snapchat, Inc.*,
    313 Ga. 533 (2022) ........................................................................................... 10, 12

*Martinez v. Bank of Am. Nat'l Tr. & Sav. Ass'n*,
    82 Cal. App. 4th 883 (2000) ......................................................................................... 20

*McCollum v. CBS, Inc.*,
    202 Cal. App. 3d 989 (1988) .................................................................................. 19, 20

*McKelvey v. Boeing N. Am., Inc.*,
    74 Cal. App. 4th 151 (1999) ........................................................................................... 7

*Michael R. v. Jeffrey B.*,
    158 Cal. App. 3d 1059 (1984) ................................................................. 10, 17, 19, 21

*Modisette v. Apple Inc.*,
    30 Cal. App. 5th 136 (2018) ....................................................................................... 11

*Nelson v. Indevus Pharms., Inc.*,
    142 Cal. App. 4th 1202 (2006) ..................................................................................... 5

*Nelson v. Sup. Ct.*,
    144 Cal. App. 4th 698 (2006) ..................................................................................... 14

*Pierson v. Sharp Mem. Hosp., Inc.*,
    216 Cal. App. 3d 340 (1989) ...................................................................................... 14

*Potter v. Firestone Tire & Rubber Co.*,
    6 Cal. 4th 965 (1993) ................................................................................................. 15

*Price v. Shell Oil Co.*,
    2 Cal. 3d 245 (1970) .................................................................................................. 14

*Regents of Univ. of Cal. v. Sup. Ct.*,
    4 Cal. 5th 607 (2018) ................................................................................................. 16

*Robinson Helicopter Co. v. Dana Corp.*,
    34 Cal. 4th 979 (2004) .......................................................................................... 15, 16

*Rowland v. Christian*,
    69 Cal. 2d 108 (1968) ................................................................................................ 18

*Rutherford v. Owens-Illinois, Inc.*,
    16 Cal. 4th 953, 968 (1997) ....................................................................................... 8, 9

*Seely v. White Motor Co.*,
    63 Cal. 2d 9 (1965) .................................................................................................... 16

*Steven F. v. Anaheim Union High Sch. Dist.*,
   112 Cal. App. 4th 904 (2003) ................................................................................. 20

*Taylor v. Elliott Turbomachinery Co.*,
   171 Cal. App. 4th 564 (2009) ................................................................................. 20

*Thing v. La Chusa*,
   48 Cal. 3d 644 (1989) ............................................................................................. 15

*Tucci v. Club Mediterranee, S.A.*,
   89 Cal. App. 4th 180 (2001) ................................................................................... 34

*Unruh-Haxton v. Regents of Univ. of Cal.*,
   62 Cal. App. 4th 343 (2008) ..................................................................................... 7

*Wash. Mut. Bank, FA v. Sup. Ct.*,
   24 Cal. 4th 906 (2001) ............................................................................................ 32

*Williams v. Beechnut Nutrition Corp.*,
   185 Cal. App. 3d 135, 141 (1986) ........................................................................... 16

*Weirum v. RKO Gen., Inc.*,
   15 Cal. 3d 40 (1975) ........................................................................................ *passim*

*Wooden v. Raveling*,
   61 Cal. App. 4th 1035 (1998) ........................................................................... 14, 15

**Other Authorities**

18 U.S.C. § 2333(a) ....................................................................................................... 11

47 U.S.C. § 230 ............................................................................................................. 23

Judicial Council of California Jury Instructions
   No. 400 ..................................................................................................................... 9
   No. 430 ..................................................................................................................... 8
   No. 1204 ................................................................................................................... 8
   No. 1220 ................................................................................................................... 8
   No. 3610 ................................................................................................................... 8

Cal. Civ. Code § 1714 ................................................................................................... 16

Fed. R. Civ. P. 9(b) ...................................................................................................... 22

Fed. R. Civ. P. 44.1 ...................................................................................................... 33

Frances E. Zollers, et al.,
   *No More Soft Landings for Software: Liability for Defects in an Industry That Has Come
   of Age*, 21 SANTA CLARA COMPUTER & HIGH TECH. L.J 745 (2005) ............................... 13

Restatement (Third) of Torts: Prod. Liab. § 19(a) ........................................................................ 13

## INTRODUCTION

Plaintiffs Jane Doe 1 and Jane Doe 2 are members of the Rohingya community, a Muslim minority group from the Rakhine State in Burma. Plaintiffs were the victims of violent attacks on their villages by the Burmese military and civilian militias, resulting in the loss of their homes and property—not to mention severe emotional distress—and forcing them to flee their homeland. After arduous journeys, they each now reside in the United States.

Those directly participating in the violent attacks against Plaintiffs are not the only ones to blame, however. As the Chairman of the United Nations Independent International Fact-Finding Mission on Myanmar found, social media giant Meta Platforms, Inc., played a "determining role" in anti-Rohingya violence. First Amended Complaint ("FAC") ¶¶ 2, 92. Specifically, Meta designed its social media platform, Facebook, in a way that both encouraged the creation of posts inciting violence against the Rohingya and amplified, promoted, and recommended such posts to those people most likely to act on them. Additionally, Meta failed to take reasonable precautions to minimize the risk of violence even though such violence was foreseeable and—most egregiously—even after Meta was informed that such violence was occurring.

Jane Doe 1 originally filed a two-count complaint for strict product liability and negligence in state court, which Meta removed to this Court and moved to dismiss. Following briefing and argument, this Court dismissed the complaint with leave to amend. Jane Doe 1 (now joined by Jane Doe 2) filed a First Amended Complaint that remedies the deficiencies identified by this Court relating to, among other things, the statute of limitations, causation, and duty.[1]

## BACKGROUND

Meta operates Facebook, a social media platform where users can create and post content and react to the posts of other users. The centerpiece of the Facebook experience is the "News Feed," a scrollable selection of posts that is the first thing a user sees when they open the app. FAC ¶ 33. Each user's News Feed is personalized for that user, with the posts they are shown

---

[1] At the hearing on the original motion to dismiss, this Court also raised the issue of federal jurisdiction. Dkt. 61 at 32. As the removing party, Meta has the burden of establishing federal jurisdiction, which it attempted to do by making certain factual allegations in its removal papers. *See Ehrman v. Cox Commc'ns, Inc.*, 932 F. 3d 1223, 1227–28 (9th Cir. 2019). Plaintiffs have no factual basis to either confirm or dispute those allegations. *See* dkt. 28 at 1–2.

selected by Facebook's proprietary algorithms. *Id*. ¶¶ 33–44. But users don't simply passively view content on Facebook. When scrolling through their feeds, users are prompted to react to others' posts by "liking," "commenting on," or "sharing" them. *Id*. ¶ 34. Under each post, users can see how many times others have liked or shared that content and can read the comments. *Id*.

Meta's goal is to maximize "engagement" on Facebook, a metric reflecting the amount of time a user spends on Facebook and the amount of interaction a user has with any given content. *Id*. ¶¶ 32, 35. That's because engagement drives advertising revenue, and, ultimately, profits. *Id*. Accordingly, Meta carefully studies user engagement and incorporates engagement-based rankings into the algorithms that drive Facebook. *Id*. ¶¶ 33, 35–37, 41. Unfortunately, and as Meta well knows, the most toxic and inflammatory content generates the most engagement. *Id*. ¶¶ 20, 36–37. Facebook's engagement-maximizing design and the engagement-generating nature of toxic content have combined to create at least three dangerous elements of Facebook.

First, Facebook's engagement-maximizing algorithms include and prioritize in users' News Feeds extreme and inflammatory content, while more benign content is buried or excluded altogether. *Id*. ¶¶ 33, 36–37, 39, 41–42. Second, when a user reacts to someone else's post— prompted by Facebook's "like," "comment," and "share" buttons—the original poster receives a dopamine hit, encouraging that poster to post additional, similar content. *Id*. ¶¶ 34–35, 39–44. Because extreme and divisive content garners more reactions—and thus more dopamine hits— users are trained to incorporate more and more toxic content into their posts. *Id*. Coupled with Facebook's prioritization of this more toxic content in others' News Feeds (leading to greater exposure and engagement), Facebook creates a feedback loop generating ever-more-toxic (and dangerous) content. *Id*. Third, Meta's efforts to maximize engagement on Facebook includes connecting users with one another. *Id*. ¶¶ 40–41. But again, because extreme content drives engagement, Facebook's algorithms (such as its "Groups You Should Join" and "Discover" features) often recommend that users join violent extremist groups. *Id*.

In addition to these dangers inherent in Meta's engagement-maximizing design choices, the manner in which Meta operated in Burma created additional risks of harm. *See id*. ¶¶ 24–27. Meta arranged for tens of millions of Burmese people to gain access to the internet for the very

1    first time by working with Burmese telecommunications providers to pre-load Facebook onto

2    mobile phones and make it effectively free to access. *Id.* ¶¶ 21–22. This strategy was extremely

3    successful, resulting in Facebook becoming synonymous with the internet in Burma. *Id.*¶ 23.

4    Paired with the fact that Meta initially employed just a single Burmese-speaking content

5    reviewer and that English was the only language in which problematic posts could be reported,

6    the proliferation of Facebook resulted in a "crisis of digital literacy" in Burma, according to Meta

7    itself. *Id.* ¶¶ 25–27.

8         Unsurprisingly, shortly after Facebook's introduction to Burma, anti-Rohingya content

9    began to proliferate on Facebook, including the spreading of rumors falsely attributing rapes and

10   other atrocities to the Rohingya, encouraging communal violence and mob justice against them.

11   *Id*. ¶¶ 50–59, 88. This included posts explicitly calling for violence against Jane Doe 1's village.

12   *Id*. ¶¶ 51, 53, 55, 83. Some Facebook users went so far as to post offers of money to those who

13   would rape and kill Rohingya in Jane Doe 1's community. *Id*. ¶ 55. These posts were successful,

14   inciting attacks on Jane Doe 1's village that destroyed her home, property, and family business

15   and forced her to flee Burma in fear for her own safety. *Id*. ¶¶ 45–49, 52, 59.

16        Several years later, a similar fate befell Jane Doe 2. In 2017, the Burmese military began

17   a "Clearance Operation" against the Rohingya. *Id*. ¶¶ 61, 71. During this operation, express

18   incitements to violence against the Rohingya—including those in Jane Doe 2's village—

19   proliferated on Facebook. *Id*. ¶¶ 68–83. For example, two soldiers who posted on Facebook that

20   they were participating in the operation were met with comments responding: "From the kids to

21   the dogs, don't leave a single one of them alive;" "Shoot the kalar [a derogatory term for

22   Rohingya]. Shoot all of them. Don't leave the kalar villages. Terminate them;" "Crush the kalars

23   into dust;" and "Don't let even one of them escape from you. Smash them all." *Id*. ¶¶ 73–74, 76,

24   80. These posts were successful, inciting vicious attacks by both Burmese soldiers and civilian

25   militias against Jane Doe 2's village. *Id*. ¶¶ 60–62, 68–71, 75, 77–79, 81–83. Like Jane Doe 1,

26   Jane Doe 2 lost her home and personal property and was forced to flee Burma in fear for her own

27   safety. *Id*. ¶¶ 62–67.

28        Before and during these attacks, Meta was warned by civil society groups that

Facebook's algorithms were encouraging users to post dangerous incitements to violence and were amplifying and promoting those incitements to the people most likely to act on them. *Id.* ¶¶ 3, 29–30, 36–38, 43, 85–86, 89–92. Critical details about Facebook's design and Meta's conduct in Myanmar were subsequently exposed in 2021 when two whistleblowers came forward. *Id.* ¶¶ 4, 38, 42, 91, 100–02. One whistleblower stated, among other things, that Meta's goal in providing the internet to the developing world was single-mindedly aimed at gaining an "impenetrable foothold" there, no matter the cost. *Id.* ¶ 91. According to the whistleblower, "Facebook executives were fully aware that posts ordering hits by the Myanmar government on the minority Muslim Rohingya were spreading wildly on Facebook," but the whistleblower was simply directed to issue a talking point that downplayed the issue. *Id.* The employee felt that they, in "working for Facebook, had been a party to genocide." *Id.*

This litigation commenced a few months after the whistleblowers came forward.

## ARGUMENT

**I.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.**

Plaintiffs' claims are not time barred because they did not discover their causes of action against Meta until 2021 and 2023 respectively, nor did they have any reason to suspect such claims even existed until—at the earliest—2021, shortly before this action was filed.[2] In order to rely on the discovery rule, Plaintiffs must allege "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (Cal. 2005) (quotation and emphasis omitted). Plaintiffs have done so here.

With respect to the first required allegation—time and manner of discovery—the FAC alleges that Jane Does 1 and 2 first learned of their potential claims against Meta from their attorneys in 2021 and 2023 respectively. FAC ¶¶ 100–01. Meta doesn't dispute that these allegations set out the time and manner that Plaintiffs discovered their causes of action, it just

---

[2] The First Amended Complaint adding Jane Doe 2 relates back to the date of the original complaint. *See Immigrant Assistance Project of L.A. Cnty. v. I.N.S.*, 306 F.3d 842, 857–59 (9th Cir. 2002); *True Health Chiropractic Inc. v. McKesson Corp.*, 332 F.R.D. 589, 605–06 (N.D. Cal. 2019).

1   doesn't like the manner. But it is routine for a plaintiff not to discover the source of an injury

2   until notified by counsel. *See, e.g.*, *Nelson v. Indevus Pharms., Inc.*, 142 Cal. App. 4th 1202,

3   1204 (2006) (discovery rule postponed commencement of limitations period until plaintiff saw

4   attorney advertisement on television and contacted attorney).

5       With respect to the second required allegation—inability to discover their claims earlier

6   despite reasonable diligence—Plaintiffs allege that they could not have discovered their claims

7   earlier because Meta's role in their attacks was not widely known or understood within the

8   Rohingya community, their ability to discover any information about Meta's role was

9   substantially hindered by their years-long harrowing journeys from Burma to the United States

10  (including a three-year stay in a Thai detention facility by Jane Doe 2), both Plaintiffs are unable

11  to read and write in their own language and unable to speak or understand English, and Meta

12  attempted to cover up its role in the attacks until whistleblowers came forward in 2021. FAC

13  ¶¶ 48–49, 62–66, 100–02. *Any one* of those bases for failing to discover Meta's role would be

14  sufficient, but together, they plainly clear the threshold. A refugee fleeing a genocide—who is

15  not literate in *any* language—cannot have been expected to discover a cause of action that one of

16  the most powerful companies in the world was trying to hide.

17      Meta criticizes Plaintiffs for failing to allege any "steps" they took to investigate Meta's

18  role in their attacks. Mot. at 5. But reasonable diligence requires a plaintiff to investigate only if

19  they are on inquiry notice of a prospective cause of action. *In re Coordinated Pretrial*

20  *Proceedings in Petroleum Prods. Antitrust Litig.*, 782 F. Supp. 487, 497–98 (C.D. Cal. 1991)

21  ("The requirement of diligence is only meaningful … when facts exist that would excite the

22  inquiry of a reasonable person.") (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.)*, 858 F.2d 499,

23  504 (9th Cir. 1988)). "Due diligence is not required in the abstract. Plaintiffs are not under a duty

24  continually to scout around to uncover claims which they have no reason to suspect they might

25  have." *Id.* at 498. In other words, "the law only requires an investigation when a plaintiff has a

26  reason to investigate." *Nelson*, 142 Cal. App. 4th at 1208. Here, Plaintiffs had no reason to

27  investigate Meta's role in their injuries because there was no reason why they should have

28  suspected wrongdoing by anyone other than their attackers until shortly before this suit was filed

1  in 2021.

2          Meta responds that Plaintiffs were surely aware of an injury, and therefore the duty to

3  investigate expanded to all possible sources of that injury. But the fact that Plaintiffs were

4  attacked by the Burmese military and civilian militias didn't put them on notice of potential

5  causes of action against Meta. "[I]njury alone is often insufficient to trigger the statute of

6  limitations." *Fox*, 35 Cal. 4th at 808 n.2. Rather, it's suspicion of a potential wrongful cause of

7  the injury that triggers the limitations period. *Id*. At 803 ("[A] cause of action accrues and the

8  statute of limitations begins to run when the plaintiff has reason to suspect an injury *and some*

9  *wrongful cause*.") (emphasis added). Furthermore, and critically, "claims based on two

10  independent legal theories against two separate defendants can accrue at different times." *E-Fab,*

11  *Inc. v. Accounts, Inc. Servs.*, 153 Cal. App. 4th 1308, 1323 (2007). For example, awareness that

12  an injury was caused by a surgeon's malpractice does not trigger inquiry notice that a medical

13  device manufacturer's defective product may also have contributed to the injury. *Fox*, 35 Cal.

14  4th at 811. Likewise, a company's awareness of an employee's embezzlement does not trigger

15  inquiry notice of potentially actionable misrepresentations by the recruiter who placed the

16  employee with the company. *E-Fab*, 153 Cal. App. 4th 1323. And a fraud victim's awareness

17  that a company was running a Ponzi scheme does not trigger inquiry notice of a bank's aiding

18  and abetting the scheme. *Evans v. ZB, N.A.*, 2019 WL 6918278, at *3–4 (E.D. Cal. Dec. 19,

19  2019) (applying California law). As in *Fox*, *E-Fab*, and *Evans*, the fact that Jane Does 1 and 2

20  were harmed by one set of wrongdoers—the people who literally attacked their villages—did not

21  put them on inquiry notice that another wrongdoer—Meta—was also potentially responsible for

22  their injuries. To paraphrase *E-Fab*, "[w]hat concerns us here is not [Plaintiffs'] discovery of [the

23  Burmese military and civilian militias' wrongdoing], but rather [their] discovery of *defendant's*

24  independent wrongdoing." 153 Cal. App. 4th at 1321.

25          Meta's argument that Plaintiffs' "ignorance of the identity of the defendant does not

26  delay the accrual of a cause of action," Mot. at 4, thus misses the point. Meta quotes *Fox* for that

27  proposition, but what *Fox* made clear is that ignorance of a later-discovered defendant's "tortious

28  conduct of a wholly different sort" *does* delay accrual of a cause of action for that wholly

different tortious conduct. 35 Cal. 4th at 813. As that case explained, "failure to discover, or have a reason to discover, the identity of the defendant does not postpone the accrual of a cause of action, *whereas a like failure concerning the cause of action itself does*." *Id*. at 807 (emphasis added). Certainly, if Plaintiffs were trying to sue one or more of the individuals who attacked their villages, Plaintiffs' ignorance of their assailants' identities would not postpone accrual of their claims against the assailants; they would have an obligation to conduct a reasonable investigation to determine their assailants' identities. *See Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103 (1988) (plaintiff's failure to identify which of several drug manufacturers made the actual pills that harmed her did not postpone accrual of claim). But here, Plaintiffs are seeking to hold Meta liable for its "tortious conduct of a wholly different sort," *Fox*, 35 Cal. 4th at 813, and nothing about the attacks on Plaintiffs' villages "revealed a factual basis for that particular cause of action," *id*. at 803.

Nor did purportedly "widespread" media coverage create inquiry notice for Plaintiffs prior to 2021. Mot. at 4. "[T]here is no rule of constructive suspicion to trigger the statute of limitations simply when the dangers of a product are publicized." *Unruh-Haxton v. Regents of Univ. of Cal.*, 162 Cal. App. 4th 343, 359 (2008) (cleaned up). In other words, "[t]he statute of limitations does not begin to run when some members of the public have a suspicion of wrongdoing, but only once the plaintiff has a suspicion of wrongdoing." *Id*. at 360 (cleaned up). Indeed, state and federal courts in California have expressly rejected the idea "that public awareness of a problem through media coverage alone creates constructive suspicion for purposes of discovery." *Id*. at 364; *Eidson v. Medtronic, Inc.*, 40 F. Supp. 3d 1202, 1220–22 (N.D. Cal. 2014) ("Defendants' argument [that plaintiffs should have been placed on notice by widespread media attention] fails because it has been rejected by California courts.").

Furthermore, the FAC explains why Plaintiffs—unable to understand English and illiterate in their own language—never learned of any such media reports on their years'-long dangerous journeys to the United States. *Cf. Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 894 n.7 (N.D. Cal. 2013) ("Plaintiffs fail to explain how the widespread media attention … escaped their attention."); *McKelvey v. Boeing N. Am., Inc.*, 74 Cal. App. 4th 151, 161 (1999)

("[Plaintiffs] do not allege that they did not read, hear, or see the articles and broadcasts they admit were published.") (emphasis omitted). And even if Plaintiffs *had* seen media reports outside the limitations period, it wasn't until the 2021 whistleblower leaks that information sufficient to suspect actionable wrongdoing by Meta emerged. Indeed, filing this suit prior to that information coming out would have "run the risk of sanctions for filing a cause of action without any factual support." *Fox*, 35 Cal. 4th at 815. As the California Supreme Court has recognized, "[i]t would be contrary to public policy to require plaintiffs to file a lawsuit at a time when the evidence available to them failed to indicate a cause of action." *Id.* (citations and quotations omitted).

At the end of the day, "the question of when the alleged wrongdoing was or should have been discovered is a question of fact [and] may be decided only as a matter of law when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered" it outside the limitations period. *Nev. Power Co. v. Monsanto Co.*, 955 F.2d 1304, 1307–08 (9th Cir. 1992) (cleaned up). The FAC alleges that Plaintiffs did not learn of Meta's role in their harms until 2021 and 2023 respectively, had no reason to suspect Meta had anything to do with the attacks on their villages before then, and even if they had, that their ability to conduct any investigation into Meta's role was significantly hampered by, among other things, their illiteracy and their harrowing years-long journeys as refugees seeking safety from genocide. "This is enough to raise a plausible inference that [Plaintiffs] acted reasonably" in failing to discover their claims against Meta earlier. *Sims v. Campbell Soup Co.*, 2018 WL 7568640, at *11 (C.D. Cal. Sept. 24, 2018). "Whether [they] actually did is a question for a later stage." *Id.*

## II.   PLAINTIFFS HAVE SUFFICIENTLY PLEADED THEIR CLAIMS.

### A.   Plaintiffs have sufficiently alleged causation (All Counts).

Meta argues that Plaintiffs have failed to plead "but for" and "proximate" causation. Mot. at 6–10. But California has "definitively adopted the substantial factor test" for causation, a "clearer rule." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 968 (1997).[3] "The traditional

---

[3] Indeed, the Judicial Council of California Civil Jury Instructions ("CACI") for each of the claims asserted by Plaintiffs expressly include "substantial factor" as the causation standard. CACI Nos. 1204, 1220, 400, 3610.

notion of 'but for' causation is subsumed within the substantial factor test, whereby defendants' actions may be the proximate cause of a plaintiff's injuries if those actions were a substantial factor in bringing them about." *Ileto v. Glock Inc.*, 349 F.3d 1191, 1206 (9th Cir. 2003). "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm." CACI No. 430. This standard "is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." *Frausto v. Dep't of Cal. Highway Patrol*, 53 Cal. App. 5th 973, 996 (2020) (quoting *Rutherford*, 16 Cal. 4th at 978). "Even 'a very minor force' that causes harm is considered a cause in fact of the injury." *Id.* (quoting *Bockrath v. Aldrich Chem. Co.*, 21 Cal. 4th 71, 79 (1999)).

Here, the FAC sets forth Meta's design of Facebook as a substantial factor in the attacks on Plaintiffs' villages specifically. Plaintiffs allege Facebook's "core product mechanics" that encourage the creation of violent posts. FAC ¶¶ 32–44, 113, 119. They allege that those mechanisms led to the creation of posts calling for violence against Jane Doe 1 and 2's villages. *Id.* ¶¶ 50–59, 68–83, 126, 133. They allege the Facebook mechanisms that distributed these posts to those most likely to act on them. *Id.* ¶¶ 40–44, 113, 119. And they allege that people saw those posts and acted on them by attacking Plaintiffs' villages. *Id.* ¶¶ 59, 68–69, 72–83. These are plausible allegations that Meta's conduct was a substantial factor in Plaintiffs' harm; "[t]he links alleged in the FAC are not too attenuated to meet this standard." *Ileto*, 349 F.3d at 1206. In *Ileto*, for example, plaintiffs alleged that gun manufacturers produced more firearms than the legitimate market demands, fostering an illegal secondary market through which a shooter was able to obtain weapons that harmed plaintiffs. 349 F.3d at 1196–98. The causal chain alleged by Jane Does 1 and 2 here is significantly more concrete than that in *Ileto*.

"Causation is an intensely factual question that should typically be resolved by a jury." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013). As the Ninth Circuit has explained, juries are "at least as reliable, if not more so, than a single judge at assessing issues of causation." *Id.* Indeed, "making reasonable inferences about causation is one of the things that juries do best." *Id.* Consequently, causation issues are generally "unsuitable for resolution in a Rule 12(b)(6) motion," *Armstead v. Cnty. of Alameda*, 2022 WL 888660, at *5

1   (N.D. Cal. Mar. 26, 2022), and "should not be taken away from the jury except where no

2   reasonable person could dispute the absence of causality," *Pavoni v. Chrysler Grp., LLC*, 789

3   F.3d 1095, 1098 n.3 (9th Cir. 2015) (quotations omitted).

4            Here, it cannot fairly be said that no reasonable person could dispute the absence of

5   causation. The issues that Meta identifies—things like whether Facebook users posted anti-

6   Rohingya content because of the built-in incentive systems and whether the attacks on Plaintiffs'

7   villages would have been different or not occurred at all absent Meta's conduct—are

8   quintessential questions of fact for a jury that are resolved in Plaintiff's favor at the pleading

9   stage. *Pac. Shores*, 730 F.3d at 1168–69. "[Meta] is free to challenge causation throughout this

10  litigation … but [Plaintiffs are] not required to actually prove [their] claims at the motion-to-

11  dismiss stage." *City of  L.A. v. JPMorgan Chase & Co.*, 2014 WL 6453808, at *5 (C.D. Cal.

12  Nov. 14, 2014).[4]

13           Meta's argument that the conduct of the Burmese military and civilian militias are

14  superseding causes that break the causal chain also fails. As an initial matter, "superseding cause

15  is an affirmative defense," *Green v. Healthcare Servs., Inc.*, 68 Cal. App. 5th 407, 415 (2021),

16  and "Rule 8 does not require plaintiffs to plead around affirmative defenses," *C.F.T.C. v. Monex*

17  *Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019). Regardless, none of the cases on which Meta

18  relies involved defendants *who encouraged the superseding actors to act*. In contrast, defendants

19  who—like Meta here—encouraged or incited the superseding actors to act can be held liable for

20  the resulting harm. *See, e.g.*, *Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 47 (1975) (defendant's

21  radio broadcast encouraged reckless driving); *Michael R. v. Jeffrey B.*, 158 Cal. App. 3d 1059,

22  1067–68 (1984) (defendant encouraged third-party to shoot plaintiff with slingshot);  *Lemmon v.*

23  *Snap, Inc.*, 2022 WL 1407936, at *5–11 (C.D. Cal. Mar. 31, 2022) (defendant's app encouraged

24  reckless driving); *Maynard v. Snapchat, Inc.*, 313 Ga. 533 (2022) (same); *Doe v. McKesson*, 339

25  _____

26  [4]  Meta argues that Burma's history of ethnic violence must mean that the attacks against
    Plaintiffs would have happened regardless of Meta's conduct. But Plaintiffs allege that Meta's

27  introduction of Facebook into Burma was a key inflection point in the pattern of violence, and
    that Meta's conduct encouraged *these* particular incitements to violence against *these* particular

28  Plaintiffs. Whether Meta is correct that the attacks against Plaintiffs would have happened
    anyway is a causation question for a jury.

So. 3d 524, 530–33 (La. 2022) (defendant encouraged protestors to violently confront police). In *Lemmon*, for example, the court distinguished one of the primary cases on which Meta relies, *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136 (2018), on precisely this ground. *Lemmon*, 2022 WL 1407936 at \*10 ("The allegation here is that the design of the Speed Filter itself encouraged speeding—not that it was simply distracting the driver of the vehicle as in *Modisette*.").

Ultimately, the issue is foreseeability of the intervening actors' acts. "[U]nder California law, where an intervening act by a third party was foreseeable, it does not amount to a superseding cause." *Ileto*, 349 F.3d at 1208. But contrary to Meta's assertion that the violent acts of the Myanmar military and civilian militias "far exceed any risk that Meta could have foreseen," Mot. at 9, Plaintiffs allege (1) that Meta knew that the engagement-maximizing algorithms it began incorporating into Facebook in 2009 were likely to lead to the creation and promotion of dangerous content, FAC ¶¶ 32–44, (2) that Meta made little effort to monitor Burmese-language Facebook content for violations of its terms of service or community guidelines when it entered the Burmese market in 2011 (a time when that country's history of ethnic violence against the Rohingya was well-documented), *id.* ¶¶ 21–28, and (3) that Meta was repeatedly warned that Facebook was being used to incite violence in Burma, *id.* ¶¶ 28–31. Plaintiffs' allegations are a far cry from the unforeseeable "idiosyncratic" copycat violence in the school shooter/violent movie and video game cases cited by Meta. *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1272 (D. Colo. 2002); *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 808 (W.D. Ky. 2000). And in any case, like causation generally, "foreseeability is a question of fact for the jury." *Weirum*, 15 Cal. 3d at 46.[5]

Finally, Meta's reliance on *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), and *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), is misplaced. Those cases were brought under the federal Anti-Terrorism Act, which includes an express "by reason of" causation standard. 18 U.S.C. § 2333(a). That language sets out a "higher" bar for establishing causation than California's "substantial factor" test and requires that a defendant's conduct "led directly"

---

[5] This further distinguishes *James*, a case decided under Kentucky law, which, unlike California law, treats superseding cause as "a legal issue for the court to resolve, and not a factual question for the jury." *James*, 90 F. Supp. 2d at 806 (quotations omitted).

to a plaintiff's injuries. *Fields*, 881 F.3d at 744; *see also Crosby*, 921 F.3d at 624.

      **B.**      **Plaintiffs state claims for strict product liability and negligent product design (Counts I and II).**

          **1.**      **Facebook is a product subject to product liability law.**

Meta argues that Plaintiffs' "challenge [to] 'extreme and polarizing content' on communication services" falls outside the realm of product liability law. Mot. at 12. But that's a gross mischaracterization of Plaintiffs' product liability claims. Plaintiffs allege that the Facebook platform itself—not the content posted on it—is the defective product. *See Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159, 170 (2014) (allowing product liability claim to proceed based on plaintiff's theory "that [defendant's] *software program*, not the information it produces, is the defective product").

Courts are split on whether software—including websites and apps like Facebook— constitute a "product" subject to product liability law. *Compare* Mot. at 10–11 (collecting cases finding or suggesting that software is not a product) *with Hardin*, 227 Cal. App. 4th at 170; *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) (describing cause of action alleging negligent design of app as "a common products liability tort"); *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991) (suggesting that "[c]omputer software that fails to yield the result for which it was designed" may be a product for purposes of tort liability); *Maynard*, 313 Ga. at 533 (claim against defendant's app deemed "a conventional design-defect claim"); *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 600–01 (E.D. La. 2007) (recognizing that "courts and legal scholars have suggested that defective computer software may give rise to strict products liability in tort"); *George v. Curwood, Inc.*, 2011 WL 13112073 (W.D. Okla. Feb. 25, 2011) (permitting products liability claim based in part on defective software to go to trial); *Est. of Alex through Coker v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723, 732 (N.D. Tex. 2018) (plaintiffs' allegations that software was defectively designed "plausibly alleged a products liability claim").

As shown by the cases above, the view that software is subject to product liability law is— unlike Meta's position—supported by Ninth Circuit and California Appellate authority. It is also the better-reasoned approach. As the Restatement explains, intangible things "are products when

1  the context of their distribution and use is sufficiently analogous to the distribution and use of

2  tangible personal property." Restatement (Third) of Torts: Prod. Liab. § 19(a). Certainly, the

3  distribution and use of apps like Facebook is analogous to the distribution and use of tangible

4  personal property—the devices on which they are installed, for example. *See* FAC ¶¶ 21–22

5  (alleging that Meta partnered with Burmese telecommunications companies to pre-load

6  smartphones with Facebook).

7          Similarly, while the "pure thought and expression" of a book may not be considered a

8  product, aeronautical charts depicting information helping pilots to land planes are. *Winter*, 938

9  F.2d at 1035–36. And as scholars have recognized, "[t]he aeronautical charts cases provide a more

10 perfect analogy to software than the book cases for a number of reasons." Frances E. Zollers et al.,

11 *No More Soft Landings for Software: Liability for Defects in an Industry That Has Come of Age*,

12 21 SANTA CLARA COMPUTER & HIGH TECH. L.J. 745, 763 (2005). Again, Plaintiffs here allege that

13 it is the Facebook platform (a tool, like aeronautical charts)—not the "pure thought and

14 expression" of the content posted on it—that is defective.

15         Furthermore, in California, "the policy reasons underlying the strict products liability

16 concept should be considered in determining whether something is a product." *Fluor Corp. v.*

17 *Jeppesen & Co.*, 170 Cal. App. 3d 468, 475 (1985); *accord Loomis v. Amazon.com LLC*, 63 Cal.

18 App. 5th. 466, 476 (2021). Treating Facebook as a product here is consistent with the purposes of

19 strict products liability. Meta places Facebook on the market for use by consumers, it is the only

20 one that knows—and can change—how the app works, and it is the only one that can ensure that

21 the app is safe. Individual users, let alone non-user victims, have no ability to change the

22 algorithms' design or functioning. Thus, "characterizing [social media apps like Facebook] as

23 'products' serves the paramount policy to be promoted by the doctrine, i.e., the protection of

24 otherwise defenseless victims of manufacturing defects and the spreading throughout society of

25 the cost of compensating them." *Fluor*, 170 Cal. App. 3d at (cleaned up).[6]

26 _____

27 [6] If this Court disagrees with Plaintiffs and determines that Facebook is not a product, it should
   dismiss only their strict product liability claim (Count I) and not their negligent product design

28 claim (Count II). *See Jacobs v. Meta Platforms, Inc.*, No. 22CV005233, 2023 WL 2655586, at
   *4 (Cal. Super. Ct. Mar. 10, 2023) (finding Facebook not subject to product liability claim but

1

### 2.    Meta's "bystander" argument is without merit.

2       Meta also presents a hodgepodge of additional arguments against Plaintiffs' product

3   liability counts under the heading "As Bystanders, Plaintiffs Cannot Bring Product Liability

4   Claims." Mot. at 12–13. Meta's arguments, however, confuse distinct concepts of "bystander."

5       First, Plaintiffs do not dispute that they were non-users of the product at issue—they were

6   harmed by other people's use of it. But while Meta asserts that that means Plaintiffs cannot bring

7   product liability claims, California law clearly holds that even "bystanders," in this sense of the

8   word, *can* bring such claims. *See, e.g*., *Barrett v. Sup. Ct.*, 222 Cal. App. 3d 1176, 1186–87

9   (1990) ("Manufacturers of defective products are liable for injuries not only to the purchaser or

10  user of such products, but to injured bystanders as well[.]"); *Barker v. Lull Eng'g Co.*, 20 Cal. 3d

11  413, 434 (1978) (liability may be found whenever the "trier of fact concludes that the product's

12  design is unsafe to consumers, users, or bystanders"); *Nelson v. Sup. Ct.*, 144 Cal. App. 4th 698,

13  695 (2006) (same); *Elmore v. Am. Motors Corp.*, 70 Cal. 2d 578, 586 (1969) ("If anything,

14  bystanders should be entitled to greater protection than the consumer or user where injury to

15  bystanders from the defect is reasonably foreseeable."); *Price v. Shell Oil Co.*, 2 Cal. 3d 245, 250

16  (1970) (same). Thus, for example, "where a driver or passenger of another car is injured due to

17  defects in the manufacture of an automobile and without any fault of their own, they may recover

18  from the manufacturer of the defective automobile." *Elmore*, 70 Cal. 2d at 586.

19       Meta next asserts that Plaintiffs can't recover emotional distress damages because they did

20  not suffer physical injury themselves and only witnessed others being physically harmed—in other

21  words, that they were "bystanders" to any actual harm. But unlike in the non-user sense, Plaintiffs

22  *are not* bystanders with respect to emotional distress. They do not seek relief based solely on the

23  emotional distress of seeing others in their villages harmed; they seek relief based on the

24  emotional distress arising out of their fear for their own safety. *See Wooden v. Raveling*, 61 Cal.

25  App. 4th 1035, 1037–38 (1998) (distinguishing between "bystander" and "direct victim"

26  emotional distress). And as the Ninth Circuit has explained, "[i]t is clear that, when the recovery is

27  _____

28  giving plaintiffs leave to amend so as to "proceed as an ordinary negligence claim for negligent
    design of [Facebook's] algorithms or features"); *Pierson v. Sharp Mem. Hosp., Inc.*, 216 Cal.
    App. 3d 340, 344–45 (1989) (distinguishing strict liability and negligence).

1  for distress caused by fear for one's own safety, rather than by an injury to another, the bystander

2  restrictions reiterated in [*Thing v. La Chusa*, 48 Cal. 3d 644 (1989), the case on which Meta

3  relies,] are simply inapplicable." *In re Air Crash Disaster Near Cerritos, Cal.*, 973 F.2d 1490,

4  1494 (9th Cir. 1992). Furthermore, that Plaintiffs were able to escape these traumatic attacks

5  without serious physical injuries is no bar to their ability to recover for their emotional distress.

6  *See Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1021 (1993) ("[A] plaintiff's right to

7  recover damages for emotional distress sustained as a result of fear or concern for his or her own

8  health and safety does not depend upon whether the plaintiff *actually* incurred a physical injury (or

9  disease) as a result of the defendant's conduct."); *Wooden*, 61 Cal. App. 4th at 1045 (pedestrian

10  who was nearly—but not actually—hit by car could seek emotional distress damages); *Taylor v.*

11  *Honeywell Int'l, Inc.*, 599 F. App'x 664 (9th Cir. 2015) (commercial pilot whose plane nearly

12  crashed—but did not—could seek emotional distress damages against manufacturer of allegedly

13  defective flight management system).[7]

14      Finally, Meta invokes the economic loss rule to suggest that Plaintiffs cannot recover in

15  product liability for their lost property. That rule, however, has no relevance here. "Simply stated,

16  the economic loss rule provides [that] where a purchaser's expectations in a sale are frustrated

17  because the product he bought is not working properly, his remedy is said to be in contract alone,

18  for he has suffered only economic losses." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th

19  979, 988 (2004) (quotations omitted) (cleaned up). Thus, for example, the purchaser of a defective

20  truck who loses business while he is unable to use the truck cannot recover lost profits through a

21

22  [7] Even if Plaintiffs were seeking emotional distress damages arising solely out of their witnessing
of injuries to others (and the bystander restrictions set forth in *Thing* therefore applied), Meta is

23  wrong that Plaintiffs fail to satisfy the second *Thing* factor—presence at the scene of the injury-
producing event and contemporaneous awareness that it was causing injury to someone else.

24  Contrary to Meta's argument that this factor is not met here because Plaintiffs were not aware
that Facebook was a cause of the attacks until much later, "*Thing* does not require that the

25  plaintiff have an awareness of what caused the injury-producing event." *Fortman v.*
*Förvaltningsbolaget Insulan, AB*, 212 Cal. App. 4th 830, 841 n.4 (2013). While Plaintiffs needed

26  to "be aware at the time of the injury-producing event of a causal connection between the
victim's injuries and *the injury-producing event*," i.e., that Plaintiffs' families' and neighbors'

27  injuries were caused by the attacks, they did not need to be aware at that time of Meta's role in
those events. *Walsh v. Tehachapi Unified Sch. Dist.*, 2013 WL 4517887, at *7–10 (E.D. Cal.

28  Aug. 26, 2013) (rejecting Meta's interpretation of the second *Thing* factor).

strict liability (or other tort) claim; his only claim for such damages lies in contract. *See, e.g.*, *Seely v. White Motor Co.*, 63 Cal. 2d 9 (1965); *see also Robinson*, 34 Cal. 4th at 988 ("Quite simply, the economic loss rule prevents the law of contract and the law of tort from dissolving one into the other.") (cleaned up). Regardless, even if the economic loss rule did apply here, the damages Plaintiffs seek for their lost property are not "economic loss." *Compare Robinson*, 34 Cal. 4th at 988 ("Economic loss consists of damages for inadequate value, costs of repair or replacement of the defective product or consequent loss of profits.") (quotations omitted) *with* FAC ¶ 46 ("[Jane Doe 1's] home, property, and family business were destroyed.") *and* ¶ 67 ("Jane Doe 2 ultimately lost her home and majority of her personal belongings.").

### C.     Plaintiffs state claims for negligence (Counts II and III).

Meta argues that Plaintiffs' negligence claims fail on the duty element. With respect to negligent product design, as the maker of Facebook, Meta has "a duty to exercise reasonable care in its design so that it can be safely used as intended," a duty that "extends to all persons within the range of potential danger." *Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 141 (1986). *See also Lemmon*, 995 F.3d at 1092 ("[M]anufacturers have a duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public.") (quotations omitted). It is this duty forms the basis of Plaintiffs' Negligent Product Design claim (Count II).

With respect to general negligence (Count III), Meta—like everyone—has a "general duty … to exercise, in [its] activities, reasonable care for the safety of others." *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1060 (9th Cir. 2018) (quoting *Cabral v. Ralph's Grocery Co.*, 51 Cal. 4th 764, 768 (2011)); *see also Regents of Univ. of Cal. v. Sup. Ct.*, 4 Cal. 5th 607, 618 (2018); Cal. Civ. Code § 1714(a).

Meta argues against a duty to protect, but that is not the duty Plaintiffs advance here. Meta points to *Brown v. USA Taekwondo*, which explains that a duty to protect is not imposed on a defendant "who did not contribute to the risk that the plaintiff would suffer the harm alleged." 11 Cal. 5th 204, 214 (2021). Thus, for example, "a person who stumbles upon someone drowning generally has no legal duty to help the victim." *Id*. But "the law imposes a general duty

of care on a defendant … when it is the defendant who has created a risk of harm to the plaintiff, including when the defendant is responsible for making the plaintiff's position worse." *Id.* (quotations omitted). And that's precisely what Plaintiffs allege. Meta didn't simply "stumble upon" ethnic violence in Burma and refuse to help the Rohingya; it helped foment the violence itself—including the attacks on Plaintiffs' villages. Meta created a risk of harm to Plaintiffs and made their position worse than if it had acted differently (or not at all).

Cases like *Weirum* and *Michael R.* support Plaintiffs' negligence claims. In *Weirum*, a woman was killed by teens who had been encouraged to drive recklessly around town as part of a radio station's cash giveaway contest. The court affirmed a jury verdict against the radio station, finding that the station "owed a duty to decedent arising out of its broadcast of the giveaway contest." 15 Cal. 3d at 45–46. In *Michael R.*, a boy was shot in the eye with a slingshot after another boy told the shooter, "Hey shoot him; go for it." 158 Cal. App. 3d at 1064. The court rejected the argument that defendant could not be liable because he had no legal duty to protect the victim or control the shooter absent a special relationship with one or both of them, finding it "has no application where the defendant, through his own action (misfeasance) has worsened the plaintiff's position and has created a foreseeable risk of harm from a third person." *Id.* at 1067–68. As the court explained, "[l]iability is not predicated upon [defendant's] failure to intervene for the benefit of the victim but rather upon his creation of an unreasonable risk of harm to [plaintiff]." *Id.* at 1070–71.

*Weirum* and *Michael R.* confirm that the general duty of care includes a duty not to encourage or incite third parties to engage in dangerous conduct that could harm others. *See also McKesson*, 339 So. 3d at 532 (recognizing "a duty not to negligently cause a third party to commit a crime that is a foreseeable consequence of negligence"). Plaintiffs allege that Meta breached that duty by encouraging the creation and posting of incitements to violence against Plaintiffs and by promoting and amplifying those posts to the people most likely to act on them. *See, e.g.*, FAC ¶¶ 119, 127.

None of the cases cited by Meta are to the contrary, as none of those cases involved allegations of encouragement or incitement of dangerous conduct. In *Bill v. Superior Court*, 137

1   Cal. App. 3d 1002 (1982), for example, the plaintiffs "d[id] not allege that [defendants' movie]

2   incited or stimulated members of the public to violence," *id*. at 1007, "concede[d] there was

3   nothing tortious about the contents of [the movie]," *id*. at 1009 (distinguishing *Weirum*), and did

4   "not claim[] … that [defendants were] responsible for any conduct which increased the risk of

5   violence on the part of [others] … in order to obtain some commercial rewards," *id*. at 1011.

6   Similarly, in *Jackson v. Airbnb, Inc.*, 2022 WL 16752071 (C.D. Cal. Nov. 4, 2022), there was no

7   allegation that Airbnb had encouraged or incited a shooting that took place at one of its rental

8   properties. And while the defendants' online business models in *Doe v. Uber Technologies, Inc.*,

9   79 Cal. App. 5th 410 (2022), and *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th

10  Cir. 2019), perhaps made it *easier* for nefarious actors to engage in conduct harmful to others,

11  the defendants didn't affirmatively *encourage* or *incite* that conduct—a crucial distinction with

12  *Weirum*, *Michael R.*, and the allegations here. Indeed, the court in *Uber* expressly distinguished

13  *Weirum* on this ground. *Uber*, 79 Cal. App. 5th at 425 ("A key fact in *Weirum* is that the plaintiff

14  was injured by third parties doing exactly what the defendant's conduct encouraged them to

15  do…. Courts have repeatedly identified this as a defining feature of *Weirum* misfeasance.")

16      Nor do the *Rowland* factors warrant exempting Meta from its otherwise applicable duty

17  not to encourage or incite third parties to engage in violent conduct. *See generally*, *Rowland v.*

18  *Christian*, 69 Cal. 2d 108 (1968). The purpose of the *Rowland* factors—which are considered "at

19  a relatively broad level of factual generality"—is to determine "whether carving out an entire

20  category of cases from th[e] general duty rule is justified by clear considerations of policy."

21  *Brown*, 11 Cal. 5th at 221. None of the factors to which Meta points—foreseeability, the First

22  Amendment, and moral blame–warrant such a carve out here.

23      Meta's invocation of foreseeability is mostly a re-hash of its superseding cause arguments

24  addressed above, and the remainder of its foreseeability argument misunderstands the

25  allegations. For example, Meta argues that "there is no ground for a baseline assumption that all

26  Facebook users will ordinarily use the service to incite, justify, or encourage violence." Mot. at

27  16 (quotations omitted). But Plaintiffs aren't alleging that *all* users will incite violence, only

28  that—when encouraged by Meta—*some* will, and that that was foreseeable. *See, e.g.*, *Weirum*, 15

Cal. 3d at 46–47 (foreseeable that some listeners would disregard highway safety when encouraged to race to next contest location). Indeed, as one of the cases cited by Meta explains in distinguishing *Weirum*:

> The *Weirum* broadcasts actively and repeatedly encouraged listeners to speed to announced locations. Liability was imposed on the broadcaster for urging listeners to act in an inherently dangerous manner. That they were likely to do so was clearly foreseeable.

*McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1005 (1988). In other words, when a defendant encourages third parties to act dangerously (as Plaintiffs allege here), it is foreseeable that some of those third parties will do so.

Meta's assertion that "there is no simple means by which Meta can predictably stop third parties from engaging in violent conduct off Facebook," Mot. at 16 (quotations omitted), likewise misunderstands the allegations here. Plaintiffs aren't complaining that Meta failed to prevent offline violence; they're complaining that Meta encouraged Facebook users to post incitements to violence (and promoted and amplified those posts to other Facebook users most likely to act on them). Stopping that conduct *is* something Plaintiffs allege Meta could have done. FAC ¶¶ 4, 41, 89, 115, 121, 130; *see also Weirum*, 15 Cal. 3d at 48 ("Defendant could have accomplished its objectives of entertaining its listeners and increasing advertising revenues by adopting a contest format which would have avoided danger to the motoring public.").[8]

With respect to the First Amendment, while Meta certainly enjoys a measure of constitutional protection for its operation of Facebook, that protection is not unlimited. Where, as here, a defendant is alleged to have encouraged or incited others to engage in tortious or criminal activity, that instigation is not protected. *See U.S. v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004). As the court noted in *Weirum*, "[t]he First Amendment does not sanction the infliction of physical injury merely because achieved by word"—or here, by algorithm—"rather than [by] act." 15 Cal. 3d at 48; *see also Michael R.*, 158 Cal. App. 3d at 1069 ("We do not find that imposing liability

---

[8] Relatedly, one of the *Rowland* factors that Meta doesn't discuss is "the policy of preventing future harm." *Brown*, 11 Cal. 5th at 217. That factor clearly weighs against exempting Meta from its otherwise applicable duty not to encourage or incite third parties to engage in violent conduct, as Meta's activities continue to foment violence in Burma and other developing countries. FAC ¶¶ 4, 95–98.

upon one who actively encourages the commission of a crime … would have a 'chilling effect' on First Amendment rights."). Again, none of the cases cited by Meta are to the contrary because none of them involved express encouragement or incitement of dangerous conduct. *See Est. of B.H. v. Netflix, Inc.*, 2022 WL 551701 (N.D. Cal. Jan. 12, 2022) (television show depicting—but not expressly encouraging or inciting—suicide); *Bill*, 137 Cal. App. 3d at 1007 (movie not alleged to incite violence); *McCollum*, 202 Cal. App. 3d at 1000–05 (song lyrics did not encourage or incite suicide); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163 (N.D. Cal. 2022) (app's decision to remove content is protected speech); *Netchoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022) (same); *Winter*, 938 F.2d at 1034 (reference book).

Finally, Meta asserts that "moral blame" lies only with the Burmese military and civilian militias that carried out the attacks against Plaintiffs' villages. That is contrary not just to the allegations of the complaint, however, but to Meta employees' own words. The "moral culpability" encompassed by this *Rowland* factor includes defendants' acting with "actual or constructive knowledge of the harmful consequences of their behavior" and "act[ing] in bad faith or with a reckless indifference to the results of their conduct." *Martinez v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 82 Cal. App. 4th 883, 896 (2000). Plaintiffs' allegations, taken as true, demonstrate that Meta acted with such knowledge, bad faith, and/or reckless indifference. FAC ¶¶ 18–44. And, indeed, Meta's CEO, COO, and other employees admitted their failings in Burma, driving one employee to say that "I, in working for Facebook, had been a party to genocide." *Id.* ¶¶ 84–91. None of the moral blame cases cited by Meta involved anything close to the conduct at issue here. *See Steven F. v. Anaheim Union High Sch. Dist.*, 112 Cal. App. 4th 904, 917 (2003) (school district not morally blameworthy where it lacked any suspicion that teacher was engaged in inappropriate relationship with student); *Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 816 (2006) (employer not morally blameworthy where it lacked knowledge that employee was using company computer to send threatening emails); *Taylor v. Elliott Turbomachinery Co.*, 171 Cal. App. 4th 564, 594–95 (2009) (supplier not morally blameworthy for asbestos-containing parts manufactured or supplied by others).

### D.     Plaintiffs state claims for aiding and abetting (Counts IV and V).

To plead aiding and abetting another person's tort, a plaintiff must allege that the defendant "[1] knows the other's conduct constitutes a breach of duty and [2] gives substantial assistance or encouragement to the other so to act." *In re First Alliance Mortg. Co.*, 471 F. 3d 977, 993 (9th Cir. 2006) (emphasis omitted); *see also ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1039 (9th Cir. 2016) ("To allege aiding and abetting, a plaintiff must show that the defendant knowingly … substantially assisted or encouraged another to breach a duty."). Meta does not challenge Plaintiffs' pleading of the substantial assistance or encouragement element. Rather, Meta argues only that Plaintiffs have failed to sufficiently allege (1) the commission of any underlying torts, (2) that Meta had actual knowledge of the underlying torts, and (3) that Meta acted with the intent to facilitate those torts. All three arguments are without merit.

First, Plaintiffs sufficiently allege the commission of underlying torts. Contrary to Meta's assertion, incitement to violence (the underlying tort in Count IV) is indeed a tort in California. *See, e.g., Michael R.*, 158 Cal. App. 3d at 1063–64 ("[E]ncouragement to commit assault with a deadly weapon is affirmative conduct sufficient, as a matter of law, to impose civil liability for damages ensuing from that assault."); *Golden Gate Land Holdings LLC v. Direct Action Everywhere*, 81 Cal. App. 5th 82, 90–91 (2022) (defendant can be civilly liable for acts committed by others if it "incited lawless action, or gave specific instructions to carry out violent acts or threats"). Similarly without merit is Meta's assertion that Plaintiffs fail to plead that anyone "actually committed" the underlying torts in Count V—assault, battery, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, conversion, and trespass to chattels. Mot. at 17 (quoting *Ogden v. Wells Fargo Bank, N.A.*,  2019 WL 1751818, at *8 (C.D. Cal. Feb. 6, 2019). Jane Doe 1 alleges that her village was attacked by members of the Rakhine militia, Burmese Border Guard, and Field Police; that her father was detained, beaten, and tortured; that many young girls in her village were raped; that other people in her village were killed; that her home, property, and family business were destroyed; and that fearing for her safety, she fled Myanmar. FAC ¶¶ 45–49. Similarly, Jane Doe 2 alleges that her village was attacked by members of the Burmese military, Rakhine militia, Border Guard, and

1  Field Police; that they burned houses and raped women in the village; that they shot and killed

2  people in the village trying to flee their burning houses; that she lost her home and majority of her

3  personal belongings; and that fearing for her safety, she and her family fled Myanmar. *Id*.  ¶¶ 60–

4  67. Meta cannot seriously contend that these allegations fail to sufficiently plead that someone

5  "actually committed" the underlying torts in Count V.

6      Second, Plaintiffs sufficiently allege Meta's actual knowledge of the underlying torts.

7  "For purposes of pleading an aiding and abetting [tort] claim, … actual knowledge of the

8  underlying [tort] may be averred generally." *Lorenz v. E.W. Bancorp, Inc.*, 2016 WL 199392, at

9  *7 (C.D. Cal. Jan. 14, 2016) (quotations omitted); *see also Opperman v. Path, Inc.*, 84 F. Supp.

10  3d 962, 985–86 (N.D. Cal. 2015); Fed. R. Civ. P. 9(b) ("knowledge … may be alleged

11  generally"). In *Opperman*, for example, iPhone and iPad users alleged that Apple had aided and

12  abetted app developers' theft of personal information from their devices' contact lists. In denying

13  Apple's motion to dismiss the aiding and abetting claim, the court held that plaintiffs' allegation

14  that Apple "knowingly and/or recklessly permitted the unauthorized access and collection of

15  [p]laintiffs' and class members' private address books" was sufficient to plead actual knowledge

16  of the developers' underlying torts. 84 F. Supp. 3d at 986; *see also Neilson v. Union Bank of

17  Cal., N.A.*, 290 F. Supp. 2d 1101, 1119 (C.D. Cal. 2003) (general allegations that "[t]he Banks

18  knew" of underlying torts that they were accused of aiding and abetting was sufficient to allege

19  knowledge). Plaintiffs have made similar allegations here. FAC ¶¶ 133–34 (alleging that "Meta

20  knew" that Facebook users were posting incitements "direct[ing] imminent violence against …

21  Plaintiffs"), ¶¶ 138–39 (alleging that "Meta knew" that "Rohingya villages—including

22  Plaintiffs'—were [being] attacked by Burmese government forces and civilian militias"). These

23  are allegations that Meta had "actual knowledge of the specific primary wrong[s]." *In re First

24  Alliance*, 471 F.3d at 993.

25      In any event, even if more detailed allegations of Meta's knowledge were required,

26  Plaintiffs have alleged that Meta was repeatedly warned by journalists, academics, and NGOs

27  that Facebook was being used to incite violence against the Rohingya, and that Meta later

28  acknowledged having received those warnings. FAC ¶¶ 29–30, 85, 89–91. Meta picks nits with

the timing and content of the particular examples set out in the FAC, but the FAC makes clear that the warnings cited are merely a sample of those that Meta received. *Id*. ¶ 29 ("For instance...."), ¶ 30 ("These examples only skim the surface."). In a putative class action alleging systematic misconduct affecting numerous individuals, it is sufficient to allege knowledge of the widespread nature of the underlying torts rather than knowledge of the particular instance directed at named plaintiffs specifically. *See, e.g.*, *Opperman*, 84 F. Supp. 3d at 985–86 (knowledge of app developers' systematic theft of personal data); *Neilson*, 290 F. Supp. 2d at 1118–22 (knowledge of underlying tortfeasor's Ponzi scheme). As in *Opperman* and *Neilson*, "Plaintiffs have alleged sufficient facts from which an inference of knowledge can be drawn." *Opperman*, 84 F. Supp. 3d at 986.

Finally, Meta argues that Plaintiffs failed to allege intent. But the California case law on whether specific intent needs to be alleged is "not entirely consistent," and the Ninth Circuit has ultimately concluded "that aiding and abetting liability under California law, as applied by the California state courts, requires a finding of actual knowledge, not specific intent." *In re First Alliance*, 471 F.3d at 993.[9]

### III.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE CDA.

Meta next argues that Plaintiffs' claims are barred by Section 230(c)(1) of the Communications Decency Act ("CDA"), which states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As the Ninth Circuit repeatedly reminds, however, "the CDA does not declare 'a general immunity from liability deriving from

---

[9] The Supreme Court's recent decision in *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206 (2023), in which the Court rejected aiding and abetting claims brought against social media companies under the Anti-Terrorism Act, does not undermine Plaintiffs' aiding and abetting claims here. As Justice Jackson noted in her concurrence in that case, "the Court's view of the facts—including its characterizations of the social media platforms and algorithms at issue—properly rests on the particular allegations in those complaints. Other cases presenting different allegations and different records may lead to different conclusions." *Id*. at 1231 (Jackson, J., concurring). Here, Plaintiffs make two important sets of allegations that were not present in *Taamneh*. First, the FAC alleges how Facebook's engagement-maximizing algorithms encouraged the creation of express incitements to violence. Second, it alleges a connection between those incitements to violence and the attacks on Plaintiffs.

third-party content.'" *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009)). In other words, "Congress has not provided an all-purpose get-out-of-jail-free card for businesses that publish user content on the internet." *Id.* at 853. Here, Meta's attempt to get a free pass for its conduct by invoking the CDA is unavailing for two reasons. First, Section 230 on its face does not apply to Plaintiffs' claims because Plaintiffs' claims do not treat Meta as a publisher or speaker of third-party content. Second, if Section 230 did provide immunity against Plaintiffs' claims, such immunity would create a true conflict with Burmese law (which provides no such immunity), and under California choice-of-law rules, Burmese law would apply.

### A.    Plaintiffs do not seek to hold Meta liable as the publisher or speaker of third-party content.

The CDA bars state law causes of action that "seek[] to treat" an internet service provider as a publisher or speaker of third-party content. *Barnes*, 570 F.3d at 1100-01. But rather than treating Meta as a publisher or speaker of harmful content provided by others, Plaintiffs' claims seek to treat Meta as (1) the designer of a dangerous product, (2) a material contributor to the harmful content, (3) a distributor of the harmful content, and/or (4) a negligent matchmaker.

### 1.    Meta was the designer of a dangerous product.

The first theory on which Plaintiffs seek to hold Meta liable as something other than the publisher or speaker of third-party content is for the dangerous design of its product. As explained above, Plaintiffs allege that Meta designed Facebook with algorithms to maximize engagement, which created a dangerous feedback loop encouraging the creation of posts inciting violence and prioritizing those posts to others likely to act on them. Plaintiffs further allege that this design led directly to attacks on their villages. In other words, they allege that a Facebook design flaw caused harm to them and others—"a common products liability tort" from which Meta is not immune under the CDA. *Lemmon*, 995 F.3d at 1091–92.

As in *Lemmon*, Plaintiffs' product liability claims rest on the premise that social media companies "have a duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public." *Id.* at 1092 (quotations omitted). This duty

"differs markedly from the duties of publishers as defined in the CDA." *Id.* Social media companies like Meta (and Snap) "have a specific duty to refrain from designing a product that poses an unreasonable risk of injury or harm to consumers." *Id.* "[E]ntities acting solely as publishers" on the other hand "have no similar duty." *Id.* Here, as in *Lemmon*, Plaintiffs' product liability claims "do[] not seek to hold [Meta] liable for its conduct as a publisher or speaker." *Id.* Rather, their design defect claims treat Meta "as a products manufacturer, accusing it of negligently designing a product ([Facebook]) with a defect ([the engagement-maximizing algorithms that encourage the creation and promotion of incitements to violence])." *Id.* Thus, "the duty that [Meta] allegedly violated 'springs from' its distinct capacity as a product designer." *Id.* (quoting *Barnes*, 570 F.3d at 1107). As in *Lemmon*, "[b]ecause [Plaintiffs'] claim does not seek to hold [Meta] responsible as a publisher or speaker, but merely seeks to hold [Meta] liable for its own conduct, principally for the creation of the [dangerous algorithms], § 230(c)(1) immunity is unavailable." 995 F.3d at 1093 (quotations and emphasis omitted); *see also A.M. v. Omegle.com*, 614 F. Supp. 3d 814, 818–20 (D. Or. 2022) (claim alleging app defectively designed not barred by CDA).

Meta cites *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008), and *Herrick v. Grindr LLC*, 765 F. App'x 586 (2d Cir. 2019), for the proposition that product liability claims whose "real liability theory is that the defendant failed to limit or prevent harmful third-party content" are barred by the CDA. Mot. at 21. But Plaintiffs' product liability theory isn't based on Meta's failure to limit or prevent content, it's based on Facebook's design defects that encourage the creation of dangerous content (like incitements to violence) in the first place. Facebook's dangerous design can thus be remedied by fixing its algorithms rather than by removing or blocking any third-party content. *Compare Omegle.com*, 614 F. Supp. 3d at 819 ("[Defendant] could have satisfied its obligation to Plaintiff by designing its product [a social media app] differently…. Plaintiff is not claiming that [defendant] needed to review, edit, or withdraw any third-party content to meet this obligation.") *with MySpace*, 528 F.3d at 419–420 (CDA barred claim that website should have blocked communications between sexual predator and minor) *and Herrick*, 765 F. App'x at 590-91 (CDA bars "manufacturing and design defect claims [that] seek

1  to hold [app] liable for its failure to combat or remove offensive third-party content"). Indeed, one

2  of the cases cited by Meta expressly distinguished *Lemmon* on these grounds. *Doe v. Twitter, Inc.*,

3  555 F. Supp. 3d 889, 930 (N.D. Cal. 2021) ("[T]o meet the obligation Plaintiffs seek to impose on

4  Twitter on [their product liability] claim, Twitter would have to alter the content posted by its

5  users, in contrast to the design defect alleged in *Lemmon*."), *aff'd in part and rev'd in part on*

6  *other grounds*, 2023 WL 3220912 (9th Cir. 2023).[10]

7      In other words, just as the alleged product defect in *Lemmon* could be fixed by removing a

8  Snapchat design element that rewarded users for posting dangerous content (there, content posted

9  while traveling at speeds over 100 mph), the alleged product defects here could be fixed by

10 removing the Facebook design elements that reward users for posting dangerous content. In both

11 cases, no third-party content need be blocked or removed. Snapchat users could still post the

12 dangerous content (a picture of their speedometer showing excessive speed, say) and Facebook

13 users could still post incitements to violence, even if a court forced those companies to remove

14 product defects that incentivize and encourage such dangerous content.

15     Contrary to Facebook's assertion, "allegations concerning [the Facebook algorithms']

16 reward system are not a creative attempt to plead around the CDA." *Lemmon*, 995 F.3d at 1094.

17 And because "[Plaintiffs'] claim[s] do[] not seek to hold [Meta] responsible as a publisher or

18 speaker, but merely seeks to hold [it] liable for its own conduct, principally for the creation of [a

19 dangerous design defect], § 230(c)(1) immunity is unavailable." *Id.* at 1093 (quotations and

20 alterations omitted).

21              **2.    Meta was a material contributor to the harmful content.**

22     A second reason why Meta is not entitled to CDA immunity is because the harmful content

23 at issue was not created solely by third parties; Meta materially contributed to its harmful nature.

24 "[I]mmunity applies only if the [defendant] is not also an 'information content provider,' which is

25

26 [10] The other cases cited by Meta are similarly distinguishable. *Doe ex rel. Roe v. Snap, Inc.*, 2022
   WL 2528615, at *14 (S.D. Tex. July 7, 2022) (sexual predator/minor case following *MySpace*
27 and distinguishing *Lemmon*); *Bride v. Snap, Inc.*, 2023 WL 2016927, at *5 (C.D. Cal. Jan. 10,
   2023) (relief sought by plaintiffs would necessarily require defendants to monitor third-party
28 content); *Jackson*, 2022 WL 16753197, at *2 ("The blame cast on Snapchat is not that any
   particular feature encouraged the sale of guns….").

1 defined as someone who is 'responsible, in whole or in part, for the creation or development of'
2 the offending content." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521
3 F.3d 1157, 1162 (9th Cir. 2008) (quoting 47 U.S.C. § 230(f)(3)). In other words, "a website may
4 lose immunity under the CDA by making a material contribution to the creation or development of
5 content." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016).

6        Here, Plaintiffs allege that Meta did exactly that. While Meta was not literally the author of
7 the incitements to violence against Plaintiffs' villages, it made a "material contribution" to the
8 creation and development of those posts. *Id.* Its engagement-maximizing algorithms and "like,"
9 "share," and "comment" features created a feedback loop among its users leading to the generation
10 of more and more extreme and dangerous content (both quantitatively and qualitatively),
11 ultimately leading to posts inciting actual violence. Facebook's dopamine-triggering reaction
12 mechanism and its extreme-content-prioritizing algorithms are more than "neutral tools"
13 facilitating the posting of content online. *Cf. Roommates.Com*, 521 F.3d at 1169 ("[P]roviding
14 '*neutral* tools' to carry out what may be unlawful [conduct] does not amount to 'development' for
15 purposes of the immunity exception."); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1196–97
16 (N.D. Cal. 2009) ("A website does not so 'contribute' when it merely provides third parties with
17 neutral tools to create web content[.]"). By rewarding and promoting the most divisive and
18 dangerous content—including express incitements to violence—Meta's Facebook algorithms are
19 far from neutral.

20        Regardless, even if Meta's Facebook tools could be considered neutral as a general
21 proposition, Meta did more than just offer them to its users; it encouraged and incentivized those
22 users to create dangerous misinformation and incitements to violence. "Providing neutral tools for
23 navigating websites is fully protected by CDA immunity, *absent substantial affirmative conduct*
24 *on the part of the website creator promoting the use of such tools for unlawful purposes*."
25 *Roommates.Com*, 521 F.3d at 1174 n.37 (emphasis added). Inducing users to create harmful
26 content—which Plaintiffs allege Meta did—is sufficient contribution to or development of that
27 content to lose the shield of CDA immunity. *See, e.g.*, *Huon v. Denton*, 841 F.3d 733, 742 (7th
28 Cir. 2016) ("A company can … be liable for creating and posting, *inducing another to post*, or

1    otherwise actively participating in the posting of a defamatory statement in a forum that that

2    company maintains.") (emphasis added); *cf. Roommates.Com*, 521 F.3d at 1171 (explaining that a

3    website had immunity in a prior case because "the website provided neutral tools, which [a third

4    party] used to publish [harmful content], *but the website did absolutely nothing to encourage the*

5    *posting* of [harmful] content.") (emphasis added).

6          In *Huon*, for example, the Seventh Circuit reversed the district court's dismissal of a

7    defamation claim against a website arising out of third-party comments on the website. The

8    website was not entitled to CDA immunity, held the court, because the website had "encouraged

9    and invited users to defame [plaintiff], through selecting and urging the most defamation-prone

10   commenters to post more comments and continue to escalate the dialogue." 841 F.3d at 742

11   (internal quotations omitted). The court saw "nothing farfetched about [plaintiff's] factual

12   allegations," particularly in light of allegations that the website "was planning to 'monetize'

13   comments, and why advertisers might find this commenting system appealing." *Id.* So too, here,

14   where Plaintiffs allege that Meta rewards its users for creating divisive posts and encourages them

15   to post ever-more-dangerous content in the name of "engagement." Plaintiffs plausibly allege facts

16   analogous to those alleged in *Huon*—that Meta "encouraged and invited users to [incite violence

17   against the Rohingya], through selecting and urging the most [violent] commenters to post more

18   comments and continue to escalate the dialogue." *Id.* (internal quotations omitted).

19         The Ninth Circuit's decision in *Dyroff* is not to the contrary. In that case, the court held

20   that an online message board called the Experience Project, which connected the plaintiff's son

21   with an illegal drug dealer (leading to a fatal overdose), was entitled to CDA immunity. Unlike

22   Plaintiffs' allegations against Meta here, however, the plaintiff in *Dyroff* did not allege that the

23   Experience Project encouraged its users to post the harmful content. 934 F.3d at 1099 ("Plaintiff

24   cannot and does not plead that [defendant] … made suggestions regarding the content of potential

25   user posts, or contributed to making unlawful or objectionable user posts."). Here, in contrast,

26   Plaintiffs allege that Facebook's reaction and News Feed algorithms created a feedback loop that

27   encouraged exactly the kinds of dangerous posts that cause them harm. Rather than arguing that

28   the Experience Project encouraged or prompted users to post unlawful content (and thus that the

defendant materially contributed to such content), the *Dyroff* plaintiff's theory of liability focused on the Experience Project's connecting drug dealers with potential buyers. *Id.* at 1095. But while *Dyroff* rejected this matchmaking theory, it did not address—because the plaintiff didn't raise— the argument that a website's encouraging its users to post harmful content is a material contribution to the creation and development of that content. *See Doe v. Mindgeek USA Inc.*, 2021 WL 5990195, at *5 (C.D. Cal. Dec. 2, 2021) ("Significantly, the plaintiff [in *Dyroff*] did not allege that [defendant] encouraged the creation of posts to sell illegal substances."). Here Plaintiffs allege that Meta encouraged the creation of the incitements to violence and describes the mechanisms by which it did so.[11]

In light of the dangerous feedback loops created by Meta's Facebook algorithms, it can hardly be said that Meta "did absolutely nothing to encourage the posting of [the harmful] content." *Roommates.Com*, 521 F.3d at 1171. Meta's conduct wasn't "merely … augmenting the content generally, but … materially contributing to its alleged unlawfulness." *Id.* at 1167–68. The "crucial distinction" with respect to material contribution is between "on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes the displayed content illegal or actionable." *Kimzey*, 836 F.3d at 1269 n.4. Here, Meta's conduct was not simply engaging in the traditional publisher activity of displaying content on its platform. Rather, it materially contributed to the content's harmfulness by encouraging its users to post more and more dangerous and violent things. Meta's Facebook algorithms are responsible—in a material way—for what makes the content actionable.[12]

---

[11] Like the Ninth Circuit in *Dyroff*, the Second Circuit in *Force v. Facebook, Inc.* focused on a matchmaking theory and did not address whether a website's reward-based algorithms that encourage the creation of extreme content can be a material contribution to the development or creation of such content. 934 F.3d 53, 65–66 & n.20 (2d Cir. 2019) ("To the extent that plaintiffs rely on their undeveloped contention that the algorithms are 'designed to radicalize,' we deem that argument waived. In addition, this allegation is not made in plaintiffs' complaints."). Unlike in *Force*, Plaintiffs' "designed to radicalize" contention here is neither undeveloped nor omitted from their complaint.

[12] As with their product liability theories, Plaintiffs' material contribution theory is not based on Meta's failure to block or remove harmful content, but on its role in generating the content in the first place. By changing its algorithms, Meta's material contribution to dangerous content could be remedied without editing, blocking, or removing any of the content posted by its users.

Finally, while Meta's conduct wasn't identical to the conduct at issue in *Roommates.Com* or *Mindgeek* where the defendants' websites provided specific tags to label unlawful content, nothing in those cases suggests that providing such tags is the only kind of conduct that can constitute material contribution to the creation or development of actionable content. Facebook didn't offer specific tags for anti-Rohingya content in the way that Roommates.Com offered race and sexual orientation drop-down menus that encouraged users to post unlawful housing ads or that Mindgeek used subject matter tags that encouraged users to post child pornography. But though the three websites used different mechanisms, each clearly encouraged users to post not just any content but content that was actionable—discriminatory housing ads in *Roommates.Com*, child pornography in *Mindgeek*, and dangerous incitements to violence here. "Read in the light most favorable to Plaintiff[s], the allegations establish that part of Defendants' operating model depends upon the development and creation of [dangerous incitements to violence] and that their tools are designed to elicit that exact content." *Mindgeek*, 2021 WL 5990195 at *7.

### 3.   Meta was the distributor—not the publisher or speaker—of third-party content.

Plaintiffs also seek to hold Meta liable for its role as a *distributor* of third-party content. "Traditionally, laws governing illegal content distinguished between publishers or speakers (like newspapers) and distributors (like newsstands)." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 14 (2020) (Thomas, J., writing separately). Publishers and speakers—because they exercised editorial control—were held to a high standard; they could be strictly liable for transmitting illegal content. *Id.* In contrast, distributors acted as mere conduits, and could thus be held liable only when they knew or constructively knew that content they were distributing was illegal. *Id.* Here Plaintiffs seek (among other theories) to hold Meta liable as the distributor of content it knew was harmful and unlawful. Specifically, they allege that Meta was made aware— repeatedly—of dangerous and unlawful content but nevertheless continued to distribute it.

The Ninth Circuit has arguably rejected treating distributors differently than publishers under the CDA. *See Barnes*, 570 F.3d at 1103–05. Nevertheless, as Justice Thomas has noted, "there are good reasons to question" decisions that "have discarded the longstanding distinction

between 'publisher' liability and 'distributor' liability." *Malwarebytes*, 141 S. Ct. at 15. Consequently, a nonfrivolous argument exists for reversing that aspect of *Barnes* by either the Ninth Circuit *en banc* or the Supreme Court, and Plaintiffs invoke Justice Thomas's statement respecting the denial of certiorari in *Malwarebytes* as their argument here to preserve the issue for further review.

### 4. Meta negligently connected violent extremists and susceptible violent actors.

Finally, Plaintiffs seek to hold Meta liable as a matchmaker negligently making dangerous connections between anti-Rohingya extremists and those likely to act on incitements to violence. Plaintiffs acknowledge that the Ninth Circuit's decision in *Dyroff* held that a social media platform was entitled to CDA immunity from claims based on a negligent matchmaking theory. Nevertheless, a nonfrivolous argument exists for reversal of that decision by either the Ninth Circuit *en banc* or the Supreme Court, and Plaintiffs invoke Judge Berzon's concurrence in *Gonzalez v. Google LLC*, 2 F.4th 871, 913–18 (9th Cir. 2021), *vacated and remanded*, 143 S. Ct. 1191, and Judge Katzman's partial dissent in *Force*, 934 F.3d at 76–89, as their argument here to preserve the issue for further review.

### B. To the extent the CDA would bar Plaintiffs' claims, U.S. and Burmese law conflict, and Burmese law of non-immunity governs.

If this Court were to disagree with the above and find that Meta is entitled to Section 230 immunity from some or all of Plaintiffs' claims, a true conflict would exist between U.S. and Burmese law, which provides for no such immunity. Under California choice-of-law rules, which apply in this diversity case, *see Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1091 (9th Cir. 2021), Burmese law would govern Meta's assertion of an immunity defense.[13]

---

[13] "California follows the doctrine of dépeçage, under which different states' laws can be applied to different issues in the case." *Chen v. L.A. Truck Ctrs., LLC*, 7 Cal. App. 5th 757, 767 (2017), *rev'd on other grounds*, 7 Cal.5th 862 (2019). Thus, "a separate conflict of laws inquiry must be made with respect to each issue in the case." *Wash. Mut. Bank, FA v. Sup. Ct.*, 24 Cal. 4th 906, 920 (2001). No detailed inquiry was necessary with respect to Plaintiffs' affirmative tort claims because neither party identifies any conflict between California and Burmese law on product liability, negligence, or aiding and abetting. *See Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1138 (9th Cir. 2003).

Meta argues that a state's choice-of-law rules can't override a federal immunity statute like Section 230, citing the district court's decision in *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315 (E.D.N.Y. 2018) ("*Force I*") in support. In that decision, the plaintiffs argued that a New York choice-of-law analysis would point to Israeli law as the law governing certain claims, and that Section 230 immunity should thus not apply to those claims "as the CDA is a feature of American law that has no corollary in Israel." *Force I*, 304 F. Supp. 3d at 324 (quotations omitted). The district court refused to perform a choice-of-law analysis, however, asserting that state choice-of-law rules "could not direct courts to disregard federal law." *Id.* at 324–25. But *Force I*, which is obviously not binding on this Court, is inconsistent with Ninth Circuit precedent, which requires a choice-of-law analysis.[14]

In *Bassidji v. Goe*, for example, the Ninth Circuit faced a question as to whether U.S. or Hong Kong law applied to a particular contract. 413 F.3d 928, 932–33 (9th Cir. 2005). Unlike *Force I*, however, the Ninth Circuit engaged in a straightforward California choice-of-law inquiry to determine which law applied. While the court ultimately determined that U.S. law applied, it did so based on California choice-of-law rules. Had the Ninth Circuit instead applied the *Force I* approach for which Meta advocates here, it would simply have held that U.S. law applies because California choice-of-law rules can't trump U.S. law, rather than applying California choice-of-law rules to see which law applied. *Compare Force I*, 304 F. Supp. 3d at 325 ("It is almost too obvious to state that New York law, including the law governing conflict of laws, could not direct courts to disregard federal law.") *with Bassidji*, 413 F.3d at 932-33 ("To determine whether [U.S. law] barred [defendant] from issuing the guarantees, we must decide whether [U.S. law] applies to them…. We therefore apply the choice-of-law principles of the forum state, here California."). Thus, to determine whether U.S. or Burmese law governs Meta's asserted immunity defense, this Court—like the Ninth Circuit in *Bassidji*—should conduct a choice-of-law analysis.[15]

---

[14] Notably, the Second Circuit in *Force* "express[ed] no opinion" on the district court's choice-of-law ruling. 934 F.3d at 75 n.32.

[15] The Supremacy Clause cases cited by Meta, Mot. at 23, are inapposite because nobody disputes that the CDA is part of California law. Indeed, all federal law is part of every state's law. *See Howlett v. Rose*, 496 U.S. 356, 367 (1990). Thus, as the cases cited by Meta illustrate, there is never a "choice" to make between state and federal law. But the CDA is *not* part of

1   California applies a governmental interest analysis, which focuses on the "comparative

2   impairment" of the interested jurisdictions by asking which sovereign's interest in the particular

3   issue would be more impaired if its law were not applied. *Rustico*, 993 F.3d at 1091. As

4   explained in detail in the prior motion to dismiss briefing, dkt. 35 at 38–45, this choice-of-law

5   inquiry points to the application of Burmese law to Meta's immunity defense because Burma's

6   interest in protecting its people from harm caused by social media platforms would be more

7   impaired by applying the CDA in this case than the United States' interest in unregulated internet

8   speech and protection of domestic corporations would be impaired by applying Burmese law of

9   non-immunity.[16]

10   Meta argues that no meaningful conclusions can be drawn about the content of Burmese

11   law. Mot. at 23–24. But as the previously-submitted declaration and deposition transcript of

12   Professor Andrew Harding make clear, Burmese law contains no CDA-like immunity for social

13   media companies. Dkts. 36-1, 46-1. Notably, Meta has never contested Professor Harding's

14   qualifications to opine on Burmese law, nor offered its own authority or other evidence that

15   Burmese law on social media immunity is anything other than what Professor Harding has

16   testified to. Furthermore, the relevance of the articles and *Unocal* case cited by Meta, Mot. at 23–

17   24, has been thoroughly refuted, *see* dkt. 35 at 39–40, as has its cherry-picking of lines from Dr.

18   Harding's deposition, *see* dkt. 45-1 at 5–6. In determining the content of foreign law, the Court

19   "may consider any relevant material or source, including testimony," Fed. R. Civ. P. 44.1, and

20   the process is "intended to be flexible and informal," *de Fontbrune v. Wolfsy*, 838 F.3d 992, 997

21   (9th Cir. 2016) (quotations omitted). Here, the prior briefing and evidence has established that on

22   the issue of immunity for social media companies, Burmese law is determinable and that no such

23   immunity exists.

24   Meta also argues briefly that California has the greater interest in having its law (including

25   the CDA) applied to the immunity question here. Mot. at 24. But as explained in the prior briefing,

26   _____

27   Burmese law (which includes no similar immunity), and thus a choice needs to be made between
    whether to apply U.S. or Burmese law here. And as illustrated by *Bassidji*, the Supremacy
28   Clause is no bar to using California choice-of-law rules to make such a determination.

[16] In addition to comparative impairment, California principles of comity would also point to the application of Burmese law to Meta's assertion of immunity here. *See* dkt. 35 at 44–45.

with respect to regulating conduct within its borders, "the place of the wrong"—in this case, Burma—"has the predominant interest." Dkt. 35 at 42 (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593 (9th Cir. 2012)); *see also Tucci v. Club Mediterranee, S.A.*, 89 Cal. App. 4th 180, 193 (2001) ("[T]he Dominican Republic's … legitimate interest in seeing that its law determines the consequences of actions within its borders causing injury to people there … would be significantly undermined if its laws were not applied.").[17]

## IV.    PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE FOREIGN AFFAIRS DOCTRINE.

Finally, Meta argues that Plaintiffs' claims are barred by the foreign affairs doctrine—"a preemption doctrine that prevents 'an intrusion by [a] State into the field of foreign affairs which the Constitution entrusts to the President and Congress.'" *Ning Xianhua v. Oath Holdings, Inc.*, 536 F. Supp. 3d 535, 556 (N.D. Cal. 2021) (quoting *Zschernig v. Miller*, 389 U.S. 429, 432 (1968)). To determine whether Plaintiffs' California tort claims create such an intrusion, the Court considers the following factors: "(1) whether there is a likelihood that [the California law at issue] will conflict with U.S. foreign policy; (2) whether [the California law at issue] addresses a traditional state responsibility, and (3) the strength of the state interest." *Id.* at 557. Meta addresses only the first factor.[18]

With respect to the first factor, Meta "ha[s] not shown a likelihood that the application of [California tort law] in the instant case 'will produce something more than incidental effect in conflict with express foreign policy of the National Government.'" *Id.* (quoting *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419–20 (2003)). While Meta makes sweeping statements about this litigation undermining U.S. policy, it fails to support that conclusory assertion with any

---

[17] Meta also drops a footnote suggesting that "if Burmese law did apply," Plaintiffs' claims would be barred by a Burmese statute of limitations. Mot. at 24 n.3. This suggestion, however, ignores dépeçage, provides no choice-of-law analysis of the statute of limitations issue, and runs contrary to Meta's position earlier in its motion (undisputed by Plaintiffs) that the "applicable" limitations period is provided by California law. Mot. at 3.

[18] With respect to the second factor, there is no dispute that California tort law "addresses a traditional state responsibility," nor is there any suggestion that the "real purpose" of California tort law is to regulate foreign affairs. *Ning Xianhua*, 536 F. Supp. 3d at 557. As to the third factor, "California has a strong interest in the conduct of its corporations and residents," even vis-à-vis non-U.S. citizens who have never resided here. *Id.* at 557–58 (quotations omitted).

explanation of how, exactly, this case is "likely to have … any appreciable effect on foreign affairs." *Gingery v. City of Glendale*, 831 F.3d 1222, 1230–31 (9th Cir. 2016). Meta does not argue that (let alone explain how) this case would "in any way affect[] relations between the United States and [Burma]." *Id.* at 1231. Nor has Meta argued "that the federal government has expressed any view on the [litigation]—much less complained of interference with its diplomatic agenda." *Id. Cf. Mujica v. Occidental Petrol. Corp.*, 381 F. Supp. 2d 1164, 1169 (C.D. Cal. 2005) (U.S. State Department filed a Statement of Interest indicating that it opposed litigation as severely impacting diplomatic relationship with Columbia). Meta simply "ha[s] not pointed to a specific policy with which the [c]ourt's adjudication of the instant case would conflict." *Ning Xianhua*, 536 F. Supp. 3d at 557. The only thing Meta cites is a State Department press conference announcing the designation of certain Burmese military officials as ineligible for entry into the United States, in which an unnamed state department official expresses a hope that Burma would hold those individuals accountable in the Burmese legal system. Mot. at 25. That hardly expresses some U.S. policy that would be impacted by this Court's consideration of Plaintiff's tort claims against Meta. "Accordingly, Defendant[] ha[s] not shown that the application of [California tort law] would produce more than an incidental or indirect effect on foreign affairs." *Ning Xianhua*, 536 F. Supp. 3d at 557.

## CONCLUSION

For the foregoing reasons, Meta's motion to dismiss should be denied. Alternatively, to the extent the Court finds Plaintiffs' First Amended Complaint deficient, Plaintiffs respectfully request leave to file a Second Amended Complaint. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (reversing dismissal of First Amended Complaint with prejudice where plaintiffs "were endeavoring in good faith" and "had a reasonable chance of successfully stating a claim if given another opportunity"); *Sentius Int'l, LLC v. Apple Inc.*, 2020 WL 2850286, at *6 (N.D. Cal. June 2, 2020 ).

1                          Respectfully Submitted,

2

3                          **JANE DOE 1** and **JANE DOE 2**, individually and
on behalf of all others similarly situated,

4  Dated: June 12, 2023

5                          By: /s/ Roger Perlstadt
                          One of Plaintiffs' Attorneys

6

7                          Rafey S. Balabanian (SBN 315962)
                          rbalabanian@edelson.com
8                          Yaman Salahi (SBN 288752)
                          ysalahi@edelson.com
9                          EDELSON PC
                          150 California Street, 18th Floor
10                       San Francisco, California 94111
                          Tel: 415.212.9300
11                       Fax: 415.373.9435

12                       Jay Edelson (*pro hac vice*)
                          jedelson@edelson.com
13                       Roger Perlstadt (*pro hac vice*)
                          rperlstadt@edelson.com
14                       J. Eli Wade-Scott (*pro hac vice*)
                          ewadescott@edelson.com
15                       Michael Ovca (*pro hac vice*)
                          movca@edelson.com
16                       EDELSON PC
                          350 North LaSalle Street, 14th Floor
17                       Chicago, Illinois 60654
                          Tel: 312.589.6370
18                       Fax: 312.589.6378

19

20                       Richard Fields (*pro hac vice* forthcoming)
                          fields@fhcfirm.com
21                       Edward Han (*pro hac vice*)
                          edhan@fhcfirm.com
22                       Martin Cunniff (*pro hac vice*)
                          martincunniff@fhcfirm.com
23                       FIELDS HAN CUNNIFF PLLC
                          1701 Pennsylvania Avenue, NW, Suite 200
24                       Washington, DC 20006
                          Tel: 833.382.9816
25

26

27                       *Counsel for Plaintiffs and the Proposed Class*

28