KRISTIN A. LINSLEY, SBN 154148
  klinsley@gibsondunn.com
ROSEMARIE T. RING, SBN 220769
  rring@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
Telephone: 415.393.8200

JACOB T. SPENCER, *pro hac vice*
  jspencer@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: 202.955.8500

PERLETTE MICHÈLE JURA, SBN 242332
  pjura@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone: 213.229.7000

*Attorneys for Defendant*
*Meta Platforms, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JANE DOE 1 and JANE DOE 2, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | CASE NO. 4:22-CV-00051-YGR<br><br>**REPLY BRIEF OF DEFENDANT META PLATFORMS, INC. IN SUPPORT OF ITS MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>**Hearing:**<br>Date:  September 19, 2023<br>Time:  2:00 p.m.<br>Courtroom:  1, 4th Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |

# <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................................ 1

II.     ARGUMENT ...................................................................................................................... 2

      A.      Plaintiffs' Claims Are Barred by the Statute of Limitations........................................ 2

      B.      The Amended Complaint Fails to Plead the Required Elements of the Claims ........... 5

            1.      Plaintiffs Have Not Plausibly Alleged Causation (All Counts)........................ 5

            2.      Plaintiffs' Products Liability Claims (Counts I and II) Fail............................. 9

            3.      Plaintiffs' Negligence Claims (Counts II and III) Fail.................................... 13

            4.      Plaintiffs' Aiding-and-Abetting Claims (Counts IV and V) Fail.................... 17

      C.      Alternatively, Plaintiffs' Claims Are Barred by Section 230 (All Counts) ............... 19

            1.      Plaintiffs' "Creative Pleading" Cannot Evade Section 230 Immunity .......... 19

            2.      Burmese Law Cannot Displace Section 230 .................................................... 23

      D.      Plaintiffs' Claims Are Barred by the Foreign Affairs Doctrine (All Counts)............ 25

III.    CONCLUSION .................................................................................................................. 25

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aas v. Superior Court*,
  24 Cal. 4th 627 (2000) ...................................................................................................13

*Estate of Alex v. T-Mobile US, Inc.*,
  313 F. Supp. 3d 723 (N.D. Tex. 2018)............................................................................11

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2005)........................................................................................................25

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
  225 Cal. App. 4th 1451 (2014) .......................................................................................18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................................7, 19

*Estate of B.H. v. Netflix, Inc.*,
  2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ..............................................................10, 16

*Barnes v. Yahoo!, Inc.*
  570 F.3d 1096 (9th Cir. 2009)........................................................................................20

*Bassidji v. Goe*,
  413 F.3d 928 (9th Cir. 2005)......................................................................................23, 24

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003)........................................................................................22

*Beasley v. Conagra Brands, Inc.*,
  374 F. Supp. 3d 869 (N.D. Cal. 2019) .............................................................................3

*Bennett v. Hibernia Bank*,
  47 Cal. 2d 540 (1957) .......................................................................................................3

*Bill v. Superior Court*,
  137 Cal. App. 3d 1002 (1982)........................................................................................16

*Bride v. Snap, Inc.*,
  2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ................................................................20

*Brown v. USA Taekwondo*,
  11 Cal. 5th 204 (2021) ...............................................................................................14, 15

*Carafano v. Metrosplash.com, Inc.*,
  339 F.3d 1119 (9th Cir. 2003)....................................................................................20, 23

*Casey v. U.S. Bank Nat. Ass'n*,
  127 Cal. App. 4th 1138 (2005) .......................................................................................18

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013)...........................................................................................7

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Chanda v. Fed. Home Loans Corp.*,
   215 Cal. App. 4th 746 (2013) ..................................................................................8

*Clark v. Baxter Healthcare Corp.*,
   83 Cal. App. 4th 1048 (2000) ..................................................................................3

*Counterman v. Colorado*,
   2023 WL 4187751 (U.S. June 27, 2023) ................................................................17

*Crosby v. Twitter, Inc.*,
   921 F.3d 617 (6th Cir. 2019)....................................................................................9

*Doe No. 1 v. Uber Techs., Inc.*,
   79 Cal. App. 5th 410 (2022) ........................................................................9, 14, 15

*Doe v. McKesson*,
   339 So. 3d 524 (La. 2022).........................................................................................8

*Doe v. Mindgeek USA Inc.*,
   2021 WL 5990195 (C.D. Cal. Dec. 2, 2021) ..........................................................22

*Doe v. Roman Catholic Bishop of Sacramento*,
   189 Cal. App. 4th 1423 (2010) .................................................................................5

*Doe v. Twitter, Inc.*,
   555 F. Supp. 3d 889 (N.D. Cal. 2021) ..............................................................20, 21

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019)...........................................................................20, 21

*E-Fab, Inc. v. Accounts, Inc. Servs.*,
   153 Cal. App. 4th 1308 (2007) .................................................................................4

*Eidson v. Medtronic, Inc.*,
   981 F. Supp. 2d 868 (N.D. Cal. 2013) ......................................................................4

*Elmore v. Am. Motor Corp.*,
   70 Cal. 2d 578 (1969) ........................................................................................12, 13

*Evans v. ZB, N.A.*,
   2019 WL6918278 (E.D. Cal. Dec. 19, 2019) ...........................................................4

*In re Facebook, Inc.*,
   625 S.W.3d 80 (Tex. 2021)......................................................................................10

*Fair Hous. Council v. Roommates.com, LLC*,
   521 F.3d 1157 (9th Cir. 2008)......................................................................21, 22, 23

*Fasugbe v. Willms*,
   2011 WL 2119128 (E.D. Cal. May 25, 2011) ..........................................................6

Gibson, Dunn &
Crutcher LLP

REPLY BRIEF OF DEFENDANT META PLATFORMS, INC. IN SUPPORT OF MOTION TO DISMISS FAC
CASE NO. 4:22-CV-00051-YGR

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018)...............................................................................................9

*In re First All. Mortg. Co.*,
   471 F.3d 977 (9th Cir. 2006)........................................................................................18, 19

*Force v. Facebook, Inc.*,
   304 F. Supp. 3d 315 (E.D.N.Y. 2018) .............................................................................23

*Fortman v. Förvaltningsbolaget Insulan AB*,
   212 Cal. App. 4th 830 (2013) ......................................................................................12, 13

*Fox v. Ethicon Endo-Surgery, Inc.*,
   35 Cal. 4th 797 (2005) ...............................................................................1, 2, 3, 4, 5

*George v. Curwood, Inc.*,
   2011 WL 13112073 (W.D. Okla. Feb. 25, 2011) ............................................................11

*George v. eBay, Inc.*,
   71 Cal. App. 5th 620 (2021) .............................................................................................18

*Gingery v. City of Glendale*,
   831 F.3d 1222 (9th Cir. 2016)...........................................................................................25

*Goddard v. Google, Inc.*,
   640 F. Supp. 2d 1193 (N.D. Cal. 2009) ............................................................................21

*Golden Gate Land Holdings LLC v. Direct Action Everywhere*,
   81 Cal. App. 5th 82 (2022) ...............................................................................................19

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) ...............................................................................................24

*Hardin v. PDX, Inc.*,
   227 Cal. App. 4th 159 (2014) ...........................................................................................10

*Hill v. Novartis Pharm. Corp.*,
   2012 WL 967577 (E.D. Cal. Mar. 21, 2012) ...................................................................25

*Huon v. Denton*,
   841 F.3d 733 (7th Cir. 2016)............................................................................................22

*Jackson v. Airbnb, Inc.*,
   2022 WL 16752071 (C.D. Cal. Nov. 4, 2022) ......................................................9, 10, 15

*Jackson v. Airbnb, Inc.*,
   2022 WL 16753197 (C.D. Cal. Nov. 4, 2022) ..................................................................20

*Jacobs v. Meta Platforms, Inc.*,
   2023 WL 2655586 (Cal. Super. Mar. 10, 2023) ...............................................1, 9, 10, 11

Gibson, Dunn &
Crutcher LLP

iv

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Jaeger v. Howmedica Osteonics Corp.,*
2016 WL 520985 (N.D. Cal. Feb. 10, 2016) ...................................................................3

*Jimenez v. Superior Court,*
29 Cal. 4th 473 (2002) ...................................................................13

*Jolly v. Eli Lilly & Co.,*
44 Cal. 3d 1103 (1988) ...................................................................2, 3

*Jones v. Dirty World Ent. Recordings LLC,*
755 F.3d 398 (6th Cir. 2014) ...................................................................22

*Kashani v. Tsann Kuen China Enter. Co.,*
118 Cal. App. 4th 531 (2004) ...................................................................23

*Kimzey v. Yelp! Inc.,*
836 F.3d 1263 (9th Cir. 2016) ...................................................................22

*L.W. v. Snap, Inc.,*
2023 WL 3830365 (S.D. Cal. June 5, 2023) ...................................................................20

*Lansdown v. Bayview Loan Servicing, LLC,*
2023 WL 2934932 (N.D. Cal. Apr. 12, 2023) ...................................................................2, 6, 15

*Lemmon v. Snap, Inc.,*
995 F.3d 1085 (9th Cir. 2021) ...................................................................10, 21

*Lemmon v. Snap, Inc.,*
2022 WL 1407936 (C.D. Cal. Mar. 31, 2022) ...................................................................8

*Long v. Walt Disney Co.,*
116 Cal. App. 4th 868 (2004) ...................................................................4

*Maynard v. Snapchat, Inc.,*
870 S.E.2d 739 (Ga. 2022) ...................................................................8, 10

*McCollum v. CBS, Inc.,*
202 Cal. App. 3d 989 (1988) ...................................................................16

*McKenna v. WhisperText,*
2015 WL 5264750 (N.D. Cal. Sept. 9, 2015) ...................................................................5

*Melton v. Boustred,*
183 Cal. App. 4th 521 (2010) ...................................................................16

*Michael R. v. Jeffrey B.,*
158 Cal. App. 3d 1059 (1984) ...................................................................8, 14, 19

*Milwaukee Electric Tool Corp. v. Superior Court,*
15 Cal. App. 4th 547 (1993) ...................................................................12

REPLY BRIEF OF DEFENDANT META PLATFORMS, INC. IN SUPPORT OF MOTION TO DISMISS FAC
CASE NO. 4:22-CV-00051-YGR

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Modisette v. Apple Inc.*,
30 Cal. App. 5th 136 (2018) ................................................................................6, 7, 8

*In re Mortg. Elec. Registration Sys., Inc.*,
754 F.3d 772 (9th Cir. 2014) ...........................................................................................19

*Movsesian v. Victoria Versicherung AG*,
670 F.3d 1067 (9th Cir. 2012) ........................................................................................25

*Nelson v. Indevus Pharmaceuticals, Inc.*,
142 Cal. App. 4th 1202 (2006) ....................................................................................3, 4

*Norgart v. Upjohn Co.*,
21 Cal. 4th 383 (1999) ......................................................................................................2

*Opperman v. Path, Inc.*,
84 F. Supp. 3d 962 (N.D. Cal. 2015) .............................................................................18

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*,
971 F.3d 1042 (9th Cir. 2020) ..........................................................................................2

*Pierson v. Sharp Mem'l Hosp., Inc.*,
216 Cal. App. 3d 340 (1989) .....................................................................................9, 11

*Plumlee v. Pfizer, Inc.*,
2014 WL 4275519 (N.D. Cal. Aug. 29, 2014) ................................................................4

*Quinteros v. InnoGames*,
2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ......................................................10, 20

*Richard B. LeVine Inc. v. Higashi*,
131 Cal. App. 4th 566 (2005) .........................................................................................19

*Doe ex rel Roe v. Snap, Inc.*,
2022 WL 2528615 (S.D. Tex. July 7, 2022) ..................................................................20

*Rowland v. Christian*,
69 Cal. 2d 108 (1968) .....................................................................................................15

*Rustico v. Intuitive Surgical, Inc.*,
993 F.3d 1085 (9th Cir. 2021) ........................................................................................25

*Rutherford v. Owens-Illinois, Inc.*,
16 Cal. 4th 953 (1997) ......................................................................................................6

*S. Cal. Gas Leak Cases*,
7 Cal. 5th 403 (2019) ......................................................................................................13

*S. Cent. Bell Tel. Co. v. Barthelemy*,
643 So. 2d 1240 (1994) ...................................................................................................10

Gibson, Dunn &
Crutcher LLP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*S&S Worldwide, Inc. v. Wells Fargo Bank*,
    509 F. Supp. 3d 1154 (N.D. Cal. 2020) .................................................................19

*Schafer v. State Farm Fire & Casualty Co.*,
    507 F. Supp. 2d 587 (E.D. La. 2007) ...................................................................10

*Simpson v. Robert Bosch Tool Corp.*,
    2014 WL 985067 (N.D. Cal. Mar. 7, 2014) .............................................................4

*Sommer v. Gabor*,
    40 Cal. App. 4th 1455 (1995) ..............................................................................24

*State Dep't of State Hosps. v. Super. Ct.*,
    61 Cal. 4th 339 (2015) .......................................................................................6, 9

*Steinle v. United States*,
    17 F.4th 819 (9th Cir. 2021) ..................................................................................9

*Thing v. La Chusa*,
    48 Cal. 3d 644 (1989) .........................................................................................12

*Twitter, Inc. v. Taamneh*,
    143 S. Ct. 1206 (2023) ...................................................................1, 14, 17, 18

*United States v. Schiff*,
    379 F.3d 621 (9th Cir. 2004) ...............................................................................16

*Viner v. Sweet*,
    30 Cal. 4th 1232 (2003) ........................................................................................6

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010) ...............................................................................25

*Warth v. Seldin*,
    422 U.S. 490 (1975) ............................................................................................19

*Wash. Mut. Bank v. Superior Court*,
    24 Cal. 4th 906 (2001) ........................................................................................24

*Weirum v. RKO Gen., Inc.*,
    15 Cal. 3d 40 (1975) .........................................................................................8, 15

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) ............................................................................9, 11

*Young v. Facebook, Inc.*,
    2010 WL 4269304 (N.D. Cal. Oct. 25, 2010) .......................................................17

*Ziencik v. Snap, Inc.*,
    2023 WL 2638314 (C.D. Cal. Feb. 3, 2023) ...........................................................9

Gibson, Dunn &
Crutcher LLP

REPLY BRIEF OF DEFENDANT META PLATFORMS, INC. IN SUPPORT OF MOTION TO DISMISS FAC
CASE NO. 4:22-CV-00051-YGR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Statutes**

47 U.S.C. § 230 ..................................................................................................................2

47 U.S.C. § 230(c) ...........................................................................................................23

47 U.S.C. § 230(f)(3) .......................................................................................................21

**Rule**

Fed. R. Civ. P. 9(b) ..........................................................................................................19

**Treatises**

Restatement (Third) Conflict of Laws § 1.02 .................................................................23

Restatement (Third) of Torts: Prod. Liab. § 19(a) ..........................................................11

**Other Authorities**

Cal. Civil Jury Instruction 400 ..........................................................................................6

Cal. Civil Jury Instruction 430 ..........................................................................................6

Cal. Civil Jury Instruction 1204 ........................................................................................6

Cal. Civil Jury Instruction 1220 ........................................................................................6

Cal. Civil Jury Instruction 3610 ........................................................................................6

Roger P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of
    Transnational Tort Litigation*, 63 Emory L.J. 1089 (2014)..........................................24

Gibson, Dunn &
Crutcher LLP

## I.    INTRODUCTION

The Myanmar military committed horrific atrocities against the Rohingya ethnic minority in Burma for decades and continues to oppress them today.  Meta stands with the international community in condemning those actions.  Meta has taken action against anti-Rohingya content on Facebook, investing heavily in people, partnerships, and technology in Burma.  But neither the Amended Complaint ("FAC") nor the opposition addresses the multiple deficiencies in Plaintiffs' claims that this Court identified.  The claims should be dismissed with prejudice.

*First*, the opposition confirms that the claims are untimely.  The applicable two-year statute of limitations bars the claims because Plaintiffs admit that the attacks on their villages occurred in 2012 (Jane Doe 1) and 2017 (Jane Doe 2).  The opposition invokes the discovery rule, but conflates the discovery of *injury* with the discovery of the alleged *cause*.  At the time of the attacks, Plaintiffs had "reason to suspect an injury and some wrongful cause."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005).  That is sufficient for the statute to begin running, yet the opposition provides no defense of the FAC's failure to allege any diligent investigation into the source of Plaintiffs' injuries.

*Second*, the opposition also confirms that the FAC fails to allege multiple elements with respect to each of Plaintiffs' claims.  Causation remains a critical defect.  The opposition applies the wrong causation standard, still fails to account for the decades of violence by the Myanmar military against the Rohingya long before Facebook became available in Burma, and distorts the FAC's allegations in an attempt to show proximate causation.  As to products liability, the opposition has no answer to the long line of cases holding that apps and websites that facilitate communications between users, including Facebook, are "service[s] for the purposes of the products liability analysis."  *E.g.*, *Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at *4 (Cal. Super. Mar. 10, 2023).  As to negligence, the opposition still does not identify a case holding that an online communications service has a legal duty to prevent offline violence.  The Supreme Court recently confirmed that "our legal system generally does not impose liability for mere omissions, inactions, or nonfeasance" absent "some independent duty to act."  *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1220–21 (2023).  And as to the aiding-and-abetting claims, the opposition fails to acknowledge the need to allege the elements of the underlying torts—as well as facts showing that Meta knowingly and substantially assisted the commission of such

still-undefined torts.

*Third*, Section 230 of the Communications Decency Act, 47 U.S.C. § 230, separately precludes Plaintiffs' claims.  Plaintiffs' efforts to evade Section 230 by labeling Meta a matchmaker, distributor, product manufacturer, and content creator conflict with settled law.  Labels aside, Plaintiffs' claims would impose liability on Meta for third-party posts on Facebook, so they are barred by Section 230.

This Court granted leave to amend before, but the FAC did not cure the prior defects.  The opposition does not even try to show that the Court was wrong before, or to show what the FAC includes that was lacking in the original complaint.  The Court should dismiss the action with prejudice.

## II.    ARGUMENT

### A.    <u>Plaintiffs' Claims Are Barred by the Statute of Limitations</u>

The FAC alleges that Plaintiffs fled Burma after witnessing violence committed by members of the Myanmar military against Plaintiffs' family members and others in 2012 and 2017.  FAC ¶¶ 46, 61.  Because these events gave Plaintiffs "reason to suspect an injury and some wrongful cause," the applicable two-year limitations period expired in 2014 for Jane Doe 1's claims and in 2019 for Jane Doe 2's.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 803 (2005); *see* Mot. 3.  Even after this Court identified limitations problems with the original complaint, the FAC did not fix those problems, and the opposition continues to misapprehend California's discovery rule.[1]

That rule does not extend the limitations period here.  It provides that "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988).  At that point, a plaintiff has "notice or information of circumstances to put a reasonable person on inquiry."  *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 398 (1999).  A plaintiff who suspects that an injury was wrongfully caused "ha[s] a duty to conduct a reasonable investigation" of all potential causes.  *Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, 971 F.3d 1042, 1048 (9th Cir. 2020).  To invoke the discovery rule, a plaintiff must plausibly plead (1) the time and manner of discovery of the facts giving rise to the cause of action and (2) that "despite

---

[1] The opposition does not argue that the continuing harm doctrine applies to Plaintiffs' claims, and fails to address Meta's argument that the statute of limitations bars their aiding-and-abetting claims.  *See* Mot. at 6 n.1.  As a result, those arguments are waived.  *Lansdown v. Bayview Loan Servicing, LLC*, 2023 WL 2934932, at *4 (N.D. Cal. Apr. 12, 2023).

diligent investigation" she "could not have reasonably discovered facts supporting the cause of action" within the limitations period.  *Fox*, 35 Cal. 4th at 808–09.

Plaintiffs cannot avoid this pleading requirement by conflating the time of *discovery of injury* (and thus inquiry notice) with the time of *discovery of a cause of action*.  Opp. 5–6.  The opposition contends that "diligence is not required in the abstract."  *Id.* at 5.  But the Court previously made clear that the relevant injury occurred when Plaintiffs' villages were attacked.  Tr. at 17:12–16 ("The injury occurred in 2012" for Jane Doe 1).  And the opposition concedes that Plaintiffs suspected wrongdoing by the Myanmar military when the attacks occurred.  Opp. 5.  This means that the opposition's reliance on *Nelson v. Indevus Pharmaceuticals, Inc.*, 142 Cal. App. 4th 1202 (2006), is misplaced.  In *Nelson*, the plaintiff lacked notice that she had suffered *any* injury in the relevant sense—*i.e.*, that her harm was the result of *anyone's* wrongdoing.  *See id.* at 1211 ("common and non-specific" symptoms that "pre-dated" use of prescription drug were insufficient to suggest a wrongful injury); *accord Clark v. Baxter Healthcare Corp.*, 83 Cal. App. 4th 1048, 1057–60 (2000).  By contrast, Plaintiffs were certainly aware in 2012 and 2017 when their villages were attacked that "*someone* ha[d] done something wrong to [them]," *Jolly*, 44 Cal. at 1110—those attacks by the Myanmar military were why they fled Burma.

Plaintiffs' allegations that they discovered their cause of action "through [their] attorneys" are insufficient to plead the "time and manner" of discovery.  FAC ¶¶ 100–01.  They do not allege, for example, whether or why they contacted their attorneys, when these conversations occurred, or what new information they learned—and are thus too conclusory to withstand a motion to dismiss.  *See Beasley v. Conagra Brands, Inc.*, 374 F. Supp. 3d 869, 883 (N.D. Cal. 2019) (allegations of time, but not manner, of discovery are insufficient); *Jaeger v. Howmedica Osteonics Corp.*, 2016 WL 520985, at *14 (N.D. Cal. Feb. 10, 2016) (plaintiff must plead date of discovery).  The "purpose of this [pleading] requirement is to afford the court a means of determining whether or not the discovery of the asserted invasion was made within the time alleged, that is, whether plaintiffs actually learned something they did not know before." *Bennett v. Hibernia Bank*, 47 Cal. 2d 540, 563 (1957).  Plaintiffs have not pled any allegations to assist the Court in that determination.

Plaintiffs similarly have not plausibly alleged diligence.  They argue that it is "routine for a plaintiff not to discover the source of an injury until notified by counsel," Opp. 5, but that does *not*

relieve a plaintiff of the duty to conduct a diligent investigation. In *Nelson*, the plaintiff "investigate[d] the cause of her symptoms" by "ask[ing] her doctors about" them *before* she saw an attorney advertisement and contacted her attorney. 142 Cal. App. 4th at 1204, 1211. The FAC does not allege *any* investigation by Plaintiffs—meaning they allege no facts to support the "essential allegation" that they "took any step whatsoever" to investigate their injuries. *Plumlee v. Pfizer, Inc.*, 2014 WL 4275519, at *9 (N.D. Cal. Aug. 29, 2014). Given that failure, Plaintiffs cannot make the requisite showing that, *despite* exercising diligence, they could not have discovered their claims earlier. *Fox*, 35 Cal. App. at 811. In *Fox*, for example, the plaintiff's mere allegation that reasonable diligence would not have revealed or created a suspicion that the defendant's product caused her injury was "insufficient to withstand demurrer." *Id.* To be sure, if "a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual" on the newly discovered claim. *Id.* at 813. But Plaintiffs' failure to allege *any* kind of diligence precludes as a matter of law Plaintiffs' theory that they could not have discovered their claims. *See Simpson v. Robert Bosch Tool Corp.*, 2014 WL 985067, at *4 (N.D. Cal. Mar. 7, 2014).

None of the cases Plaintiffs cite holds otherwise. In *E-Fab, Inc. v. Accounts, Inc. Services*, the court held that plaintiff had alleged diligence "[g]iven the specificity of … [its] allegations," which included notifying law enforcement and requesting a formal police investigation after discovery of the injury. 153 Cal. App. 4th 1308, 1314, 1324–25 (2007). And in *Evans v. ZB, N.A.*, the plaintiffs assisted in criminal proceedings against one wrongdoer before discovering the accomplice's fraud. 2019 WL 6918278, at *3 (E.D. Cal. Dec. 19, 2019).[2]

"[W]idespread media attention" published in multiple languages *after* Plaintiffs' injuries undermines the opposition's contention that such "information was unavailable to a reasonably diligent" person. *Eidson v. Medtronic, Inc.*, 981 F. Supp. 2d 868, 894 n.7 (N.D. Cal. 2013); *Plumlee*

---

[2] Plaintiffs' conclusory allegation that "Meta attempted to cover up its role until whistleblowers came forward in 2021" contradicts their other allegations. FAC ¶ 102; Opp. 5. The FAC admits that, as early as 2018, Meta conducted a publicly available and independent human rights assessment of its role in Burma. FAC ¶¶ 27, 88. In any event, absent a fiduciary relationship, nondisclosure of facts is not fraudulent concealment, and Plaintiffs do not allege any facts that would establish any fraud or misrepresentation. *Long v. Walt Disney Co.*, 116 Cal. App. 4th 868, 874–75 (2004).

*v. Pfizer, Inc.*, 2014 WL 4275519, at *8 (N.D. Cal. Aug. 29, 2019).  Plaintiffs allege that both "[b]efore and during the[] attacks" on their villages, "civil society groups" warned Meta that "Facebook's algorithms were encouraging users to post dangerous incitements to violence."  Opp. 3–4 (citing FAC ¶¶ 3, 29–30, 36–38, 43, 85–86, 89–92).  And documents incorporated into the FAC confirm that, as early as 2018, public materials (including a UN report published in both English *and* Burmese) specifically raised questions about Facebook's role in Burma.  *E.g.* FAC ¶ 84 (2018 U.S. Senate Testimony); *id.* ¶ 90 (2018 PBS Frontline report); *id.* ¶ 92 (2018 U.N. report).

Plaintiffs were not "under a duty to discover, merely to investigate diligently."  *Doe v. Roman Catholic Bishop of Sacramento*, 189 Cal. App. 4th 1423, 1432–33 (2010).  And they were required to plead the reasonable steps they took to "obtain knowledge from sources open to [them]."  *Fox*, 35 Cal. 4th at 808–09.  Because the FAC does not do so, their claims are time-barred.

## B.      The Amended Complaint Fails to Plead the Required Elements of the Claims

### 1.      Plaintiffs Have Not Plausibly Alleged Causation (All Counts)

All of Plaintiffs' claims fail because the FAC does not plausibly allege that Meta's conduct was the but-for or proximate cause of their injuries.  Mot. 6–10.  The opposition does not address the fatal impact of Plaintiffs' admissions—both in the prior complaint and in the FAC—that the Myanmar military had been engaged in a longstanding and concerted campaign of violence against the Rohingya for decades *before* Facebook was introduced in Burma.  *See* FAC ¶¶ 13–15 (alleging that, in the decades following 1948, Rohingya faced "abuse," "violence and persecution"); *id.* ¶ 1 (Rohingya "have long been the victims of discrimination and persecution" by "the Burmese government"); *see also* Dkt. 1-2 (original complaint) ¶ 92 (alleging, based on a UN Report, that "[s]ince late 1989" the Rohingya in Burma had been subjected to persecution "involving extrajudicial executions, torture, arbitrary detention, forced disappearances, intimidation, gang-rape, forced labour, robbery, setting of fire to homes, eviction, land confiscation and population resettlement"); *id.* ¶ 91 (alleging that since 1962, the Myanmar military "has consistently used an imagined threat from the Rohingya to justify its hold on power").[3]  Any allegation that social media somehow "caused" violence that had already been

---

[3] On a motion to dismiss, the Court may consider allegations in a prior complaint when "assess[ing] whether an amended complaint plausibly suggests an entitlement to relief."  *McKenna v. WhisperText*,

Gibson, Dunn &
Crutcher LLP

occurring without social media's involvement makes little sense.  This alone means Facebook cannot have caused that same campaign of violence.  As this Court noted, the decades-long campaign of violence defeats any "plausible inference that [Meta's] business activity was used to perpetrate that violence by a military regime that was already engaged in deplorable violence." Dkt. 61 at 14:24–15:3.

None of Plaintiffs' arguments changes that conclusion.  *First*, to avoid the but-for causation requirement, Plaintiffs argue that the "substantial factor test" should govern.  Opp. 8–9 (citing *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953 (1997)).  This is incorrect.  In 2015, the California Supreme Court clarified that the "substantial factor" test applies only "where *concurrent independent causes* contribute to an injury." *State Dep't of State Hosps. v. Super. Ct.*, 61 Cal. 4th 339, 352 n.12 (2015) (emphasis added).  "Concurrent independent causes" exist when there are "multiple forces operating at the same time and independently, each of which would have been sufficient by itself to bring about the harm." *Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003).  Where a case does not involve concurrent independent causes, "the 'but for' test governs questions of factual causation." *Id.*; *see also Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 153 n.14 (2018) (rejecting "substantial factor" test where facts did not present concurrent independent causes).[4]  Because Plaintiffs do not and cannot allege that Meta's conduct would have independently caused their injuries, the concurrent independent cause rule does not apply, and Plaintiffs must allege facts giving rise to a plausible inference that Meta was a but-for cause of their injuries.  Their claims should be dismissed because they have not done so.

In fact, the opposition does not dispute that Plaintiffs' allegations fail to establish Meta's conduct as a but-for cause of their injuries.  The "failure to respond … to an argument constitutes waiver or abandonment, and thus concedes the argument." *Lansdown*, 2023 WL 2934932, at *4.

*Second*, even if the substantial factor test applied, the FAC offers no new factual allegations

---

2015 WL 5264750, at *3 (N.D. Cal. Sept. 9, 2015); *accord Fasugbe v. Willms*, 2011 WL 2119128, at *5 (E.D. Cal. May 25, 2011) (explaining that "the court need not ignore the prior allegations in determining the plausibility of the current pleadings" and collecting cases (emphasis omitted)).

[4] Plaintiffs cite jury instructions to argue that "'substantial factor' [is] the causation standard." *See* Opp. 8 n.3 (citing CACI Nos. 1204, 1220, 400, 3610).  But the instruction describing the "substantial factor" test explains that (aside from a case involving multiple concurrent causes), "substantial factor" causation *requires* a showing of but-for causation.  *See* CACI 430 ("Causation:  Substantial Factor") ("Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.").

that address the shortcomings this Court identified.  The original complaint, this Court held, did not allege facts giving rise to a "plausible inference" that Meta's "business activity" caused "violence by a military regime," when "the ethnic violence had been occurring for decades."  Dkt. 61 at 14:22–15:3. The FAC does not cure this defect.  As Plaintiffs now describe their theory, Facebook's "mechanisms led to the creation of posts calling for violence against Jane Doe 1 and 2's villages," and some (unspecified) "people saw those posts and acted on them by attacking Plaintiffs' villages."  Opp. 9. The FAC is long on conclusory statements and causation labels but short on new factual allegations. Plaintiffs still have not alleged that the content purportedly posted on Facebook predated the attack on Jane Doe 1's village in 2012, nor do they offer any arguments to refute the equally (if not more) plausible inference that the users at issue had *already* decided to attack the Rohingya *before* posting on Facebook, or that *other* individuals (who had not posted or viewed the posts on Facebook) were the attackers.  *See* Mot. 7; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("When faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation.") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Most crucially, the FAC does not plead that the Facebook posts it cites had *actually* been promoted or prioritized by Facebook's features—a necessary link to establish the existence of a causal chain back to Meta's alleged conduct in developing Facebook.  Mot. 7–8.

*Third*, Plaintiffs also fail to allege proximate causation.  The opposition offers nothing to tighten the impermissibly attenuated assumptions by which Plaintiffs try to connect Meta's alleged conduct to their injuries—a connection that is "too remote[] … to constitute their legal cause."  *Modisette*, 30 Cal. App. 5th at 154.  And the facts alleged here compared with those alleged in *Modisette* confirm that conclusion.  The "gap" in *Modisette* between Apple's conduct (designing an iPhone that could be used while driving) and the plaintiffs' injuries (caused by a driver using FaceTime while driving) was minuscule compared to the chasm in the FAC here between developing algorithms and engagement features for a social media service and genocide or ethnic violence—a chasm that, even more so than in *Modisette*, is far "too great for the tort system to hold [Meta] responsible."  *Id.* at 155.  That is especially true because, in *Modisette*, the driver's conduct was foreseeable, whereas the harms alleged

1    here are "of a kind and degree so far beyond the risk" anyone "should have foreseen." Mot. at 8–10

2    (citing *Chanda v. Fed. Home Loans Corp.*, 215 Cal. App. 4th 746, 755–56 (2013)).

3           To shore up Plaintiffs' case for proximate causation, the opposition repeatedly misstates what

4    the FAC actually says. It asserts that there is a close causal connection because Meta supposedly

5    "encouraged or incited the superseding actors to act." Opp. 10. That is simply not true. Nowhere does

6    the FAC allege that Meta "encouraged" or "incited" violence against the Rohingya. Nor could

7    Plaintiffs make that allegation, as there are no facts whatsoever to support it. The only causation theory

8    in the FAC alleges that Meta created features and algorithms that promoted engaging content, FAC

9    ¶¶ 32–35; that the most engaging content may sometimes be "hateful, outraged, and divisive," *id.* ¶¶ 36,

10   39; and that some individuals may become emboldened to act based on speech they see online, *id.*

11   ¶¶ 53–59, 68–83. Under that causation theory, the harms alleged here are far too remotely attenuated

12   from any action by Meta to satisfy proximate causation, and well beyond the risk that Meta should

13   have foreseen in developing features for Facebook.

14          The FAC's causation theory is different from cases involving liability for harms inflicted by

15   third parties. *See* Opp. 10–11. In those cases, the defendant allegedly encouraged the dangerous

16   activity itself—whether it be racing in the streets, shooting a slingshot, speeding, or violently

17   confronting police officers. *See Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 47 (1975); *Michael R. v.*

18   *Jeffrey B.*, 158 Cal. App. 3d 1059, 1067–68 (1984); *Maynard v. Snapchat, Inc.*, 870 S.E.2d 739, 744

19   (Ga. 2022); *Doe v. McKesson*, 339 So. 3d 524 (La. 2022); *see also Lemmon v. Snap, Inc.*, 2022 WL

20   1407936, at *10 (C.D. Cal. Mar. 31, 2022) (key factor in finding causation was that Snap's "design of

21   the Speed Filter itself encouraged speeding"). Here, by contrast, there is no allegation that Meta

22   encouraged *any* dangerous conduct—or even that its features generally promoted violent content over

23   *other types* of engaging content. *See*, *e.g.*, FAC ¶¶ 113, 119. Plaintiffs' allegations are more analogous

24   to *Modisette*, where Apple's conduct could not be deemed the proximate cause of a car accident simply

25   because the driver found his iPhone distracting, as driver distraction is not the object of Apple's conduct

26   in designing and manufacturing a smartphone. 30 Cal. App. 5th at 154.

27          Indeed, the most analogous cases involving violence allegedly related to third-party content on

28   social media have consistently held that social media services are *not* the legal causes of such violence.

Meta cited *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), and *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), not as authorities on California law of causation, but rather to show how courts have rejected the notion that a social media company is a "proximate cause" of off-line third-party violence.  And although *Fields* and *Crosby* applied the federal Anti-Terrorism Act, that proximate cause standard mirrors many of the same factors as California law, including "substantiality, directness, and foreseeability."  *Crosby*, 921 F.3d at 624.  That Plaintiffs cannot identify a *single* analogous case to support their theory underscores its unprecedented nature.

*Finally*, Plaintiffs are simply wrong that causation issues "should typically be resolved by a jury."  Opp. 9.  It is well established that where, as here, "the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact."  *Steinle v. United States*, 17 F.4th 819, 822 (9th Cir. 2021) (quoting *State Dep't of State Hosps.*, 61 Cal. 4th at 353) (no causation "as a matter of law" where the link between defendant's conduct and plaintiff's injury is too remote).

For all of these reasons, Plaintiffs' claims fail as a matter of law for want of causation.

## 2. Plaintiffs' Products Liability Claims (Counts I and II) Fail

### a. Facebook Is Not a "Product"

The FAC does not and cannot plead a viable products liability theory.  Meta cited multiple cases holding that an intangible communications service like Facebook is not a "product" under California law—that is, "a physical article which results from a manufacturing process and is ultimately delivered to a consumer."  *Pierson v. Sharp Mem'l Hosp., Inc.*, 216 Cal. App. 3d 340, 345 (1989); *see* Mot. 10–11.  The opposition contends that courts are "split" on this question, Opp. 12, but that is simply untrue: Every court to address the question under California law has held that products liability law does not apply to online services that facilitate communication and connections between users.  *E.g.*, *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023); *Jackson v. Airbnb, Inc.*, 2022 WL 16752071, at *9–10 (C.D. Cal. Nov. 4, 2022); *Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 427–28 (2022).  In fact, a case that Plaintiffs put in a footnote, Opp. 13 n.6, recently held that "*Facebook* is a service for the purposes of the products liability analysis."  *Jacobs*, 2023 WL 2655586, at *4 (emphasis added).  The well-established rule is thus that plaintiffs cannot bring products liability claims for injuries caused by "pure thought and expression" in a communications medium.  *Winter v.*

*G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991) (books); *see*, *e.g.*, *Quinteros v. InnoGames*, 2022 WL 898560, at *7 (W.D. Wash. Mar. 28, 2022) (video games); *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) (streaming movies).

Plaintiffs' theory that courts are "split" on whether communications "software" constitutes a "product" depends on two cases, both of which they misread.  Opp. 12.  In *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), the Ninth Circuit held that Section 230 did not bar a negligent design claim involving Snapchat (a photo-sharing app) because the plaintiff's claim did not depend on third-party content, as required for Section 230 to apply.  *Id.* at 1093.  The court did not consider, much less decide, whether the Snapchat app meets the legal definition of a product—an issue the parties did not raise.  *See Jackson*, 2022 WL 16752071, at *9 (citing *Lemmon*, 995 F.3d at 1095); *accord Jacobs*, 2023 WL 2655586, at *3 (Ninth Circuit "did not address" whether Snapchat "was 'a product' for purposes of California tort law").  Likewise, in *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159 (2014), the court did *not* hold that the defendant's software program was a defective product.  The defendant "ha[d] not argued" that the software itself was not a product, and the court of appeal declined to reach the issue in the context of an anti-SLAPP appeal.  *Id.* at 170.

In sum, Plaintiffs offer no precedent for deeming a communications service like Facebook a product under California law.  And the same is true elsewhere.  *E.g.*, *In re Facebook, Inc.*, 625 S.W.3d 80, 85 n.1 (Tex. 2021) (noting trial court's dismissal of products claim because "Facebook is not a 'product'").  Plaintiffs cite *Maynard v. Snapchat, Inc.*, but that court addressed only whether Snap owed a legal duty—not whether Snapchat was a product under Georgia law—and "t[ook] no position … on other elements of [plaintiffs'] claim[s]."  870 S.E.2d at 747–48 & n.5.  *Schafer v. State Farm Fire & Casualty Co.*, 507 F. Supp. 2d 587 (E.D. La. 2007), held that a product liability claim was *not* "adequately alleged"; although the court speculated in dicta that a computer program used for estimating losses "may be a product" under Louisiana products law, *id.* at 601, it cited only *S. Cent. Bell Tel. Co. v. Barthelemy*, 643 So. 2d 1240 (1994), which addressed "[p]hysical recordings of computer software" as forms of "personal property" under a city tax code, *id.* at 1244.

Pivoting to a more abstract theory, Plaintiffs argue that claims sometimes can proceed against intangible things "'when the context of their distribution and use is sufficiently analogous to the

1    distribution and use of tangible personal property.'"  Opp. 12–13 (quoting Restatement (Third) of

2    Torts: Prod. Liab. § 19(a)).  But the cases that Plaintiffs cite strongly suggest that such a theory would

3    apply only if the intangible thing (*e.g.*, software) was a component of an overall physical product that

4    malfunctioned.  In *George v. Curwood, Inc.*, 2011 WL 13112073 (W.D. Okla. Feb. 25, 2011), a

5    software defect caused a machine turret to rotate inadvertently, piercing the skull of the man using the

6    machine.  *Id.* at *2–3.  And in *Estate of Alex v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723 (N.D. Tex.

7    2018), the software at issue caused mobile phones to make accidental and duplicative calls to 911.  *Id.*

8    at 732.  Both cases involved a physical product—a turret machine and a phone—that malfunctioned

9    due to a software error.  *See also Winter*, 938 F.2d at 1036 & n.4 (objectively inaccurate

10   aeronavigational chart that caused a plane crash was "equivalent to a 'physical product'" like a

11   defective compass).  The underlying software defect in the physical product was "objectively

12   measurable" and manifested as real-world harm from a physical product—twin features that made the

13   products liability framework workable.  *Pierson*, 216 Cal. App. 3d at 345.  Obviously, that is nothing

14   like what Plaintiffs are trying to establish here.

15       Recognizing that Facebook could be a product only if analogous to "tangible personal

16   property," Plaintiffs note that some people install Facebook on mobile phones.  Opp. 13.  But that

17   makes no difference whatsoever:  Plaintiffs' liability theory is not some problem with the functioning

18   of a phone, but that Meta developed content and communications features that promoted the most

19   engaging content, some of which was polarizing.  Although Plaintiffs' incitement-of-violent-speech

20   theory has many legal flaws, it certainly does not assert that Facebook caused some physical device

21   such as a phone to malfunction.  *Cf. Estate of Alex*, 313 F. Supp. 3d at 732.  It is a theory about the

22   "transmission of words"—a line that courts have refused to cross given the serious First Amendment

23   concerns with imposing products liability on the "unique characteristics of ideas and expression."

24   *Winter*, 938 F.2d at 1034, 1036 n.6.

25       As a fallback, Plaintiffs cite *Jacobs* to argue that the door would remain open to a negligent

26   design claim even if (as *Jacobs* held) Facebook is not a product.  Opp. 13 n.6.  But *Jacobs* merely

27   granted leave for the plaintiffs to attempt to plead "ordinary negligence" (*i.e.*, Count III here), not a

28   deficient product-based negligence theory (*i.e.*, Count II here).  2023 WL 2655586, at *4.  In this case,

Plaintiffs' negligent design claim depends no less on an existence of a product than their strict liability claim—in fact, the opposition concedes that the negligent design rests on an alleged "'duty to exercise due care in supplying products.'" Opp. 16; *see Milwaukee Electric Tool Corp. v. Superior Court*, 15 Cal. App. 4th 547, 557 (1993) (negligent design is "alternate" theory to strict liability for "a plaintiff injured by an allegedly defective *product*") (emphasis added). The Court should not grant leave to amend either Count I or II because the absence of a product is fatal to both claims.

### b.   No Relief Could Be Granted on the Products-Based Claims

Plaintiffs also cannot establish any entitlement to relief on their products claims. The opposition begins by reiterating common ground: Bystanders can recover for physical injuries caused by defective products. Opp. 14 (citing, *e.g.*, *Elmore v. Am. Motor Corp.*, 70 Cal. 2d 578 (1969) (driver injured in crash caused by other driver's defective car)). Meta has never disputed that point. Mot. 12. But Plaintiffs do not allege physical injuries—only emotional distress and economic losses, neither of which is recoverable.

As for emotional distress, Plaintiffs concede that *Thing v. La Chusa*, 48 Cal. 3d 644 (1989), restricts a bystander's ability to recover for emotional distress from injuries to others, Opp. 15 n.7, but now argue that they seek to recover damages only for "their fear for their own safety," *id.* at 14. That is simply not accurate: The FAC alleges only a generalized theory that Plaintiffs suffered emotional distress from witnessing acts of violence against others, including concerns that the Myanmar military might continue to attack their villages. FAC ¶¶ 47–48, 62. By contrast, every "direct victim" case Plaintiffs cite involved someone who experienced a specific threat to their own safety directly from a physical product. Opp. 15 (citing cases where a homeowner was almost hit with falling plane debris, a pedestrian was almost hit by a car, and a pilot almost died in a near-crash).

Plaintiffs next insist that *Thing* applies because they knew of the attacks, even though (as the opposition concedes) they "were not aware that Facebook was the cause of the attacks until much later." Opp. 15 n.7. This confuses the source of their emotional distress claim. If Plaintiffs were suing the attackers, the "injury-producing event" would be the attacks themselves. *Thing*, 48 Cal. 3d at 666. But they are suing Meta, so the injury-producing event under their theory would be the content shared on Facebook. Opp. 19. And the case on which they rely, *Fortman v. Förvaltningsbolaget Insulan AB*,

212 Cal. App. 4th 830 (2013), expressly holds that a bystander needs "meaningful comprehension of the injury-producing event," meaning "contemporaneous awareness of the causal connection between the company's defective product and [the relative's] injuries." *Id.* at 845.  The opposition cannot say that "the Facebook platform" itself is "defective," Opp. 13, and then turn around and argue that the injury-producing events for that claim were the violent actions of the Myanmar military and their supporters, *id.* at 15 n.7.  *See Fortman*, 212 Cal. App. 4th 830 (rejecting products claim under *Thing* where plaintiff saw brother's heart attack but was unaware defect in scuba gear caused death).

Nor can Plaintiffs recover for property they left behind in Burma.  FAC ¶¶ 46, 67.  Plaintiffs seem to suggest that the economic loss rule applies only when the plaintiff has a contractual relationship with the defendant—in other words, is a purchaser and not a bystander.  Opp. 15–16.  But that would turn California tort law on its head.  *Elmore* expanded products liability by allowing bystanders a new ability to recover for physical injuries on the same terms as purchasers of the product.  70 Cal. 3d at 586.  But it did not *elevate* bystanders over purchasers for economic losses.  The California Supreme Court has made clear that "[d]amages available under strict products liability do not include economic loss." *Jimenez v. Superior Court*, 29 Cal. 4th 473, 482 (2002).  That means that Plaintiffs cannot recover economic losses in strict liability or negligence absent a special relationship.  *See Aas v. Superior Court*, 24 Cal. 4th 627, 636–43 (2000) (applying this rule categorically where only a subset of plaintiffs had "privity of contract" with defendant), *abrogated by statute on other grounds as noted in S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 402 (2019).  This rule serves to cut off "limitless liability and unending litigation," and would be flimsy protection if "happenstance bystanders" could recover economic losses.  *S. Cal. Gas Leak Cases*, 7 Cal. 5th at 403, 406.  Although Plaintiffs also argue that the economic loss rule bars recovery only of lost profits and repair costs, Opp. 16, the California Supreme Court has explained that this precise argument "mistake[s] the particular application for the governing principle," which covers "economic losses in a broader sense," *Aas*, 24 Cal. 4th at 642.

Because Plaintiffs do not allege that Meta put them in fear for their own lives or physically damaged their property, no relief can be granted on Counts I and II even if Facebook were a "product."

### 3. Plaintiffs' Negligence Claims (Counts II and III) Fail

The Court should also dismiss Plaintiffs' negligence claims (Counts II and III) for failure to

1    identify a duty that was breached.

2              a.    **The FAC Does Not Plead an Exception to the No-Duty-to-Protect Rule**

3         Meta explained that a negligence claim based on third-party wrongdoing cannot proceed as a

4    matter of law unless the plaintiff can first identify an exception to the "general rule" that "one owes no

5    duty to control the conduct of another, nor to warn those endangered by such conduct." *Brown v. USA*

6    *Taekwondo*, 11 Cal. 5th 204, 211 (2021); *see* Mot. 13–15.  As the Supreme Court recently recognized,

7    "our legal system generally does not impose liability for mere omissions, inactions, or nonfeasance"

8    absent "some independent duty to act." *Taamneh*, 143 S. Ct. at 1220–21.  Plaintiffs have not identified

9    any such duty.

10        The opposition relies on a misfeasance theory of duty—that Meta allegedly "created a risk of

11   harm to Plaintiffs and made their position worse than if it had acted differently."  Opp. 17.  But the

12   essential feature of misfeasance as a means of assessing a duty to protect is "whether the third-party

13   conduct was a necessary component of the defendant's conduct at issue." *Uber*, 79 Cal. App. 5th at

14   427. *Weirum* and *Michael R.*, cited by Plaintiffs (Opp. 17), only reinforce this rule.  As the opposition

15   acknowledges, the "key fact in *Weirum* [was] that the plaintiff was injured by third parties doing exactly

16   what the defendant's conduct encouraged them to do":  speed to the next location announced by the

17   disc jockey, whatever the cost.  Opp. 18 (quoting *Uber*, 79 Cal. App. 5th at 425).  And in *Michael R.*,

18   the defendant urged the assailant to shoot the plaintiff in the eye with a marble slingshot.  158 Cal.

19   App. 3d at 1064.  In both cases, the injurious conduct was the "necessary component" of the defendant's

20   conduct.

21        Nothing like that is alleged here.  Meta did not "create" the harm that is alleged to have injured

22   Plaintiffs.  As the FAC admits, the Myanmar military had been engaged in violence against the

23   Rohingya for decades before Facebook was introduced in Burma.  And the FAC never alleges that

24   Meta "affirmatively *encourage*[*d*] or *incite*[*d*]" violent conduct.  Opp. 18.  It alleges that Meta built

25   features that promoted and recommended engaging content (some of which may be polarizing).  Simply

26   put, there is no allegation that violence by the Myanmar military is a "necessary component" of

27   anything Meta allegedly did.

28        At most, Plaintiffs' misfeasance theory amounts to the assertion that Meta "ma[de] their

position worse." Opp. 17.  But *Weirum* expressly forecloses a duty based on the mere allegation that a defendant made a "plaintiff's position worse"; that phrase just means that the "defendant has created the risk," and "*Weirum* thus does not stand for the proposition that a defendant worsening the plaintiff's position in the simplest, most literal sense is alone sufficient to establish misfeasance." *Uber*, 79 Cal. App. 5th at 428 (quoting *Weirum*, 15 Cal. 3d at 49); *see also id.* at 428–29 (warning against "read[ing] *Weirum* and its progeny too broadly" when the test is whether the third-party conduct is a "necessary component" of the defendant's actions).  Analogous cases like *Uber* and *Jackson v. Airbnb, Inc.*, 2022 WL 16752071, at *7 (C.D. Cal. Nov. 4, 2022), illustrate this principle well.  Even if Uber's alleged conduct might have made their position "worse," what matters for assessing misfeasance is whether the "defendant has *created* the risk that ultimately harms the plaintiff"; it was the third-party criminals—not Uber—who created that risk.  *Uber*, 79 Cal. 5th at 428.  That Uber's business might have "create[d] an opportunity for criminal conduct … and thereby worsen[ed] the plaintiff's position does not render such criminal conduct a necessary component of the [business]'s actions— even when that conduct is foreseeable."  *Id.* at 428–29; *see also Airbnb*, 2022 WL 16752071, at *7 (same).  In sum, Plaintiffs' failure to identify a source of duty forecloses the negligence claims as a matter of law.[5]

### b.   The *Rowland* Factors Preclude a Finding of Duty

Even if the FAC established conduct that might be a basis for a potential duty, the opposition still has no good argument why the *Rowland* factors would support imposing such a duty here.  *See Brown*, 11 Cal. 5th at 217 (citing *Rowland v. Christian*, 69 Cal. 2d 108 (1968)).  The *Rowland* factors are principally concerned with two considerations—foreseeability and public policy—both of which counsel against recognition of a duty.

As for the *Rowland* foreseeability factors, the opposition's primary retort is that "when a defendant encourages third parties to act dangerously (as Plaintiffs allege here), it is foreseeable that

---

[5] The opposition does not address (and thus concedes) Meta's argument that there is no "special relationship" that could give rise to a duty.  Mot. 15; *see also Lansdown*, 2023 WL 2934932, at *4 (plaintiff waives argument by failing to address it in their opposition).  Although Plaintiffs also argue a duty based on the general "duty to exercise reasonable care" in the design of a product (*see* Opp. 16), that argument runs headlong into another deficiency:  Facebook is not a "product" subject to products liability law.  *See supra*, pp. 9–11.

some of those third parties will do so." Opp. 19.  But as explained above, this argument does not work because the FAC never alleges that Meta "encourage[d] third parties to act dangerously."  Instead, it alleges that Meta developed features in Facebook that promoted engaging content.  Indeed, Plaintiffs' only case cited on this point—*Weirum*—involved a situation where a defendant radio station actively "urg[ed] listeners to act in an inherently dangerous manner" by racing in the streets—making it entirely foreseeable that the defendant's conduct would bring just that dangerous result.  Again, nothing like that is alleged here: Facebook is not alleged to have ever "urged" its users to participate in violence.

The opposition also fails to grapple with the rule that "foreseeability is balanced against the burden of the duty to be imposed."  *Melton v. Boustred*, 183 Cal. App. 4th 521, 532 (2010).  A "very high degree of foreseeability would be required" to impose duties when claims implicate expression, *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1004 (1988), as this Court has recognized, Dkt. 61 at 30:10–11; *accord Netflix*, 2022 WL 551701, at *3 ("California courts have declined to find a duty as a matter of law under the *Rowland* factors for claims implicating expression.").  The opposition offers no meaningful response, instead trying to mischaracterize their case as one about Meta's "express encouragement or incitement of dangerous conduct" (Opp. 20)—a characterization without any factual support in the FAC.

*Rowland*'s public policy factors also weigh against imposing any duty.  Plaintiffs do not seriously dispute that Meta's development of content organization features for Facebook is "socially unobjectionable."  *Bill v. Superior Court*, 137 Cal. App. 3d 1002, 1011 (1982); *see McCollum*, 202 Cal. App. 3d at 1005–06 (it is "simply not acceptable to a free and democratic society" to impose a duty upon defendants "to limit and restrict their creativity in order to avoid the dissemination of ideas" that "may adversely affect [some] individuals").

The opposition also acknowledges that "Meta certainly enjoys a measure of constitutional protection for its operation of Facebook," but has no compelling response to the serious constitutional concerns that their claims raise.  Opp. 19.  Plaintiffs' only response is that constitutional rights are "not unlimited" when it comes to incitement to "tortious or criminal activity," *id.* (citing *United States v. Schiff*, 379 F.3d 621, 626 (9th Cir. 2004))—but, again, that is not what they allege Meta did.  And in any event, the First Amendment demands heightened protection even when an individual *is* alleged to

have engaged in incitement, which is "commonly a hair's-breadth away from political 'advocacy'—and particularly from strong protests against the government and prevailing social order." *Counterman v. Colorado*, 2023 WL 4187751, at *7 (U.S. June 27, 2023).  The same constitutional concern with chilling "dissenting speech at the First Amendment's core," *id.*, strongly counsels against imposing a duty on website services to prevent injuries committed by third parties off the service.

Nor does the opposition address the fact that any regulation over what obligations social media services may have to take down certain content is a policy decision best left for Congress, and not the tort system, to regulate.  *See Young v. Facebook, Inc.*, 2010 WL 4269304, at *5 (N.D. Cal. Oct. 25, 2010).  As the Supreme Court put it:  "Plaintiffs have not presented any case holding such a company liable for merely failing to block such criminals despite knowing that they used the company's services. Rather, when legislatures have wanted to impose a duty to remove content on these types of entities, they have apparently done so by statute." *Taamneh*, 143 S. Ct. at 1227 n.14.

Plaintiffs also argue that Meta shares in "moral blame," citing certain individuals' personal reflections that they shared in 2018 about the genocide.  Opp. 20 (citing FAC ¶¶ 84–91).  These statements do not reflect what Meta knew at the time the underlying events occurred, and simply acknowledging the desire to take steps to fight the spread of violence and hateful ideas (that had been proliferating in Burma for decades) does not indicate an acceptance of moral blame by Meta.

### 4.    Plaintiffs' Aiding-and-Abetting Claims (Counts IV and V) Fail

Plaintiffs' aiding-and-abetting claims should also be dismissed without leave to amend.  Under the Supreme Court's recent decision in *Taamneh*, the allegations that Facebook's algorithms and recommendations displayed and organized third-party content "does not convert [Meta's] passive assistance into active abetting."  143 S. Ct. at 1227.  Plaintiffs here, like the plaintiffs in *Taamneh*, also do not allege that Meta gave anti-Rohingya content any "special treatment."  *Id.* at 1226.  In fact, they allege the exact opposite—that Meta tried, but should have done more, to prevent these posts from circulating.  *E.g.*, FAC ¶ 26.  The theory, at its core, is "that some bad actors took advantage" of Facebook to spread content in violation of Meta's policies; but such an allegation, without more, "is insufficient to state a claim that [Meta] knowingly gave substantial assistance and thereby aided and abetted" the attacks.  *Taamneh*, 143 S. Ct. at 1228.  And contrary to Plaintiffs' suggestion, Opp. 23 n.9,

1    their allegations that "engagement-maximizing algorithms encouraged the creation" of anti-Rohingya

2    content are not materially different from the allegations in *Taamneh* that recommendation algorithms

3    were "crucial to ISIS' growth, allowing it to reach new audiences, gain new members, and spread its

4    message of terror," 143 S. Ct. at 1216.  Even if the FAC's conclusory labels about "encouragement"

5    were adequately alleged, that sort of loose "encouragement" simply is not enough for either the

6    knowledge or "substantial assistance" elements of aiding and abetting.[6]

7          Plaintiffs' main authority, *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962 (N.D. Cal. 2015), does

8    not establish knowledge or substantial assistance here.  In *Opperman*, the plaintiffs alleged that one of

9    Apple's policies "explicitly" told app developers to steal customers' data.  *Id.* at 985; *see id.* at 973

10   (quoting the relevant Apple policy).  They also alleged that Apple reviewed each app before exposing

11   it to the marketplace and served as the agent for each app.  *See id.* at 972, 986.  The FAC includes no

12   similar assertions.

13         The opposition also incorrectly argues that Plaintiffs need not allege that Meta acted with *intent*

14   to facilitate the underlying torts.  Opp. 22.  But whether or not California case law was "'entirely

15   consistent'" in 2006, *id.* (quoting *In re First All. Mortg. Co.*, 471 F.3d 977, 993 (9th Cir. 2006)), recent

16   appellate decisions are perfectly clear:  "[K]nowledge alone, even specific knowledge, is not enough

17   to state a claim for aiding and abetting."  *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 641 (2021).

18   Rather, "for aiding and abetting liability to attach, a defendant [must] have made 'a conscious decision

19   to participate in tortious activity for the purpose of assisting another in performing a wrongful act.'"

20   *Id.* (quoting *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1476 (2014)).

21   That is, "an alleged aider and abettor must have acted with the intent of facilitating the commission of

22   that tort."  *Id.* at 641–42 (citation omitted).  And as Plaintiffs' own case makes clear, federal courts

23   must "follow the decisions of the state's intermediate appellate courts" (such as *George* and *American*

24

---

25   [6] Plaintiffs are incorrect that Meta has not challenged the "substantial assistance" element.  Opp. 21.
     Meta's motion noted that the complaint failed to "allege that Meta acted with the intent of facilitating
26   the commission of a tort."  Mot. 18.  As the Supreme Court explained in *Taamneh*, knowledge and
     substantial assistance are "twin requirements" that "work[] in tandem, with a lesser showing or one
27   demanding a greater showing of the other."  143 S. Ct. at 1222; *see also In re First All. Mortg. Co.*,
     471 F.3d 977, 995 (9th Cir. 2006) (noting that California law "is not entirely clear" on substantial
28   assistance and that "'[k]nowledge is the crucial element'" (quoting *Casey v. U.S. Bank Nat. Ass'n*, 127
     Cal. App. 4th 1138, 1145 (2005))).

Gibson, Dunn &
Crutcher LLP

*Master Lease*) absent guidance from the state supreme court. *In re First All. Mortg.*, 471 F.3d at 993.

Even if knowledge alone were sufficient, the FAC does not satisfy Plaintiffs' pleading burden. Again, Plaintiffs' own case confirms that "the defendant must have actual knowledge of the *specific primary wrong* the defendant substantially assisted." *In re First All. Mortg.*, 471 F.3d at 993 (emphasis added; citation omitted).   The FAC does not even identify specific primary wrongs that Meta purportedly assisted, much less that Meta had actual knowledge of them.   It does not plausibly allege, for example, that Meta knew in advance of any specific plan to attack Plaintiffs' villages.   And despite the rule that knowledge may be alleged "generally," Fed. R. Civ. P. 9(b), a plaintiff "may not merely allege that a defendant 'knew' of some specified circumstance" without providing facts making that allegation plausible.   *S&S Worldwide, Inc. v. Wells Fargo Bank*, 509 F. Supp. 3d 1154, 1165 (N.D. Cal. 2020) (citing *Iqbal v. Ashcroft*, 556 U.S. 662, 680–81 (2009)).   The FAC alleges no such facts.

The FAC also does not plead facts establishing the "actual commission of a tort" against Plaintiffs.   *Richard B. LeVine Inc. v. Higashi*, 131 Cal. App. 4th 566, 574 (2005).   Count IV alleges aiding and abetting of incitement to violence, but that is not a freestanding tort under California law. Plaintiffs' two cited cases involved allegations that the defendants aided and abetted established torts, not ill-defined incitement to violence.   *See Michael R.*, 158 Cal. App. 3d at 1059 (alleging aiding and abetting negligence per se); *Golden Gate Land Holdings LLC v. Direct Action Everywhere*, 81 Cal. App. 5th 82 (2022) (alleging aiding and abetting trespass and intentional interference with economic relations).   Incitement to violence is an exception to the First Amendment, not a substantive tort.

Count V also is starkly deficient.   The FAC recites a litany of underlying torts without alleging facts establishing their elements, FAC ¶ 138—a transparent attempt to avoid the pleading standard.   *See In re Mortg. Elec. Registration Sys., Inc.*, 754 F.3d 772, 784–86 (9th Cir. 2014) (claim for aiding and abetting wrongful forfeiture properly dismissed for failure to allege elements of the "underlying tort" of wrongful forfeiture).   To the extent Plaintiffs sue for alleged torts against third parties, they lack standing under Article III.   *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

**C.      Alternatively, Plaintiffs' Claims Are Barred by Section 230 (All Counts)**

**1.      Plaintiffs' "Creative Pleading" Cannot Evade Section 230 Immunity**

Section 230 bars Plaintiffs' claims, which would impose liability on Meta for the alleged

1    harmful effects of anti-Rohingya content posted by third parties on Facebook.  Mot. 18–22.  Plaintiffs'

2    contrary arguments fail as a matter of law.

3           *First*, as the opposition concedes, binding Ninth Circuit precedent forecloses Plaintiffs'

4    "matchmaker" theory—*i.e.*, that Meta allegedly made "dangerous connections between anti-Rohingya

5    extremists."  Opp. 31; *see Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003); *Dyroff*

6    *v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019).

7           *Second*, Ninth Circuit precedent also bars Plaintiffs' "distributor" theory—*i.e.*, that Meta

8    "continued to distribute" "dangerous and unlawful" third-party content of which it "was made aware."

9    Opp. 30.  Plaintiffs' implicitly concede this point as well, *id.* 30–31, and for good reason:  In *Barnes v.*

10   *Yahoo!, Inc.*, the Ninth Circuit expressly rejected a distinction between publishers and distributors,

11   declining to engage in an "academic debate" over whether the statutory term "publisher" as used in

12   defamation law includes the term "distributor,"  570 F.3d 1096, 1103–05 (9th Cir. 2009).

13          *Third*, there is no basis for Plaintiffs' argument that their claims treat Meta as a "designer of a

14   dangerous product" and not a publisher of third-party content.  Opp. 24–26.  Section 230 is not a

15   "labeling" game.  *Barnes*, 570 F.3d at 1103.  What matters is that "the nature of the alleged design flaw

16   in this case—and the harm that is alleged to flow from that flaw—is directly related to the posting of

17   third-party content."  *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 930 (N.D. Cal. 2021), *aff'd in part and*

18   *rev'd in part on other grounds by* 2023 WL 3220912 (9th Cir. 2023); *see* Opp. 25 (faulting Meta for

19   "design defects that encourage the creation of dangerous *content*" (emphasis added)); *id.* at 2

20   (describing defect as "includ[ing] and prioritiz[ing] … extreme and inflammatory *content*" while other

21   "*content* is buried or excluded" (emphasis added)).  The law is clear that Section 230 bars such claims,

22   regardless of whether they are styled as "products" defect claims.  *See, e.g., L.W. v. Snap, Inc.*, 2023

23   WL 3830365, at *5 (S.D. Cal. June 5, 2023); *Bride v. Snap, Inc.*, 2023 WL 2016927, at *5 (C.D. Cal.

24   Jan. 10, 2023); *Jackson v. Airbnb, Inc.*, 2022 WL 16753197, at *2 (C.D. Cal. Nov. 4, 2022); *Doe ex*

25   *rel Roe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022); *Quinteros v. InnoGames*,

26   2022 WL 898560, at *1, *4–*5 (W.D. Wash. Mar. 28, 2022).

27          Plaintiffs again misread *Lemmon*, this time on Section 230.  There, the plaintiffs' design flaw

28   theory was fundamentally different because it did not turn on any third-party content.  The "danger"

allegedly posed by Snapchat was a speed filter that rewarded users for driving at unreasonably high speeds. The products theory survived Section 230 because it had "nothing to do" with any third-party content, 995 F.3d at 1092–93; the alleged duty was "fully independent" of Snap's role in monitoring or publishing third-party content because the flaw in the design was one generated by Snap itself—the award granted when the user achieved a certain (in that case, dangerously high) speed. *Id.* The Ninth Circuit made clear that Section 230 would not permit plaintiffs to "fault Snap for publishing other Snapchat-user content … that may have incentivized [users] to engage in dangerous behavior." *Id.* at 1093 n.4. But that is *precisely* what Plaintiffs allege here—that Facebook's algorithms and features amplified hateful content, causing users to post more hateful content, which then led some people to carry out or acquiesce to attacks against the Rohingya. Because the alleged design defect "is directly related to the posting of third-party content," Section 230 bars the claims. *Twitter*, 555 F. Supp. 3d at 930 (Section 230 bars claims based on "how well" a defendant's "algorithm" was designed to prevent and remove "third-party content containing" harmful messages).

*Fourth*, Plaintiffs are also incorrect that Section 230 does not apply because Meta "is responsible, in whole or in part, for the creation or development" of anti-Rohingya content. 47 U.S.C. § 230(f)(3); *see* Opp. 26–30. The opposition correctly concedes that "Meta was not literally the author of the incitements to violence" posted by third parties. Opp. 27. Nor did Meta "materially contribut[e]" to the "alleged unlawfulness" of such content. *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc). Plaintiff's "content development" theory is simply wrong.

The opposition's effort to avoid this conclusion is convoluted at best. It targets certain features that *users* employ to create content, asserting that Meta "materially contributed" to the content by allowing users to express themselves through "engagement-maximizing algorithms" and "like," "share," and "comment" features that allegedly "created a feedback loop among its users." Opp. 27. But a complaint "cannot plead around Section 230 immunity by framing these website features as content." *Dyroff*, 934 F.3d at 1098. And the FAC never alleges that Meta designed these features to encourage polarizing speech, much less anti-Rohingya speech. Opp. 25. The features that Plaintiffs' highlight—Facebook's algorithms and tools that allow other users to like, share, or comment—may affect how Facebook *displays* content, but "users ultimately determine what content to post." *Goddard*

*v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197 (N.D. Cal. 2009).  And because those features are "'neutral

tool[s]' operating on 'voluntary inputs,'" they cannot "amount to content development or creation."

*Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016).  Even Plaintiffs concede (Opp. 30) that this

case is unlike *Roommates*, where the website "designed its system to use allegedly unlawful criteria so

as to limit the results of each search, and to force users to participate in its discriminatory process."

521 F.3d at 1167.[7]

The opposition next asserts that Facebook's algorithms displayed anti-Rohingya content more

prominently along with other content with high user engagement.  The Ninth Circuit has rejected this

Section 230 workaround as well.  The "proliferation and dissemination of content does not equal

creation or development of content."  *Kimzey*, 836 F.3d at 1271; *see also Batzel v. Smith*, 333 F.3d

1018, 1031 (9th Cir. 2003) (the "'development of information' … means something more substantial

than merely editing portions of an e-mail and selecting material for publication"—while "rejecting

other e-mails for inclusion").  The opposition slaps a new term—"dangerous feedback loop[]," Opp.

24—on that old idea, but the opposition identifies no case that has adopted that theory.  For example,

the plaintiff in *Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016), "adequately pleaded that at least some

of the allegedly defamatory comments were authored by [defendant's] employees," so the court did

not need to address whether the defendant was "an 'information content provider'" under Section 230.

*Id.* at 743.  And other courts have warned that adopting "an encouragement test" that would turn on

how an interactive computer service provider chooses to display (or not) third-party content—"would

inflate the meaning of 'development' to the point of eclipsing the immunity from publisher-liability

that Congress established."  *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 414 (6th Cir.

2014).  That commonsense approach follows from *Roommates*, where the Ninth Circuit reasoned that

"there will always be close cases where a clever lawyer could argue that *something* the website operator

---

[7] The opposition also cites *Doe v. Mindgeek USA Inc.*, 2021 WL 5990195 (C.D. Cal. Dec. 2, 2021).  But there, the website, among other things, allegedly "took one of the videos featuring Plaintiff and uploaded, distributed, and featured that video on a separate, independent platform, where it was tagged as 'teen' porn to drive traffic"; "feature[d] other videos containing child pornography to target users interested in this unlawful content"; "compile[d] video playlists with titles and tags indicating the videos are child pornography"; "instruct[ed] sex traffickers to post videos using categories that are coded language for child porn"; and acknowledged that using "age verification technology would severely harm [its] business operations."  *Id.* at *6.  Those allegations are nothing like this case.

REPLY BRIEF OF DEFENDANT META PLATFORMS, INC. IN SUPPORT OF MOTION TO DISMISS FAC
CASE NO. 4:22-CV-00051-YGR

did encouraged the illegality," but "[s]uch close cases … must be resolved in favor of immunity, lest we cut the heart out of section 230."  521 F.3d at 1174.

In sum, under Section 230, where a third party "willingly provides the essential published content, the interactive service provider receives full immunity *regardless* of the specific editing or selection process."  *Carafano*, 339 F.3d at 1124 (emphasis added).  There is no dispute that third parties—and only third parties—provided the anti-Rohingya content that Plaintiffs allege led to their harms.  As a result, Section 230 bars their claims.

### 2.    Burmese Law Cannot Displace Section 230

The opposition continues to insist, against "law [and] logic," that a state's choice-of-law rules can displace a federal immunity statute.  *Force v. Facebook, Inc.*, 304 F. Supp. 3d 315, 324 (E.D.N.Y. 2018), *aff'd on other grounds by* 934 F.3d 53 (2d Cir. 2019); Mot. 22–24.  It does not cite a single case for that proposition, which would defy the plain text of Section 230, the Constitution, and applicable case law.  The Court should reject this invitation to error—particularly given that Burmese law would not apply in any event.

Congress created no exception for foreign-law claims when it directed U.S. courts not to treat an interactive computer service provider as "the publisher or speaker" of third-party content, 47 U.S.C. § 230(c).  The opposition urges this Court to imply such an exception but offers no response to black-letter interpretive principles preventing the Court from doing so.  Mot. 22–23.  It also says almost nothing about the Supremacy Clause, other than to note that "federal law is part of every state's law," Opp. 32 n.15, and then it even misapplies that conclusion.  California law does and must incorporate Section 230, both in its substantive law *and in its choice of law*.  *See Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 543 (2004) ("California law includes federal law" for choice-of-law purposes); *see also* Restatement (Third) Conflict of Laws § 1.02 (Supremacy Clause "limits the power of the States … in the field of conflict of laws").  And if, as all agree, California must follow Section 230 as part of its substantive law, it may not disregard Section 230 as part of its choice of law rules.

The opposition cites *Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005), but it just confirms that California's choice of law rules cannot undermine federal law.  There, the plaintiff argued that an executive order did not make a contract made in Hong Kong illegal because, as a matter of California

law, contracts are interpreted according to their place of execution.  *See id.* at 932–33.  But California law, the court reasoned, "incorporates [the executive order] through the Supremacy Clause," so the court had to read the contract in accordance with federal law.  *Id.* at 933.  And because both federal and California law would bar an American court from ordering a payment that "violate[d] the precise terms of the Executive Order," no American court could award the remedy the plaintiff sought.  *Id.* at 939–40.  Nothing in *Bassidji* suggests a state choice of law exception to applicable federal law.

Nor does the opposition carry Plaintiffs' burden to show that Burmese law and California law materially differ, or that Burma's interests will be comparatively more impaired if Section 230 applies.  *See* Mot. 23–24.  Plaintiffs cannot show a conflict, because California courts have correctly found that one cannot draw "meaningful conclusions" about Burmese tort law.  *Sommer v. Gabor*, 40 Cal. App. 4th 1455, 1469 (1995).  The opposition does not dispute that California courts have refused to apply Burmese law on this basis, Opp. 33; that leading scholars have explained that "[t]he content of Burmese law is unknowable"; Roger P. Alford, *Human Rights After Kiobel: Choice of Law and the Rise of Transnational Tort Litigation*, 63 Emory L.J. 1089, 1131 (2014); or that Plaintiffs' expert conceded that that "the law reports" in Burma "are quite thin," Dkt. 42-2 (Harding Tr.) at 42:2–6, and that he does not "know anybody who would be able to describe themselves as an expert on Myanmar [tort] law," *id*. at 72:17–21; *see also id*. at 87:8–11.  At most, Plaintiffs' expert opines that Burmese law lacks an immunity similar to Section 230—not that Burmese law would affirmatively impose liability on the facts of this case.

As to the relative interests, Plaintiffs cannot show that Burma has a greater interest in having its law applied.  *See Wash. Mut. Bank v. Superior Court*, 24 Cal. 4th 906, 920 (2001) (courts consider "the relative commitment of the respective states to the laws involved," "the history and current status of the states' laws," and "the function and purpose of those laws").  Although Plaintiffs suffered harm in Myanmar (Opp. 34), "[t]he conduct relevant to [Section 230's] focus occurs at the location associated with the imposition of liability"—in this case, California.  *Gonzalez v. Google LLC*, 2 F.4th 871, 888 (9th Cir. 2021), *vacated on other grounds by* 143 S. Ct. 1191 (2023).  Myanmar has no interest in regulating the authority of a federal court with respect to interactive computer service providers in California.  By contrast, California has a strong interest "in promoting economic activity within its

borders, attracting corporations and protecting those corporations … located in [California]," an interest furthered by Section 230.  *Hill v. Novartis Pharm. Corp.*, 2012 WL 967577, at *8 (E.D. Cal. Mar. 21, 2012).  This is all the more true here because Meta is a California company that "directs its operations out of California."  *See Rustico v. Intuitive Surgical, Inc.*, 993 F.3d 1085, 1095 n.5 (9th Cir. 2021).

### D. <u>Plaintiffs' Claims Are Barred by the Foreign Affairs Doctrine (All Counts)</u>

Finally, this Court should dismiss Plaintiffs' claims under the foreign affairs doctrine.  Mot. 24–25.  Although the opposition argues the doctrine should not apply because the federal government has not "expressed any view on the litigation" or made any formal pronouncement about foreign policy objectives that might be impacted by this litigation, Opp. 35, that is not needed to invoke the doctrine.  All that is required is the "likelihood" that a state-law claim will have a "more than incidental effect" that conflicts with the United States' foreign policy, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 420 (2005)—which is what Meta demonstrated in its motion.

*Gingery v. City of Glendale*, 831 F.3d 1222 (9th Cir. 2016), cited by Plaintiffs, actually supports the application of the doctrine here.  In *Gingery*, the court held that a state's construction of a monument did not implicate the foreign affairs doctrine.  The court expressly contrasted the facts with situations where a state's action "would affect the legal rights and responsibilities of any individuals or foreign governments," citing as examples a state law that might "create a cause of action … that might provide relief" to affected individuals.  *Id.* (citing *Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1076–77 (9th Cir. 2012); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 at 965–68 (9th Cir. 2010)).  That is precisely what Plaintiffs seek to do here, by invoking California law in a way that implicates the "legal rights and responsibilities" of individuals who resided in Burma and were affected by the Myanmar military's atrocities.

### III. CONCLUSION

For the above reasons, and because further amendment would be futile, Meta respectfully requests that the FAC be dismissed in its entirely with prejudice.

1    Dated: July 12, 2023              GIBSON, DUNN & CRUTCHER LLP

2                                By:       */s/ Rosemarie T. Ring*

3                                          Rosemarie T. Ring

4                          *Attorneys for Defendant Meta Platforms, Inc.*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28