UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JANE DOE 1 AND JANE DOE 2,** *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>**META PLATFORMS, INC.,**<br><br>Defendant. | Case No. 4:22-cv-00051-YGR<br><br>**ORDER GRANTING MOTION TO DISMISS** |

Plaintiffs Jane Doe 1 and Jane Doe 2 are members of the Rohingya community, a Muslim minority group from Burma.[1] They bring this putative class action alleging a variety of tort claims against defendant Meta Platforms, Inc. for the role its social media platform Facebook allegedly played in facilitating attacks by Burmese government forces and allied civilian militia against the Rohingya people.

Pending before the Court is Meta's motion to dismiss plaintiff's First Amended Class Action Complaint ("FACAC") on the grounds that, among other purported deficiencies, the claims therein are time-barred.

Having carefully reviewed the briefing on the pending motion, as well as the pleadings, and for the reasons below, the Court determines plaintiffs' claims fall outside the applicable limitations period and may not proceed. On that basis, the Court **GRANTS** Meta's motion to dismiss **WITHOUT LEAVE TO AMEND**.[2]

---

[1] The Court understands that Burma is also sometimes referred to as "Myanmar." Because plaintiffs more frequently refer to their homeland as "Burma," the Court follows suit.

[2] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.

## I. BACKGROUND

The relevant facts, as pled in the FACAC, are these:

### A. Persecution of the Rohingya People

The Rohingya, a predominantly Muslim, ethnic minority group,[3] have faced "discrimination and persecution by non-Rohingya Burmese and the Burmese government" for some time. (FACAC ¶¶ 1, 11.) Over the last ten years, however, the nature of this persecution has "changed drastically," "turning from sporadic violence to widespread human rights abuses" at the hands of government forces and civilian militias (*Id.* ¶¶ 1-2, 15.) Jane Doe 1 and Jane Doe 2, both of whom are Rohingya women, witnessed this violence when Burmese forces and civilian militia attacked their villages.

#### i. *Jane Doe 1*[4]

In 2012, Burmese government forces and civilian militia attacked Jane Doe 1's village, killing men, women, and children in the process. (*Id.* ¶¶ 45-47; *see also* ¶ 59 (explaining that "more than 50 Rohingya" were killed and 140,000 displaced during the rioting that followed the 2012 attacks).) Jane Doe 1's family lost their home, property, and family business. Her father was also "detained, beaten, and tortured for two weeks." (*Id.* ¶ 46.) Following the attack, Jane Doe 1's family feared she would be targeted for abduction, sexually assaulted, or killed. She ultimately fled Burma on her own at their urging. (*Id.* ¶¶ 46, 48.) Jane Doe 1 ultimately resettled in the United States "after a grueling years-long, near-death journey fleeing through multiple countries." (*Id.* ¶ 49.)

---

[3] The fact that most Rohingya are Muslim sets them apart from non-Rohingya Burmese, the majority of whom are Buddhist. *See* FACAC ¶ 11.

[4] The FACAC alleges Jane Doe 1 was 16-years-old when her village was attacked in 2012. *Id.* ¶ 46. Parties do not genuinely dispute that any statute of limitations applicable to her claims was tolled until she turned eighteen in 2014. Thus, the analysis in this order assumes the two-year statute of limitations here at issue began to run for Jane Doe 1 in 2014, not 2012. Ultimately, however, this distinction makes no difference to the outcome of the order because the Court concludes that plaintiffs' claims are untimely whether the statute of limitations is deemed to have started running in 2012 or 2014.

ii. *Jane Doe 2*

In August 2017, Burmese government forces and civilian militia launched what was subsequently referred to as the "2017 Clearance Operation," or the Rohingya genocide. This included an attack on Jane Doe 2's village in which homes were burned and their inhabitants murdered when they sought to escape. (*Id.* ¶ 61.) Jane Doe 2 and her family survived the attack by fleeing on foot. (*Id.* ¶¶ 62-63.) She ultimately left the country for Thailand, where she spent three years in a detention facility. (*Id.* ¶ 65.) In November 2022, Jane Doe 2 resettled in Chicago with the assistance of the United Nations Refugee Agency. (*Id.* ¶ 66.)

B. Meta's Operations in Burma

Meta operates Facebook, a social media platform. (*Id.* ¶ 2.) "Beginning around 2011," Meta partnered with telecommunications companies in Burma to expand internet connectivity, including by pre-loading the Facebook mobile app onto smartphones sold in the country and enabling users to access the app free of charge. (*Id.* ¶¶ 21-22.) These efforts yielded huge returns, with "tens of millions of Burmese citizens" becoming active Facebook users. (*Id.* ¶ 23.)

Beginning shortly thereafter, in 2012, Meta began to receive reports from journalists, academics, and humanitarian leaders "that Facebook was being used to spread hate speech and misinformation, and to incite violence." (*Id.* ¶ 29.) For instance, a Burmese development organization "raised concerns over the proliferation of anti-Rohingya hate speech on Facebook" while attending an event organized by Freedom House and attended by a high-level Meta representative. (*Id.*) Meta continued to receive reports of a similar nature "regularly through at least 2018." (*Id.* ¶ 30.)

As pled, Facebook failed to take sufficient action to address such reports. They did not, for example, reconfigure components of the Facebook platform known to drive engagement with inflammatory rhetoric, posts, and images. (*See, e.g.*, *id.* ¶ 31; *see also id.* ¶¶ 32-44 (describing how Meta allegedly designed Facebook to promote inflammatory content, which drives increased use of the platform).) Instead, divisive anti-Rohingya posts "spread like wildfire across Facebook." (*Id.* ¶ 51.) Such posts included calls "for violence in Jane Doe 1's village" and efforts "to terrorize and dehumanize the Rohingya" in order to "justify" violent persecution, such as the attack on Jane Doe 2's village. (*Id.* ¶¶ 51, 69.)

C. <u>Events Culminating in the Initiation of this Litigation</u>

Following the 2017 Clearance Operation, Meta faced increased calls from civil society and elected officials to tamp down inflammatory, anti-Rohingya posts on its Facebook platform. For instance, in 2018, Meta executive Mark Zuckerberg faced questioning in the U.S. Congress regarding Facebook's "role in inciting possible genocide in [Burma]" and admitted that his company "need[ed] to do more" to prevent such violence. (*Id.* ¶ 84.) This sentiment was then echoed by Meta's Director of Asia Pacific Policy in an interview with the news outlet Reuters; in a post on Facebook's blog; and by Meta executive Cheryl Sandberg, among others. (*Id.* ¶¶ 85-87; *see also* ¶¶ 88-91 (summarizing additional public reactions by the company to calls for accountability relative to the Rohingya genocide).)

As the above fallout was unfolding, other stakeholders conducted independent assessments of Meta's role in the Rohingya genocide. The chairman of the United Nations Independent International Fact-Finding Mission on Myanmar, following such an investigation, explained that Meta played a "determining role" in the genocide (including violence in 2012-2013 and the 2017 Clearance Operation) through its "reckless business practices." (*Id.* ¶ 92.) Investigations by Amnesty International and Global Witness reached similar conclusions, as did reporting by *The Wall Street Journal*. (*Id.* ¶¶ 92, 95, 97-98.)

Despite the above scrutiny of Meta's practices in Burma, plaintiffs allege Jane Doe 1 and Jane Doe 2 did not learn "that Meta's conduct was a cause of [their] injuries" until 2021 and 2023, respectively, and then, only learned such information through their attorneys. (*Id.* ¶¶ 100-01.) Further, as pled,

> A reasonable investigation by Jane Doe 1 [and Jane Doe 2] into the causes of [their] injuries would not have revealed this information prior to [2021 and 2023, respectively] because Facebook's role in the genocide was not widely known or well understood within the Rohingya community. Further, even if such information was known to various journalists or investigators at earlier points in time, [their] ability to discover such information was significantly hindered by [their] inability to read or write any language, or to speak or understand spoken English, and it was not until 2021 that whistleblowers leaked critical information revealing Facebook's role in the attacks on [them] and [their] village[s].

*Id.* Plaintiffs also allege that the Rohingya "have been substantially hampered in their ability to gather

United States District Court
Northern District of California

information by the horrific circumstances to which they have been subjected" (*id.* ¶ 102) and that "Meta attempted to cover up its role [in the genocide] until whistleblowers came forward in 2021" with information regarding how Facebook's algorithm drives engagement with inflammatory content.[5] (*Id.* ¶ 102; *see also id.* ¶ 42 (describing the whistleblower revelations).)

D. Procedural Background

The pending motion is part of the second set of dismissal briefing filed in this action. The Court held a hearing on defendant's motion to dismiss an earlier version of plaintiffs' complaint on December 14, 2022. Shortly thereafter, the Court granted that motion, citing numerous deficiencies identified on the record at the hearing, including with respect to the timeliness of plaintiffs' claims. They were nonetheless granted leave to amend their pleadings to address such issues. (*See* Dkt. No. 55, Order Granting Motion to Dismiss with Leave to Amend.)

**II.   LEGAL STANDARD**

The standard for a motion to dismiss is well-known and not in dispute. Thus, the Court does not recount it here. Instead, the Court sets forth the legal standard relevant to the statute of limitations arguments raised in defendant's motion and on which this order focuses.

A. Accrual of a Cause of Action

As a threshold matter, plaintiffs "must bring claims within the limitations period after accrual of a cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 77, 806 (2005) (cleaned up). A cause of action accrues when "the cause of action is complete with all of its elements." *Id.* at 806-07 (citations omitted); *see also Norgart v. Upjohn Co.*, 21 Cal.4th 383, 397 (1999) (explaining that accrual of a cause of action occurs "when, under the substantive law, the wrongful act is done, or the wrongful result occurs, and the consequent liability arises") (quotations and citation omitted). California recognizes the discovery rule, however, which functions as "[a]n exception to the general rule," described above. *Id.* (citation omitted). The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to

---

[5] Plaintiffs also suggest that any injury to Jane Doe 1 and Jane Doe 2 is ongoing, writing, "Meta's continuing tortious conduct is inflicting ongoing injury on Jane Doe 1 [and Jane Doe 2]." *Id.* ¶¶ 100-01.

5

discover, the cause of action." *Id.* (citations omitted).

In *Fox*, the California Supreme Court parsed myriad cases interpreting the discovery rule, summarizing the relevant standard as follows:

> Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for that cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light. In order to adequately allege facts supporting a theory of delayed discovery, the plaintiff must plead that, ***despite diligent investigation of the circumstances of the injury***, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period.[6]

35 Cal.4th at 808-09 (emphasis supplied). Plaintiffs must "specifically plead facts" showing that the above standard is met in order to invoke the discovery rule. *Id.* at 808 (citation omitted). In other words, they must "***show diligence***;" "conclusory allegations" are insufficient. *Id.* (citation omitted) (emphasis supplied).

### III.    ANALYSIS

Resolution of the pending motion hinges on whether plaintiffs have alleged sufficient facts to invoke California's discovery rule to toll the two-year statute of limitations applicable to their claims.[7] Plaintiffs argue they cannot be expected to have uncovered Meta's purported facilitation of the Rohingya genocide because: (i) Meta's role in the violence was unknown among community members until very recently, and (ii) plaintiffs could not reasonably have discovered Meta's alleged involvement due to their inability to communicate in English or to read or write in

---

[6] The case law contains multiple, similar articulations of this standard. The Court discerns nothing in such articulations which would change the outcome of this order. For instance, elsewhere in *Fox*, the California Supreme Court writes of the discovery rule, "A plaintiff whose complaint shows on its face that her claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal.4th at 808 (cleaned up) (emphasis in original). Further, to the extent this excerpt refers more explicitly to plaintiffs' obligation "to plead facts to show the time and manner of discovery," the Court elects not to consider that issue because the "inability to have made earlier discovery despite reasonable diligence" prong is dispositive.

[7] Parties do not dispute that plaintiffs' claims are governed by the two-year statute of limitations under California law for personal injury claims. Cal. Civ. P. Code § 335.1.

1   any language. Defendants respond that plaintiffs have not pled that they conducted **any**
2   investigation into the injuries they sustained by virtue of witnessing attacks on their villages and
3   therefore they cannot invoke the discovery rule.

4   In short, the Court agrees with defendants. Plaintiffs' FACAC does not satisfy the standard
5   for invoking the discovery rule, as articulated in *Fox* and reproduced above. Plaintiffs have not
6   plead any "diligent investigation of the circumstances of the injur[ies]" they sustained when
7   Burmese government forces and civilian militia attacked their villages. *See id.* at 809; *Doe v.
8   Roman Catholic Bishop of Sacramento*, 189 Cal.App.4th 1423, 1432 (2010) ("[Plaintiffs were] not
9   under a duty to discover, merely a duty to *investigate diligently*.") (emphasis supplied). The
10  FACAC, as summarized above, does not address what steps, if any, plaintiffs may have taken after
11  fleeing their villages to better understand the nature of the attacks, the parties involved, or the
12  circumstances giving rise to the anti-Rohingya sentiment that culminated in the attacks, such as
13  Facebook's purported incitement of Burmese users to violence.[8]

14  The absence of such factual allegations is particularly striking in light of two things. First,
15  plaintiffs *do* allege facts relative to plaintiffs' activities since leaving their villages, just not efforts
16  undertaken to research the attacks thereon. (*See, e.g.*, FACAC ¶ 65 (explaining that Jane Doe 2
17  "first escaped to Thailand, close to the Malaysian border," but "because of COVID-19 restrictions,
18  she was unable to enter Malaysia" and "remained in a detention facility in Thailand for three
19  years").) Second, the Court previously and repeatedly told plaintiffs that they needed to plead with
20  more specificity what diligence they exercised, if any, in investigating the attacks on their
21  villages.[9] In the absence of such allegations, the Court must conclude that no such investigation
22  was conducted and no "diligence" shown. As such, *Fox* compels dismissal of the instant action.[10]

---

[8] To the extent plaintiffs suggest that Meta "was trying to hide" its purported involvement in the Rohingya genocide from the world and that this should factor into the Court's analysis, they fail to develop this argument beyond a cursory aside. *See* Dkt. No. 72, Plaintiffs' Opposition ("Pls' Opp'n") at 5:15-16. As such, the Court does not credit it.

[9] *See* Dkt. No. 61, Tr. of Dec. 14, 2022 Hrg. at 17:13-16; 18:6-7; 21:18-19; 23:2-4.

[10] *See also Doe*, 189 Cal.App.4th at 1432-33 (expressing skepticism when plaintiff, who had not conducted *any* investigation into suspected wrongdoing, speculated that a diligent

7

1  In addition, plaintiffs' main counterarguments fail to compel a different result.

2  *First*, plaintiffs argue that they need not have "show[n] diligence" in their investigation of their injuries so long as they adequately pled they could not have discovered their cause of action against Meta by exercising reasonable diligence. Even assuming without deciding that diligence need not be shown in such circumstances, the Court finds that plaintiffs have not alleged sufficient, well-pled facts in support of their assertion that they could not have discovered Meta's purported role in this case through a reasonable investigation. For instance, the FACAC states: "A reasonable investigation by [plaintiffs] into the causes of [their] injuries would not have revealed" Meta's alleged involvement "prior to 2021 because Facebook's role in the genocide was not widely known or well understood within the Rohingya community." (FACAC ¶¶ 100-01.) However, plaintiffs provide no factual support for such a sweeping claim regarding what the Rohingya people generally knew and when. There are other issues, too. Plaintiffs' allegations that insufficient detail was publicly available regarding Facebook's purported role in the Rohingya genocide until 2021 is belied by contradictory assertions in the FACAC.[11] Further, plaintiffs' allegations regarding their limited language skills are not enough,

---

investigation would not have revealed facts sufficient to trigger accrual of her cause of action); *see also Anderson v. Brouwer*, 99 Cal.App.3d 176, 182 (1979) ("At the pleading stage, however, the rule is that the showing of excuse for late filing must be made in the complaint. Formal averments or general conclusions to the effect that the facts were not discovered until a stated date, and that plaintiff could not reasonably have made an earlier discovery, are useless.") (cleaned up).

[11] Plaintiffs allege that, "even if" information pertaining to Meta's facilitation of anti-Rohingya violence "was [previously] known to various journalists or investigators," "it was not until 2021 that whistleblowers leaked critical information revealing Facebook's role in the attacks." *See* FACAC ¶¶ 100-01. The Court declines to credit these allegations as they are undermined by the FACAC. *See Hernandez v. Select Portfolio, Inc.*, 2015 WL 3914741, at *10 (C.D. Cal. June 25, 2015) ("Contradictory allegations . . . are inherently implausible, and fail to comply with Rule 8, *Twombly*, and *Iqbal*.") (citations omitted). For instance, "several senior Meta executives, including Mark Zuckerberg, [ ] admitted [in 2018] that the company had a responsibility to prevent Facebook from being used to incite violence in Burma and should have done more in that regard." FACAC ¶ 84. Plaintiffs' complaint goes on to identify numerous instances where information relating to Meta's purported role in facilitating the Rohingya genocide was made public prior to the 2021 whistleblower statements. *See, e.g., id.* ¶¶ 86-87, 90. Plaintiffs' acknowledgment of these reports undermine their suggestion that Facebook's role in the genocide was not publicly known until 2021.

Plaintiffs' related suggestion that the instant case could only have been brought after the

without more, to establish that they could not have discovered the nexus between Meta and the anti-Rohingya violence they witnessed.[12]

*Second*, plaintiffs argue that they need not have pled "diligence" because they were not on inquiry notice of a prospective cause of action against Meta until informed as much by their lawyers in 2021 and 2023.[13] They relatedly contend that any cause of action against their attackers could accrue at a different time than a cause of action against Meta. Even assuming

---

2021 whistleblower revelations is also undermined by the FACAC. The Business for Social Responsibility report to which plaintiffs cite concluded, in 2018, that "Facebook has become a means for those seeking to spread hate and cause harm, and posts have been linked to offline violence . . . ." *Id.* ¶ 88. It may be true that the whistleblower provided additional details regarding Meta executives' knowledge of how their Facebook platform was being used to facilitate anti-Rohingya violence (*id.* ¶ 91) and how Facebook's "core product mechanics" allowed "misinformation and hate speech [to] flourish on the site." *Id.* ¶ 38. However, in light of the above-referenced public reports connecting Meta to anti-Rohingya violence, plaintiffs fail to persuade that, without the benefit of the whistleblower leaks, this case could not have been filed and additional details regarding Meta's business practices identified in pretrial discovery.

[12] *See, e.g.*, *Zamora v. Wells Fargo Bank*, 2013 WL 2319079, at *6 (N.D. Cal. May 28, 2013) (explaining, as a general matter, that difficulties speaking or understanding a language do not relieve plaintiffs of their burden to plead reasonable diligence).

[13] Separately, plaintiffs appear to suggest that, following the attacks on plaintiffs' villages, Jane Doe 1 and Jane Doe 2 were not on notice of any injury that could possibly be connected to Meta. They cite a footnote in the *Fox* opinion in which the California Supreme Court opined that, "At common law, the term 'injury,' as used in determining the date of accrual of a cause of action, means both a person's physical condition *and* its negligent cause. Thus, physical injury alone is often insufficient to trigger the statute of limitations." *Fox*, 35 Cal.4th at 808 n.2 (internal quotation marks and citations omitted) (emphasis in original). It appears they view this footnote as standing for the proposition that ignorance of Meta's purported involvement in the attacks means the "injury" was not complete.

However, the Court is skeptical of this reading of the above-referenced footnote when viewed in the broader context of *Fox*. Here, plaintiffs effectively concede suspicion of "some wrongful cause" of their injury (*i.e.*, the attackers pillaging their village). *See* Pls' Opp'n at 5:26-6:1 (effectively conceding that plaintiffs suspected wrongdoing when their villages were attacked). This is enough, under *Fox*, for the causes of action here at issue to accrue. *See Fox*, 35 Cal.4th at 803 ("[A] cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and *some wrongful cause*," unless the discovery rule applies) (emphasis supplied); *see also id.* at 808 ("[A] potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of *all potential causes* of that injury.") (emphasis supplied).

9

without deciding that plaintiffs' cause of action against their attackers and Meta could accrue at different times, the Court nonetheless disagrees with plaintiffs that they could not be considered on inquiry notice of claims against Meta until much later. Under *Fox*, "plaintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put them on inquiry or *if they have the opportunity to obtain knowledge from sources open to their investigation*." 35 Cal.4th at 807-08 (cleaned up) (emphasis supplied). As set forth in the preceding paragraph, plaintiffs' allegations concerning what they could reasonably have identified about Meta's purported involvement in the Rohingya genocide through a diligent investigation are lacking. The Court therefore declines to hold that plaintiffs were not on inquiry notice of Meta's alleged wrongdoing until 2021 or later.[14]

Thus, the Court determines plaintiffs' claims, having been brought in 2021, were filed outside the applicable two-year statute of limitations.[15] They may therefore not proceed. In addition, since plaintiffs have already been provided the chance to amend their pleadings to cure this deficiency, *see supra*, Part I.C, the Court determines further amendment would be futile. On that basis, defendant's motion shall be granted without leave to amend.[16]

---

[14] The Court does not view this outcome as in tension with *Fox*. That case states, in relevant part, "[I]f a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim." 35 Cal.4th at 813. This rule permits but does not require a court to determine an independent cause of action accrues later based on the nature of the "reasonable and diligent investigation" conducted. However, plaintiffs here conducted no such investigation.

[15] The Court does not here take a position on the specific dates on which the statute of limitations began to run. It suffices for the Court to note that, as information of Meta's purported role in the Rohingya genocide was publicly available beginning at least as of 2018 and considering, as pled, Meta's extensive market penetration in Burma even earlier, plaintiffs arguably should have been able to identify, through reasonable diligence, Meta's potential nexus with their injuries by at least 2018.

[16] Plaintiffs allege in a conclusory manner that "Meta's continuing tortious conduct is inflicting ongoing injury," FACAC ¶¶ 100-01, although they do not meaningfully defend any theory of continuing harm in their Opposition. As such, the court considers the argument waived. Even if this were not the case, application of the continuing harm doctrine would remain inappropriate here. The Ninth Circuit in *Flowers v. Carville, et al.* explained that the doctrine "applies where there is no single incident that can fairly or realistically be identified as the cause

IV. **CONCLUSION**

For the foregoing reasons, the Court finds plaintiffs' claims time-barred as a matter of law. Thus, the Court **GRANTS** defendant's motion to dismiss **WITHOUT LEAVE TO AMEND**.

The Clerk is directed to close the case.

This terminates Dkt. No. 69.

**IT IS SO ORDERED.**

Dated: January 25, 2024

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

---

of significant harm." 310 F.3d 1118, 1126 (9th Cir. 2002) (citation and internal quotation marks omitted). Here, plaintiffs' alleged harms arise out of the attacks on their villages in 2017 and 2017, which prompted them to flee the country. The attacks are specific incidents that represent "the cause of significant harm," and, thus, *Flowers* precludes application of the continuing harm doctrine to the instant case.

11